## Page 1

```
 1          UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF OHIO
 2               WESTERN DIVISION
 3
 4
 5   YELLOW BOOK USA, INC., et al., :
 6          Plaintiffs,
 7
 8   vs.            :  CASE NO. 3:10-CV-025
 9
10   STEVEN M. BRANDEBERRY,
11          Defendant.   :
12
13
14          Deposition of STEVEN M. BRANDEBERRY, the
15   Defendant herein, taken as upon cross-examination by the
16   Plaintiffs, and pursuant to the Federal Rules of Civil
17   Procedure, agreement of counsel, and stipulations
18   hereinafter set forth, at the offices of Thompson Hine, LLP,
19   312 Walnut Street, 14th Floor, Cincinnati, Ohio, 45202, on
20   the 16th day of June, 2010, at 9:30 a.m., before Julie A.
21   Patrick, a Notary Public for the State of Ohio.
22
23
24       TRI-COUNTY COURT REPORTING AND VIDEOTAPE SERVICE
25              886 BRADBURY ROAD
                CINCINNATI, OHIO 45245
```

## Page 2

```
 1               (513) 732-1477
 2   APPEARANCES:
 3       On behalf of Plaintiffs:
 4       BRYCE A. LENOX, ESQ.
         Thompson Hine, LLP
 5       312 Walnut Street, 14th Floor
         Cincinnati, Ohio  45202
 6
         JOHN J. BUTLER, ESQ.
 7       Senior Vice President and General Counsel
         Yellow Book
 8       398 RXR Plaza
         Uniondale, NY  11556-0398
 9
         On behalf of Defendant:
10
         DARRELL L. HECKMAN, ESQ.
11       Harris, Meyer, Heckman & Denkewalter, LLC
         One Monument Square, Suite 200
12       P.O. Box 38130
         Urbana, Ohio  43078-8130
13
14       S T I P U L A T I O N S
15          It is stipulated and agreed by and amongst
16   counsel for the respective parties that the deposition of
17   STEVEN M. BRANDEBERRY, the Defendant herein, called as upon
18   cross-examination by the Plaintiffs, may be taken at this
19   time and place pursuant to the Federal Rules of Civil
20   Procedure, agreement of counsel; that the deposition may be
21   recorded in stenotype by the Notary Public, Julie A.
22   Patrick, who is also the court reporter, and transcribed out
23   of the presence of the witness; and that signature of the
24   deponent was requested and shall be affixed outside the
25   presence of the Notary Public.
```

## Page 3

```
 1
 2            I N D E X
 3
 4   WITNESS      DIRECT CROSS REDIRECT RECROSS
 5   STEVEN M. BRANDEBERRY
 6     By Mr. Lenox:        5
 7
 8            - - -
 9
10   PLAINTIFFS' EXHIBITS  MARKED
11   1:              15
12   2:              17
13   3:              42
14   4:              62
15   5:              66
16   6:              92
17   7:             139
18   8:             141
19   9:             157
20   10:            162
21   11:            172
22   12:            182
23   13:            184
24   14:            189
25   15:            191
```

## Page 4

```
 1   16:             192
 2   17:             192
 3   18:             193
 4   19:             199
 5   21:             207
 6   22: 216
 7
```

Page 5

1         STEVEN M. BRANDEBERRY,
2 the Defendant herein, being of lawful age, after having been
3 duly cautioned and sworn, was examined and deposed as
4 follows:
5         CROSS-EXAMINATION
6 BY MR. LENOX:
7     Q. Would you please state your full name for the
8 record?
9     A. Steven, with a V, Michael Brandeberry,
10 B-R-A-N-D-E-B-E-R-R-Y.
11     Q. Sir, what's your home address?
12     A. 1061 Three Mile, T-H-R -- Three Mile Road,
13 Urbana, U-R-B-A-N-A, Ohio, 43078.
14     Q. What is your business address?
15     A. 682 Scioto, S-C-I-O-T-O, Street, Urbana, Ohio.
16     Q. Any other business addresses other than that
17 one?
18     A. No.
19     Q. Have you taken any medications within the last
20 24 hours that you think will make it difficult for you to
21 testify truthfully today?
22     A. No.
23     Q. Have you ever had your deposition taken
24 before?
25     A. Yes.

Page 6

1     Q. When were you deposed?
2     A. In 2003-ish over a -- yeah, 2003. And
3 probably in mid-1990s. I'm sorry, I can't think of the
4 date.
5     Q. That's fine. Two occasions that you can
6 recall?
7     A. Correct.
8     Q. Let's talk about the one in 2003.
9     A. Okay.
10     Q. Why were you deposed in 2003?
11     A. I had filed a lawsuit against William Barney
12 White who had purchased my company, so I was deposed for
13 that lawsuit.
14     Q. Where did you file that lawsuit?
15     A. Champaign County, Ohio.
16     Q. What was the nature of that lawsuit?
17     A. I had sued him for fraud and breach of
18 contract on a sales contract.
19     Q. When you say on a sales contract, the sales
20 contract to which you refer is the asset/purchase agreement
21 that you two entered into with respect to the assets for
22 certain yellow pages directories?
23     A. That was one of the agreements, correct.
24     Q. There were other agreements as part of that?
25     A. Correct.

Page 7

1     Q. What other agreements were part of that?
2     A. This was an employment contract and a right to
3 repurchase contract.
4     Q. And you were the Plaintiff in that lawsuit,
5 correct?
6     A. Correct.
7     Q. How was a that lawsuit resolved?
8     A. Mr. White was found guilty of breach of
9 contract.
10     MR. HECKMAN: By arbitration?
11     A. Or mediation. By mediation.
12     MR. HECKMAN: Go off the record just for a
13 second.
14     (Off-the-record discussion.)
15     Q. So do you know whether it was resolved through
16 mediation or arbitration?
17     A. I would have to ask my attorney.
18     Q. Well, the mediation -- let me ask you this.
19 Did you present testimony to a panel of individuals?
20     A. No.
21     Q. Was there, like, a mini trial?
22     A. There was a judge/gentleman there that
23 listened to the hearing and made a decision.
24     Q. Were you awarded damages?
25     A. Correct.

Page 8

1     Q. How much were you awarded?
2     A. 75,000.
3     Q. How much were you claiming?
4     A. I had professional testimony in -- my thoughts
5 were a million dollars.
6     Q. And what specifically were you claiming that
7 he breached?
8     A. Mr. White had approached me to purchase my
9 company and, after several months of thinking about it -- he
10 was purchasing it to assist me in a cash flow situation.
11 After thinking about it, we agreed to -- or he had
12 approached me that he would buy the company offering only --
13 you know, only, but I had to buy the company back within
14 five years. I've lost my train of thought. What was the
15 question?
16     Q. The question -- or what were you claiming as
17 part of this lawsuit, what sorts of breaches?
18     A. Mr. White had offered me a -- had prepared --
19 and I was only selling the company because I had the option
20 to buy the company back. He neglected to sign that
21 particular document, the right for me to repurchase. So
22 that's why I filed the lawsuit, because he wouldn't give me
23 that option that he had offered and prepared. And he lost
24 and I won.
25     Q. So I take it from your response, you actually

Page 9

1  offered to purchase the company back?
2      A.  I would only have sold it had I had the right
3  to purchase it back, correct.
4      Q.  And this is the directories business that you
5  sold him, correct?
6      A.  Correct.
7      Q.  And we're going to get into a lot more detail
8  about all of that in a little bit later.
9      A.  Sure.
10     Q.  Do you have any of the papers or pleadings
11 relating to that lawsuit?
12     A.  I'm sure I do.
13     Q.  Did you retain a lawyer for that suit?
14     A.  Correct.
15     Q.  Who was that lawyer?
16     A.  Kelly Morgan, a gentleman in Columbus, Ohio.
17     Q.  Did Mr. White indeed pay the $75,000 award?
18     A.  Correct.
19     Q.  When did he pay that?
20     A.  Modestly -- immediately after the judgment,
21 but that would have been in -- I don't know what year.
22 2005.
23     Q.  And you just answered my next question.  How
24 long did it take to resolve this lawsuit?
25     A.  About three years.

Page 10

1      Q.  And we talked about the right to repurchase.
2  You said you also brought a breach of contract claim on an
3  employment contract?
4      A.  No.  The breach was just -- the claim was just
5  against the -- his lack -- his not signing the document that
6  he presented to me.
7      Q.  And I didn't mean to interrupt you.
8      A.  The option to repurchase, he would not sign it
9  after I signed it.
10     Q.  You said you also brought a claim for fraud?
11     A.  Correct.
12     Q.  What was the basis for that claim?
13     A.  I would have to ask my attorney.  He was the
14 one that suggested it.  It appeared to me that it was a
15 calculated attempt to steal my business.
16     Q.  To the extent that you have any of the
17 documentation relating to that, I would ask that you produce
18 that as part of this lawsuit.
19         MR. HECKMAN:  If he's got it, sure.  And it's
20 public record, as far as the pleadings go.
21         MR. LENOX:  That's fine.
22         MR. HECKMAN:  We'll see what we can come up
23 with.
24         MR. LENOX:  Very well.
25     Q.  Now, I'm going to get to this a little bit

Page 11

1  later, too, but you said that you sued him on an employment
2  contract and a right to repurchase, correct?
3      A.  No, sir.
4      Q.  I'm sorry.  I take that back.  That was a
5  poorly asked question.  You stated that you had an
6  employment contract and a right to repurchase contract with
7  him, or at least that they were negotiated, right?
8      A.  If I may be more clear?  At the table, when
9  Mr. White was purchasing the assets or the, quote, unquote,
10 what I would call "The Company", he presented to me, which
11 was agreed upon, an asset agreement, a separate statement
12 which was an option to repurchase agreement, and a separate
13 statement that was an employment contract for me.  Mr. White
14 merely neglected to sign the -- or refused to sign the --
15 after signing the asset agreement to Mr. White, he refused
16 to sign the option to repurchase contract, which he prepared
17 and handed to me in my hand.  So, no, we never got to the
18 point of the employment contract because he wouldn't sign
19 the option to repurchase.  So the lawsuit was strictly
20 towards the option to repurchase.
21     Q.  How long was your employment contract?
22     A.  It would have been a five-year.
23     Q.  And the option to repurchase was also to be a
24 five-year?
25     A.  Correct.

Page 12

1      Q.  Do you have copies of both of those documents?
2      A.  Certainly.
3         MR. LENOX:  I would like those, too.  And if
4  you need -- at the end of this, Darrell, if you want a
5  letter from me recapping all of the documents that I had
6  requested, I'd be more than happy to do that.
7         MR. HECKMAN:  Yeah, only because I might
8  forget something and you've got it.
9         MR. LENOX:  Sure.
10         MR. HECKMAN:  I'll see what we've got on that.
11 I think you may have one or more of those, but I'm sure you
12 don't have all of them.  Okay.
13     Q.  We'll talk about that in a little more detail.
14 You'd also mentioned that you had testified at a deposition
15 in the 1990s, correct?
16     A.  Correct.
17     Q.  What were the circumstances surrounding that
18 deposition?
19     A.  I had rented a vehicle in Florida through
20 Thrifty and a driver of that vehicle was in an accident.  So
21 I was required to testify because I was a Defendant in a
22 suit.
23     Q.  Have you ever testified in a court proceeding,
24 other than the suit against Mr. White that we've previously
25 discussed?

## Page 13

1     A. Not that I'm aware of or can think of off of
2 the top of my head.
3     Q. And I know we already talked about the suit
4 against Mr. White. Have you ever filed any other lawsuits?
5     A. Probably small claims, but nothing a -- you
6 know, a small bill or something that somebody may owed
7 me.
8     Q. You say you may have filed suit in small
9 claims. Would that be as part of one or of several
10 businesses that you owned?
11     A. Yes.
12     Q. Are those for -- well, describe the nature of
13 those suits for me.
14     A. It would have been the publishing company,
15 somebody -- Amtel -- American Telephone, Amtel or somebody
16 owed me a bill and didn't pay. I probably -- my company
17 probably sued in small claims to collect small bills.
18     Q. Did you use lawyers in those circumstances?
19     A. No.
20     Q. You would do it individually?
21     A. Someone from my company would, yes.
22     Q. Have you ever been sued?
23     A. I don't believe so.
24     Q. Other than this suit that we're in?
25     A. Well, yeah.

## Page 14

1     MR. HECKMAN: No, the auto accident.
2     A. I'm sorry. Well, was I sued? Yes, in the
3 auto accident.
4     Q. Were you required to pay damages in that auto
5 accident?
6     A. Correct.
7     Q. Did you review any documents to prepare to
8 give your deposition today?
9     A. Nothing specific.
10     Q. Did you review your documents generally?
11     A. The question is? I'm sorry.
12     Q. Did you review all of your documents
13 generally? You said "nothing specific". Did you just
14 glance through all of your documents, for example?
15     A. Not today or not in the last few days, no.
16     Q. Did you meet with your attorney?
17     A. Monday.
18     Q. How long did you meet with him?
19     A. Fifteen minutes.
20     Q. Did you review responses to interrogatories in
21 preparation for your deposition today?
22     A. I did not.
23     Q. When I say "interrogatories", do you know what
24 I mean?
25     A. I believe so.

## Page 15

1     MR. LENOX: Let's go ahead and mark these.
2     (Plaintiffs' Exhibit 1 marked.)
3     Q. Sir, I've handed you what's been marked as
4 Plaintiffs' Exhibit 1. I will represent to you these are
5 interrogatories that my -- that I propounded to you and to
6 which I received responses. Have you ever seen these
7 interrogatory responses before?
8     A. They're my responses?
9     Q. Correct.
10     A. I have not seen -- I apologize, my ignorance.
11 You have typed in the answers or did your people type in the
12 answers?
13     Q. Well, that's not -- let me ask the question.
14     A. No, I'm sorry. Yeah, sure, sure, sure.
15     Q. My question to you is, have you ever seen this
16 document before?
17     A. Yes.
18     Q. Do you remember giving answers to these
19 questions?
20     A. Correct.
21     Q. And if you go to the very last page, is that
22 your signature there?
23     A. Yes.
24     Q. And as you sit here today, are there any
25 responses or answers to those interrogatories that have

## Page 16

1 changed or that need to be supplemented?
2     A. I reserved my --
3     MR. HECKMAN: You need to take a couple of
4 minutes.
5     A. Well, yeah. I would just like to say,
6 obviously, I had written handwritten answers and Mr. Heckman
7 had typed them in. I guess I would -- without seeing my
8 handwritten responses, I did review these and I would
9 believe them to be complete and accurate, but I would
10 respectfully ask that my written statements given to
11 Mr. Heckman would reflect the accurate -- more accurate, if
12 this would be of any change.
13     Q. That's not really my question. My question
14 is, is there anything new or that needs to be supplemented
15 in these responses since they were given a couple of months
16 ago?
17     A. It's possible, but without thinking about it
18 and reading this and --
19     Q. Well, that's fine. We can do it at a break or
20 if, at some point after this deposition, if you would like
21 to review these, and if there's responses that need to be
22 supplemented, I would ask that you do that pursuant to Rule
23 26(E).
24     A. I will do that.
25     MR. HECKMAN: He has a right to know if you're

Page 17

1  standing by these answers.
2       A.  Well, yes, I would certainly stand by these
3  answers.  But he asked me if there is anything else to add
4  to it, there may be.  But what's stated here should be one
5  hundred percent accurate and I stand by this, assuming he,
6  Mr. Heckman, which I believe he did, transcribed my
7  handwriting in the proper manner.  And I will review them.
8  If there's any additions, I'll let you know today.
9       MR. LENOX:  Let's mark this.
10       (Plaintiffs' Exhibit 2 marked.)
11       Q.  Sir, I've handed you what's been marked as
12  Plaintiffs' Exhibit 2.  I can represent to you that these
13  are some document responses that I received from your
14  counsel.  Have you ever seen these documents before?
15       A.  Yes.
16       Q.  Did you search for the documents requested of
17  you?
18       A.  Correct.
19       Q.  Where did you look for such documents?
20       A.  Just in the 682 Scioto Street office.
21       Q.  Is that where you keep all of your business
22  records?
23       A.  Correct.
24       Q.  Is that where your business, American
25  Telephone Directories, operates out of?

Page 18

1       A.  Correct.
2       Q.  Does it operate at all out of your home?
3       A.  No.
4       Q.  Do you use e-mail or a computer as part of
5  that business?
6       A.  Correct.
7       Q.  Do you have an e-mail account for that
8  business?
9       A.  Correct.
10       Q.  What is the e-mail account for that business?
11       A.  Steveb@amteldirectory, singular, .com.
12       Q.  Do you receive e-mails from customers through
13  that account?
14       A.  Correct.
15       Q.  And do you send e-mails to customers through
16  that account?
17       A.  Rarely, but correct.
18       Q.  Did you check your e-mails for responsive
19  documents as they relate to these document requests?
20       A.  Did not.
21       Q.  Any particular reason why you didn't?
22       A.  Clarity.  I attempted to bring everything and
23  anything I had.  I certainly was not clear on that and there
24  was no reason that I wouldn't have.
25       Q.  Well, I would request, as part of this, that

Page 19

1  you search your e-mail accounts, your computer, because when
2  I say "documents", as pursuant to this document, if you read
3  the definitions, document doesn't just mean paper documents,
4  it means electronic documents, e-mails, any generated form
5  or production such as that.  And so, I would ask that you go
6  back through your computer, search for any responsive
7  documents on your computer, on your hard drive, search for
8  any responsive documents through any e-mail account, through
9  any e-mail provider you have, through any server system that
10  you would have, and produce anything that is responsive to
11  these requests, you know, in paper form or in the native
12  form, be it a PST file or otherwise, and turn those over to
13  me.
14       A.  Okay.
15       Q.  So, as you sit here today, and based upon my
16  requests, do you believe that there's probably documents
17  that may be on your e-mail or computer system that may be
18  responsive to some of these requests?
19       A.  That there would be some e-mails?  Correct,
20  there would be some e-mails, yes.
21       Q.  Okay.  Have you had any conversations with
22  anyone other than your lawyers regarding your deposition
23  today?
24       A.  No.
25       Q.  Are you married?

Page 20

1       A.  No.
2       Q.  Do you have children?
3       A.  I have one son.
4       Q.  Did you talk to your son about it?
5       A.  No.
6       Q.  What's your son's name?
7       A.  Steven Johnson Brandeberry.
8       Q.  How old is Steven Johnson Brandeberry?
9       A.  Oh, man, that's terrible.  He was born 8/4/83,
10  so that would make him --
11       Q.  Twenty-six.
12       A.  Twenty-six?  Thank you.
13       Q.  Where does your son live?
14       A.  Springfield, Ohio.
15       Q.  Does he work for you in any capacity?
16       A.  No.
17       Q.  What does he do for a living?
18       A.  He works for his grandmother, Johnson Welded
19  Products of Urbana, as an engineer.
20       Q.  Would you tell me your educational background?
21       A.  I graduated Urbana High School 1973, and
22  that's it.
23       Q.  Any post-high school education?
24       A.  I went to Northwood Institute, Midland,
25  Michigan, in a business/automobile career college for two

Page 21

1    weeks.
2         Q.   When was that?
3         A.   It would have been in '73, '74.
4         Q.   Any job-related training or education?
5         A.   No.
6         Q.   I want to talk about your job history in a
7    little bit.  And if you can tell me briefly the jobs you've
8    held, basically, from high school to the present?
9         A.   In '73, I was employed by my father at
10   Brandeberry Chrysler until 1994, the only job I ever had,
11   selling cars, washing cars.  And I ultimately owned the
12   dealership.  Sold the dealership and managed it for a short
13   period of time.  And sold it in '93 or '94.  At the same
14   time, I purchased Amtel Directories, certain assets or the
15   assets from Amtel Directories, a phone book in Champaign
16   County.  Until I sold it in 2002.  Possibly 2003 or four, I
17   worked for Yellowbook out of Dayton, Ohio, for six, eight
18   months.  And, in 2008, I started a quick print shipping
19   company in Urbana at the 682 Scioto address.  And then I
20   started in the revision of the -- a telephone directory in
21   Champaign County in 2009, late 2009.
22        Q.   Okay.  So you stated you had a yellow pages
23   directory book you called Amtel Directories from 1994 to
24   2002, correct?
25        A.   Yes.

Page 22

1         Q.   And then you said, from 2003, you worked for
2    Yellowbook, correct?
3         A.   Sometime in there.  I don't know if it was
4    2003 exactly, but I did work for Yellowbook after 2003,
5    because I had been fired.  Late 2003, yes, I worked for
6    Yellowbook, yes.
7         Q.   What did you do from 2004 to 2008?
8         A.   Nothing.
9         Q.   Unemployed?
10        A.   Correct.
11        Q.   Were you looking for a job?
12        A.   No.
13        Q.   Retired?
14        A.   I was in a lawsuit with Mr. White and I had
15   every expectation of getting my company back.  So, no, I did
16   not wish to get a job.
17        Q.   Let's talk about your present employment.  You
18   said that you are employed by a quick print shipping
19   company?
20        A.   I own it.
21        Q.   What's the name of that company?
22        A.   Red Rabbit Rapid Reproduction.
23        Q.   Is that a full-time job?
24        A.   Correct.
25        Q.   How many employees do you have?

Page 23

1         A.   No employees.
2         Q.   Do you have any part-time help?
3         A.   I have one gentleman that works -- assists me,
4    well, because he must for -- he's on -- he broke his neck.
5    He's on health benefits from the state and he has to
6    volunteer 30 hours a week.  So he does assist me, yes,
7    without pay.
8         Q.   And other than this assistant, anybody else
9    help run that business?
10        A.   No.
11        Q.   Who are the shareholders of that business?
12        A.   It's not a corporate -- well, it's under the
13   umbrella, for tax purposes, of American Telephone
14   Directories, Incorporated.
15        Q.   So it is not a separate company or LLC is what
16   you're telling me?
17        A.   Just what I told you is what I told you.  I
18   don't know the business lingo.  It's not an LLC, that's
19   correct.
20        Q.   What type of business is that?
21        A.   Quick prints and shipping.
22        Q.   Describe that for me.
23        A.   A mini Kinkos.
24        Q.   And that business has been running
25   continuously from 2008 to present?

Page 24

1         A.   About October of 2008, correct.
2         Q.   And is that based out of the 682 Scioto Street
3    address?
4         A.   Correct.
5         Q.   Are you the only owner of that company?
6         A.   Correct.
7         Q.   Do you have any partners in that company?
8         A.   Do not.
9         Q.   Who keeps the books and records for that
10   business?
11        A.   I do.
12        Q.   Do you have an accountant?
13        A.   I personally have an accountant, yes.
14        Q.   Who's your personal accountant?
15        A.   Stephen, a P-H, I think, Alexander.
16        Q.   Where is Mr. Alexander located?
17        A.   Court Street, Urbana, Ohio.
18        Q.   How long have you been using Mr. Alexander?
19        A.   Ten-plus years.
20        Q.   Now, we've talked about Red -- that's a tongue
21   twister, I've got to tell you.  We've talked about Red
22   Rabbit Rapid Reproductions.
23        A.   Yes.
24        Q.   And we have talked about your yellow pages
25   directory that you are in the process of working on

Page 25

1 presently, correct?
2     A.  Yes.
3     Q.  Do you own any other business?
4     A.  Do not.
5     Q.  Are you a shareholder in any other businesses?
6 And I'm not talking owning stock.  I'm talking a major
7 shareholder.
8     A.  No.
9     Q.  Are you a partner in any business?
10     A.  No.
11     Q.  Do you have any partnerships?
12     A.  No.
13     Q.  So as we sit here today, the only two
14 businesses that you operate are the yellow pages directory
15 that you are forming and Red Rabbit?
16     A.  That's correct.
17     Q.  Do you have other sources of income other than
18 those two business?
19     A.  Currently, no.
20     Q.  You say "currently, no", was there a point in
21 time where you had other businesses from which you derived
22 income?
23     A.  No.
24     Q.  Why did you say currently then?
25     A.  Well, my father had passed and I had some

Page 26

1 financial -- income from that.
2     Q.  You have mentioned a business by the name of
3 American Telephone Directories, Inc.; is that right?
4     A.  Yes.
5     Q.  When was that formed?
6     A.  1994.
7     Q.  Why was the business formed?
8     A.  To put the assets of Amtel Directories, which
9 I had purchased in '94, under that legal entity.
10     Q.  And I take it the business address of that
11 corporation is at 682 Scioto Street?
12     A.  The corporate address, I believe, is -- no, it
13 is not.  It's parked at, if you will, 1061 Three Mile, my
14 personal address.
15     Q.  What is the corporate form of that entity?
16     A.  A C Corp.
17     Q.  A C Corp?
18     A.  Yes.
19     Q.  Is it incorporated with the Ohio Secretary of
20 State?
21     A.  Yes.
22     Q.  When was it incorporated?
23     A.  1994.
24     Q.  Under what name?
25     A.  American Telephone Directories.

Page 27

1     Q.  Is it still active?
2     A.  Yes.
3     Q.  Has it ever been inactivated?
4     A.  Explain "inactivated".
5     Q.  Well, as -- have you ever -- has it ever been
6 inactivated by the Ohio Secretary of State?
7     A.  No.
8     Q.  Has there ever been a period of time where
9 there's been no businesses operating under that entity?
10     A.  Yes.
11     Q.  From what period of time was that entity
12 dormant, for lack of a better word?
13     A.  2003 until 2008, when I started Red Rabbit.
14     Q.  And during that period from 2003 to 2008, did
15 that corporation, American Telephone Directories, Inc., have
16 any assets?
17     A.  No.
18     Q.  And it did no business?
19     A.  Correct.
20     Q.  Did it have any liabilities?
21     A.  No.  It would have had the existing assets,
22 whatever it might have been.  I mean, it certainly had an
23 asset of whatever it was incorporated at, $500 or 1,000, it
24 would have had that asset.
25     Q.  Did it have any cash?

Page 28

1     A.  No.
2     Q.  No property?
3     A.  Correct?
4     Q.  No receivables?
5     A.  Correct.
6     Q.  Who are the shareholders of that company?
7     A.  Myself.
8     Q.  Have you always been the sole shareholder?
9     A.  Of American Telephone Directories, yes.
10     Q.  You qualified that by saying "of American
11 Telephone Directories", which leads me to believe that you
12 have been a shareholder in other entities; is that right?
13     A.  My stopping wasn't for that.  I just didn't
14 know if you were talking about Red Rabbit or whatever.
15 Correct, I was a sole shareholder of Branderberry Chrysler
16 Plymouth, Incorporated, from, again, whenever I bought it in
17 the '80s to 1994.
18     Q.  How many employees are there of American
19 Telephone Directories presently?
20     A.  I have never hired.  I've had independent
21 contractors.
22     Q.  So from 1994 to the present, you've never had
23 employees of that company?
24     A.  Correct.  That's correct.
25     Q.  Have you been an employee of that company?

Page 29

1      A.  I've never taken an income out of it.
2      Q.  Well, you said it was incorporated in 1994 to
3  the present --
4      A.  I beg your pardon.  I beg your pardon.  1994,
5  when I -- I'm sorry.  Yes, when Amtel was active, from '94
6  until 2002, when I sold it to Mr. White, yes, we had
7  employees.  I beg your pardon.
8      Q.  How many employees did you have during that
9  period?
10     A.  Maybe up to six or seven.
11     Q.  What are the names of those employees, if you
12  can recall?
13     A.  It would be myself, Patrick Hamilton, Barney
14  White, Debbie Jenkins, Hannah McGowan, Kay McGowan, Kurt
15  Heintz, H-E-I-N-T-Z -- did I say Jania Wiseman?
16     Q.  No.
17     A.  Betty Plymell, P-L-Y-M-E-L-L, and I'm sure
18  there were several -- a few others in that time.  I can see
19  their face, but I can't think of their --
20     Q.  Do you still possess business records from
21  that period of time, from 1994 to 2002?
22     A.  Probably, yes.
23     Q.  Where would those be kept?
24     A.  At my home.
25     Q.  How big of a file would that be of all of

Page 30

1  those business records?
2      A.  Four or five boxes.
3          MR. LENOX:  I would request his business
4  records for that period of time, from '94 to 2002.  And to
5  the extent there is attorney's eyes only or confidential
6  materials in there, I would certainly be willing to
7  stipulate to a designation.
8          MR. HECKMAN:  What are you looking for, stuff
9  like W-2s of employees, stuff like that?
10         MR. LENOX:  I'm looking for all of the
11  records.  Anything relating to that business.  That business
12  has been put into play, among other things, as has the
13  transaction thereafter.
14         MR. HECKMAN:  Make your request.
15         MR. LENOX:  Okay.
16     Q.  So, to summarize, from 1994 to 2002, you
17  operated the Amtel Directories Yellowbook or -- strike that.
18  Let me start over.  From 1994 to 2002, you operated the
19  Amtel Directories out of that company, correct?
20     A.  Out of American Telephone Directories, that's
21  correct.
22     Q.  And then, from 2008, you testified that it was
23  dormant?
24     A.  Up until 2008, that's correct.
25     Q.  And then, in 2008, what activities were

Page 31

1  running out of that business?
2      A.  The 2010 telephone directory that I'm
3  publishing.
4      Q.  And Red Rabbit, right?
5      A.  Correct.
6      Q.  In fact, in 2008 is when Red Rabbit started
7  operating under that entity, right?
8      A.  Correct.
9      Q.  And then, in late 2009/2010 is when you began
10  your new yellow pages directory, right?
11     A.  Correct.
12     Q.  Other than that summary that we just
13  endeavored to go through, have there ever been any other
14  businesses or business operations conducted out of that
15  entity?
16     A.  I apologize.  That entity is American
17  Telephone?
18     Q.  Correct.
19     A.  Has not.
20     Q.  Did you have an attorney assist in the
21  formation of that company?
22     A.  Correct.
23     Q.  And who was that?
24     A.  The law firm was Davidson, whatever.  I don't
25  know which attorney it was.  Wagner, Maurice, M-A-U-R-I-C-E,

Page 32

1  in Dayton.  Wagner, Maurice, I don't know if Davidson was
2  even there.  West Court Street in Urbana.
3      Q.  And so I'm clear.  You keep the books and
4  records for that company, correct?  Actually, let me ask a
5  clearer question.  You keep the books and records for Red
6  Rabbit, right?
7      A.  Correct.
8      Q.  You keep the books presently for your
9  directories business, correct?
10     A.  Correct.
11     Q.  Did you keep the books from 1994 to 2002?
12     A.  I guess I would ask you to clarify.  Did I
13  handle the books or --
14     Q.  Did you have a bookkeeper from 1994 to 2002?
15     A.  Correct.
16     Q.  Who was that?
17     A.  I mean, people in my office would do -- I
18  don't know that I had a quote, unquote, "bookkeeper".
19  Several people, of the names that I just mentioned, would do
20  parts of deposits and bookkeeping.
21     Q.  Did you keep financial statements for that
22  period of time?
23     A.  Correct.
24     Q.  You did?
25     A.  Yes.

Page 33

1     Q. Who put together the financial statements for
2 you?
3     A. The attorney.
4     Q. Who was the attorney?
5     A. I beg your pardon. I'm sorry. My accountant.
6     Q. Who was the accountant for that period?
7     A. Mr. Alexander.
8     Q. So correct me if I'm wrong, it sounds like
9 multiple employees of your company, from 1994 to 2002, with
10 respect to your directories business, would do the books,
11 correct?
12     A. Do activities that would culminate in a
13 financial statement.
14     Q. And then you take all of that information and
15 you give it to your accountant, right?
16     A. That's correct.
17     Q. And then he would generate some financial
18 records for you?
19     A. That's what I believe, that's correct.
20     Q. Do you still have your financial records from
21 that period?
22     A. Possibly.
23     Q. To the extent that you do, I would ask that
24 you turn those over also. I forgot to mention to you at the
25 beginning of this. If at any time you want to take a break,

Page 34

1 let me know. This isn't an endurance contest certainly. I
2 can assure you we're going to take a lunch break at around
3 11:45 as we discussed. But if, in the interim, you need to
4 take a few minutes —
5     A. I'm not bashful.
6     Q. Fair enough. Now, you want to talk about your
7 transaction with Mr. Burkhalter?
8     A. Okay.
9     Q. How did you meet Mr. Burkhalter?
10     A. Mr. Burkhalter was a customer of Brandeberry
11 Chrysler Plymouth. Maybe that's not — that's not how I met
12 him. I'm wrong about that. I met Mr. Burkhalter because he
13 was selling dealership advertising, is how I met Mr.
14 Burkhalter, for his phone book, Amtel Directories.
15     Q. So he approached you about purchasing
16 advertisements for your dealership in his directory?
17     A. Correct.
18     Q. What is Mr. Burkhalter's first name?
19     A. I know him as Herb, H-E-R-B. Probably
20 Herbert.
21     Q. Is Mr. Burkhalter still living?
22     A. Is not.
23     Q. When did he pass?
24     A. Several years ago. Four years maybe.
25     Q. And so, at that time, when you were running

Page 35

1 your dealership, where were you purchasing space in
2 directories?
3     A. Where was I spending my money or where was I
4 placing my ad?
5     Q. Well, where were you placing your money?
6     A. Mr. Burkhalter had approached my father, Max
7 Brandeberry, as the first customer Mr. Burkhalter ever had
8 for his directory, and my father purchased a back quarter
9 page, a back cover quarter page. And then I'm sure we had
10 ads within the space as well under auto dealers.
11     Q. What was the name of that directory?
12     A. Amtel Directories.
13     Q. When you say "Amtel Directories", was that --
14 was the word Amtel, was it one word? Was it a slash? Did
15 it have a hyphen in it? How did it look?
16     A. Mr. Burkhalter would be -- it always had a
17 slash, I believe. Mr. Burkhalter's company was an area
18 marketing telephone directory. Whether it was a
19 corporation, I don't know. So an area marketing is where
20 Mr. Burkhalter came up with Am -- and then A-M tel, Amtel.
21 I just knew it as Amtel because that's how he approached us.
22 And I believe it had a slash in it.
23     Q. And so your father and you placed ads in the
24 Amtel Directory, correct?
25     A. Correct.

Page 36

1     Q. For what counties?
2     A. Mr. Burkhalter only had Champaign County.
3 That's not true either. I think he did have other counties.
4 When I purchased, it served Champaign County.
5     Q. Do you know what other counties he published
6 in?
7     A. I think he had a Miami County book.
8     Q. Do you know what he called the Miami County
9 book?
10     A. No. I don't even know what the cover looked
11 like.
12     Q. So all you know as you sit here today is,
13 there was an Amtel Directory in Champaign County?
14     A. Correct.
15     Q. And, at that time, your dad's and your
16 dealership was placing ads in there?
17     A. Correct.
18     Q. So what were the circumstances whereby you
19 began negotiations with respect to the purchase of certain
20 assets from him?
21     A. Mr. Burkhalter approached me one day in '94
22 and said, "You want to buy my company?" I said, "Yes." He
23 said, "Meet me at my house tomorrow." And I said, "I can't.
24 I'm going on vacation. I'll see you in a couple of weeks."
25     Q. Did he tell you why he wanted to sell that

### Page 37

1  business?
2      A.  Did not.
3      Q.  And when he said, "Do you want to buy my
4  business?", what business were you contemplating buying?
5      A.  Mr. Burkhalter had the Champaign County phone
6  book, Amtel, and that's what he was alluding to, if I wanted
7  to purchase his Amtel Champaign County telephone directory.
8      Q.  And that was my point.  Were you negotiating
9  buying any other telephone directories for any other
10 counties that he owned?
11     A.  At that time, he did not own other
12 directories.  So -- and, no, I was not.  I was just
13 negotiating the Champaign County.
14     Q.  So is it your testimony that he started
15 developing other yellow pages directories after your
16 transaction with him?
17     A.  No.  To be more accurate, he had -- the Miami
18 County book, from recollection, he was the president of that
19 company, Miami County Amtel book.  He got two partners, and
20 the two partners, they fired the president.  So he lost that
21 book.  So the only book that Mr. Burkhalter had at the time
22 that I purchased it is his Amtel Champaign County -- was the
23 Champaign County Amtel book.
24     Q.  And these books that you refer to, were these
25 yellow pages directories or white pages directories or both?

### Page 38

1      A.  A combination of both.
2      Q.  At the time he approached you, do you know for
3  how long Mr. Burkhalter had been publishing his Amtel
4  directories book in Champaign County?
5      A.  As I stated, my father was the first one to
6  buy an ad, so, yes, I was well aware.
7      Q.  When was the first time your father bought an
8  ad?
9      A.  When Mr. Burkhalter first started in '82,
10 1982.
11     Q.  And so, is it fair to say that Mr. Burkhalter
12 had been using the same Amtel and Amtel Directory since
13 1982?
14     A.  Correct.
15     Q.  Was that name, Amtel and Amtel Directories,
16 recognizable in Champaign County at that time?
17     A.  It was to me.
18     Q.  Were there any other books?  And when I say
19 "books", I mean yellow pages directories, that would compete
20 with him at that time?
21     A.  Was not.  Well, there were other telephone
22 directories within that county.  So, yeah, they competed
23 with it.
24     Q.  So there were multiple yellow pages
25 directories at that time?

### Page 39

1      A.  There were seven that came into the county,
2  yes.
3      Q.  Seven?
4      A.  Correct.
5      Q.  When did those seven come into the county?
6      A.  They were all AT&Ts. -- they were all the
7  phone company's.  I have no idea.
8      Q.  So would you agree that Amtel and Amtel
9  Directories is a pretty distinct name and mark?
10     A.  I would believe so.
11     Q.  So he approached you.  You guys agreed to meet
12 in a couple of weeks, right?
13     A.  Right.
14     Q.  Why were you interested in buying this
15 telephone directory?
16     A.  I had sold the dealership, the car
17 dealership.  Regardless, I would have been a player, because
18 I like the business.  I like the advertising business.
19     Q.  And you had no experience, at that point, with
20 yellow pages directories, right?
21     A.  Other than purchasing, correct, ads.
22     Q.  And did you indeed meet him a few weeks later
23 after you got back from vacation?
24     A.  Correct.
25     Q.  What took place at that meeting?

### Page 40

1      A.  I met Mr. Burkhalter at his home in Piqua.  I
2  asked him a few questions.  I took out a -- for lack of
3  other paper, I took out a deposit slip out of my checkbook,
4  asked him a few questions, and bought the company.
5      Q.  You cut him a check on the spot?
6      A.  Did not.
7      Q.  Did you negotiate a deal?
8      A.  Correct.
9      Q.  You said you asked him a few questions.  What
10 did you ask him?
11     A.  I probably -- he probably -- I just probably
12 asked him, tell me the story of the book.  And he explained,
13 here's the sales, here's the cost, and here's your profit.
14 Probably a 10-, 15-minute conversation.
15     Q.  What did he say the profits were?
16     A.  I don't know that he specifically said.  At
17 the time, Mr. Burkhalter had $300,000 worth of sales in
18 Champaign County annually.  He explained to me, in the
19 industry, that a phone book was worth one to three times its
20 sales if it was selling to somebody.  That he wanted
21 $380,000 for the sale and he wanted wanted, maybe, $25,000
22 down, and he would be the banker.
23     Q.  Now, were those terms negotiated?
24     A.  Changed or what do you mean?
25     Q.  Well, you said that he wanted 380 grand for

Page 41

1  the sale, 25,000 down, and he would be the banker. Were
2  those terms that he just laid out, were those negotiated
3  over time?
4      A.  Probably within the next week, I, not having
5  the cash to give him, I negotiated that I would give him
6  480,000 for the business and $25,000 cash, but the cash
7  would be in the form of a new Chrysler that he wanted that
8  had a value of 25,000.  And he accepted those terms.
9      Q.  Now, you said, the first time you met, you
10 said you took out a deposit slip and bought the company,
11 what did you mean by that?
12     A.  That's not exactly what I said.  I took a
13 deposit slip out to write information down.  It was a piece
14 of paper I had to write my information down on.  The
15 information that I was gleaning from him, I wrote that on
16 the back of a deposit slip.
17     Q.  So, after you two hashed out the basic terms
18 of the deal, was that deal committed to a writing?
19     A.  Correct.
20     Q.  Were you represented by an attorney in that
21 transaction?
22     A.  I was not.
23     Q.  Any particular reason why?
24     A.  Stupidity.
25     Q.  Was Mr. Burkhalter represented by an attorney?

Page 42

1      A.  He was.
2      Q.  Who was his attorney?
3      A.  A gentleman out of Dayton.  I can't think of
4  his name.
5      Q.  Now, during the course of negotiating those
6  terms and committing it to paper, were you corresponding
7  with Mr. Burkhalter and/or his lawyer?
8      A.  No.  I mean, hi, Herb, blah, blah, blah.
9  Nothing regarding the business.
10     Q.  For how long did these negotiations last?
11     A.  I have no idea.  The negotiations to purchase?
12     Q.  Well, let's start with that.  How long did
13 that take?
14     A.  You know, two hours.
15     Q.  Did you negotiate drafts of the final asset
16 purchase agreement?
17     A.  I did not participate in any draft other than
18 the day I went to sign the documents.
19         MR. LENOX:  Mark this as 3.
20         (Plaintiffs' Exhibit 3 marked.)
21     Q.  Sir, we've marked this as Plaintiffs' Exhibit
22 3.  Do you recognize this document?
23     A.  I do.
24     Q.  I can represent to you that this is a document
25 that was produced by your lawyer.  If you could turn to page

Page 43

1  five, is that your signature on page five?
2      A.  It is.
3      Q.  And you signed both individually and as a
4  guarantor; do you see that?
5      A.  Correct.
6      Q.  And that's a guarantor of the obligations of
7  American, right?
8      A.  That's correct.
9      Q.  I assume that means American Telephone
10 Directories, Inc.; is that correct?
11     A.  Oh, I see what you're saying.  Yes, I believe
12 so.
13     Q.  Now, if you go back to the first page.  Up in
14 the right-hand corner it says "ATT copy, 1 of 9".
15     A.  Yes.
16     Q.  Whose handwriting is that?
17     A.  Mine.
18     Q.  What did you mean when you put that down
19 there?
20     A.  ATT would be the attorney copy.  I don't know
21 why I specifically put that, but when I purchased the
22 company from Mr. Burkhalter, there were nine different
23 agreements.
24     Q.  So there were nine separate, what I would call
25 addenda or things that would accompany this document, right?

Page 44

1      A.  Each one has a monetary value, that's correct,
2  that brought it up to 480,000.
3      Q.  Well, I can represent to you that the only
4  documents that I've got as part of this overall transaction
5  are the asset purchase agreement and the license.  Are there
6  other documents other than these two that would have
7  accompanied this transaction?
8      A.  Yes.
9      Q.  What other documents would there have been?
10     A.  For lack of not seeing them, they would have
11 been a non-compete -- Mr. Burkhalter -- I would have to look
12 at the name.  They were just all -- I can't tell you what
13 they were called.  I don't know.  Just different entity --
14 you know, that would provide him the income up to $480,000.
15     Q.  Do you still have copies of all of those other
16 documents that would accompany this?
17     A.  I do.
18     Q.  I would ask you to produce those also.
19 Now, I take it from your prior testimony that you formed
20 American Telephone Directories, Inc., specifically for the
21 purpose of purchasing or holding certain of these assets
22 that you were buying, right?
23     A.  Correct.
24     Q.  Now, there's also some other markings on this
25 document, and I want to go through these and ask whose

## Page 45

1 handwriting they are. If you can look under number one,
2 there's underlined "all of the customer"; do you see that?
3     A. Yes.
4     Q. I take it you made those markings?
5     A. I would assume so, yes.
6     Q. When would you have made those markings?
7     A. I have no idea.
8     Q. Do you recall why you would have marked that
9 at that point?
10     A. I have no idea.
11     Q. Down at the bottom it says -- there's some
12 more handwriting that appears to say "26 months"; is that
13 right?
14     A. Yes.
15     Q. Is that your handwriting also?
16     A. Correct.
17     Q. Do you know when that handwriting was placed
18 on this document?
19     A. No idea.
20     Q. Go to page two, and on to page three there are
21 brackets around 2(e); did you see that?
22     A. I do.
23     Q. And that provision has to do with escrowing
24 funds to defray the costs of printing?
25     A. Okay.

## Page 46

1     Q. Do you agree with that?
2     A. I believe so, yeah.
3     Q. Do you recall why you put brackets around that
4 section?
5     A. No idea.
6     Q. To the right of number paragraph three,
7 there's something that appears to say V-I and something. I
8 can't read it.
9     A. I can't either.
10     Q. Okay. That was my question. So you don't
11 know what that says either?
12     A. Do not.
13     Q. 6(d) on page four, it appears to be a bracket
14 around at least a portion of the 6(d); do you see that?
15     A. I do.
16     Q. And that has to do with the inspection of the
17 books of the purchaser at reasonable times and places; do
18 you see that?
19     A. I do.
20     Q. And do you know why you bracketed that?
21     A. I have no idea.
22     Q. And I take a step back. I take it that is
23 your handwriting?
24     A. I believe it would be, yes.
25     Q. Okay. 6(e), "In view of the low down payment"

## Page 47

1 is underlined. Do you remember why you underlined that?
2     A. No idea.
3     Q. Is there a particular reason why there was a
4 low down payment with respect to this transaction?
5     A. Mr. Burkhalter made the offer. I mean, why he
6 -- no, I don't know.
7     Q. The same thing in 6(e), the second paragraph,
8 it looks like what is underlined, is "including the escrow",
9 there's a few lines, and that says, "for printing and
10 distribution" are also underlined. Also your handwriting?
11     A. It is, I believe.
12     Q. No idea why you marked that?
13     A. Correct.
14     Q. Finally, on paragraph seven on the last page,
15 there's some underlining in the middle of the page, "In the
16 event of a default that is not cured within", and it looks
17 like there's some light underlining below that; do you see
18 that?
19     A. Correct.
20     Q. Do you know -- that is your handwriting again?
21     A. I would believe so.
22     Q. No idea, as you sit here, why you marked that?
23     A. For no -- I can't think of a specific reason,
24 no.
25     Q. And that involves default. Was there a

## Page 48

1 concern on your part that either you would default or that
2 Mr. Burkhalter would default in this agreement?
3     A. I had no thought of defaulting or, obviously,
4 Mr. Burkhalter defaulting, no.
5     Q. Who drafted this agreement?
6     A. Mr. Burkhalter and his attorney.
7     MR. HECKMAN: Bryce, you went over everything
8 that was interlineated on there?
9     MR. LENOX: Sure.
10     MR. HECKMAN: On one of the copies that I
11 have, on the bottom of page two, it says the wordS "very
12 vague", and you referenced the bracket, you didn't reference
13 those words. I think in the continuing copying part, that
14 just doesn't show up. I mean, I don't care, but I thought
15 since you went over --
16     MR. LENOX: No. I appreciate that, because
17 the copies that you sent to me, it's illegible. It just
18 looks like scribbles.
19     MR. HECKMAN: I do see the words "very vague"
20 there on at least a copy of it, so --
21     MR. LENOX: If that's not an attorney copy
22 that you've marked up, obviously, I don't want your work
23 product, but could I see that to see if there's anything
24 else that may be a little more clear on there?
25     MR. HECKMAN: Yeah. Just run a copy of the

Page 49

1    page that might be a little darker or whatever.
2           MR. LENOX: We'll do that at a break.
3           MR. HECKMAN: Yeah, sorry, but I did see that.
4           MR. LENOX: Well, it's in pencil and pencil
5    doesn't read very well. Actually, I see something else
6    here, too.
7       Q. Okay. What I'm going to do, I'm going to, if
8    it's all right to use your counsel's copy, and I want to
9    just show you that. And on page two, as he had represented,
10   next to the bracket of (e), it says the words "very vague";
11   would you agree with that?
12      A. Correct.
13      Q. Do you recall why you wrote that?
14      A. That doesn't look like my writing. My memory
15   brings me back. Mr. Burkhalter had a second mortgage on my
16   home. I had a home in Indianapolis. And I can't talk for
17   Mr. Burkhalter, but Mr. Burkhalter didn't enjoy me living in
18   Indiana and running a business out of Ohio. I think it was,
19   not a buyer's remorse, but Mr. Burkhalter was -- it was his
20   baby, and he didn't like some of the changes I made to the
21   company. And I'll use one example. He chastised me for
22   over an hour for putting one staple in a paper instead of
23   two in the event that one would fall out. That's how
24   trivial Mr. Burkhalter was. So I was moving back to Ohio.
25   He had the second mortgage on the house. I had maybe

Page 50

1    $100,000 equity. In talking to Herb, I said, "Herb, you're
2    going to get this money, but I need some money, equity, to
3    buy a home in Urbana." And he said, that's fine. Well, the
4    day of the house closing -- when I went to the closing, Mr.
5    Burkhalter had called the closing agent and said, no, he's
6    going to take all of the money. I was not in default. I
7    paid him religiously. It was just his -- I can't explain
8    why he wanted back control of the company. Or when I say
9    "control", he wanted -- he was upset that I had bought a new
10   car. Well, you know, he didn't buy a new car for 10 years
11   and stuff like that. So there was some animosity there, but
12   there was no legal proceedings or -- and that's possibly --
13   I'm going to think that's probably why did I pull these, now
14   that I think about it.
15      Q. Well, you said that doesn't look like your
16   handwriting?
17      A. That particular word, "very vague".
18      Q. Let me ask you this. Who has had access to
19   these agreements other than you?
20      A. I mean, at the time, maybe my partner, maybe
21   possibly. This doesn't look like my handwriting though.
22      Q. At the time, who was the your partner?
23      A. Patrick Hamilton. My partner, as in life
24   partner.
25      Q. Okay.

Page 51

1       A. That doesn't look like his writing either.
2    And I went to no attorney, so I can't explain that.
3           MR. HECKMAN: It's not my writing either.
4           MR. LENOX: Okay. Fair enough.
5           MR. HECKMAN: Because I wondered if some of
6    that scribbling was mine, but I can't say that it was. And
7    that certainly isn't mine.
8       Q. So you said your life partner at the time, his
9    the name is Patrick Hamilton, right?
10      A. And is today, yes.
11      Q. Does Patrick Hamilton participate in the
12   business?
13      A. Currently, no.
14      Q. Did Patrick Hamilton participate in the
15   business, and I'm going to start in 1994?
16      A. As I mentioned earlier, his name was on that
17   list.
18      Q. Thank you for that. How long did Patrick
19   participate in the business?
20      A. '94 through the 2003 -- '02 when I owned it,
21   yes.
22      Q. And then, does Mr. Hamilton -- well, from your
23   prior testimony, I take it Mr. Hamilton does not participate
24   in your Red Rabbit business?
25      A. Correct.

Page 52

1       Q. And he's not presently participating in your
2    directories business that you're forming right now, right?
3       A. That's correct.
4       Q. Okay.
5           MR. LENOX: We've been going an hour and 20
6    minutes. You guys want to take a five- or 10-minute break,
7    and then we'll go another hour and then break for lunch?
8           MR. HECKMAN: Yeah, that's fine.
9           (Break taken.)
10      Q. We are talking about Exhibit 3 here, which is
11   entitled the Corporate Asset Purchase Agreement. Would you
12   agree with me that that was between Area Marketing
13   Directories, Inc., and Steven M. Brandeberry and American
14   Telephone Directories, Inc.?
15      A. Yes.
16      Q. And this was the agreement or at least part of
17   the agreement between you and Mr. Burkhalter for the sale of
18   certain assets relating to his Amtel Directories yellow
19   pages directory in Champaign County?
20      A. Correct.
21      Q. And this is dated the 6th day of May, 1994,
22   right?
23      A. Correct.
24      Q. Now, let's take a look at paragraph one. Now,
25   would you agree with me that this paragraph identifies at

Page 53

1    least some of the assets that you were purchasing, right?
2        A.  The entire agreement does, yes, not paragraph
3    one.
4        Q.  Okay.  So it shows that you were buying
5    customer lists, for example?
6        A.  Correct.
7        Q.  And you were purchasing the records and the
8    documents of the business?
9            MR. HECKMAN:  I'm sorry, you're on paragraph
10   one?
11           MR. LENOX:  Paragraph one.
12       A.  Oh, I thought you were talking about the top.
13       Q.  No, no, no.  Paragraph one.
14       A.  No, you said one.  I'm sorry.  Paragraph one
15   speaks for itself.  What it says, it says.
16       Q.  Well, I know.
17       A.  But I'm not reading it and, you know --
18       Q.  I'm just giving you some examples of some of
19   the things you were buying.  You were buying the customer
20   lists, right?
21       A.  It says that, correct.
22       Q.  And you were buying the records and the
23   documents of the business, right?
24       A.  "Including all records and the documents used
25   in the business", correct.

Page 54

1            MR. HECKMAN:  I'm looking at the wrong
2    exhibit.
3        A.  Well, I know I'm at 1 here.  She gave you 1.
4    That's that license agreement.  You didn't mark it.  Oh, no.
5            MR. HECKMAN:  No, I'm looking at two different
6    things here.  There's multiple --
7            MR. LENOX:  I've got an extra copy here.
8            MR. HECKMAN:  Yeah, I'm sorry, Bryce.  There's
9    multiple --
10           MR. LENOX:  There's the copy that I'm using.
11           MR. HECKMAN:  The problem is, there's more
12   than one document dated May 6th of 1994.  All right.  Go
13   ahead.  Yes, I see customer list.  Go ahead.
14       Q.  And it also shows that you bought, for
15   example, records of sales and salesperson's commission,
16   right?
17       A.  Yes.
18       Q.  And you bought 12 years of business goodwill,
19   right?
20       A.  Correct.
21       Q.  Now, this document also identifies some assets
22   that you didn't purchase, right?
23       A.  I don't see where it says -- yeah.  Yeah.
24   Yeah, help me.
25       Q.  It says you bought that, it says, "but

Page 55

1    excluded" --
2        A.  There you go, correct.
3        Q.  So you didn't buy the cash of the company,
4    right?
5        A.  That's correct.
6        Q.  You didn't assume its bank accounts, right?
7        A.  Correct.
8        Q.  You didn't take any of its office furniture or
9    its equipment?
10       A.  Correct.
11       Q.  You didn't take its cars?
12       A.  Correct.
13       Q.  You didn't take its receivables?
14       A.  Correct.
15       Q.  You didn't take its tax records, right?
16       A.  Correct.
17       Q.  Now, it appears from paragraph two that you
18   paid $205,000 for those assets, right?
19       A.  That's correct.
20       Q.  Now, a little earlier, you told me that you
21   paid 489,000 for those; is that right?
22       A.  I did not say for this particular asset.  I
23   paid 480,000 for the entirety.
24       Q.  So if I understand correctly, you're saying
25   you paid other sums for other things?  For example, such as

Page 56

1    a covenant not to compete, right?
2        A.  Correct.
3        Q.  And so, paragraph two, at least with respect
4    to the $205,000, sets out a payment plan, right?
5        A.  Yes.
6        Q.  And you were required as part of that to pay
7    20 percent of sales until the $205,000 was paid, right?
8        A.  It says that -- it says that just that,
9    "Monthly installments to be credited against an annual
10   obligation equal to 20 percent of sales".
11       Q.  And as I read paragraph 2(c), it appears that
12   you were going to get certain credits for, it states, "The
13   purchase of the AM/TEL name, insignia and logo, consulting
14   services and covenant not to compete"; is that right?
15       A.  Again, I don't know where you're seeing that,
16   but I agree.
17           MR. HECKMAN:  Right in here, Steve.
18       A.  Okay.  All right.
19       Q.  I'm not trying to trick you here.
20       A.  No.  No.
21           MR. HECKMAN:  Let's go off the record just for
22   a second.
23           MR. LENOX:  Yeah.
24           (Off-the-record discussion.)
25       Q.  Let me ask you this.  What is your

Page 57

1 understanding of how the purchase of the business was to
2 transpire based upon paragraph 2 or this contract in
3 general?
4     A.  I had a real simple -- with all of the
5 contracts, I had a payment to be made, all of which went to
6 Mr. Burkhalter. Pretty simple. That was it.
7     Q.  How did it work? Tell me how the payment
8 schedule worked in practice?
9     A.  Every one of these had a payment schedule on
10 it, and I followed it exactly as it was. I never paid him
11 more. I never paid him less.
12     Q.  Now, that payment, would it fluctuate every
13 month based on sales?
14     A.  Never.
15     Q.  So it was a flat payment that you would just
16 pay him every month, is that what you're telling me?
17     A.  That is exactly correct.
18     Q.  And that was an amalgam of -- a portion of the
19 payments identified in this contract, a portion of the
20 payment identified in --
21     A.  Other contracts.
22     Q.  The other contracts that were associated with
23 this, right?
24     A.  That is correct.
25     Q.  Okay. Now, on -- take a look at paragraph

Page 58

1 (d).
2     A.  Okay.
3     Q.  It required you to provide a covnovit note,
4 right?
5     A.  It does.
6     Q.  Is that one of the documents that you had
7 signed as part of this agreement?
8     A.  I've seen no note that says whatever that is.
9 It could be. I don't know what -- there were promissory
10 notes, how about that. I know there were promissory notes
11 probably with each one of these.
12     Q.  Fair enough. Do you have copies of those
13 promissory notes?
14     A.  I would have.
15     Q.  And those are part of that group of documents,
16 right?
17     A.  That's correct. You need to put a note of
18 that.
19     MR. HECKMAN: Yeah. I'm sure you want those.
20 We'll try to obtain them.
21     MR. LENOX: Fair enough.
22     Q.  Do you have any idea, as you sit here today,
23 what the terms of that note were?
24     A.  Well, each note here, agreement, spoke just
25 whatever this said, whatever was on -- am I saying that

Page 59

1 right?
2     Q.  Are you telling me that it could echo,
3 basically, the terms of the agreement, for example?
4     A.  That's correct.
5     Q.  Now, if you look at paragraph 3, it says that
6 "Herb E. Burkhalter will enter into a consulting agreement
7 with you"; is that right?
8     A.  That was one of the entities the one of the
9 nine, yes.
10     Q.  And do you have a copy of that consulting
11 agreement?
12     A.  That is part of the one of nine, yes.
13     Q.  We'll want that one also. Do you remember
14 what the terms of that consulting agreement were as you sit
15 here today?
16     A.  I do not.
17     Q.  Let me ask you this. How long did Mr.
18 Burkhalter work for you as a consultant or in any capacity
19 after the sale?
20     A.  He never worked as a consultant. That was
21 merely one of the venues, avenues of the agreement to come
22 up with this $480,000 for tax reasons, I remember that. So
23 he never worked for me. I never went to Herb for anything.
24 He never worked for me. And then I paid him off
25 approximately two years after the date of this.

Page 60

1     Q.  You say he never worked for you. So I want to
2 be clear. Did he do anything for you? Did he go out and
3 try to make some sales calls, do some marketing? Did he act
4 for you in any capacity?
5     A.  When you say "work for me", I think of an
6 employee. He was not an independent contractor nor a paid
7 employee. He did nothing for me other than cause me
8 headaches. Hence, I paid him off in two years, in full.
9     Q.  Is that -- pursuant to these agreements, would
10 that have been accelerated compared to what you -- vis-a-vis
11 what this contract required?
12     A.  It was accelerated, that's correct.
13     MR. HECKMAN: You testified that everything
14 else was in accordance with that schedule. So you're saying
15 that was in advance of the schedule?
16     A.  Well, until I paid him in full, I paid as
17 agreed. I don't know that there was an accelerated clause
18 or anything of that -- you know, a negative accelerating
19 clause.
20     MR. HECKMAN: It's your deposition.
21     A.  Up to the date that I paid him in full, I did
22 everything according to the agreements.
23     Q.  All I'm asking, and I'm not trying to be
24 tricky here, this agreement is dated in 1994?
25     A.  Correct.

Page 61

1    Q.  You testified that you paid him off in about
2  two years?
3    A.  That's correct.
4    Q.  So you think you paid him off somewhere in
5  1996?
6    A.  That's correct.
7    Q.  In full?
8    A.  I had borrowed money, that's correct.
9    Q.  And at least according, for example, to the
10  first page of this agreement, you had payments that were due
11  well beyond 1996 into 1999 and thereafter, right?
12    A.  Absolutely, yes.
13    Q.  Okay. I get it. Now, I want you to turn to
14  paragraph 8. Now, I'm going to read it, and tell me if I
15  read this right. It says, "Both parties agree to avoid
16  confusion to the customers and the public in that Area
17  Marketing Telephone Directories, Inc., is a corporation
18  continuing after the sale of certain assets, while the
19  purchaser intends to use the name, insignia and logo of
20  Am/Tel by virtue of a separate purchase of said assets",
21  right?
22    A.  Correct.
23    Q.  So is it fair to say that you were not buying
24  the corporation Area Marketing Telephone Directories, right?
25    A.  I was not.

Page 62

1    Q.  And you didn't buy the name Area Marketing
2  Telephone Directories, right?
3    A.  That's correct.
4    Q.  And it says, "purchaser intends to use the
5  name, insignia and logo of Am/Tel by virtue of a separate
6  purchase of said assets", and my question to you is, was
7  there a separate agreement relating to the purchase of the
8  name, insignia and logo of Am/Tel?
9    A.  That would be one of the nine, yes.
10    Q.  Okay.
11    MR. LENOX:  Why don't we go ahead and mark
12  this.
13    (Plaintiffs' Exhibit 4 marked.)
14    Q.  Sir, I've marked Plaintiffs' Exhibit 4. Do
15  you recognize this document?
16    A.  I do.
17    Q.  It's entitled License Agreement?
18    A.  Correct.
19    Q.  And it's dated May 6th, 1994, right?
20    A.  Correct.
21    Q.  Is this one of the documents that accompanied
22  the corporate asset purchase agreement that we were just
23  looking at and which is marked as Exhibit 3?
24    A.  Yes.
25    Q.  Now, would you agree with me that this

Page 63

1  document, Exhibit 4, the license agreement, deals with your
2  use of the name, insignia and logo of Am/Tel and Am/Tel
3  Directories?
4    A.  Say that again.
5    Q.  Sure. Would you agree with me that the
6  license agreement addresses or deals with your ability to
7  use the Amtel and Amtel Directories name, insignia and logo?
8    A.  Yes.
9    Q.  And my question to you is, if you flip back to
10  paragraph 8, when it talked about your use of the name,
11  insignia and logo of Amtel by virtue of a separate purchase
12  of said assets, my question is, other than the license
13  agreement, were there any other documents as part of this
14  overall transaction that dealt with the Amtel Directories
15  name, insignia and logo?
16    A.  I'm not sure. Without looking at them, I
17  don't know. I mean, the only agreements were these nine and
18  probably subsequent liens or —
19    Q.  Notes?
20    A.  Notes. I'm not sure if any others referred to
21  them in any way.
22    Q.  You just don't know as you sit here?
23    A.  Correct.
24    Q.  Fair enough. Now, at the time you purchased
25  this business, what did the Amtel insignia and logo look

Page 64

1  like?
2    A.  I provided that to you, Darrell. It had a —
3  I can't explain it. I can't explain it. It was just a
4  little block — I'm sorry. I could draw it for you.
5    Q.  Well —
6    A.  I do have something that I can provide.
7    Q.  Fair enough. If you could provide documents
8  —
9    MR. HECKMAN:  And just, haven't we given to
10  you something to that effect? And we'll get something else.
11  But I was thinking we've shown you something to that effect.
12  Maybe not.
13    MR. LENOX:  I can represent to you that you've
14  produced to me about 35 documents and none of them showed --
15  you may have showed me what the new Amtel mark looks like,
16  but I've never seen any -- at least I don't recall any
17  documents that you've given me that show it during that
18  period of time.
19    MR. HECKMAN:  Let's see what we've got. If
20  nothing else, the phone books with the Am/Tel on them.
21    MR. LENOX:  Fair enough.
22    Q.  Do you have old copies of those directories?
23    A.  I do not.
24    Q.  Do you have photos of those old directories?
25    A.  I wish I did. I do not.

Page 65

1    Q. But you do, as you sit here today, believe you
2 have documents showing that old logo, insignia and mark?
3    A. I do have.
4    Q. I would ask that you produce those marks. And
5 while we're at it, what I would really like is -- and we're
6 going to get into this a little bit -- to the extent that
7 that mark has changed over the years, I would like every
8 iteration of that mark from 1994 to 2002.
9    A. You have it. It changed once. I changed it
10 once and as that's existing is what I'm using now.
11    Q. We'll get into that in a minute. But, for
12 now, my request is all documents showing the form or the
13 look of that name, insignia and logo at that time. Now,
14 just now you told me that when you purchased the business,
15 the mark, name, insignia and logo was Am, A-m, with a slash,
16 and then Tel, T-e-l, right?
17    A. That's correct.
18    Q. And at any point -- well, I think you just
19 testified that that changed at some point, right?
20    A. Immediately after I purchased it.
21    Q. What happened immediately after you purchased
22 it?
23    A. Well, that's unfair, too. The first book I
24 published, I changed the logo.
25    Q. How did you change it?

Page 66

1    A. To the format that it's in right now that you
2 have in your hand as my business card.
3    Q. Well, let's mark that.
4       (Plaintiffs' Exhibit 5 marked.)
5    Q. We've just marked Plaintiffs' Exhibit 5. Sir,
6 this is your business card, correct?
7    A. Correct.
8    Q. And this is the business card that you are
9 presently using, right?
10    A. Yes, sir.
11    Q. Now, you just testified that shortly after you
12 purchased the assets from Mr. Burkhalter you changed the
13 name, insignia and logo to that which is on your card now,
14 right?
15    A. I did not change the name. I changed the
16 look, yeah.
17    Q. That's fair. To --
18    A. Remove the slash.
19    Q. You took the slash out, right?
20    A. Yes.
21    Q. Was the font of the lettering the same?
22    A. I have no idea.
23    Q. Was the -- there's a color scheme here of the
24 Am and Tel; do you see that?
25    A. I do.

Page 67

1    Q. The Am is in yellow and the Tel is in white,
2 right?
3    A. Yes, it is.
4    Q. How long has it been like that?
5    A. I believe it's always been like that.
6    Q. So the Am has always been yellow?
7    A. I believe so.
8    Q. The Tel has always been white?
9    A. I believe so.
10    Q. Was it yellow and white when you purchased it
11 from Mr. Burkhalter?
12    A. I believe so.
13    Q. So it even looked like that back then?
14    A. Oh, I beg your pardon. It would have had a
15 slash in it.
16    Q. But for the slash, it would have looked the
17 same?
18    A. Correct. Excuse me, no. His logo -- the logo
19 or the name, sir? His logo was slightly different. We were
20 referring to the slash I thought.
21    Q. Well, I didn't mean to confuse you. And maybe
22 I was not clear in what I was saying. To the extent there's
23 a difference between the name and the logo, or the insignia,
24 for that matter, when you purchased it from Mr. Burkhalter,
25 were those three things different?

Page 68

1    A. I didn't buy Am/Tel from Mr. Burkhalter. It
2 appears it is written in that fashion. I purchased Amtel
3 Directories. I never enunciated it Am/Tel, nor had it ever
4 been enunciated that way. When I purchased it, the records
5 indicate Mr. Burkhalter had written it as Am/Tel. And his
6 logo did have it A-m, slash, Tel in it. His logo did not
7 look exactly as my simple logo. I merely changed it and
8 cleaned it up to as you're showing it on Exhibit 5.
9    Q. Okay. I think we weren't connecting there.
10 And so what I'm asking you is, do you have copies of what
11 Mr. Burkhalter's name, insignia and logo for Amtel or Amtel
12 Directories looked like before you bought it?
13    A. As I answered a few moments ago, I do, and we
14 will provide it to you.
15    Q. And you have copies of what your name,
16 insignia and logo looked like after you changed it, right?
17    A. You have it in your hand, Exhibit 5.
18    Q. Okay. So we're back on the same page now,
19 I think.
20    A. Yes.
21    Q. So Mr. Burkhalter's name, insignia and logo,
22 we've already discussed, had a slash in it, right?
23    A. That's correct.
24    Q. Did it have the same styling as what you have
25 here on Exhibit 5?

Page 69

1   A.  Explain to me "styling".
2   Q.  Well, like I talked to you before, did Mr.
3 Burkhalter's have Am in yellow and Tel in white?
4   A.  You asked me that, and I said it did.  I
5 believe it did.
6   Q.  Well, if you have copies, we'll see what it
7 looks like down the road.  Now, I believe you testified that
8 Mr. Burkhalter signed a non-compete?
9   A.  Correct.
10   Q.  Do you remember what the terms of his
11 non-compete were?
12   A.  I do not.
13   Q.  Do you know what the scope of that non-compete
14 was?
15   A.  I do not.
16   Q.  Do you know what the duration was?
17   A.  I do not.
18   Q.  Do you have a copy of that non-compete?
19   A.  It's one of the nine, and I will provide it.
20   Q.  Okay.  Now, when you bought the yellow pages
21 directory from Mr. Burkhalter in 1994, were there other
22 competitors at that time?
23   A.  You asked that previously.  Yes.
24   Q.  Well, my question back then was a little
25 different.  I think I asked over a broader period of time.

Page 70

1 And my question is a little more narrow.  In 1994, were
2 there competitors?
3   A.  In 1994, there were seven local telephone
4 directories in Champaign County, excluding Amtel.
5   Q.  Did that change over time?  In other words,
6 have there become more or less since then?
7   A.  The seven I referred to are public utility
8 phone books.  There probably were other independent
9 directories that shot in and out.
10   Q.  Well, let me ask you about today.  As you sit
11 here today, how many yellow pages directories are in
12 Champaign County that you're aware of?
13   A.  There would be seven public utility books, a
14 Yellowbook, a book called The Local Pages.  I think that's
15 it.
16   Q.  Now, I want to turn your attention to the
17 license agreement, which is number 4.  And this license
18 agreement is between you individually, American Telephone
19 Directories, Inc., and Mr. Burkhalter, right?
20   A.  Correct.
21   Q.  And that's your signature, and we've already
22 talked about that, right?
23   A.  Correct.
24   Q.  And on the back of that there's some lines for
25 witnesses; do you see that?

Page 71

1   A.  Correct.
2   Q.  Do you know who any of these people are?
3   A.  I can't even read anybody's name except
4 Brenda.  No, I don't.
5   Q.  Where did you execute these documents?
6   A.  At Mr. Burkhalter's attorney in Dayton, Ohio.
7   Q.  And I want to -- actually, before we get to
8 this, I want to take a step back.  And I apologize for
9 making you do this, but this corporate asset purchase
10 agreement, were there multiple drafts of this document that
11 switched hands between you and Mr. Burkhalter or his lawyer?
12   A.  No.
13   Q.  So Mr. Burkhalter gave you this document and
14 it went unchanged?
15   A.  The best of my recollection is, on the 6th, I
16 saw it, read it, and signed it.
17   Q.  So you didn't make any changes or require any
18 changes to it?
19   A.  Not, that I recall.
20   Q.  You signed it as is?
21   A.  Obviously, yes.
22   Q.  The same question with Exhibit 4.  Did this
23 document -- or were there drafts of this document?
24   A.  There were drafts of none of the one of nine.
25   Q.  So of all of these nine documents, you signed

Page 72

1 them as they were presented to you?
2   A.  That's correct.
3   Q.  And is it fair to say that, with respect to
4 all of those nine documents or this sub-set of documents
5 involving this transaction, you did not consult an attorney
6 for any of them?
7   A.  That is correct.
8   Q.  Now, if you take a look at the -- a quarter of
9 the way down the page, the first "whereas", it states that,
10 "Burkhalter has developed a distinctive name, insignia and
11 logo entitled AM/TEL" --
12   A.  What are we on, sir?
13   Q.  I'm sorry, I didn't mean to jump on you.  I'm
14 on 4.  I apologize for that.  Before I started reading, do
15 you see where I am?
16   A.  Yes, I do.
17   Q.  And you agree with me that it says,
18 "Burkhalter has developed a distinctive name, insignia and
19 logo entitled AM/TEL, which has been used in the Champaign
20 County, Ohio, telephone directory for years"?
21   A.  Correct.
22   Q.  Now, do you agree that the name, insignia and
23 logo were unique?
24   A.  Yeah.  I mean, I don't know.  Unique, I mean
25 --

Page 73

1       MR. HECKMAN: I'll object to the question.
2   But go ahead and answer it to the best of your ability.
3       A.  Yeah, whatever. I don't know. Unique, I
4   mean, it was different. It wasn't -- it didn't look like
5   Coca-Cola. I know where you're coming from, but I wouldn't
6   say, wow, that's unique.
7       Q.  Well, was it different than anything else that
8   was in the marketplace at that time?
9       A.  I doubt it. I imagine there's a lot of yellow
10  and black stuff and with the slash. I don't know.
11      Q.  Was anybody using the word Amtel in Champaign
12  County at that time?
13      A.  No.
14      Q.  Do you know if anybody was using the word
15  Amtel anywhere in Ohio at that time?
16      A.  I'm not aware, but I know that Amtel was being
17  used in other entities, yes.
18      Q.  Well, was there anything that made Mr.
19  Burkhalter's yellow pages directory special from any of the
20  other directories?
21      A.  His directory or the name?
22      Q.  Either one.
23      A.  Yeah, the directory was unique. People bought
24  the directory for what it was, for the uniqueness of its
25  scope.

Page 74

1       Q.  Did people affiliate the uniqueness of the
2   book with the name Amtel?
3       A.  I don't know that they specifically did. It
4   was obviously marketed that way. Whether they --
5       Q.  And we've already talked that name Amtel had
6   been used for years, right?
7       A.  Since 1982, correct. Was it Amtel or Am/Tel?
8   Excuse me, clarify yourself, would you, please?
9       Q.  That's fair enough. So you would agree with
10  me that Am/Tel, the name, insignia and logo, had been used
11  in Champaign County for several years, right?
12      A.  Previous to me buying it, yes.
13      Q.  Now, let's go down to paragraph one. It says,
14  "Burkhalter hereby grants to licensee the use of the name,
15  insignia and logo: AM/TEL, AM/TEL DIRECTORIES", and it goes
16  below that and says, "for the exclusive use of licensee ,
17  throughout Champaign County, Ohio, until Burkhalter has
18  received payment in full of all monies due him on a certain
19  asset purchase agreement, consulting agreement and covenant
20  not to compete agreement", there's a semi-colon, and it
21  says, "after which all payments have been made in full,
22  licensee shall be the owner of said name, insignia and logo,
23  insofar as Burkhalter can license or sell same." Now, did I
24  read that right?
25      A.  I believe so.

Page 75

1       Q.  Okay. And I take it you testified that you
2   paid him in full; is that right?
3       A.  That is correct.
4       Q.  So is it your belief that, at the point you
5   paid him in full, the Am/Tel name, as well as the Amtel
6   Directories name, insignia and logo -- well, strike that. I
7   want to be more clear. So is it your testimony and is it
8   your belief that, once you paid him in full, the name,
9   insignia and the logos, Am/Tel and Am/Tel Directories,
10  became your property?
11      A.  Yes.
12      Q.  And when did that officially occur?
13      A.  A guestimate of '96, probably late '96.
14      Q.  Now, as part of that, it says that, "you will
15  be the owner of said name, insignia and logo, insofar as
16  Burkhalter can license or sell same"; do you see that?
17      A.  Yep.
18      Q.  What did you understand that to mean?
19      A.  I didn't understand it to mean anything. I
20  just read it.
21      Q.  Now, paragraph two notes that the name,
22  insignia and logo are not registered trade names or
23  trademarks, right?
24      A.  That's what it says.
25      Q.  And you, under paragraph 4, were required to

Page 76

1   pay $50,000 for that license; is that right?
2       A.  That's correct.
3       Q.  And under paragraph 5, if you defaulted on
4   payments for 30 days, the license was immediately revoked
5   unless cured within 15 days of a 30-day grace period; is
6   that right?
7       A.  That's correct.
8       Q.  Was that license ever revoked?
9       A.  It was never revoked.
10      Q.  So, in other words, you always made timely
11  payments, right?
12      A.  Correct.
13      Q.  Do you ever recall conversations about the
14  license as part of your negotiations?
15      A.  With whom?
16      Q.  With anybody.
17      A.  Quite vague. Explain what you're trying to
18  ask me.
19      Q.  Well, do you recall talking to Mr. Burkhalter
20  as part of your negotiations about acquiring the Am/Tel or
21  Am/Tel Directories name, insignia or logo?
22      A.  A specific question or comments or -- with him
23  or discussion about getting that, no.
24      Q.  Did you advise him that you wanted to use that
25  name, insignia and logo?

Page 77

1    A.  I was purchasing his directory business that
2  was referred to as Amtel Directories.  No.  When he handed
3  me this document, I looked at it.  I own the right to use
4  it.  That was the first time it was brought to my attention
5  or probably crossed my mind.
6    Q.  So there was never conversations about that,
7  it just appeared in the form of a document and you signed
8  it, is that what you're telling me?
9    A.  That's correct.
10    Q.  Now, you said you paid Mr. Burkhalter in full
11  in about two years, right?
12    A.  Correct.
13    Q.  Do you have documents evidencing those
14  payments or do you have those checks?
15    A.  I've got the documents marked paid by
16  Mr. Burkhalter.
17    Q.  And after you purchased the assets, did you
18  also pay in full the $50,000 payment enumerated under the
19  license?
20    A.  I paid -- again, there was nine documents
21  which consummated the $480,000, and all nine documents --
22  all 480,000 was paid either in monthly payments or in one
23  lump sum on the date I'm mentioning in about 1996.
24    Q.  To the extent that you have a document or
25  correspondence evidencing the final payment or full payment

Page 78

1  of that total $480,000 amount, including -- and to the
2  extent it includes payment for the license, I would ask that
3  you turn it over and produce it.
4    MR. HECKMAN:  I don't really understand.
5  We're admitting that he owns the assets.  Why do you want
6  him to prove that he owns the assets when we've already
7  admitted it?  Nobody is denying that.  What's the point to
8  establishing something that you want him to admit that he's
9  already admitted.
10    MR. LENOX:  As part of it, he claims that he
11  had the right to transfer this name, insignia and logo, and
12  so I want to make sure that he paid for it, paid for what he
13  said he's transferring.
14    MR. HECKMAN:  But if he didn't, your case
15  collapses.  And if he did, your case is good.  And we're
16  admitting that he did, so what's the point to that?  Come
17  on.  Why would you want him to prove that which he's already
18  admitted which you wanted him to admit?  Okay.  Ask your
19  next question.
20    Q.  Now, you testified that, after you took over
21  the business, you changed the name, insignia and the logo
22  and took the slash out, right?
23    A.  I didn't change the name.  I changed the logo,
24  yes.
25    Q.  Well, when I say --

Page 79

1    MR. HECKMAN:  I think he means it's pronounced
2  the same way.
3    Q.  I'm not trying to split hairs here, but, you
4  know, the name, when we say the insignia and logo, when I
5  say that, I'm referring to taking the slash out, fair
6  enough?
7    A.  Yeah.
8    Q.  So we're all on the same page.  I'm not trying
9  to split hairs with you on that.  Now, when you switched to
10  to take the slash out and switched the insignia and logo,
11  was there ever a period of time when you stopped using it
12  from 1994 to 2002?
13    A.  Stopped using -- I'm sorry, which logo?
14    Q.  The Amtel logo that you changed.
15    A.  When I changed the logo to read A-M-T-E-L
16  without a slash and printed the company name A-M-T-E-L,
17  without a slash, when I changed that in nineteen ninety,
18  probably five, when the first phone book came out, it's
19  always been used that way and never changed.
20    Q.  Now, when you would market your directory,
21  would you market it as the Amtel Directory or would you
22  market it as American Telephone Directories, Inc., if you
23  understand what I'm saying?
24    A.  Both names would be on all products, but I
25  would market it Amtel.

Page 80

1    Q.  So, for instance, if you would send out
2  correspondence, would you have Amtel and American Telephone
3  Directories, Inc., on your letterhead?
4    A.  To the best of my knowledge, yes.
5    Q.  And did you use these Amtel and Amtel
6  Directories marks on the directories themselves?
7    A.  When I purchased the phone book in '94, the
8  first book I published was in '95, and I used the new
9  Exhibit 5, Amtel Directories, from then on.
10    Q.  Okay.  So the first book you ever published
11  had the Amtel Directories name, insignia and logo without
12  the slash is what you're telling me?
13    A.  Correct.
14    MR. HECKMAN:  And I think he was asking if you
15  had the words.
16    A.  Oh.
17    Q.  And let me ask you this.  That first book that
18  you published, did it have the corporate name, American
19  Telephone Directories, Inc., on it?
20    A.  I would feel comfortable it did somewhere,
21  yes.  My best guess, it probably was not under -- as it's
22  shown in the business card.  When I'm refer to the logo, I'm
23  referring to the black box with the letters A-M-T-E-L within
24  them.
25    Q.  Now, did you ever publish directories of any

Page 81

1    kind in any other county?
2        A.  Yes.
3        Q.  And I can point you to your response to
4    interrogatory number two, if that would refresh your
5    recollection, and you stated you published a book in Logan
6    County from 1998 to 2002, correct?
7        A.  That was my best recollection, correct.
8        Q.  And you state that you published a book in
9    Union County from 1999 to 2002, right?
10       A.  Those dates are my best recollection and
11   that's correct.
12       Q.  And then Madison County from 2000 to 2002?
13       A.  My best recollection and, correct.
14       Q.  Now, I want to take each one of these
15   individually.  Let's start with Logan County.  What was the
16   name of that directory?
17       A.  Interesting you say that.  I never thought of
18   a name of a directory.  It was the Logan County telephone
19   book by Amtel.  It would say Logan County on it and would
20   have the Amtel logo on it.  What it was called, I don't
21   know.
22       Q.  That's fine.  And I think you answered my
23   question.  Did you use the name Amtel or Amtel Directories
24   name, insignia and logo on the Logan County book?
25       A.  Any dealings I had with phone books,

Page 82

1    publications, letterhead, from 1995 on always had the Amtel
2    logo as we're discussing it in Exhibit 5, probably without
3    the name American Telephone below it.  So, yes, that logo
4    was used.
5        Q.  So the answer to my question was yes, right?
6        A.  That's correct.
7        Q.  And the same goes for the Union County book,
8    right?
9        A.  That is correct.
10       Q.  And the same goes for the Madison County book,
11   right?
12       A.  That is correct.
13       Q.  How did you begin publishing in Logan County?
14       A.  I knocked on doors and asked if they wanted an
15   ad and they said yes.
16       Q.  So you started that book from the ground up?
17       A.  Correct.
18       Q.  You did not acquire any assets as part of
19   starting that book?
20       A.  That is correct.
21       Q.  What about Union County, how did it come to be
22   that you started that book?
23       A.  Exactly the same as Logan.
24       Q.  Once again, you did not purchase any assets or
25   acquire any companies as part of that, starting that book,

Page 83

1    right?
2        A.  That is correct.
3        Q.  What about Madison County?
4        A.  The same for the Madison, acquired no
5    companies, started it from scratch.
6        Q.  Now, other than these three books and the
7    Champaign County book, did you ever use the Amtel or the
8    Amtel Directories name, insignia or logo as part of any
9    other product?
10       A.  No.
11       Q.  I take it from your testimony that, for the
12   Logan County, Union County, and Madison County books you
13   never used the Am/Tel name or logo, correct?
14       A.  That is correct.
15       Q.  Did you ever use a logo Am-Tel?
16       A.  I didn't.
17       Q.  Did Mr. Burkhalter ever use a logo, name or
18   insignia Am-Tel?
19       A.  You'd have to ask him.  All I know is what he
20   gave me, sir, the A-M, slash.
21       Q.  Did you see any documents that he provided you
22   that had the name, insignia or logo Am-Tel?
23       A.  Not that I'm aware of.
24       Q.  Was that Champaign County directory
25   profitable?

Page 84

1        A.  That's interesting you ask me that.  There
2    were seven Champaign County phone books.  Which one are you
3    referring to?
4        Q.  Yours, of course.
5        A.  Well, so you say, but there were so many
6    different -- what was it called?  My book was called the
7    Champaign County phone book, you're exactly right.  Yes, it
8    was profitable.  I thought that was funny you didn't say the
9    Amtel Champaign County.
10       Q.  Was your Logan County book profitable?
11       A.  Now you're splitting hairs.  Without looking
12   at a financial statement and really digging into it, the
13   company was successful itself, American Telephone in general
14   was profitable.  I'm sure Logan County was not profitable
15   the first year.  Whether it was the second year, I would
16   have to look at financial statements.  As a whole, American
17   Telephone was successful.  Profitable.
18       Q.  So is it fair to say that you ran all four of
19   these books out of the American Telephone Directories, Inc.,
20   corporation, right?
21       A.  Correct.
22       Q.  And did you do consolidated financial
23   statements for all four of these books?
24       A.  All four entities were within one financial
25   statement and we had the sales of all four books.  I don't

Page 85

1  think we allocated expenses per book.
2      Q.  So during this time period, how were you
3  generating clients for your Champaign County book?
4      A.  What year are we talking?  Give me the years.
5  No, no, because I'm doing a book now.  So be more specific.
6      Q.  That's fair.  I understand, as part of the
7  transaction, you acquired certain customer lists from Mr.
8  Burkhalter, right?
9      A.  Correct.
10     Q.  In addition to that customer list that you
11 had, how else were you generating customers?
12     A.  People would call me and we would talk to new
13 businesses.
14     Q.  Did you ever buy additional lists, for
15 example?
16     A.  I did not.
17     Q.  Did you ever buy customer or client lists for
18 any of your other three books?
19     A.  Did not.
20     Q.  Do you still have copies of those client
21 lists?
22     A.  Probably not.
23     Q.  Now, we talked about the employees of your
24 American Telephone Directories, Inc., business during that
25 period, and you gave me several names, right?

Page 86

1      A.  Correct.
2      Q.  Did all of those individuals work on all four
3  of the books or were certain employees assigned to a
4  specific book?
5      A.  All employees worked, if it be financially, it
6  would incorporate the money from all four books.  So
7  everybody worked towards one goal for the company, which
8  included four books.
9      Q.  Who were the salespeople of this group of
10 individuals that worked for you?
11     A.  I had very few.  At the end it was Kay McGowan
12 and Kurt Heintz for me.  I believe that was all we had.
13     Q.  So, for instance, some of these other people,
14 Jania Wiseman, what did she do?
15     A.  She did some dye ad input, it would be some
16 keying.  She would assist in making the yellow pages and
17 white pages.
18     Q.  So explain the process for me.  Somebody wants
19 to place an ad in your directory, you give them a price.
20 What do they do next and how does it end up in the book?
21     A.  There's software from a company that's called
22 Dye Ad.  The company is called Polylogics.  They are a
23 service bureau.  They provide a turnkey operation.  I sell,
24 send them the contracts, they enter that information into
25 the software they've created so they can create white page

Page 87

1  pages and yellow page pages and listings for space for the
2  book.  I purchased the software from the service bureau and
3  did their work in-house.  So three or four support staff, we
4  did everything in-house, other than printing the
5  directories.
6      Q.  So Ms. Wiseman would do this inputting?
7      A.  Correct.
8      Q.  What about Hannah McGowan?
9      A.  She was a graphic artist.
10     Q.  What did she do?
11     A.  She was a graphic artist.
12     Q.  What did she do with respect to the book?
13     A.  She was a graphic artist.  She designs the
14 graphics.
15     Q.  Okay.  Debbie Jenkins?
16     A.  Was an assistant to myself.
17     Q.  Barney White, what did he do?
18     A.  Barney was hired in maybe 2000, and I say this
19 loosely, as a CFO to assist me in getting financing because
20 of our increased production.  So he worked maybe an hour --
21 maybe an hour a day to get -- his only role was to find
22 financing.  That was his only role.
23     Q.  Were you having cash flow issues around 2000?
24     A.  I sold the company in 2002.  I was starting to
25 have cash flow issues in 2002, yes, after the several -- the

Page 88

1  last two books, yes.
2      Q.  And Pat Hamilton, what did he do for the
3  company?
4      A.  He did -- I think he did input for the
5  financial statement.  He would put -- and then he did a lot
6  of the white page -- most of the white page verification,
7  proofing.
8      Q.  The last one was Betty Plymell, what did she
9  do for the company?
10     A.  Betty did not work for me -- I mean, she
11 worked for me -- you know what, Betty may never have been an
12 employee payroll wise, but she was a sales rep.  She started
13 with Herb.  She was one of the first to start with Herb in
14 1982.
15     Q.  Now, you --
16         MR. LENOX:  I'll tell you, this may be a good
17 time to have lunch before I switch into a bigger topic.
18 How's that?
19         MR. HECKMAN:  Okay.
20         (Lunch break taken.)
21     Q.  Sir, I want to switch gears a little bit and
22 talk about your sale of your directories business to Mr.
23 White.
24     A.  Okay.
25     Q.  Now, you testified a little earlier Mr. White

Page 89

1  was working for you in what I would call a part-time basis;
2  is that right?
3      A.  Full-time paid, part-time basis, correct.
4      Q.  So full-time paid, part-time basis. What do
5  you mean by that?
6      A.  He worked about an hour a week, or a day,
7  maybe, and I think he would get paid 500 a week.
8      Q.  And I believe you testified that he began
9  working with you in 2000; is that right?
10     A.  When was 9/11? What year? Well, that's
11 terrible.
12        MR. BUTLER:  2001.
13     A.  You know, maybe early 2001. I'm sorry.
14        MR. HECKMAN:  It's okay, Steve, but -- go
15 ahead.  So more like early 2001.
16     A.  So more like early 2001.
17     Q.  Did you know Mr. White before he began working
18 with you?
19     A.  I knew him and his family in passing. Was not
20 a -- yes.
21     Q.  How long had you known him prior to him
22 beginning to work with you?
23     A.  I knew of Mr. White and his presence and his
24 family 10 years.
25     Q.  And you said his sole job was to help secure

Page 90

1  financing for your business; is that right?
2      A.  Correct.
3      Q.  What were Mr. White's business credentials
4  that made him qualified to do that?
5      A.  That I was aware of, he used to be a plant
6  manager of International Harvester in our community and then
7  was the CEO, I believe, of Monroe Shock of several of his --
8  and to hear him, he was the operations manager of Ford Motor
9  of Europe.
10     Q.  Was Mr. White living in Urbana at the time?
11     A.  He had just retired and moved back to Urbana,
12 that's correct.
13     Q.  Where was he living before that, if you know?
14     A.  I don't know.
15     Q.  How old was Mr. White at the time he began
16 working with you?
17     A.  I don't know.
18     Q.  Can you estimate?
19     A.  Sixties.
20     Q.  Now, you said his job, when he was working
21 with you, was to attempt to secure financing?
22     A.  Correct.
23     Q.  Tell me what he was doing in those regards?
24     A.  We were looking -- because of cash flow
25 problems, we were looking to borrow against receivables, and

Page 91

1  that was his job. He went to two or three banks and could
2  not get financing secured.
3      Q.  So he was unable to secure financing for you,
4  right?
5      A.  Correct.
6      Q.  And I think you testified that, around this
7  time, you were starting to have cash flow problems?
8      A.  That's correct.
9      Q.  Why were you having cash flow problems?
10     A.  We were selling directory advertising and
11 offering people to start paying for it when the book came
12 out. So we had to pay for books prior to the payments
13 coming in.
14     Q.  Was that a change of protocol for your company
15 at that time?
16     A.  Yes.
17     Q.  Why did you switch to that model?
18     A.  Probably greed.
19     Q.  So was your business, around this time, on the
20 verge of closing?
21     A.  No.
22     Q.  You were having cash flow problems, but you
23 were still operational?
24     A.  Correct.
25     Q.  I mean, was there a contemplated shutdown of

Page 92

1  the business?
2      A.  Never.
3      Q.  Well, I take it at some time either you
4  approached Mr. White or Mr. White approached you about a
5  sale of the business; is that right?
6      A.  Mr. White approached me, correct.
7      Q.  When did Mr. White approach you?
8      A.  Probably, maybe, early 2002.
9      Q.  Let's do this.
10        MR. LENOX:  Mark this as 6.
11        (Plaintiffs' Exhibit 6 marked.)
12     Q.  Sir, I've handed you what's been marked as
13 Plaintiffs' Exhibit 6. Do you recognize this document?
14     A.  Yes.
15     Q.  And this is the Contract for Sale of Assets
16 between Amtel Directories, Inc., and P.B.J. White
17 Directories, LLC, right?
18     A.  Correct.
19     Q.  Now, this document is dated July 3rd, 2002; do
20 you see that at the bottom?
21     A.  Correct.
22     Q.  Now, with that date as a reference, when do
23 you recall beginning the negotiations with Mr. White?
24     A.  Early 2002.
25     Q.  What did Mr. White propose as his offer to

Page 93

1　purchase as part of your transaction?
2　　　A. Mr. White had been working with me and knew
3　the basis of the business for maybe a year -- six months, a
4　year. A year let's say. And I proposed selling the company
5　because financing wasn't going to be available in a timely
6　fashion. So I arranged a meeting with a telephone directory
7　company out of the Columbus/Dayton area. I can't think of
8　their name. Mr. White sat in on a luncheon meeting, in a
9　nutshell, where they proposed that they would be -- might be
10　able to pay a million dollars for the company, but they'd
11　want to do due diligence. It wasn't a contract. It wasn't
12　a commitment. They were very interested in buying the
13　company in the million dollars range. I said a million and
14　a half, and I said, "I'll get back with you." And that was
15　probably February/March of 2002, my best recollection.
16　That's when the meeting was. Mr. White was present.
17　　　Q. Before you go on. Who else was present at
18　that meeting other than you and Mr. White?
19　　　A. The gentleman from whatever the name of the
20　company. Haynes? Haynes Publishing.
21　　　Q. Haynes?
22　　　A. I believe it was.
23　　　Q. And you said that's out of Columbus?
24　　　A. I think it's in that area.
25　　　Q. Okay. Where did this meeting take place?

Page 94

1　　　A. The Urbana Country Club.
2　　　Q. How long was this meeting?
3　　　A. It was a lunch and maybe a half hour
4　conversation out at my father's farm. My father wasn't
5　there. Nobody was there.
6　　　Q. What happened next?
7　　　A. The next morning Mr. White approached me. I
8　could smell on his breath what he had for breakfast he was
9　so close to me. He said, "If this company is really worth a
10　million dollars, you and I can turn it into five million.
11　I'll be your banker." It was a simple remark. I said,
12　"Well, I'd entertain that, but it would be wise" -- and I
13　don't know what the exact conversation was, and it wasn't a
14　simple transaction. I said, "Well, let's talk about it."
15　At one point, several days later, I gave him a wish list.
16　He, basically, agreed to the wish list.
17　　　Q. Before you go any farther. What was on your
18　wish list? What points or what terms were on your list?
19　　　A. I have a copy of that and I'll provide it to
20　you. I certainly couldn't tell you exactly.
21　　　Q. Okay.
22　　　A. And Mr. White's -- in his offer to be my
23　banker, there was a stipulation that I had to buy it back,
24　just had to buy it back within five years, because he didn't
25　want anything to do with it, but he was going to make 50,000

Page 95

1　a year for five years, plus a quarter of a million dollars.
2　　　Q. Slow down. I'm sorry. So he said -- when you
3　say he said he wanted to make 50,000 a year -- repeat that.
4　You spoke very quickly. I didn't understand it.
5　　　A. I'm sorry. When Mr. white approached me to be
6　my banker, he said, you know, that I would have to buy the
7　company back within five years, just had to buy it back.
8　Well, at that time, he was making 50,000 a year, to the best
9　of my recollection, and -- no. It doesn't matter. He was
10　making 500 a week, would have been 25,000. Excuse me. But
11　as a part of the sale, he would give me $100,000 just as a
12　stipend to buy my company, but I had to buy it back for a
13　quarter of a million dollars within a five-year period, had
14　to, just vehemently had to. He didn't want anything to do
15　with it.
16　　　Q. So he was going to buy it from you for
17　$100,000 with a stipulation that you had to buy it back from
18　him within five-years for $250,000?
19　　　A. I had to assume all of the assets and debts
20　and pay him 250, that's correct.
21　　　Q. So you gave him the wish list. You -- and he
22　told you what his requirements were with respect to the
23　purchase price and buy back?
24　　　A. Real simple, 100,000, and I had to buy it back
25　for 250, that was all we discussed verbally.

Page 96

1　　　Q. What was the next step?
2　　　A. Several months later, I gave -- well, a month
3　later I gave him a wish list of I had to have this, this,
4　and this as well.
5　　　Q. A different --
6　　　A. No, the same wish list that I was discussing
7　earlier with you, which I will provide.
8　　　Q. So I want to make sure I understand the
9　sequence here. Mr. White came to you and said he would buy
10　it for $100,000, plus you've got to buy it back for 250 in
11　five years, right?
12　　　A. That's correct.
13　　　Q. He made the initial offer?
14　　　A. Correct.
15　　　Q. Then you came back a few months later with
16　your wish list?
17　　　A. Maybe several weeks later.
18　　　Q. Fair enough. What were the terms on your wish
19　list, as best you recall?
20　　　A. Exactly what I just told you. I'll have to
21　provide you with the wish list. I can't tell you. It's
22　probably 30 or 40 different items that I required. And I
23　will provide that. When I say "wish list", there's one, and
24　I'm going to provide it to you. Now, I can't tell you
25　what's on it.

Page 97

1    Q.  That's fair.  I just want to make sure I
2  understood the sequence here.  So after you gave him the
3  wish list, what did Mr. White do to counter?
4    A.  We merely sat down and he initialed the wish
5  list of everything that he agreed to.  The few things he
6  didn't agree to, he lined out and I initialed.
7    Q.  So, after you came up with this wish list,
8  which was initialed by him, and for all intents and
9  purposes, you agreed upon?
10    A.  That's correct.
11    Q.  What was the next step in the process?
12    A.  I still wasn't happy selling to Mr. White
13  because his family and himself has a reputation of being
14  dishonest.  I had been warned by other people, "Steve, he'll
15  steal your business", so I wasn't putting it in place.
16    Q.  Who told you he would steal your business?
17    A.  I can't remember their names.  It was just —
18  goes around town.  Many people would say that.
19    Q.  You said that he has a reputation for being
20  distrustful?
21    A.  Correct.
22    Q.  Did you have firsthand experience with Mr.
23  White being dishonest or distrustful in any way?
24    A.  Prior to this, no.
25    Q.  Had people told you that he's distrustful?

Page 98

1    A.  I had heard it in conversation.
2    Q.  Do you recall who was part and parcel of that
3  conversation?
4    A.  Do not.
5    Q.  But these conversations were taking place
6  before your transaction with him, right?
7    A.  Correct.
8    Q.  So after you initial the wish list, what
9  happens next?
10    A.  I still hadn't made up my mind to actually go
11  through with it.  So I thought for weeks, maybe 30 days.  At
12  which time Mr. White, having begged, "Let's do this.  Let's
13  do this.  Let's do this deal."  He came to my house one day
14  when I was off of work just begging me to sell him the
15  business and go through with the contract and wish agreement
16  that we did.  At which point I shook his hand, I said,
17  "Fine, Barney, you can steal my money, but you can't steal
18  my reputation and my integrity."  I shook his hand.  I said,
19  "Draw the contracts up."
20    Q.  Now, up until this point when you had this
21  hand shake, had you consulted with an attorney?
22    A.  I had not.
23    Q.  Had you consulted with an accountant?
24    A.  I had not.
25    Q.  Had you consulted with a financial advisor?

Page 99

1    A.  I had not.
2    Q.  Had you talked to your family about this deal?
3    A.  I don't believe so.
4    Q.  Now, I know you said you don't recall what was
5  on your wish list and you're going to provide it, I
6  understand that, but as you sit here today, do you recall
7  anything relating to the Amtel name, insignia or marks being
8  on that wish list?
9    A.  Absolutely nothing was on that list regarding
10  the name, correct.
11    Q.  It simply wasn't brought up in the wish list?
12    A.  Correct.
13    Q.  Up until the point where you shook hands on
14  your deal, was there any discussions about the Amtel name,
15  insignia or logo?
16    A.  Nothing whatsoever.
17    Q.  Now, so I'm clear, when you and Mr. White were
18  having these discussions, this was to acquire the assets of
19  your entire directories business, right?
20    A.  He was going to acquire the directory business
21  and sell it back to me within five years, yes.
22    Q.  And when I say "the directory business", I'm
23  talking about all four accounts?
24    A.  Correct.
25    Q.  Okay.  So you shook hands?

Page 100

1    A.  Correct.
2    Q.  You had a deal?
3    A.  Correct.
4    Q.  At some point, were papers drawn up?
5    A.  I'm sorry?
6    Q.  Were agreements drawn?
7    A.  Obviously, yes.
8    Q.  In fact, Exhibit 6 is one of them, right?
9    A.  Correct.
10    Q.  Now, after you had this handshake deal, did
11  you ever retain a lawyer?
12    A.  I did not.
13    Q.  So is it fair to say that, throughout this
14  entire process of you selling your business to Mr. White,
15  you did not have counsel?
16    A.  Correct.
17    Q.  Did you ever, during this whole sales process,
18  at any point, even after the documents were negotiated and
19  signed, did you ever consult an accountant?
20    A.  An accountant?
21    Q.  Yes.
22    A.  No.
23    Q.  How about a financial advisor?
24    A.  No.
25    Q.  So you did this deal all by yourself?

## Page 101

1      A. Excuse me. I mean, I certainly would have
2  seen an accountant. Not specifically because of these
3  contracts.
4      Q. Well, that was my question. Did you consult
5  an accountant about the —
6      A. Sale?
7      Q. Let me finish my question. Did you ever see
8  an accountant about either the terms of the agreement or the
9  terms of the sale?
10     A. No.
11     Q. So these documents were drawn up and presented
12 to you, right?
13     A. Drawn up by Mr. White's attorney, correct.
14     Q. And what was his name?
15     A. This is the truth, Harley Davidson. Is it
16 Davidson or Davison?
17         MR. HECKMAN: No, it's just like the
18 motorcycle.
19     Q. So Mr. Davidson drew up the papers. And did
20 he present them to you?
21     A. At the time of the signing.
22     Q. Okay. So were these documents ever
23 negotiated?
24     A. No.
25     Q. There were no drafts that went back and forth?

## Page 102

1      A. Correct.
2      Q. So it's kind of like your last transaction,
3  you showed up and you signed them?
4      A. Correct.
5      Q. Where did you sign these papers?
6      A. Mr. Davidson's office.
7      Q. Now, in between the time you shook Mr. White's
8  hand and the time these papers were drawn up, did you and
9  Mr. White or Mr. Davidson have any discussions about the
10 terms?
11     A. No.
12     Q. So you show up at Mr. Davidson's office. Did
13 you read through the contract documents?
14     A. Correct.
15     Q. And you signed them?
16     A. I signed the asset agreement and the other two
17 agreements I was asked to, "Why don't you go see an
18 attorney." Mr. White, "You better see an attorney. You
19 ought to take it to an attorney." And to appease them --
20 and the option to repurchase was less than a half a page and
21 it didn't require me paying an attorney 300 bucks to read
22 what I could read -- so I did take the blank option to
23 repurchase home with me and then, within a week or so, I
24 returned it to either Mr. White or his attorney, I don't
25 know which. I just remember going to Mr. White's attorney

## Page 103

1  and he said, "Well, he's not going to sign it now."
2      Q. Let's take a few steps back. When you showed
3  up to sign these documents, you were presented with three
4  documents?
5      A. Correct.
6      Q. We are looking at the Contract For Sales of
7  Assets, which is Exhibit 6?
8      A. Yes.
9      Q. This was one of them, right?
10     A. Correct.
11     Q. And you signed this document on the spot?
12     A. Correct.
13     Q. Now, you also said there was a repurchase
14 agreement?
15     A. Correct.
16     Q. And you did not sign that that day, right?
17     A. Correct.
18     Q. Mr. White hadn't signed it that day, right?
19     A. Correct.
20     Q. And what was the third document?
21     A. An employment contract.
22     Q. An employment contract for you?
23     A. Correct.
24     Q. Was that employment contract signed?
25     A. It was not.

## Page 104

1      Q. Either by you or by Mr. White?
2      A. By neither, correct.
3      Q. So you walked out that day having signed
4  Exhibit 6?
5      A. Correct.
6      Q. But you said you took — and you say you took
7  the repurchase agreement with you that day?
8      A. Correct.
9      Q. Did you take the employment agreement with you
10 that day?
11     A. Correct.
12     Q. And I think you said you didn't do anything
13 with them and -- well, I shouldn't say that. Let me take
14 that back. You testified that you didn't take them to a
15 lawyer?
16     A. That's correct.
17     Q. And then, at a period of time later, you
18 signed them and you returned them to Mr. White? Mr. White's
19 attorney?
20     A. To somebody, either Mr. White and/or his
21 attorney.
22     Q. And, at some point thereafter, Mr. White or
23 his attorney told you that Mr. White was not going to sign
24 the repurchase agreement or the employment agreement, right?
25     A. I don't know if White told me he wasn't going

Page 105

1  to sign it, you know, kind of snotty, "Hey, I own my
2  company. I'm not signing that." I just remember going into
3  Mr. Davidson's office, "I need this signed", and Mr.
4  Davidson said, "He's not going to sign it." And, at that
5  point, I knew -- well, I must have known that White wasn't
6  going to sign them. The employment contract was moot at
7  that point if I wasn't going to get my company back. So the
8  employment contract has never been an issue whatsoever.
9       Q.  Do you recall what the terms of the employment
10 contract are?
11      A.  No. But I have it and I'll provide it.
12      Q.  Okay. I think we've talked about that
13 already?
14      A.  We have.
15      Q.  So we'll get copies of those. Now, did Mr.
16 White do any due diligence with respect to your company?
17      A.  I have no idea.
18      Q.  Well, did he ask to see your books and records
19 or any documents before he bought the business?
20      A.  If you recall, Mr. White was working there for
21 six or eight months.
22      Q.  Well, I understand that. But did he have
23 access to your books and records?
24      A.  Certainly.
25      Q.  So he knew the financial wherewithal of the

Page 106

1  company at that point?
2       A.  Correct.
3       Q.  Why don't you turn your attention to Exhibit 6
4  for me.
5       A.  Uh-huh.
6       Q.  And look at some of the language in this
7  contract. Now, if you look at the first line, it says --
8           MR. HECKMAN:  Just for the record, I'm going
9  to object to any questions about the language of the
10 contract on the grounds that it speaks for itself.
11          MR. LENOX:  That's fine. I'll let you have
12 that running objection, if you so desire.
13          MR. HECKMAN:  Yes. But go ahead and answer
14 all of his questions.
15      Q.  I will read the sentence and tell me if I read
16 it correctly. It says, "due to economic necessity, the
17 Directors and Officers of Am-Tel Directories, Inc., have
18 voted to sell the assets of the business." Did I read that
19 right?
20      A.  Correct.
21      Q.  I want to break this down a little bit. It
22 says, "Due to economic necessity", what does that refer to?
23      A.  The need for economic assistance in the
24 business.
25      Q.  Because you were having cash flow problems,

Page 107

1  right?
2       A.  Correct.
3       Q.  Were you having other financial problems other
4  than just cash problems?
5       A.  No.
6       Q.  Now, it says, "The Directors and Officers of
7  Am-Tel Directories, Inc., have voted to the sell the assets
8  of the business."
9       A.  Uh-huh.
10      Q.  You were the directors and officers of Am-Tel
11 Directories, Inc.?
12      A.  There was no such entity.
13      Q.  So it's your testimony that you were never
14 part of or a shareholder in any company called Am-Tel
15 Directories, Inc.?
16      A.  Correct.
17      Q.  Did you read this contract before you signed
18 it?
19      A.  Correct.
20      Q.  You notice that the corporate name was
21 incorrect?
22      A.  Probably at the time I did not.
23      Q.  You didn't notice it?
24      A.  That was my answer.
25      Q.  So you certainly didn't point it out to Mr.

Page 108

1  White?
2       A.  At the moment of this, I did not.
3       Q.  Now, it goes on to say that, "the Directors
4  and Officers of Am-Tel Directories, Inc., have voted to sell
5  the assets of the business", right?
6       A.  Correct.
7       Q.  So it was your intention, at that time, to
8  sell all of the assets of the business, right?
9       A.  Specific, that's correct.
10      Q.  In other words, he was taking the business as
11 is, right?
12      A.  Based on the other stipulations we had,
13 correct, on the wish list.
14      Q.  What were the other stipulations you had?
15      A.  Those that were on the wish list.
16      Q.  Well, is your wish list incorporated into this
17 document?
18      A.  It is not. Well, it specifically is not, no.
19      Q.  So is it your testimony that those things that
20 were on your wish list are somehow incorporated into this
21 agreement?
22      A.  Similar to Mr. Burkhalter's agreements with
23 me, there were nine different agreements which answer all of
24 Mr. Burkhalter's and my, slash, wish list. The agreements
25 -- the other agreement, i.e., the option to repurchase would

Page 109

1    have covered the wish list. May I give you a simple
2    example? I needed car insurance for my son. That was on
3    the wish list. You know, if Mr. White didn't provide that,
4    that wasn't going to be the end of the world, but I had it
5    signed that he was going to, so that -- on the wish list --
6    the wish list was maybe what you could consider frivolous
7    items.
8         Q. Now, as we said, it says -- the language says
9    you're going to sell the assets of the business, right? It
10   doesn't say some assets, right?
11        A. Correct.
12        MR. HECKMAN: Object to that specific
13   question, but go ahead.
14        Q. Now, it says, "Accordingly, under the
15   provisions and power of such resolution, it is hereby agreed
16   by AMTEL DIRECTORIES, INC., and P.B.J. WHITE DIRECTORIES,
17   LLC, as follows". Now, before we go forward, we have yet
18   another company that is different from what we looked at
19   above, right?
20        A. Yes.
21        Q. In this case, it's Amtel, with no dash,
22   Directories, Inc., and above it was Am-Tel Directories,
23   Inc., right?
24        A. Yes. Correct.
25        Q. And my question to you is, did you have a

Page 110

1    company by the name of Amtel Directories, Inc.?
2         A. No.
3         Q. Once again, did you notice this when you
4    executed this document?
5         A. Probably not. I mean --
6         Q. Irrespective of whether it was Am-Tel
7    Directories, Inc., Amtel Directories, Inc., it was your
8    understanding when you signed this document, irrespective of
9    what they called it, that you were selling your business for
10   your yellow book or your yellow pages directory to Mr.
11   White, right?
12        MR. HECKMAN: Objection.
13        A. Again, under the auspices that there were two
14   other agreements, three other agreements that would go with
15   it, that's correct.
16        Q. Now, let's go to -- before we go on. Is Mr.
17   Davidson still practicing?
18        A. I believe so.
19        Q. Is he in Urbana?
20        A. Correct.
21        Q. Do you know where he lives?
22        A. No.
23        Q. Now, when you sold your business to Mr. White,
24   had he had any experience in the directories business other
25   than working with you?

Page 111

1         A. No.
2         Q. And when you sold the business to him, I think
3    you've testified that you were having cash flow problems,
4    and my question was, were you having net losses at that
5    time?
6         A. I don't believe so.
7         Q. So you were still in the black, you just
8    didn't have cash?
9         A. The net worth of the company at the time of
10   the sale, which was attached, I believe, speaks for itself.
11   It was 137,000 and the company owed me 80-some thousand. So
12   I would say we weren't ready to keel over.
13        Q. Let's turn to that Exhibit A that you just
14   pointed to.
15        A. What, please? Exhibit A?
16        MR. HECKMAN: It's suppose to be Exhibit A.
17        Q. There's three pages in --
18        MR. HECKMAN: Yeah, we know what you're
19   talking about, Bryce.
20        Q. Okay. But for clarity and for the record, I'm
21   looking at the top of this and it says, "Amtel Directories,
22   Inc., Balance Sheet as of July 3, 2002"; do you see that?
23        A. I do.
24        Q. And this page and the page after that show the
25   -- what I would call the balance sheet; do you agree with

Page 112

1    that?
2         A. I do.
3         Q. Who generated this document?
4         A. No idea.
5         Q. Is it from your records?
6         A. Mr. White. I believe it would be from my
7    records, correct.
8         Q. If it was from your records -- well, let's
9    look at the top. It says, "Amtel Directories, Inc."; do you
10   see that?
11        A. I do.
12        Q. When you would generate financial statements,
13   did they read Amtel Directories, Inc.?
14        A. I never printed them myself, personally.
15   Somebody did. I rarely, if ever, got a copy of the
16   financial statements.
17        Q. Did you get copies of your financial
18   statements from your accountant?
19        A. Probably tax records or -- I guess I was more
20   interested in looking at the cash in hand, cash on hand.
21        Q. So I want to be clear. You do not recall
22   printing or otherwise providing this balance sheet for
23   purposes of this agreement?
24        A. I personally did not. Nothing with this. It
25   was attached when I got it. No doubt it's very possible

Page 113

1  that Mr. Hamilton — the only person that would have
2  provided it was Mr. Hamilton. Or Mr. White could have
3  generated it himself having access to it. Who generated it,
4  I have no idea. Obviously, I would testify, it's probably
5  from our books.
6      Q. And I apologize if I've asked for this,
7  because I've asked for several things in the course of this,
8  do you have financial records from the period from 1994 to
9  2002? And when I talk financial records, I'm talking about
10  balance sheets and income statements and things like that.
11      A. I'm not aware if I do at all. They probably
12  were left — I probably do not. They probably were left
13  with the business. There would be no reason for me to take
14  them.
15      Q. And when you say "left with the business", did
16  you literally hand the keys over to Mr. White that day and
17  he assumed the business in its location?
18      A. I didn't hand the keys over, but, yes, we
19  walked back and he was in charge.
20      Q. And that business operated out of the same
21  location, right?
22      A. The same location being?
23      Q. What was the business address?
24      A. I don't know. Monument Square — I don't
25  know.

Page 114

1      Q. Let me take a step back. From the point when
2  you acquired the business in 1994 until you sold all of the
3  business in 2002, where did you operate?
4      A. Originally, I operated out of my home. I
5  moved to a small 20-by-20 room in downtown Urbana, then
6  moved to a larger location on North Main Street, then moved
7  into a property on Monument Square that I owned when we
8  expanded the company.
9      Q. And how long were you at that Monument Square
10  address?
11      A. Maybe three years. And that, from whence
12  Barney bought it, that was the location.
13      Q. Well, as you look at this balance sheet, does
14  — well, let me ask you this. When you got this document,
15  did you review this balance sheet for accuracy?
16      A. No.
17      Q. Did you review it at all?
18      A. No.
19      Q. Why not?
20      A. You know, there's what you call integrity
21  sometimes, and I — and ignorance, you know. So that's
22  probably it.
23      Q. Well, let's go back to the first page. And if
24  you could turn — well, let me ask you one more question
25  before I turn to that. I take it from your testimony you

Page 115

1  have no correspondence relating at all to this transaction
2  other than your wish list?
3      A. Correct.
4      Q. So is it fair to say that the universe of the
5  documents relating to this transaction include your wish
6  list and this contract for the sale of assets and the two
7  other unsigned documents?
8      A. Correct.
9      Q. Now, in the beginning of this, we were looking
10  at the first paragraph which said that, "it is hereby agreed
11  by AMTEL DIRECTORIES, INC., and P.B.J. WHITE DIRECTORIES,
12  LLC, as follows". What was your understanding of what
13  business P.B.J. White Directories, LLC, was?
14      A. I never thought — I didn't care. I knew Mr.
15  White was buying it. Under what name, I could care less.
16      Q. So you just didn't inquire as to what business
17  was buying it?
18      A. Mr. White, as an individual, maybe with a
19  business name, was buying it, I knew that.
20      Q. Did you know if Mr. White had partners?
21      A. I did not.
22      Q. He was buying it by himself?
23      A. No, you asked me if I knew he had partners. I
24  have no idea if he had partners. I don't know to this day
25  if he had partners.

Page 116

1      Q. Okay.
2      A. I know P.B.J. White refers to Peter, his son,
3  Barney, and J., his wife Jenny, and that company has never
4  existed as well.
5      Q. When you say "that company", which company are
6  you referring to?
7      A. P.B.J. White Directories, LLC.
8      Q. How do you know that that company never
9  existed?
10      A. Because he never did business as P.B.J. White
11  Directories.
12      Q. Let me ask you this. Did he ever tell you
13  that this was never incorporated?
14      A. Yeah, I think we had a conversation, after the
15  fact.
16      Q. When after the fact?
17      A. After the fact.
18      Q. He just said, yeah, I never incorporated that
19  business?
20      A. It might have been something, he couldn't get
21  that name or you, you know, I don't know. Just in passing,
22  there — maybe I — I don't know.
23      Q. So do you remember — and I want you to be
24  specific here. I don't want you to guess. Do you
25  specifically recall a conversation where he told you that

## Page 117

1  P.B.J. White Directories never came into existence?

2      A.  It may have come into conversation during the

3  trial. Maybe that's where it came from. Or depositions.

4      Q.  Do you know whether Mr. White eventually took

5  these assets that he purchased from you and put them in

6  another corporation or another entity?

7      A.  Correct. Yes, he did.

8      Q.  Do you know the name of that entity?

9      A.  At the time, it was P.B.J. White Directories,

10 I assume, because that's what he prepared and gave to me.

11     Q.  No, I don't think you understood my question.

12 My question is, sometime after the transaction with you, do

13 you have an understanding that Mr. White took these assets

14 that he acquired from you and placed them in another

15 company, some company other than the P.B.J. White

16 Directories, LLC?

17     A.  Again, knowing that P.B.J. White Directories,

18 LLC, never existed, he placed them somewhere. To what he's

19 calling it at this point, I have no idea.

20     Q.  Have you ever heard of the company P.B. White

21 Directories, LLC?

22     A.  I have.

23     Q.  How have you heard of that company?

24     A.  I have no idea. He was sitting at the office

25 and/or depositions for the trial.

## Page 118

1      Q.  After Mr. White took over the business and the

2  assets, what did, for example, the letterhead of the company

3  say?

4      A.  I don't ever remember it being changed from

5  what we had. Whether it was, I have no idea. That was the

6  least of my worries.

7      Q.  Let me take a step back. After this

8  transaction, did you work for Mr. White?

9      A.  Correct.

10     Q.  During this period where you worked with him

11 on, for example, letterhead, did you ever use the term P.B.

12 White Directories, LLC?

13     A.  I don't recall ever seeing anything changing

14 or I was never a part of anything getting a new letterhead

15 or a stationary change.

16     Q.  Very well. Let's go back to the agreement

17 now. And I'm sorry for jumping around on you. If you look

18 at paragraph one, it says, and I'm going to read it, "P.B.J.

19 WHITE DIRECTORIES, LLC, will acquire the assets in their

20 entirety as set forth on the attached Exhibit A of AM-TEL

21 DIRECTORIES, INC., and the right to use the name AM-TEL

22 DIRECTORIES effective as of the first day of July, 2002,

23 under the following terms"; did I read that right?

24     A.  You did.

25     Q.  Okay. Now, you would agree with me that that

## Page 119

1  says that he was going to acquire the assets in their

2  entirety as set forth on Exhibit A, right?

3      A.  Right.

4      Q.  Now, if you turn three pages back, are these

5  two pages, page three and four, Exhibit A?

6          MR. HECKMAN:  This is still my continuing

7  objection, but go ahead.

8      A.  Say that again, sir. I'm sorry.

9      Q.  Sure. Are pages three and four the Exhibit A

10 that was referenced on page one?

11     A.  I take your word for it that they are,

12 somebody's word for it. It doesn't say that, but there

13 would be no reason --

14     Q.  I don't want you to take my word for it. I

15 need you to tell me if they were or -- it's your document.

16     A.  Fair enough.

17     Q.  You need to tell me if this is or is not

18 Exhibit A.

19     A.  Let me tell you, it doesn't say Exhibit A, so

20 I don't know. I would say it's not.

21     Q.  Well, what do you think Exhibit A is?

22     A.  I would say it says Exhibit A someplace. I

23 don't know. I don't see Exhibit A.

24     Q.  Do you have any other copies of this document?

25     A.  No, sir, I don't.

## Page 120

1      Q.  In the course of this litigation, I have seen

2  a copy of this agreement with a penciled in Exhibit A on it.

3      A.  Okay.

4      Q.  Do you ever recall penciling in Exhibit A?

5      A.  I may have.

6      Q.  Well, was it your understanding that P.B.J.

7  Directories, LLC, was buying all of the assets listed on

8  page one of -- well, I'm going to rephrase that since we're

9  not using --

10     A.  Well, I'm make it simple. This could be

11 considered A. There was no -- let's assume. I'll recant

12 and say, I believe this to be Exhibit A, yes.

13     Q.  Okay.

14     A.  Even though it's not clearly marked, I will

15 accept that.

16     Q.  So is it fair to say that, if you look on the

17 third page of this document, Mr. White was acquiring all of

18 the assets above the line where it says, "Total Assets" of

19 $691,379.71?

20     A.  Correct.

21         MR. HECKMAN:  I'll object to that question.

22     Q.  So let's go through this list. So you've got

23 current assets. So he acquired all of the checking accounts

24 which totaled $12,783.60, right?

25     A.  Correct.

**Page 121**

1     Q. He acquired all of the receivables, which were
2 approximately $381,903 and some change, right?
3     A. Yes.
4     Q. He acquired all of the employee advances,
5 right?
6     A. Correct.
7     Q. And there's a list of fixed assets here, with
8 furniture and fixtures and equipment, he got all of that,
9 right?
10     A. Correct.
11     Q. The transportation equipment and the like of
12 $15,000, he got all of that stuff, right?
13     A. Correct.
14     Q. Okay. Now, there is other assets listed here;
15 do you see those?
16     A. Uh-huh.
17     Q. And you have three. There's an intangible
18 asset asset purchase, he acquired that, right?
19     A. Whatever that is, yes.
20     Q. Well, would you agree with me that that
21 intangible asset asset purchase number is $205,000?
22     A. Correct.
23     Q. Would you agree with me that that is the exact
24 same amount that is identified on the corporate asset
25 purchase agreement that you entered into with Mr. Burkhalter

**Page 122**

1 and his company on Exhibit 3?
2     A. Correct.
3     Q. Now, he also acquired an intangible asset
4 non-compete valued at $150,000; do you see that?
5     A. Correct. Right.
6     Q. Now, we don't have a non-compete document
7 because it hasn't been produced. But my question to you is,
8 as you sit here today, do you recall that the non-compete
9 that you — that was executed was valued at $150,000?
10     A. I would believe so, that would be correct.
11     Q. Now, there's a third line, it says, "Other
12 Assets, Intan. Asset License Agreement", and that's valued
13 at $50,000; do you see that?
14     A. Correct.
15     Q. And you'd agree with me that that is the exact
16 same amount, $50,000, that is listed on the license
17 agreement between you and Mr. Burkhalter that's Exhibit 4,
18 right?
19     MR. HECKMAN: Objection.
20     Q. And that license agreement was the license
21 agreement that involved the name, insignia and logo for
22 AmTel and AmTel Directories, right?
23     A. Which one? I'm sorry.
24     Q. Exhibit 4.
25     A. Exhibit 4, correct, is the license agreement

**Page 123**

1 to Steve Brandeberry and American Telephone Directories,
2 correct, it was to both of us; that is correct. And
3 American Telephone Directories. I said Amtel Directories.
4     Q. So you would agree with me that Mr. White,
5 through his company, acquired all of the intangible assets
6 relating to that license agreement, right?
7     MR. HECKMAN: Objection.
8     A. I don't know the correct answer.
9 Contractually, I don't know, but I could say yes.
10     Q. Well, you would agree with me, at the
11 beginning of this, it says he agreed to acquire the assets
12 in their entirety as listed on Exhibit A, and that's what's
13 on Exhibit A, isn't it?
14     MR. HECKMAN: I'll object to that question for
15 the specific reason that the sentence in question does say
16 acquire all the assets. It goes on to state, and the right
17 to use the name Amtel Directories, which, obviously is a
18 completely different sentence than what you propounded, but
19 go ahead and answer the question.
20     Q. We'll do it this way. Would you agree with me
21 that Mr. White acquired the intangible asset license
22 agreement valued at $50,000 that's listed on page three of
23 this document?
24     MR. HECKMAN: Objection.
25     A. Yes.

**Page 124**

1     Q. And I think we've already agreed and you've
2 already testified that that intangible asset license
3 agreement was valued at $50,000, right?
4     A. Correct.
5     Q. And that's the same amount that is listed on
6 Exhibit 4, right?
7     A. Correct.
8     Q. And so, would you agree with me that the
9 intangible license agreement that's listed on the balance
10 sheet was for the license to use the name, insignia and logo
11 of AmTel and AmTel Directories?
12     A. I would agree with exactly what you said, has
13 the right to use it, because that's his exact language on
14 page one of his contract. Yes, I would agree with exactly
15 what you said, he has the right to use it, correct.
16     Q. Well, but if you look at Exhibit 4, you would
17 agree with me that it says, "Burkhalter hereby grants to
18 licensee the use of the name, insignia and logo: AM/TEL,
19 AM/TEL DIRECTORIES for the exclusive use of the licensee
20 throughout Champaign County", right?
21     A. It does say that, to Steve Brandeberry and
22 American Telephone Directories, that is correct.
23     Q. You told me earlier that you paid the full
24 amount for this, right?
25     A. The full amount for what?

Page 125

1    Q. Let me be more clear because that was not a
2 very clear sentence. You told me that you paid the full
3 $50,000 under the license agreement, right?
4    A. The corporation did, yes.
5    Q. So it's fair to say that you owned the name,
6 insignia and logo, Amtel and Amtel Directories, right?
7    A. Who's I?
8    Q. Well, you tell me.
9    A. The contract speaks for itself. It says Steve
10 M. Brandeberry and American Telephone Directories are
11 getting those assets. It says exactly that. Am I correct?
12 Am I missing something on the license agreement?
13    Q. So let me ask you this. Is it your testimony
14 that -- and I want to make sure I understand your testimony.
15    A. I know you do.
16    Q. Is it your testimony that you have never
17 transferred to B.P. White -- actually, I want to take that
18 back. I'm going to hold off on that actually. Let's go
19 through a little bit more of this contract. Now, the next
20 line says -- after that it says, "P.B. White Directories,
21 LLC, will acquire the assets in their entirety, as set forth
22 on the attached Exhibit A, of AM-TEL DIRECTORIES, INC., and
23 the right to use the name AM-TEL DIRECTORIES effective as of
24 the 1st day of July, 2002, under the following terms"?
25    A. Yes.

Page 126

1    Q. My question is, did you ever discuss this
2 language with Mr. White about the use of any of the Amtel
3 name insignia marks?
4    A. There was never a discussion through the sale
5 process of him using the name or having the name
6 exclusively.
7    Q. Well, let me ask you this. Did you ever tell
8 him as part of this that he is getting a non-exclusive right
9 to use the Amtel or Amtel Directories name, insignia and
10 mark; did you ever tell him that?
11    MR. HECKMAN: Objection.
12    A. Because of the whole concept and conversation
13 of the sale of him buying it from me -- and I only sold him
14 on the auspices that I would get it back in five years.
15 There would never have been the need for him to have
16 exclusive rights. I didn't even have a non-compete. So
17 that would have not even come up in the conversation. It
18 would have come up as exclusive A-M, hyphen, A-M slash. It
19 was obvious he was going to continue the company exactly as
20 it was. I was to buy it back in five years. So there was
21 no conversation specifically about -- other than what he
22 wrote that he wanted the right to use the name. Mr. White
23 had never seen any of those documents that you're discussing
24 whether that -- that's a moot point, but he's never seen
25 them to know that I owned an exclusive right. And he never

Page 127

1 asked me.
2    Q. Well, did Mr. White ever tell you, hey, I'm
3 giving you the right to use this Amtel name, insignia and
4 mark; did he ever specifically tell you that?
5    A. There would never have been a need for him to
6 say that.
7    Q. So the answer is no?
8    A. Correct.
9    Q. Where in this agreement does it say that
10 Mr. White acquired a non-exclusive use of the name Amtel or
11 Amtel Directories?
12    A. I would merely state his own words. He says
13 he wants the right to use. It's his words.
14    Q. But you'd agree with me that Exhibit A --
15 under Exhibit A, he had already acquired the intangible
16 asset for $50,000?
17    MR. HECKMAN: I'm going to object. Now you're
18 just getting argumentative.
19    MR. HECKMAN: No, I'm not
20    MR. HECKMAN: Yeah, you are. That's the whole
21 case, so file your brief, but let's ask a question here.
22 The questions have been asked and answered on more than one
23 occasion, so you can ask it one more time, and if you try it
24 again, we're not going to answer the question.
25    Q. You can answer that.

Page 128

1    A. I don't even know what the question was.
2    MR. LENOX: Would you read the question back?
3    MR. BUTLER: Let's take a break.
4    MR. LENOX: Okay. We'll take a break.
5    (Break taken.)
6    MR. LENOX: Back on.
7    (The pending question was read back.)
8    A. Well, okay. There's two intangible assets,
9 one of which is listed at 50,000.
10    Q. Thank you. Now, did you ever discuss with Mr.
11 White your -- strike that. And you had agreed with me that
12 where the language says that it's -- you were acquiring the
13 assets in their entirety as set forth in Exhibit A, and for
14 completeness, and the right to use the name Amtel
15 Directories, you would agree that there was no carve out
16 with respect to any of the assets on Exhibit A, correct?
17    A. I don't understand what you mean by "carve
18 out".
19    Q. There was no language in there that said
20 except for these assets, right? There's no such language in
21 there, is there?
22    A. There's no "except for" in there, correct.
23    Q. Now, did you ever discuss with Mr. White any
24 perceived -- let me ask you this. You told me Mr. White
25 never had advised you that you had a non -- or you had an

Page 129

1  ability to use the Amtel names and mark subsequent to this
2  contract, right?
3      A.  There was never a need to discuss it, and
4  there was never a discussion, correct.
5      Q.  The answer is no.  And you never told him that
6  you believed that you had the ability to use the mark,
7  right?
8      A.  Never discussed it and there was never a need
9  to discuss it.
10     Q.  No conversations ever about that?
11     A.  Correct.
12     Q.  It was never discussed, period?
13     A.  Correct.
14     Q.  Now, after this sale of assets, you advised
15  Mr. White -- walked back to the building and he was the new
16  owner, right?
17     A.  Correct.
18     Q.  He took over?
19     A.  He was the owner.  He didn't take over.  I
20  kept running it as usual.
21     Q.  Did your role change in any way?
22     A.  I didn't sign checks.  That's about it.
23     Q.  Were you still an employee of the business?
24     A.  Correct.
25     Q.  You were still taking a check from the

Page 130

1  business?
2      A.  A payroll, correct.
3      Q.  What did your checks say?  Who were they from?
4      A.  A good question.
5      Q.  Do you have any of your checks from back then?
6      A.  I doubt it.
7      Q.  Now, how long did you work for the business
8  before you left?
9      A.  I was fired September 2003.
10     Q.  After Mr. White came back to you and said,
11  "I'm not signing these two agreements", what did you do?
12     A.  Well, I was quite frustrated and just was
13  thinking, you know, somehow I'll get him to sign it, or
14  we'll come to some agreement.  I mean, that was pretty
15  devastating.  I mean, I physically, literally, did nothing
16  other than think.
17     Q.  And I know eventually you said you filed a
18  lawsuit, correct?
19     A.  Correct.
20     Q.  Now, after you sold the assets of the business
21  to Mr. White, did you, and when I say "you", I mean you
22  personally, ever use the Amtel or Amtel Directories name or
23  mark in any business after that?
24     A.  Well, I'm using it now.
25     Q.  And when did you start using it for the first

Page 131

1  time?
2      A.  Well, I may have used it several months
3  afterwards in an attempt to start a new directory after the
4  fact, after I was fired, for a period of maybe two or three,
5  maybe a month.  I may have used that -- the same mark that
6  we're discussing on the business card.  But at the advice of
7  my attorney, I stopped trying to sell advertising for a
8  directory to compete against a company I was to get back.
9  So I probably did use it then, or something similar, I don't
10  know.  I have no paperwork to that effect, but I may have.
11  And then, I used it starting in late 2008, started using it.
12     Q.  So you don't recall one way or the other
13  whether you did or did not use the Amtel name and mark those
14  few months after the business was sold; is that fair?
15     A.  It wouldn't have been months after the
16  business was sold.  It would have been after I got fired in
17  2003.  And I do not recall if I did.
18     Q.  So is it fair to say that, at a minimum, from
19  2003 until late 2009, you never used the Amtel name or mark?
20     A.  Correct.
21     Q.  I have another question.  If you turn back to
22  Exhibit 6, page one.  We've been looking at paragraph one
23  quite a bit, and I want to focus on the paragraph that says,
24  "and the right to use the name Am-Tel Directories effective
25  as of the 1st day of July, 2002"; do you see that?

Page 132

1      A.  Yes.
2      Q.  I think you testified earlier that you had
3  never used Am-Tel Directories; is that right?
4      A.  Correct.
5      Q.  Did you notice that when you signed this
6  document?
7      A.  No.  My recollection is no.  It meant nothing
8  to me.  If I did, it just was -- no, I don't recall.
9      Q.  There's some underlining there; do you see
10  that?
11     A.  Yes.
12     Q.  Whose writing is that?
13     A.  I'm sure that's mine.
14     Q.  When did you put that underlining on there?
15     A.  Probably late, you know, in 2008.  Yeah.  What
16  am I saying?  2009.  I don't know.
17         MR. HECKMAN:  It might be mine.  That's just
18  for what it's worth.  That's my --
19     A.  I mean, it could have been mine, you know.
20  And if I would have underlined it, I would have underlined
21  it --
22     Q.  So the moral of the story is, it's either
23  yours or your lawyer's, right?
24     A.  Again, I don't know where this particular copy
25  of a copy of a copy came from.  That would be the absolute

Page 133

1   most likely.
2        Q.  And it's fair to say that, irrespective if
3   it's yours or your lawyer's, this marking was not on here at
4   the time this was executed, right?
5        A.  That is correct.
6        Q.  This is a recent marking?
7        A.  Correct.
8        Q.  And at the top it has "ATT copy".  Who put
9   that on there?
10       A.  I would have.
11       Q.  Why did you put that on there?
12       A.  Identifying that it wasn't an original or a
13  copy.  I mean, it was a copy for somebody.
14       Q.  What does that stand for or mean?
15       A.  I would assume it's attorney.  That's my
16  attorney copy.  Or a copy -- I have marked a copy to give to
17  an attorney, being Mr. Heckman, or an attorney with the
18  White lawsuit.
19       Q.  After you sold the business to Mr. White, from
20  that point until you filed your lawsuit, did you ever seek
21  counsel about this transaction?
22       A.  I don't believe so.
23       Q.  And I believe you said your lawsuit was filed
24  --
25       A.  Say that again.  I beg your pardon.

Page 134

1        Q.  Sure.
2        A.  The lawsuit -- say it again.
3        Q.  You filed a lawsuit against Mr. White in 2004,
4   I think you've testified, correct?
5        A.  Yes.
6        Q.  From that point and back to the date of this
7   asset purchase agreement, did you seek counsel with respect
8   to any of the terms herein?
9        A.  Not prior to filing the lawsuit.  Yeah, I
10  would have had an attorney for several months and then we
11  filed a lawsuit.  So I would have talked to them about -- I
12  wasn't seeking counsel.  This was legitimate.  I was just
13  discussing this contract.
14       Q.  And I want to make sure I've got my dates
15  straight.  This was executed July 3rd, 2002, right?  And
16  "this" being Exhibit 6?
17       A.  Yes.
18       Q.  You said you were terminated or fired when?
19       A.  I believe September 2003.
20       Q.  So from July 3rd, 2002, to September of 2003,
21  what did you do for the business?
22       A.  The total same capacities, just sales, make
23  sure the books were out properly, anything that I did
24  before, sales.  Made sure the White pages were done
25  properly, the yellow pages were done properly.  Everything

Page 135

1   that I did previously.
2        Q.  How were you being paid?
3        A.  By check.
4        Q.  Now, on Exhibit 6, it shows the purchase price
5   of $100,000, plus the assumption of certain indebtedness of
6   Amtel Directories as asset forth on the listing of such
7   indebtedness as attached here as Exhibit B.  Were you
8   eventually paid that $100,000?
9        A.  No.  No.
10       Q.  You were never paid that amount?
11       A.  I was paid 75,000.  And then I settled on a
12  smaller amount for the second payment of 25,000.
13       Q.  How much did you settle for?
14       A.  I want to say 12,000, 15,000, 18,000.
15       Q.  Why did you settle for a lesser amount?
16       A.  Mr. White said -- no, actually, it went to a
17  -- to some type of -- Mr. White alluded that 25,000 belonged
18  -- was to be paid to somebody else, unlike the contract says
19  here, and that particular piece of it belonged to Patrick
20  Hamilton.  Which, again, the contract doesn't say that.  And
21  Mr. Hamilton had filed bankruptcy.  So Mr. -- after we were
22  both filed.  So Mr. White told the bankruptcy court that
23  Patrick was owed $25,000, and the bankruptcy court believed
24  it, which, again, this contract does not say that, and
25  awarded -- it was strange.  I don't know.  I don't know.  I

Page 136

1   don't know how it got -- I don't know.  I didn't get the
2   25,000.  I can't really put my finger on that number.  But
3   it had something to do with Hamilton.
4        Q.  Well, this contract also says that he was
5   going to assume the indebtedness on Exhibit B.  Is it fair
6   to say that Exhibit B would be the list of unpaid bills and
7   the bill detail that is the remaining pages of this
8   document?
9        A.  Yes.
10       Q.  Now, why were you let go in September of 2003?
11       A.  I think it came to a head that Barney -- I'm
12  thinking, previous to that, he pulled me aside and took me
13  to a coffee house and specifically told me he was tired of
14  playing poker with me, to, quote, unquote, "Go fuck myself",
15  he owned my business and he wasn't going to sign the
16  contract, in so many words.  That's exactly what he said.
17       Q.  When you say "the contract", are you referring
18  to the repurchase agreement?
19       A.  Correct.  He said, "I own your business.  Go
20  fuck yourself, I own the business."
21       Q.  Now, for clarity, you've been calling Mr.
22  White Barney White?
23       A.  Correct.
24       Q.  Some of these documents show William N. White.
25  Is that the same person?

Page 137

1    A. Correct. So that inflamed me. At which point
2  he sent me a letter of, whatever, and fired me.
3    Q. I didn't hear you.
4    A. I'm sorry. After that blowup at the office,
5  he fired me.
6    Q. When did you seek a lawyer?
7    A. I don't know. Within several months.
8    Q. Now, during your lawsuit, was ownership or use
9  of the Amtel or the Amtel Directories marks ever brought up?
10    A. I apologize. Say that again.
11    Q. Sure. During the course of your lawsuit
12  against Mr. White or Mr. White's company, was ownership or
13  use of the Amtel or Amtel Directories marks ever brought up
14  or ever an issue?
15    A. To whom?
16    Q. At any point in the litigation, was it an
17  issue?
18    A. Not in the litigation, no.
19    Q. Was it ever discussed?
20    A. No.
21    Q. Now, when Mr. White assumed the company, you
22  went on board and started working for him, correct?
23    A. I didn't go on board. I just continued.
24    Q. Fair enough. Did all of the other employees
25  continue with Mr. White?

Page 138

1    A. Correct.
2    Q. And after Mr. White took over, was it pretty
3  much business as usual?
4    A. It was exactly business as usual.
5    Q. Now, I think you testified, at that point,
6  American Telephone Directories was without any assets,
7  correct?
8    A. Correct.
9    Q. You weren't doing business with that company,
10  right?
11    A. Correct.
12    Q. Do you know whether Mr. White or one of Mr.
13  White's companies ever registered the name Amtel
14  Directories?
15    A. No, I do not. That's not true. I saw an R or
16  something on -- to rephrase that, that's not accurate. I
17  did see an R or something on one of his books once. And I
18  went to the State of Ohio and, yes, one of his companies had
19  registered, yes. If that's the same thing, the State of
20  Ohio.
21    Q. What did you see that had an R on it?
22    A. He had -- he had changed the logo again to an
23  upper and lower case, and that's what I'm thinking had a
24  registered R.
25    Q. Did Mr. White -- and when you say he changed

Page 139

1  the logo, are you talking about the Amtel logo?
2    A. Correct.
3    Q. How did Mr. White's Amtel logo differ from
4  yours?
5    A. Substantially different. It wasn't even
6  close, other than the name A-M-T-E-L.
7    Q. What did it look like?
8    A. I'm not prepared to tell you what it looked
9  like. Well, I don't have that handy. It was upper case A,
10  small m, small t, small e, small l, with a, what I call
11  A-T-T globe line around it. So it was substantially
12  different.
13    MR. HECKMAN: Have you got one of those other
14  books there?
15    MR. LENOX: No. Let's mark this.
16    (Plaintiffs' Exhibit 7 marked.)
17    Q. Sir, I've handed you what's been marked as
18  Plaintiffs' Exhibit 7. I can represent to you that these
19  are Plaintiffs' Yellowbook directories covers from Union
20  County, Madison County, Logan County, and Champaign County.
21  And my question is, if you take a look in the middle of the
22  page, you see the Amtel Directories logo there; do you see
23  that?
24    A. Correct.
25    Q. And it's got a little R on it; do you see

Page 140

1  that?
2    A. Correct.
3    Q. And it's got the, I don't know what you call
4  them. It's got some kind of an oval around it; do you see
5  that?
6    A. Yes.
7    Q. Does this mark on this page look like the mark
8  that Barney White used?
9    A. Very similar, yes.
10    Q. Well, you say "very similar", was it the same
11  or is it very similar?
12    A. Very similar. It could be the same. I don't
13  have that in front of me.
14    Q. You just don't know?
15    A. It's very similar.
16    Q. When did Mr. White change the mark to look
17  like this?
18    A. I have no idea.
19    Q. Were you still employed there when he did it?
20    A. I don't believe so. No, I would say
21  definitely not.
22    Q. Now, have you seen these covers before?
23    A. Certainly.
24    Q. And does -- or has your company, Red Rabbit,
25  bought placement in any of these Yellowbook Directories?

## Page 141

1     A.  I purchased in the current -- not current.
2  The -- this directory here, which would be the 2009 book.
3     Q.  So you purchased space in the Champaign County
4  2009 book for Yellowbook?
5     A.  Correct.
6     Q.  And you got a copy of this directory yourself?
7     A.  Correct.
8     Q.  When did you get a copy of that directory, the
9  best you can recall?
10     A.  Probably May of 2009.
11     Q.  Do they usually come out in May?
12     A.  My book did, yes.  Yes.
13     Q.  Is that usually the time when yellow page
14  directories come out as a general rule?
15     A.  No.
16     Q.  They come out at different times?
17     A.  Yes.
18     Q.  And when you placed your ad with Yellowbook,
19  did you negotiate with the Yellowbook employees for purposes
20  of that placement?
21     A.  Did I negotiate?  We discussed it.  They gave
22  me a price and I said yes.
23     (Plaintiffs' Exhibit 8 marked.)
24     Q.  Sir, I've handed you what's been marked --
25     A.  I'm sorry.  I'm sorry.  You're all right.  Go

## Page 142

1  ahead.
2     Q.  You've got a cramp?
3     A.  No, I'm fine.
4     Q.  We've been going for about an hour and 20
5  minute.
6     A.  No, no, I've got to get out of here.  I've got
7  another life.
8     Q.  Okay.  Sir, I've marked Defendant's Exhibit 8,
9  (sic) and I ask if you've ever seen this document before?
10     A.  I have not.
11     Q.  I'll represent to you this is a filing with
12  the Secretary of State with the State of Ohio and it is a
13  filing.  And if you could take the middle of the page, do
14  you see the name B.P. White Directories, LLC?
15     A.  Okay.
16     Q.  You see the address is 35 Monument Square,
17  Urbana, Ohio?
18     A.  Yes.
19     Q.  And that's the building where you used to
20  operate out of, correct?
21     A.  That is correct.
22     Q.  And that's the building where Mr. White
23  operated out of, correct?
24     A.  That's correct.
25     Q.  And you see that there's filing and right next

## Page 143

1  to that it says, "Documents", and it says "Trade
2  Name/Original Filing"; do you see that?
3     A.  Yes, I do.
4     Q.  If you go to the second page, there's a name
5  registration; do you see where I am?
6     A.  I do.
7     Q.  And if you go to the middle of the page, it
8  says, "The exact name being registered or reported is", and
9  it states "AMTEL Directories", right?
10     A.  Yep.
11     Q.  And it lists an Ohio Limited Liability
12  Registration Number in the middle of the page, right?
13     A.  Okay.
14     Q.  And it says, "The name of the registrant
15  designated above is B.P. White Directories, LLC"?
16     A.  Yes.
17     Q.  And it shows the same business address, right?
18     A.  Yes.
19     Q.  And the last page, it's signed by a gentleman
20  by the name of Ray Cox; do you see that?
21     A.  I do.
22     Q.  And at least at the beginning of this document
23  it shows Ray Cox is an attorney?
24     A.  Correct.
25     Q.  Do you know Mr. Cox?

## Page 144

1     A.  Of Mr. Cox.
2     Q.  You do know him?
3     A.  Yes.
4     Q.  How do you know Mr. Cox?
5     A.  He represented Mr. White in the lawsuit.
6     Q.  And you testified that you've never seen this
7  document before?
8     A.  That is correct.
9     Q.  So you've never talked to Mr. White about his
10  registration of the Amtel Directories name, correct?
11     A.  That is correct.
12     Q.  Now, I want to go back to your arbitration and
13  talk about that in a little more detail.
14     A.  Uh-huh.
15     Q.  When you filed your arbitration or your
16  lawsuit?
17     A.  Yeah.
18     Q.  Fair enough.  And it was referred to
19  arbitration, did you give a deposition testimony?  I think
20  you said you did, right?
21     A.  Sure.  Sure.
22     Q.  How long was that testimony; how many days?
23     A.  Half a day.
24     Q.  Was Mr. White deposed?
25     A.  Correct.

Page 145

1    Q.  Was Mr. Davidson deposed?
2    A.  He would not attend.
3    Q.  He would not attend?
4    A.  Correct.
5    Q.  So he was not deposed then?
6    A.  That sounds like he didn't.
7    Q.  Well, I'm want to be clear.
8    A.  No, he was not deposed.
9    Q.  Now, there was a hearing on this, you stated.
10   Who were the witnesses on your side?
11   A.  I don't believe I stated there was a hearing.
12   Q.  Well, did you present witnesses?
13   A.  No.  Well, excuse me.  I beg your pardon.  The
14   lawsuit -- we went to trial.  Maybe I'm misunderstanding
15   you.  We went to pick a jury.  The judge walked off of the
16   bench and said, do you want to go to mediation, which we had
17   said we would for a year.  And so then we went to -- is that
18   what you're discussing, I'm sorry, the mediation; is that
19   what you're discussing?
20   MR. LENOX:  Can we go off the record for a
21   minute?
22   MR. HECKMAN:  Yeah.
23   (Off-the-record discussion.)
24   Q.  For clarity and in order to speed this up,
25   counsel has advised that this was an arbitration in this

Page 146

1    case.  And my question to you is, at this arbitration, did
2    you or any other witnesses testify?
3    A.  I testified, and there was a gentleman that
4    testified as to the value of my company.  That's to the best
5    of my -- for me, I'm sorry.  Mr. White testified.  I don't
6    know if he had witnesses.  Off of the top of my head, I
7    don't think so.
8    Q.  So you testified?
9    A.  Correct.
10   Q.  And you said you had a person testify about
11   the value of your company?
12   A.  Correct.
13   Q.  What was that person's name?
14   A.  No idea.
15   Q.  Was he retained by your lawyer?
16   A.  He was retained by me.  I mean --
17   Q.  You paid his bill, in other words?
18   A.  I called him, drug his ass in, and he talked.
19   Q.  Did you find this gentleman or did your lawyer
20   find him for you?
21   A.  He was a company that sells radio stations, TV
22   stations, and I had been solicited over the years, if you
23   ever want to sell your business, call our company, and
24   that's what this gentleman's company did.
25   Q.  But -- let me ask it again.

Page 147

1    A.  No, no, I did.  I had had correspondence.
2    Q.  And for Mr. White, you said Mr. White
3    testified, correct?
4    A.  Yes.
5    Q.  Do you recall anybody else that testified on
6    Mr. White's behalf?
7    A.  No.  I'm thinking -- I'm thinking Debbie
8    Jenkins, one of the employees testified, and maybe Kay
9    McGowan.  Possibly his wife, because I remember her crying
10   sometime during the testimony.
11   Q.  What was his wife's name?
12   A.  What's the J stand for?  P&J.  What's her
13   name?
14   MR. HECKMAN:  I believe you said Jane earlier.
15   A.  It's not Jane.  Sorry.
16   MR. HECKMAN:  You don't know?
17   A.  I know.  I just can't think of it.
18   Q.  So you don't recall off of the top of your
19   head?
20   A.  I'll get it in a second.  I'm sorry.  Jeanie?
21   Q.  Now, other than the mark we had previously
22   looked at on Exhibit 7, do you recall Mr. White using any
23   other iterations of the Amtel mark?
24   A.  Under my employ, I don't, and otherwise, no.
25   Q.  So, for a little while, he used the same mark

Page 148

1    that you used, and then he switched the mark himself?
2    A.  The first book that was published under Mr.
3    White's ownership would have been a 2003 book and would have
4    been using the trade -- the logo created by me.  So Mr.
5    White owned the company and used the creation that was
6    created by me shown on my business card.  And then after --
7    when he changed it, I don't know.  And Mr. White would have
8    used it in several books prior to, so, yeah.
9    Q.  Did Mr. White continue to publish all four
10   directories after the sale?
11   A.  Yes.
12   Q.  Did he ever cease publishing any of those
13   directories?
14   A.  No.
15   Q.  And in each case, was he using the Amtel name,
16   insignia and logo on the book itself?
17   A.  Correct.
18   Q.  For all four counties?
19   A.  Correct.  I'm sorry, I didn't mean to write on
20   that.
21   MR. HECKMAN:  He circled something on the
22   original.
23   A.  I'm sorry.  I would like to circle it on
24   yours.  I'm sorry.
25   Q.  Well, let me ask you this.  You just circled

Page 149

1  something on the main one. What is the significance to what
2  you circled?
3      A. Well, that's — I'm going to ask my attorney
4  that. So — I don't know the significance other than the
5  date of first use, 1992. I don't know where Mr. White would
6  have come up with that. And then on the back, the second
7  page that I circled, he says, check the box here, it says
8  1982, so I don't know why Mr. White chose to use those dates
9  or what they have to do with it.
10     Q. Well, I think you and I discussed earlier, you
11  would agree with me that Mr. Burkhalter started using the
12  mark in 1982, right?
13     A. A mark, yes.
14     Q. And that was the Am/Tel mark, right?
15     A. That is correct.
16     Q. Now, per your interrogatories, it states that
17  you worked for at company called The Phone Book; is that
18  correct?
19     A. I guess, yeah. I don't know if that was the
20  name of it. I did a — I don't know what the word is. I
21  tried to help him get a book — yes, it was a book up in
22  Toledo that this gentleman owned and I assisted him for a
23  couple of weeks.
24     Q. When did you work — well, take a look at
25  interrogatory number eight for me. That's Exhibit 2. I'm

Page 150

1  sorry, Exhibit 1.
2      A. Yes. What page? I'm sorry.
3      Q. It's page seven of that document.
4      A. Okay.
5      Q. Look at response to interrogatory number
6  eight, which it asks you to please explain your work history
7  since '94. You state, "I also worked about two months,
8  probably 2003 to 2004, as a consultant for The Phone Book
9  out of Cleveland, Ohio"?
10     A. Correct.
11     Q. Now, for whom did you consult?
12     A. And it probably wasn't two months, but —
13  that's not even the name of the company that I'm aware of.
14  But there was a gentleman out of South Carolina that
15  approached me at a trade show, wanted me to help him get his
16  book back off of the ground. And I went up to Cleveland to
17  — because his books were in Cleveland. And I don't know
18  his name. He's dead, but I could find it.
19     Q. Were you paid for this work?
20     A. I would certainly think so, but for some
21  reason, I don't think I was.
22     Q. Why were you attending a trade show around
23  this time?
24     A. No, probably in two thousand — let's see
25  here. It wouldn't have been 2003 and '04, that would be

Page 151

1  inaccurate, because it was during the time I was employed by
2  Barney. So the 2003-2004 is inaccurate. It would be closer
3  to mid-2002. And I met the gentleman at a trade show. The
4  trade show would have been maybe six or eight months earlier
5  at a trade show where CMRs, Certified Marketing Reps, for
6  yellow -- that buy yellow page advertising attend to meet
7  publishers. And I had met this gentleman that I did some
8  consulting for at this trade show.
9      Q. So I'm clear. You met this gentleman at a
10  trade show while you were still running your directory
11  business or is that when you still owned your directory
12  business or was it after you had already sold it to Mr.
13  White?
14     A. I want to think I met him prior to, but I did
15  some consulting while I was with Mr. White.
16     Q. And he was trying to get a book up in
17  Cleveland, you say?
18     A. No, it was an existing book in Cleveland. I
19  think he had a son working and he was in trouble or
20  something and asked me to kind of assist him.
21     Q. And how long did you work for him?
22     A. A couple of weeks.
23     Q. Was that the end of it after that?
24     A. Oh, yeah. And, again, I didn't work for him,
25  but I assisted him for a couple of weeks.

Page 152

1      Q. And interrogatory number eight says that, in
2  2005, you worked for Yellowbook for about six months; is
3  that right?
4      A. Again, I worked for Yellowbook, and I
5  apologize for the dates. It was probably 2004 or -- I was
6  fired in 2003. It would have been late 2004 through '05,
7  yes.
8      Q. And I think you testified that that is out of
9  Dayton?
10     A. Correct.
11     Q. What was your job for Yellowbook?
12     A. Sales.
13     Q. Where was your territory?
14     A. Whatever. I mean, it was from Greenville to
15  Urbana. There was several books they produced in those
16  areas.
17     Q. Which specific — you said there was several
18  books they produced in those areas. Can you elaborate on
19  that, please?
20     A. The Dayton market area would produce books in
21  Miami/Shelby County, Clark County, Champaign County, and
22  Richmond, Indiana. I think that was their -- my
23  responsibility out of that office.
24     Q. And you believe this was for about six months?
25     A. (Affirmative head shake.)

Page 153

1    Q.  Why did you leave that employment?
2    A.  Well, sales practices that I wouldn't
3    accommodate.
4    Q.  What do you mean by that?
5    A.  And other reasons.  I was asked to go sell a
6    customer that had a 20-some thousand dollar account that had
7    a rate chart of about 15,000.  So if I saw his brother and
8    priced him the same ad, I could charge him 15,000, but one
9    of the Yellowbook reps the year previous had hit a home run
10   and overcharged the guy and they required me to go sell him
11   at the same price or at least a dollar more.  I said, "I
12   won't do it.  If you want to lie to somebody, you go lie to
13   him."  That was just one of the reasons.
14   Q.  You said "Other reasons", what were other
15   reasons that you left?
16   A.  Out of the 20 employees they had, 19 had been
17   fired, and I knew I was on the chopping block.  Nobody was
18   meeting the quotas.
19   Q.  How many salespeople did they have in your
20   region when you were working there?
21   A.  I don't know if they called it a region.  I
22   believe there was 20 sales reps and two or three sales
23   managers.
24   Q.  Do you remember who your sales managers were?
25   A.  You know, I think I had three or four of them

Page 154

1    in a short period of time because everybody quit or got
2    fired.  I wouldn't have any idea.
3    Q.  You don't remember their names as you sit here
4    today?
5    A.  Dan Mangan was the head man or head of sales.
6    He wasn't mine, but I kind of think I was employed by
7    Yellowbook and him.
8    Q.  Do you remember any of the other Yellowbook
9    employees that were higher-ups, for lack of a better word,
10   when you were working there?
11   A.  Yeah, I can remember one lady that came into
12   my office and lied to me about who she worked for to collect
13   some of my Amtel phone books.  It was a great group of
14   people.  She's still there now.  She's kind of upper
15   management.  She's there now.  She would be in her 60s.
16   Q.  I was going to switch topics.  I know you want
17   to keep going, but I kind of need a short break, to be
18   honest.
19       MR. HECKMAN:  Yeah, let's do that.
20       (Break taken.)
21   Q.  Sir, I want to switch gears a little bit here
22   and I want to talk about your present yellow pages
23   directory.
24   A.  Okay.
25   Q.  And I know, probably at the beginning of this,

Page 155

1    you told me when you started to develop your yellow pages
2    directories book, and what date was that?
3    A.  Maybe July or August — let's say July of two
4    thousand and — what year is this?
5    Q.  This is 2010.
6    A.  Nine?  Oh, God, Jesus.  Yeah, it was July of
7    2009.
8    Q.  So you've been at this for a little under a
9    year now, right?
10   A.  Correct.  Correct.
11   Q.  What prompted you to begin to develop a yellow
12   pages directories?
13   A.  I had many, 20, 30, phone calls or visits from
14   residents and businessmen in Champaign County begging me to
15   start the book back up after they had received their May
16   2009 Yellowbook for Champaign County.
17   Q.  Do you recall any of those individuals that
18   were begging you to bring this book back?
19   A.  Certainly.  Probably take the phone book and
20   circle half of the people in Champaign County.  If I didn't
21   see them someplace or talk to them.  So let's say Joe,
22   Carol, Bob of Champaign County.  So I couldn't stop.
23   Q.  Give me an example of some people that — I
24   don't need the whole universe, but give me an example of
25   some people that had made this request of you.

Page 156

1    A.  Bob Boyd of Urbana.  I'm trying to think of
2    some business people.  Is that what you're —
3    Q.  Yeah, I'm really looking for business people.
4    A.  Yeah, that's fair enough.  Champaign Garage
5    Door, John something.  Mechanicsburg Farm and Implements,
6    whoever the secretary is or the owner.  It's easier to tell
7    you who didn't.
8    Q.  Any other businesses that you can recall?
9    A.  Well, again, there would be a thousand of
10   them.  So just to go down the list — and I don't want to
11   tell you something that maybe they didn't, but there was
12   just so many, I couldn't begin to tell you all of them.  I
13   know you're not asking for all of them.  I wrote -- to do my
14   due diligence, I sent a letter to a hundred and some
15   business people and said — I think we've given you a copy
16   of that letter today -- that I had been approached, would
17   they like me to do another phone book?  Were they happy with
18   Yellowbook?  Would they like me to do it?  Out of the 160 I
19   sent, I got 101 responses, and 86 of them said, yes, they
20   would come with me.  And those cards have been lost -- or
21   not lost, but coffee spilled all over them and I don't have
22   those people.  And their names weren't on them anyway.  I
23   didn't have their responses on it.  So it was overwhelming
24   that they were displeased with Yellowbook.
25   Q.  You said you brought that letter with you

Page 157

1 today?
2     A.  I did, sir, I thought.
3     Q.  Well, here's the documents, at least a subset
4 of the documents that you brought today.  Pull out of that
5 stack which letter you're referring to.
6     A.  Sure, absolutely.  Not a problem.
7 Right there, sir, the first one.  You've got three or four
8 of them.
9     Q.  These are multiple copies?
10     A.  Oh, you made copies.  That's fine.  That's the
11 letter.  Let me see it, if I may?  Yes, that was my due
12 diligence, if you will.
13     Q.  Okay.
14         MR. LENOX:  Let's go ahead and let's mark this
15 document.
16         (Plaintiff's Exhibit 9 marked.)
17     Q.  Okay.  Sir, we just marked Exhibit 9, this is
18 a document you brought today, correct?
19     A.  Yes.
20     Q.  And this is dated June 3rd, 2009; do you see
21 that?
22     A.  Yes.
23     Q.  And you said you sent this to approximately
24 160 people or businesses?
25     A.  Business owners, correct.

Page 158

1     Q.  How did you pick those 160 business owners?
2     A.  Totally random, going through a telephone
3 directory, looking at a name and address, typing it, going
4 on to the next person.  Typing an envelope.
5     Q.  And you said you got about 100 responses back,
6 correct?
7     A.  Correct.
8     Q.  Do you have copies -- well, I'm sorry.  You
9 said you spilled coffee on them so you don't have the
10 responses from these people?
11     A.  I have a few of them left.
12     Q.  Whichever ones you have, I want you to produce
13 those, please.
14     A.  I will.
15     Q.  Now, the heading at the top of this is Amtel
16 Directories with a little mini R; do you see that?
17     A.  I do.
18     Q.  So by this time you had already decided to use
19 Amtel Directories as your business name; is that fair to
20 say?
21     A.  Correct.
22     Q.  And that's as of June of 2009; is that
23 correct?
24     A.  That's correct.
25     Q.  When did you decide to use the Amtel

Page 159

1 Directories name to solicit your new book?
2     A.  Within a week of this letter, or the day I
3 wrote the letter.
4     Q.  Did you consider using any other names for
5 your directories book?
6     A.  It's not considered a name of the book.  It
7 was just an entity selling the product.  No, I did not.
8     Q.  So you knew from the get-go you were going to
9 use Amtel Directories?
10     A.  In some fashion, yes.
11     Q.  And I take it you never did a trademark
12 search, right?
13     A.  I had not done a trademark search.  Well,
14 again, I don't understand trademark and registration.  So
15 maybe help me with that.  I knew Mr. White had registered --
16 am I saying that right, registered it?  Or with this
17 document you showed us.  And it expired in 2008.  And after
18 that, I looked up the State of Ohio and he no longer held it
19 and so I did register it.
20     Q.  Let me ask you this.  How did you know that
21 Mr. White had registered the name Amtel?
22     A.  Well, we discussed this earlier.  I saw the
23 little R on the book when Mr. White owned it.
24     Q.  Well, you saw the R, so did you assume that he
25 registered it?

Page 160

1     A.  That's exactly right.  At the moment I saw the
2 R, I assumed he registered it, that's correct.
3     Q.  And what I'm getting at is, did Mr. White ever
4 tell you that he had registered the mark?
5     A.  No.
6     Q.  So you just stated that you knew that it
7 expired in 2008?
8     A.  Correct.
9     Q.  How did you know that?
10     A.  I went to the State of Ohio web site.
11     Q.  So you got on-line?
12     A.  Sure.
13     Q.  The Secretary of State's site, right?
14     A.  Correct.
15     Q.  And typed in Amtel or Amtel Directories?
16     A.  I have no idea what I typed in.
17     Q.  Some iteration of that?
18     A.  Absolutely.
19     Q.  And you learned that it expired in 2008,
20 right?
21     A.  Correct.
22     Q.  So you went and registered it yourself, right?
23     A.  After it expired in 2008 -- I mean, I looked
24 for the registration probably in 2006 when I saw the
25 registration, just for my own curiosity.  No other reasons

## Page 161

1  except to see if he really did or did they just throw an R
2  on it. So after it expired, before I was even thinking
3  about doing the phone book, I looked it up that it had
4  expired and I applied for it.
5      Q. So I'm clear. You did this search in around
6  2006, right?
7      A. A good guestimate, yes.
8      Q. So, 2006, you learned that it was going to
9  expire in 2008?
10     A. Correct.
11     Q. Did you make a mental note of that or
12  something?
13     A. Sure.
14     Q. And that was an important date to you?
15     A. That it was going to expire in 2008, yeah.
16     Q. And then, when it expired, did you ever talk
17  to Mr. White about it expiring?
18     A. No.
19     Q. No conversations with him since then?
20     A. No, Mr. White -- he won't even make eye
21  contact with me.
22     Q. Since your lawsuit, have you ever spoken with
23  Mr. White?
24     A. I probably said hello in passing, that's all.
25  No, I've never had any conversation with Mr. White.

## Page 162

1      Q. Fair enough. So now, you said you went and
2  registered it. And what year did you register that mark?
3  Or that question, pardon me.
4      A. Probably 2009.
5      MR. LENOX: Let's mark this.
6      (Plaintiff's Exhibit 10 marked.)
7      Q. I've handed you what we've marked as Exhibit
8  10,
9      A. Yeah.
10     Q. Have you ever seen this document before?
11     A. Yes.
12     Q. What is this document?
13     A. A certificate from the State of Ohio that
14  certifies that, "the Secretary of the State has custody of
15  the business records for AMTEL DIRECTORIES and, that said
16  business records show the filing and recording of: Trade
17  Name/Original Filing". I don't know what you call it. It's
18  a receipt.
19     Q. Well, why don't we do this. At the top it
20  shows "Red Rabbit Reproduction at 682 Scioto Street,
21  Urbana, Ohio, 43078". At the top of this document. My
22  question to you is, did Red Rabbit file this document with
23  the Secretary of State?
24     A. I would -- I mean, that may have been a
25  mailing address. The statement says, "Steve M. Brandeberry,

## Page 163

1  President of American Telephone Directories". I signed it,
2  so I assume I filed for it under Steve Brandeberry,
3  President of American Telephone Directories, Incorporated.
4      Q. Does Red Rabbit -- my real question is, did
5  you do this on purpose just to throw people -- make people
6  --
7      A. Kind of, yes. And it works.
8      Q. No. Does Red Rabbit Rapid Reproduction have
9  any affiliation with your directories book?
10     A. It's a doing business as American Telephone
11  Directories. Red Rabbit is a d/b/a of American Telephone
12  Directories.
13     MR. HECKMAN: Remember, he said the tax return
14  is under the name of American Telephone Directories.
15     Q. Let me start from the beginning because I want
16  to make sure we're on the same page here. Originally, you
17  told me that you have a company, American Telephone
18  Directories, Inc., correct?
19     A. That's correct.
20     Q. And that Red Rabbit operates under that
21  umbrella, although it is not a separate corporation,
22  correct?
23     A. Correct.
24     Q. And I think you testified that your Yellowbook
25  directory operates under that umbrella, yet it's not a

## Page 164

1  separate corporation, correct? Or is it a separate
2  corporation?
3      A. No. The telephone directory business is under
4  -- is the direct -- American Telephone Directories,
5  Inc.. That's the base corp. or whatever you want to call
6  it, the main corporation. Then Red Rabbit -- for tax
7  purposes, I wanted Red Rabbit to fall under American
8  Telephone Directories. So I believe they required me to do
9  a d/b/a. You know, Amtel Directories is not a corporation,
10  is a -- is Coke to Coca-cola. It's what the company -- my
11  phone books were known as.
12     Q. And so my question to you is, I want to make
13  sure that I'm clear, is there any affiliation between Red
14  Rabbit and your Yellowbook Directories business?
15     A. No.
16     Q. Thank you. Now, let's go to page two of this
17  document.
18     A. Yes.
19     Q. Well, before we get to page two. What steps
20  did you have to take to file this with the Secretary of
21  State?
22     A. I don't know if I called them or e-mailed them
23  and they sent me the forms. I filled it out and sent the 50
24  bucks and they sent me this paper.
25     Q. When you say fill out the forms, are you

Page 165

1    referring to the second and third page of this document?
2        A.  Correct.
3        Q.  Did you fill out any other documents?
4        A.  I don't believe so.
5        Q.  Was there any instructions that accompanied
6    this document?
7        A.  Probably.
8        Q.  Let's look at page one.  If you look under the
9    box, and it requires you to check, and you checked Trade
10   Name, right?
11          MR. HECKMAN:  You mean page two, I think.
12       Q.  I'm sorry, page two.  Pardon me.  You checked
13   Trade Name, correct?
14       A.  That's correct.
15       Q.  And it states, "Date of first use:  March 1st,
16   1998", correct?
17       A.  Correct.
18       Q.  Where did you come up with that date?
19       A.  I was thinking '88 -- again, I'm thinking when
20   Mr. Burkhalter used it, it would have been March -- I was
21   guessing March of '88.  That's an error.
22       Q.  So March 1998 has no affiliation with anything
23   as far as you sit here today?
24       A.  No specific -- correct, it would be an error.
25       Q.  And it says, "Name being registered or

Page 166

1    reported", and it states, "Amtel Directories", correct?
2        A.  Yes.
3        Q.  Now, crossed out is the word "Directory"; do
4    you see that?
5        A.  Yes.
6        Q.  Why did you cross that out?
7        A.  Because I have a web site or an e-mail site
8    that is Amtel Directory, singular.  It was just an error.
9        Q.  Let me ask you a question about any web site
10   or e-mail addresses.  Do you have any domain names for your
11   yellow pages directory business?
12       A.  Amteldirectory.com.
13       Q.  Is that the only one?
14       A.  Correct.
15       Q.  Did you try to acquire any other domain names?
16       A.  No.
17       Q.  Did you ever try to acquire
18   Amteldirectories.com, for example?
19       A.  I may have.
20       Q.  Do you know why you were not able to acquire
21   it?
22       A.  Probably it's still in Barney/ somebody else's
23   name.
24       Q.  So somebody else owns it?
25       A.  I would say that's probably correct.

Page 167

1        Q.  Now, as far as e-mail addresses, what e-mail
2    addresses do you have that are associated with the business?
3        A.  We mentioned that earlier,
4    SteveB@Amteldirectory.com and Art, A-R-T,
5    @Amteldirectory.com.
6        Q.  And Art is the part-time, unpaid employee?
7        A.  No, that would be like the art department.
8    That's where people would send my art.
9        Q.  I get it.  Does your part-time, unpaid
10   employee have an e-mail address?
11       A.  No.  The Red Rabbit gentleman just works for
12   Red Rabbit.
13       Q.  And I apologize if I asked this and I might
14   have.  What is that person's name?
15       A.  John House.
16       Q.  Now, it also shows the name of the registrant
17   of this is American Telephone Directories, Inc.; is that
18   right?
19       A.  Yes.
20       Q.  And lastly, on the second page, is that your
21   signature there?
22       A.  Yes.
23       Q.  And it's dated May 1st of 2009, right?
24       A.  Yes.
25       Q.  Let me ask you a question.  And I can

Page 168

1    represent to you that this is all that I could print from
2    the Secretary of State's web site.  This shows page two of
3    three at the bottom of this; do you see that?  Do you recall
4    having to submit any form of trade name, trade address, or
5    trade logo, or insignia along with this document?
6        A.  No, I did not have to.
7        Q.  So as far as you can recall, the only pages
8    that you filled out were these two pages?
9        A.  Yes, probably a cover letter of some sort, but
10   it doesn't require any filling out.
11       Q.  Do you recall reading any documents or any
12   requirements that would be associated with this filing?
13       A.  If a cover letter had it, I would have read
14   it.
15       Q.  You can set that aside.  Do you agree with me
16   that you filed this with the Secretary of State, "this"
17   being Exhibit 10, just about a month before you sent out
18   your letter to these 160 businesses, right?
19       A.  Correct.
20       Q.  Prior to this filing with the Secretary of
21   State with respect to the name Amtel Directories, what other
22   steps, if any, had you taken to begin potentially developing
23   a yellow pages directory?
24       A.  Prior to that, I physically had done nothing.
25       Q.  You said "physically".  Is there --

Page 169

1     A.  Literally, physically had done -- just thought
2  about it in my mind.
3     Q.  Did you develop a business plan?
4     A.  No.
5     Q.  Did you start contacting potential customers?
6     A.  No.
7     Q.  So fast forward.  After you received these
8  letters from this 100 businesses or so --
9     A.  Postcards, yes.
10     Q.  What were the next steps you took?
11     A.  Well, I still dwelled on it for some time.
12  Then, once I made a decision, I proceeded to have leads
13  prepared so we could go solicit sales.
14     Q.  Who prepared the leads?
15     A.  Polylogics in New Jersey or St. Louis.  I
16  don't know which office prepares the leads.  Polylogics.
17     Q.  How much did you pay for these leads?
18     A.  I think approximately $1,600.
19     Q.  How many leads did that generate?
20     A.  A guestimate, 500.
21     Q.  So is this a printout of local businesses in
22  the Urbana/Champaign County area with name, address and
23  phone number?
24     A.  Correct.
25     Q.  And other than this lead sheet, did you have

Page 170

1  any other form of -- or any other resource from which to
2  develop potential customers?
3     A.  A resource?
4     Q.  Yeah.
5     A.  My eyes, the newspaper, seeing other -- you
6  know, I wasn't interested in looking for others.  I was
7  looking for the existing businesses to contact.  So I really
8  wasn't looking for additional.  I had my hands full with the
9  500.
10     Q.  So you get this list of leads, and what do you
11  do with it?
12     A.  I start calling and/or seeing customers.
13     Q.  Okay.  Now, did you develop business cards at
14  this point?
15     A.  Yes.
16     Q.  And are those the business cards that we
17  looked at earlier?
18     A.  Yes.
19     Q.  Exhibit 5?
20     A.  Yes.
21     Q.  Do you take these business cards with you out
22  on your sales calls?
23     A.  Yes.
24     Q.  And, at this point, had you made arrangements
25  for a potential publisher of a book?

Page 171

1     A.  I probably had priced the product, but not
2  committed to someone yet.
3     Q.  When did you start pricing product?
4     A.  I'm sure within that -- I had priced books
5  several years -- four or five years previously, and knowing
6  the industry, I knew what I was paying previously.  So the
7  price never fluctuated much.  I knew mentally what the price
8  should be probably in June -- May, June I may have got a
9  quote.
10     Q.  Who did you call for quotes?
11     A.  Liberty Press out of Utah.
12     Q.  Did you contact any other potential vendors?
13     A.  No.
14     Q.  That's the only one?
15     A.  Correct.
16     Q.  Is Liberty Press the one that you have
17  contracted with to produce your book?
18     A.  Correct.
19     Q.  When did you enter into a contract with them?
20     A.  I don't believe I physically signed a
21  contract.  As a matter of fact, I'm sure I haven't.  Just
22  good faith.
23     Q.  Well, I guess at what point did you call
24  Liberty and say, we're going forward with the book?
25     A.  Probably August/September of '09.

Page 172

1     Q.  Now, I want to take a step back.  You started
2  seeing customers.  When did you get your first contract?
3     A.  Within a 90-day period of August/September of
4  2009.  Probably closer to September.
5         MR. LENOX:  Let's mark this.
6         (Plaintiff's Exhibit 11 marked.)
7     Q.  Sir, I've handed you Plaintiff's Exhibit
8  Number 11, and this is a document that your counsel produced
9  to me.  I understand this to be your contract application;
10  is that right?
11     A.  Application for advertising, correct.
12     Q.  And at the top it says Amtel Directories?
13     A.  Correct.
14     Q.  And it's got a P.O. box?
15     A.  Correct.
16     Q.  Why do you have a P.O. box rather than your
17  business address?
18     A.  I always had a P.O. box.  I just didn't know
19  if I would stay at the 682 where I'm currently, quote,
20  unquote, "based out of".  But I always had a P.O. box.  I
21  never had a physical address on communications, on billing,
22  that I'm aware of.
23     Q.  And it shows a telephone number there?
24     A.  Yes.
25     Q.  Whose phone number is that?

Page 173

1    A.  That's registered to Amtel Directories.
2    Q.  Now, at the bottom it says, "The applicant
3 promises to pay to the order of Amtel Directories"; do you
4 see that?
5    A.  Yes.
6    Q.  Does Amtel Directories have its own checking
7 account?
8    A.  Yes.
9    Q.  And what bank is that?
10    A.  People's Savings Bank in Urbana.
11    Q.  Who are the name holders on that account or
12 the signers on that account?
13    A.  No one but me.
14    Q.  So when you go on your sales calls, would you
15 take copies of this with you?
16    A.  I would take a completed copy, yes.
17    Q.  Now, do you recall when your first sale
18 occurred?
19    A.  I mentioned, because you had asked earlier,
20 and I'm thinking in August, maybe, of 2009.
21    Q.  Do you remember who your first sale was to?
22    A.  I truthfully don't.
23    Q.  Now, I can -- for the record, counsel has
24 produced a stack of contracts or completed applications here
25 for a variety of customers. I'm not going to mark these.

Page 174

1 We've agreed these are attorneys' eyes only, for the record.
2 I'm not going to mark them just for convenience sake at this
3 point because we're expecting a marked set now. But, as we
4 sit here today, sir, this stack of documents and contracts
5 that you handed me, is this an updated stack of contracts to
6 date?
7    A.  That is a current, complete -- there may be
8 one or two more stragglers.
9    Q.  So there may be one or two more, but this is
10 pretty much it, right?
11    A.  That's it.
12    Q.  Well, if you can figure out whichever --
13 whatever two stragglers there are, I want you to produce
14 those to me with the appropriate designation and we'll take
15 this from there.
16    A.  May I ask this quickly? Are we getting that
17 pile back or -- and I only say that for ease of
18 recopying, it would a heck of a lot easier. Does he need a
19 copy of the stamp or something?
20    Q.  That's the idea.
21    A.  I'm saying, for tremendous ease of --
22    Q.  Here's the deal. If these aren't stapled,
23 which they don't appear to be, if we can go off the record
24 for five seconds, I'll have my secretary run a copy.
25    A.  Beautiful.

Page 175

1         (Break taken.)
2    Q.  Now, when you would go on these sales calls,
3 who accompanied you?
4    A.  I would go by myself.
5    Q.  Was there ever a period where you were
6 accompanied by any other salespeople, or anyone, for that
7 matter?
8    A.  I would go by myself. No, nobody would
9 accompany me.
10    Q.  Did you ever have sales reps helping you sell?
11    A.  Correct, I had two independent contractors.
12    Q.  Who were those independent contractors?
13    A.  They're in the interrogatories. Annalease
14 Matheson from Dayton, Ohio, and Phil Morman, Springfield,
15 Ohio.
16    Q.  What were the circumstances by which Miss
17 Matheson came to work for you?
18    A.  I had advertised for a yellow page sales rep.,
19 I want to think on Craigslist, and she called me.
20    Q.  Did you advertise in any other medium other
21 than Craigslist?
22    A.  I'm trying to think if that's where I
23 advertised. No, I did not.
24    Q.  Any ads in the newspaper classifieds, for
25 example?

Page 176

1    A.  No, not for sales reps. No, nothing.
2    Q.  So it was Craigslist?
3    A.  It was Craigslist.
4    Q.  When did you put that ad in Craigslist?
5    A.  Some time after 6 of '09.
6    Q.  When did Ms. Matheson start working for you as
7 an independent contractor?
8    A.  Maybe September/October of '09.
9    Q.  What is your financial arrangement with Ms.
10 Matheson?
11    A.  As an independent contractor, she gets a
12 commission based on sales.
13    Q.  What is her commission?
14    A.  I think it was 25 percent of the sale.
15    Q.  And is she still acting as an independent
16 contractor for you?
17    A.  No, she worked a couple of months. She was --
18 she physically didn't visit people for two months, but she
19 was -- I thought she was for two months. She didn't work
20 out. I was thinking she was working for about two months,
21 but she wasn't.
22    Q.  Did you enter into a written contract with
23 her?
24    A.  I don't believe so.
25    Q.  Did you pay her for any of her sales?

## Page 177

1    A. Yes.

2    Q. Did she make sales?

3    A. Did she?

4    Q. Yes.

5    A. Correct.

6    Q. Do you know how many sales she made

7 approximately?

8    A. I paid her maybe $2,000. Back that up. So

9 $8,000, $10,000 of sales.

10    Q. Let's turn to Mr. Morman. How did you come to

11 have Mr. Morman work for you?

12    A. A friend of my son's, out of the military,

13 needed employment. Again, he's an independent contractor.

14    Q. So Mr. Morman is a friend of your son?

15    A. Correct, and myself.

16    Q. How old is Mr. Morman?

17    A. Twenty-six, 27.

18    Q. How old was Ms. Matheson?

19    A. You ask her. I don't know. Fifty.

20 Thirty-nine.

21    Q. So when did you -- well, let me ask this. Did

22 Mr. Morman approach you or did you approach Mr. Morman about

23 working?

24    A. I would have approached Mr. Morman.

25    Q. What is your financial arrangement with him?

## Page 178

1    A. He gets commission.

2    Q. When did he begin working as an independent

3 contractor for you?

4    A. August-ish, September of 2009.

5    Q. Is he still working for you?

6    A. Yeah, he's an independent contractor. He's

7 not doing anything now. We've stopped selling.

8    Q. Okay. What was the sales period?

9    A. September, whenever I said, through February

10 of 2010.

11    Q. And why did you stop selling?

12    A. We're publishing the book. We stopped selling

13 because the deadline is over to sell for the 2010 Champaign

14 County phone book.

15    Q. What is the, for lack of a better word,

16 selling season for a business like that, if there's a

17 cutoff, obviously.

18    A. There's no rhyme nor reason. When I owned one

19 phone book, we sold for nine months. We sold for nine

20 months and published in three months. When I had four

21 books, I was out for four months -- well, we'd sell for

22 three months. Three times four, twelve. Generally it would

23 be three months to sell. My particular instance. Everybody

24 is different.

25    Q. So when did Mr. Morman stop selling?

## Page 179

1    A. February 2010.

2    Q. So he's doing no work for you presently?

3    A. Correct.

4    Q. Any other independent contractors other than

5 Ms. Matheson or Mr. Morman?

6    A. No.

7    Q. How much have you paid Mr. Morman to date?

8    A. Nothing. For cash flow problems, I owe him.

9    Q. How much do you owe him?

10    A. I'm going to guestimate $10,000.

11    Q. And was he on the same deal as Ms. Matheson,

12 where he got 25 percent of sales?

13    A. No, he got, I think, 15 percent and then 20

14 percent if he brought in cash, any cash.

15    Q. So can you estimate approximately how many

16 dollars in sales Mr. Morman generated?

17    A. To use the simplicity of $100,000, 15 percent.

18 That's a close figure.

19    Q. Now, you did a lot of the selling, too, I

20 presume?

21    A. Correct.

22    Q. For the business, who did the lion's share of

23 the selling?

24    A. It may be 50/50. Annalease did $10,000, as I

25 mentioned. At that point, 50/50, Phil and I.

## Page 180

1    Q. What are the total sales for the business?

2    A. I want to say 170.

3    Q. And of that 170, you estimate that she did a

4 -- she being Ms. Matheson, did about 10,000?

5    A. Yes.

6    Q. So that would be about 80,000 roughly each for

7 you and Mr. Morman?

8    A. Correct. So with that auspices, the 15,000

9 would be high for him. The 80,000 is more accurate.

10    Q. How did you split up the territory or the

11 leads?

12    A. There's no rhyme nor reason to it. People are

13 people. You go down the street and your contracts come to

14 you by street, if you order them that way. You just go down

15 the street. You don't bypass anybody.

16    Q. Now, when your team, for lack of a better

17 word, would go out and try to sell space in your

18 directories, what marketing materials did they take with

19 them?

20    A. We'd have no marketing material except for a

21 -- we did -- we would have a telephone directory similar to

22 what I published with a 2010 cover on it. Merely for a

23 visional for them. And if we took it, we would have a

24 postcard that you have a copy of there or it was a postcard

25 size. I don't think we mailed it to anybody, but it was a

Page 181

1  postcard that merely mentioned that we're back and where our
2  delivery areas were and a contract.
3      Q.  So I'm clear.  You said you took a copy of a
4  book; is that right?
5      A.  Correct.
6      Q.  Whose booking did you take?
7      A.  That's one of them right there.  It would have
8  been an old Amtel Directories'.
9      Q.  An old Amtel Directories' from what year?
10     A.  Who knows.  I don't know what year they are.
11 Oh, don't tear that off of there.
12     MR. HECKMAN:  Off the record.
13     (Off-the-record discussion.)
14     MR. HECKMAN:  Go back on the record.  I'm
15 sorry.
16     Q.  I want to start from scratch here.  So what
17 you have in front of you, and I'm probably eventually going
18 to want a whole copy of that book because it's --
19     A.  You may have that.
20     Q.  It's not what I thought it was.  Let's put it
21 that way.  Let me understand.  You have a book in front of
22 you.  And I'm going to mark the cover of that right here.
23 Here's what we've got.  Here's the front and back cover of
24 the document that you brought.  Now, we're going to mark
25 this as Exhibit 12.

Page 182

1      (Plaintiff's Exhibit 12 marked.)
2      Q.  Now, if I understand your testimony correctly
3  -- and, for the record, Exhibit 12 is the front cover and
4  the back cover of the book that you brought with you; is
5  that right?
6      A.  No, the back cover -- that's an inside page.
7      Q.  My secretary copied it wrong.
8      A.  She copied it wrong.  Here's the page.
9      Q.  Okay.  She did page one.
10     MR. HECKMAN:  It's still useful to you because
11 that page says 2006 on it.
12     Q.  Okay.  Well, let's do this.  So she's copied
13 pages one and two.  Now, so what you would take with you, as
14 far as I know, you took a -- you made a new cover for this
15 book, or what you wanted your cover to look like, correct?
16     A.  Correct.
17     Q.  And page one of Exhibit 12 is what your book
18 would look like on it's front cover, right?
19     A.  About, yes.
20     Q.  And what you did is you took this front cover
21 and pasted it on top of an old Amtel Directory, correct?
22     A.  Correct.
23     Q.  And, for example, the book that you brought
24 with you, it was a 2006 Amtel, Champaign County, telephone
25 directory, correct?

Page 183

1      A.  Correct.
2      Q.  Now, that would have been one of Mr. White's
3  books, right?
4      A.  Well, yes.  Yes, it was.  I think, yes.
5      Q.  I take it you never asked Mr. White if you
6  could use his old book as a mock-up for your new directory,
7  did you?
8      A.  I did not.
9      Q.  And so what you would do is, you took this
10 book around, and what would you do with it?
11     A.  Occasionally -- we did a lot of phone calls as
12 well.  Walk in, say hi to the people that we -- because they
13 knew me, and most of them knew we were coming back.  And I
14 would say, "We're back", and I would just basically hold the
15 book merely to show them what size it's going to be.  And
16 they would tell me how glad that we're coming back in a
17 full-size book.  They were very clear who I was and what
18 book I represented.  They were very clear and adamant that I
19 was not working for Yellowbook or with Yellowbook.  Would
20 never open the book up or say other than, well, what's it
21 going to look like?  Is it going to be like that?  Yes, it's
22 going to look and feel just like the books you used to have.
23 If you spent two or three seconds on the book -- the book
24 was just still for a visual, explained to them what we're
25 doing, just like we did before, like I had done, and sign

Page 184

1  and sell them and then leave.
2      Q.  Now, did you sell some -- or sign some
3  customers up on the spot?
4      A.  Certainly.
5      Q.  In some instances you'd fill a contract out
6  right there, correct?
7      A.  Certainly.
8      Q.  And you'd use that form that we looked at
9  which was Exhibit 11, right?
10     A.  Similar to that, correct.
11     Q.  And then you said you would leave them with --
12 you would give them some marketing materials in an envelope;
13 is that right?
14     A.  No.  This was an item we made which happened
15 to be the size of a large postcard.  I'm calling it a
16 postcard.  It wasn't mailed out, but it was a handout that
17 we would show them that -- it's been given to you awhile
18 back, I hope, that showed simply the distribution area.
19     Q.  Let's mark this.
20     (Plaintiff's Exhibit 13 marked.)
21     Q.  I'm handing you what's been marked as
22 Plaintiff's Exhibit 13.  This was provided to us by your
23 counsel.  Now, what is the first page of Exhibit 13?
24     A.  It is an enlarged version of a postcard size,
25 which would have been half of that size.

Page 185

1      Q.  So this is the postcard that you would leave
2  with customers, right?
3      A.  That is an enlarged copy of — I doubt if we
4  ever left it.  We would use it — yeah, it probably have
5  been left with five or six people, 10 people, over the —
6      Q.  Now, on the face of this it says, "We're back!
7  Due May 2010"; do you see that?
8      A.  Yep.
9      Q.  Have you published a book yet?
10     A.  No.
11     Q.  Is there an expected date of publication of
12  the book?
13     A.  The printer hasn't given a dead date, but
14  probably the first week in July.
15     Q.  Why has it been delayed?
16     A.  My errors in digital files.
17     Q.  When you say "errors in digital files", what
18  do you mean by that?
19     A.  We send the books to graphic, to Polylogics,
20  and the files that we prepared, the graphic files — part of
21  it's graphic files, and we did — our sales went too far.
22  We extended our sale season.  The biggest issue would be the
23  sales season, we extended it.  But we are having some
24  electronic file problems with Polylogics which prepares the
25  book for print.

Page 186

1      Q.  Now, you said Polylogics is the company that
2  provided you with the leads list, right?
3      A.  Right.
4      Q.  Is Polylogics the company that also does all
5  of the formating of you for your books?
6      A.  They would literally prepare white pages and
7  yellow pages in the format digitally to send to a printer
8  for printing, correct.
9      Q.  To, for example, if someone wants to put an,
10  advertisement in your yellow pages directory and they have a
11  logo or whatever their art is?
12     A.  Correct.
13     Q.  Do they send it to you?
14     A.  They would give it to me, correct.  I would
15  send that to a graphic artist who we mentioned.  Her e-mail
16  is art@amteldirectory.com.  We would rarely, for any reason,
17  e-mail her.  We would give her hard copies and she would
18  design the ad electronically.
19     Q.  You said she has an address of
20  art@amteldirectory.com.  Who is "she"?
21     A.  Our graphic artist is Lisa Williams.
22     Q.  Where is she based out of?
23     A.  I think her address is Springfield, Ohio.
24     Q.  She's an independent contractor?
25     A.  Correct.

Page 187

1      Q.  What's her arrangement with you?  How does she
2  get paid?  What's her arrangement?
3      A.  As the cash flow allows.
4      Q.  Do you owe her money?
5      A.  Correct.
6      Q.  How much do you owe her?
7      A.  I owed her 7,000.  Don't hold me to this.  I
8  think I paid her 2,500.  So maybe 5,000.
9      Q.  Do you use any other independent contractors,
10  other than the sales team we talked about, the graphic
11  artist Lisa, are there any other independent contractors
12  that you use?
13     A.  No.
14     Q.  So give me a list of all of your vendors.  Who
15  do you owe money to?  Or who do you pay to get your book out
16  is what I'm asking?
17     A.  We would ultimately pay Polylogics for all of
18  their work, which is paid for.  We would pay the printer,
19  which is half paid for.
20     Q.  And that printer is?
21     A.  Liberty Press in Utah.  You pay your sales
22  team.  That's it.  That's it.  Somebody to distribute the
23  book.
24     Q.  Who's your distributor?
25     A.  I don't know yet.  We're negotiating.

Page 188

1      Q.  With whom are you negotiating?
2      A.  A church in town.
3      Q.  A church.  What church is that?
4      A.  I don't know their name.  They've done it for
5  years.  I don't remember what the name of the church is.
6      Q.  Who's your contact at that church?
7      A.  Bruce Thoma, T-H-O-M-A.
8      Q.  And have you ever distributed — let me ask
9  you this.  When you owned your directories business from '94
10  to 2002, who was your distributor?
11     A.  We had several.  Often we would get a lot of
12  independent people that just wanted to deliver 500 books,
13  1,000 books.
14     Q.  Do you need to take a break?
15     A.  No, no, no.  I'm thinking Thoma came on at the
16  last and his church delivered them for me, I'm thinking.  I
17  know they did for Barney for several years.
18     Q.  So, other than the distributor, the printer
19  your art person, your two salespeople —
20     A.  And Polylogics.
21     Q.  And Polylogics, do you have any other vendors
22  or entities to whom you pay to get your book published?
23     A.  I'm trying to think.  No.  No.
24     Q.  Now, I want you to go back to Exhibit 12,
25  which we were looking at a few minutes ago.

Page 189

1    A.  13.
2    Q.  You're right, 13.  Pardon me.  I want you to
3  look at page two.  What is page two?
4    A.  That is a copy of an advertisement in the
5  Urbana Daily Citizen.
6    Q.  When did this advertisement run?
7    A.  I'm going to say early/late January 2010 or
8  early February 2010.
9    Q.  Now, at the bottom it states, "Has ownership
10  rights to use the name AMTEL", and you've checked both
11  Amtel, American Telephone Directories, Inc., and Yellowbook
12  Amtel; is that right?
13    A.  That's correct.
14    Q.  Was this your idea to ad this or who drafted
15  this document?
16    A.  I did.
17    Q.  Who did all of the drafting of your
18  advertisements for your business?
19    A.  The only advertisements we had are the two
20  that are attached here, and I did.
21    Q.  I take it you never contacted Yellowbook about
22  your using the Amtel mark?
23    A.  Correct, I did not.
24    (Plaintiff's Exhibit 14 marked.)
25    Q.  Sir, I'm handing you what's been marked as

Page 190

1  Plaintiff's Exhibit 14.  This is a document that you brought
2  with you today.  Would you describe for me what this is?
3    A.  It's a two-sided piece of paper from which you
4  would draw a customer's ad, depending on the size of it, to
5  give to a graphic artist for them to design the ad.
6    Q.  So I'm understanding it.  This is something
7  you give your customers for the purpose of getting their
8  logo to put in your book?
9    A.  The sales rep. would have this and -- the
10  sales rep. would write on this the pertinent information to
11  give to a graphic artist so the graphic artist could design
12  an ad for the customer.  You use the word logo loosely, and
13  they put more than a logo.  It would be their ad.  And, no,
14  the customer would not receive this.  This would be
15  something that the salesman used.
16    Q.  So this would be given to a graphic artist,
17  for example?
18    A.  Correct.
19    Q.  And they would write out all of the specs or
20  whatever they need for the ad in there?
21    A.  No, the salesman would write the information
22  on here for the graphic artist for her to create an ad.
23    Q.  And then this is given to the graphic artist?
24    A.  Correct.
25    Q.  And then they would do their work?

Page 191

1    A.  Correct.
2    Q.  How long have you been using this document?
3    A.  Since the inception of the company.  The new
4  book rather.  August of '08.  Or, excuse me, '09.  Yeah,
5  '09.
6    (Plaintiff's Exhibit 15 marked.)
7    Q.  Sir, I've marked Plaintiff's Exhibit 15.  This
8  is also a document that you brought today.  And I would ask
9  that you please explain what this is for me.
10    A.  This happens to be a two-page proof sheet that
11  would -- that I would send to a customer after my salesman
12  had filled out the sheet we're calling Exhibit 14, the copy
13  sheet.  This is the proof of the advertising, which was the
14  ad that the graphic artist designed.  It happens to be a two
15  part simply because this ad won't fit on the front page by
16  itself.  So the customer would receive this, review it and
17  approve or ask for more changes and send it back to me.
18    Q.  So if I understand, page two, for example, is
19  for the Urbana Conference Center; is that right?
20    A.  Which is referenced on the front as the
21  customer, correct.
22    Q.  So this is an example of one of the proofs
23  that you have sent to an actual customer?
24    A.  Correct.
25    Q.  And this is dated on the front of page one

Page 192

1  6/10 of '10; is that right?
2    A.  That is correct.
3    Q.  And is that the date you actually sent it to
4  the customer?
5    A.  That the date that the ad was revised.
6    Q.  Okay.
7    MR. LENOX:  Let's mark these together.
8    (Plaintiff's Exhibit 16 and 17 marked.)
9    Q.  Sir, I'm handing you documents 16 and 17 which
10  you produced today at your deposition.  Let's start with 16.
11  Could you please tell me what this document is?
12    A.  Well, that's a copy of, obviously, a number 10
13  envelope that I was attempting to give you anything that I
14  had with Amtel on it at your request.  I was just trying to
15  gather anything per your request.
16    Q.  So that's the envelopes you used for all
17  correspondence or any routine documents that you've sent via
18  post?
19    A.  On 16 is correct.
20    Q.  Now, what is 17?
21    A.  17 is a number nine envelope, which we give to
22  customers when we sent them a proof for ease of them to send
23  their proof back to us.
24    Q.  So this is the equivalent of a
25  self-addressed envelope to give to a customer to send back

Page 193

1  to you, right?
2      A.  A return envelope, correct.
3          (Plaintiff's Exhibit 18 marked.)
4      Q.  Sir, we've marked Exhibit 18. It's a document
5  that you produced today also. It's from Brown Publishing
6  Company; is that right?
7      A.  Correct.
8      Q.  What is this document?
9      A.  It's a copy of a statement to Red Rabbit for
10 advertising. It's a statement that — it's the best record
11 of the amount of the one ad I ran in the Urbana Citizen or
12 with Brown Publishing at your request. It identifies the
13 $497.80 due and/or bill at your request. You wanted to know
14 how much I spent on advertising.
15     Q.  So I'm clear. You spent $528 to run an ad in
16 the Urbana paper, right?
17     A.  No, sir, the far right, 497.80.
18     Q.  I'm sorry. So you paid 497.80 to run an ad in
19 the Urbana paper; is that correct?
20     A.  That's correct.
21     Q.  And which ad did you run?
22     A.  It would be page two of Exhibit 13. And it
23 ran two times, I believe.
24     Q.  And I may have asked you this, and if I did, I
25 apologize. Do you recall what dates or what publications

Page 194

1  that ad ran?
2      A.  Yeah, we did discuss it. And it was late
3  January, early February of 2010.
4          MR. HECKMAN: I think he said what
5  publication.
6      A.  What was the question?
7      Q.  No, I asked him on what date did they run?
8          MR. HECKMAN: I'm sorry.
9      A.  Yes, late January '10, or early February '10.
10 And I will provide you with the exact statement, I just
11 couldn't find it.
12     Q.  Thank you.
13     A.  And if I can't find it it's because they won't
14 give me anything because of an order you sent them. So if I
15 can't produce a copy of it, you may have to. And I'm giving
16 you my permission.
17     Q.  Now, when you would go and sell spots in your
18 book to the local businesses as you discussed, did anyone
19 ever ask you if you were affiliated with Yellowbook?
20     A.  Not me personally. Nor am I aware of anybody
21 asking the sales reps. On a phone call, they would. But in
22 a person to person, no.
23     Q.  So I understand --
24     A.  I'm talking me as well. I can't speak for the
25 other sales reps.

Page 195

1      Q.  I thought I had you, but you just lost me.
2  Let me ask you about you personally. In any of the times
3  that you were selling to any businesses or customers for
4  your new book, did any of them ever come up to you or ask
5  you if you were affiliated with Yellowbook?
6      A.  Nobody asked me that.
7      Q.  Did any of your sales reps ever tell you that
8  customers had asked them whether they were affiliated with
9  Yellowbook?
10     A.  No, they specifically did not ask me that —
11 or tell me that.
12     Q.  As you sit here today, do you have any
13 knowledge of any customers or potential customers asking
14 whether there was an affiliation between your book and
15 Yellowbook?
16     A.  The response I gave you was, not when we were
17 on premises, but on the telephone, adamantly, pretty much
18 the first thing out of anybody's mouth was, "Are you
19 Yellowbook?"
20     Q.  How often did you get solicitations by
21 telephone?
22     A.  No, sir, we would solicit some small accounts
23 by phone, and they would ask us, "Are you Yellowbook?"
24     Q.  Okay. And when you would call and solicit
25 these people by telephone, did you have a script that you

Page 196

1  would use?
2      A.  No.
3      Q.  When you would call people and solicit them
4  over the telephone, what would you tell them?
5      A.  Ninety-nine out of a 100, or even better than
6  that, 499 out of 500, "Hey, Cathy, this is Steve. We're
7  bringing the book back like you used to love it." "Well,
8  thank God, Steve."
9      Q.  Let me ask you this. On how many occasions do
10 you recall potential customers asking if you were
11 Yellowbook?
12     A.  Nobody physically asked me if I was
13 Yellowbook.
14     Q.  When I say that, I meant over the phone.
15     A.  When I solicited over the phone or in person,
16 I was talking to people that knew me. So nobody ever asked
17 me if I was Yellowbook personally.
18     Q.  So if I understand you correctly, it did
19 happen over the phone, correct?
20     A.  Correct.
21     Q.  And that it happened to your other sales
22 folks, correct?
23     A.  It happened over the phone to Mr. Morman that
24 I was aware of and heard.
25     Q.  Describe that circumstance to me with respect

Page 197

1  to Mr. Morman being asked over the telephone if he was
2  Yellowbook or affiliated with Yellowbook?
3      A.  My office is about five yards from the area
4  from where he was soliciting by the phone and I kept -- he
5  would say, "Hi, this Phil", that was specifically what he
6  was saying. "We're bring the big, full-sized phone book
7  back. Steve Brandeberry is bringing the phone book back."
8  And he'd start laughing, and this went on for hours, hours.
9  And finally I asked him, I said, "Phil, what the hell's
10  going on?" He said, "The first thing these people want
11  to know is, are we Yellowbook." And he said, "I would
12  distance myself as far from Yellowbook", and the customers
13  would reply, and this is what Mr. Morman would tell me,
14  "Thank God. We don't want anything to do with Yellowbook."
15  And we'd proceed to sell them an ad.
16      Q.  When Mr. Morman would contact potential
17  customers, would he tell them that he was -- what was his
18  speech?
19      A.  I don't know. I'm sure it was very similar,
20  hi, I'm Phil Morman. Steve Brandeberry is bringing back the
21  full-sized Champaign County phone book.
22      Q.  You ever hear Mr. Morman mention the name
23  Amtel Directories?
24      A.  Certainly.
25      Q.  That was part of his speech, if you will?

Page 198

1      A.  There was no speech. He may have said it, but
2  there was no pattern, bullet points, or talking points. It
3  was just -- I'm sure the name of Amtel did arise.
4      Q.  Did your other salesperson --
5      A.  Annalease.
6      Q.  Ms. Alease?
7      A.  No, Annalease Matheson.
8      Q.  Ms. Matheson, thank you. Did Ms. Matheson
9  ever tell you that people asked her if there was any
10  affiliation between you and Amtel? Or between you and
11  Yellowbook? Pardon me.
12      A.  To my very best recollection, nobody asked if
13  we were affiliated with. They wanted to know specifically
14  that we were not Yellowbook. It was just a plea that, if
15  you're anything to do with Yellowbook, we don't want nothing
16  to do with you. It's kind of a good feeling.
17      Q.  Did anybody ever ask you or inquire how you
18  and Yellowbook were both using the name Amtel?
19      A.  One or two people would say, "How can you do a
20  new book? Didn't you have a non-compete and/or" -- it was
21  out of their ignorance, how can you start a new phone book.
22      Q.  Who were those two people?
23      A.  I mean, there was more than two, but, again,
24  it was just -- it might be in a crowd of 20 people at a
25  party and somebody would say -- I can't imagine -- I can't

Page 199

1  tell you specifically.
2      Q.  So you can't name specific names for me, is
3  that what you're telling me?
4      A.  Of the 500 people I talked to, you know,
5  almost every one of them would have said, how can you do
6  this? It would be easier to tell you who didn't. Several
7  would ask, well, Yellowbook says you're not printing a book.
8  We can't print a book, we've sued you. You've got a cease
9  and desist order. So I would have to explain to them --
10  that's what I spent more time putting fires out because
11  Yellowbook, the sales reps were saying horrendous things.
12  We were met with huge, gracious open arms. There was no --
13  again, the people we saw wanted nothing to do with
14  Yellowbook.
15      Q.  Well, that wasn't really my question. My
16  question is, has anybody asked you how you can use the name
17  Amtel or Amtel Directories when Yellowbook is presently
18  using it; has anybody asked you that, customers?
19      A.  No, nobody has asked me that question.
20          MR. LENOX:  Let's mark this.
21          (Plaintiff's Exhibit 19 marked.)
22      Q.  Sir, I've hand you Exhibit 19. This was just
23  produced by you today. And at the top of this page it's
24  dated November 23rd, 2009; do you see that?
25      A.  Yes.

Page 200

1      Q.  And at the top it also says, "Fax cover 1
2  additional page"; do you see that?
3      A.  Yes.
4      Q.  And it also says, "Angela." who is Angela?
5      A.  She's a manager or owner of a Servepro
6  franchise in Urbana or Clark County.
7      Q.  What is Servepro?
8      A.  I think, you have fire damage, they come in
9  and fix your place up.
10      Q.  What were the circumstances surrounding you
11  sending this letter to Angela?
12      A.  This was one of the few people that Annalease
13  had spoke with. The lady wasn't familiar with our name.
14  And the attachment to this would have been what you're
15  calling page one of this Exhibit 13. That's pretty much it.
16  The lady wanted to know about our company. And this is the
17  only letter I ever sent -- or any conversation I had -- or,
18  excuse me, that's not true. Any writing or e-mails that I
19  ever had for Annalease. And, again, just in trying to rack
20  my brain, you wanted anything that I had, and I ran across
21  this and I brought it.
22      Q.  Did Proserve (sic) or Angela in any way
23  express concern about their ability to publish in your book?
24      A.  I don't think your question said what you
25  wanted to say. Rephrase your question.

96660a03-976f-425f-9689-e1c0adf4d53b

Page 201

1    Q.  Well, I think it was what I wanted to say, but
2  I'll ask it again.  Did Proserve or Servepro, whatever the
3  company was, or Angela to whom you sent this document, have
4  any concern about their ability to be published in your
5  book?
6    A.  They wouldn't publish.  I'm not a publisher.
7  To advertise in my book.
8    Q.  Okay.  I understand now.  So, yes.  And my
9  question is, did Angela or Proserve or Servepro ever express
10  any concern about their ability to place ads in your book?
11    A.  No concern.  They were asking for information
12  about the book.
13    Q.  Did they ever -- anyone, be it Angela or
14  anyone at that company, ask about your use of the Amtel name
15  or mark?
16    A.  I never spoke with Angela.  I was merely kind
17  of giving a -- if you look at any -- the very people -- the
18  only piece of marketing we have, just stating the facts
19  about Amtel Directories.  I never spoke with Angela myself.
20    Q.  Do you know whose account this was on your
21  sales team?
22    A.  We discussed that.  Annalease.
23    Q.  Did Annalease ever express to you that Angela
24  had concerns about advertising in the book?
25    A.  I don't recall any concern other than she

Page 202

1  wanted to know which -- people that are unfamiliar with
2  buying, advertising, blah, blah, blah, would say, well, just
3  give me some information.  Kind of a come back later.  Just
4  send me some information.  Just kind of blow you off.
5    MR. LENOX:  Let's mark this.
6    (Plaintiff's Exhibit 20 marked.)
7    Q.  Sir, we've marked Exhibit 20, which appears to
8  be a letter dated February 3rd, 2010; do you see that?
9    A.  Yes.
10    Q.  What is this letter?
11    A.  It's a reiteration of all of the facts that
12  any of the letters that we just -- number 19 and any of --
13  the postcard, Exhibit 13, just, again, a reiteration of the
14  information that we would tell our customers.  Obviously
15  prepared by me.  Probably sent -- not sent.  Probably
16  printed four or five times to hand to customers after an
17  incident would happen in Urbana with the Yellowbook reps.
18    Q.  Which four or five customers were presented
19  with this document?
20    A.  I'm assuming four or five did.  I don't -- I
21  physically handed this to nobody.  When Phil did --
22  Annalease, she wasn't working at this point.  If Phil handed
23  it to two or three people, I don't know.
24    Q.  Do you know, as you sit here today, whether
25  Phil did indeed give this to anybody?

Page 203

1    A.  I do not know for a fact.
2    Q.  You said this was developed as part of an
3  incident in Urbana.  What incident was there in Urbana that
4  prompted --
5    A.  After an incident in Urbana.  Several of which
6  happened.  Yellowbook reps would go in to advertisers, one
7  of which was a dear friend of mine.  We have a town of 10 or
8  12,000.  I've known her for 30 years.  She says, and this is
9  -- she owns the Under Cut Beauty Salon.
10    Q.  What's this person's name?
11    A.  A dear friend of mine.  I've known her
12  forever.  Shoot.  Heather Downs, D-O-W-N-S.  She's the owner
13  of -- she relates to me that this was the seventh time that
14  a Yellowbook rep. came in.  She called in tears to my office
15  saying, Steve, I've told them to leave, don't come back.
16  And now the sales rep. is telling me that she can't cancel
17  because she has to speak to his manager out of Dayton and
18  sign some forms.  And she was just frazzled.  Within that
19  same day or two, several clients, the second of which was
20  Kurt Scott of the Shirt Stop, said a gentleman came in, a
21  different gentleman, for the fifth, if not sixth or seventh
22  time, to sell him his ad.  And Mr. Scott was quite upset,
23  stood up, got up out of his desk and told the man, if he
24  ever comes in again, he's calling the police.  And he
25  physically didn't care, just like the letter says, "I don't

Page 204

1  care what Steve Brandeberry calls it."  These people would
2  say, "Well, we're Amtel.  We're Amtel.  We're Amtel."  And
3  Mr. Scott says just what it says here, and I'll read it,
4  "Recently, a local business owner told me", and the business
5  owner was Mr. Scott, "told me a part of a conversation he
6  had with his Yellowbook sales representative.  He told the
7  Yellowbook representative, 'I don't care what Steve calls
8  his Champaign County phone book.  It's a better product.'"
9  That's exactly what I've heard -- and that's what I've heard
10  from hundreds of people.  He specifically said, "I don't
11  care if he calls it the toilet paper book, I want to be in
12  Steve's book."  And the Yellowbook people keep saying,
13  "Well, we're Amtel.  We're Amtel."  It doesn't take a wise
14  person to see that they weren't producing the same product
15  that I was producing.  So that's what spawned this letter,
16  if it ever even got to anybody.  I didn't give it to
17  anybody.  The story was related to many people.
18    Q.  So you said in this letter, "This is exactly
19  what I heard from hundreds of business owners, managers, and
20  residents of Champaign County".  Did anybody else, other
21  than Mr. Scott, make these similar statements regarding not
22  caring what you called your book?
23    A.  This was related to me by Mr. Scott, that he
24  was referring to what his conversation was to the Yellowbook
25  rep.  I don't know what other people said to them

Page 205

1  specifically.
2       Q.  Now, in paragraph three, you lay out what I
3  would call the chain of the sale of assets, at least as you
4  see it.  Why did you put this in this letter?  Were people
5  asking you about that?
6       A.  A few people would ask, how can I use the name
7  Amtel.
8       Q.  And my question, and I think I asked it
9  earlier is, who specifically asked you how you can use the
10 name Amtel?
11      A.  It would be safe to say probably 80 percent of
12 the people on that list would have said that, for ease of
13 names of people, 80 percent of the file.
14      Q.  So when you say 80 percent of the people,
15 you're talking about 80 percent of the stack of contracts
16 that you have produced to us today?
17      A.  Let's back it up to 50 percent just out of
18 inquisitiveness, well, how can you use the name Amtel.
19      Q.  So that was a pretty regular question amongst
20 potential customers?
21      A.  It wasn't a question.  It was an inquisitive
22 remark.  It was a remark.
23      Q.  But it came up a lot, right?
24      A.  Yeah.
25      Q.  Eighty percent of your customers?

Page 206

1       A.  I would say 50.  A better response would be
2  50.  You know, I believe, I'm not chatting, I believe that
3  came because the Yellowbook reps were adamant that they were
4  Amtel and that I was not going to print a book and I was --
5  had -- just couldn't print a book.
6           MR. LENOX:  Let'S go ahead and mark this.
7           (Plaintiff's Exhibit 21 marked.)
8       Q.  Sir, I've handed you Exhibit 21.  And this is
9  a letter dated January 20th, 2010; do you see that?
10      A.  I do.
11      Q.  And it appears that this is a very similar
12 letter to Exhibit 20 but it's a little bit different; would
13 you agree with that?
14      A.  Yes.
15      Q.  And if you'd set these two documents, 20 and
16 21, side by side, at least the first pages, would you agree
17 with me, and I have not admittedly gone through this --
18 well, let me ask you this question.  Why was Exhibit 21
19 drafted and by whom was it drafted?
20      A.  It would be by myself.  I would have drafted
21 it.
22      Q.  Why did you put together Exhibit 21?
23      A.  The document in its entirety was produced to
24 be what I would consider more proof positive that I could
25 continue to produce a phone book to give to anybody that

Page 207

1  would be questioning it.
2       Q.  Did you distribute this document to anybody?
3       A.  Personally, I may have shown it to some people
4  that were in my office.  I never would hand it out.  I mean,
5  I could speak for myself.  It probably was sent to two or
6  three people.
7       Q.  To whom was it sent?
8       A.  I don't know.
9       Q.  Who of your sales force sent out this letter?
10      A.  If it was sent, Phil.
11      Q.  You said you personally showed it to two or
12 three people; is that right?
13      A.  I'm confident I showed it to several people in
14 the office, correct.
15      Q.  Who did you show it to?
16      A.  Off the top of my head, Brad Yocum.
17      Q.  Who's Brad Yocum?
18      A.  A gentleman from Florida that came in to see
19 me and say hi.
20      Q.  Does he live in Urbana?
21      A.  A gentleman from Florida.  He was from Urbana,
22 but he was visiting.  Again, this was not brought up by any
23 -- you know, it wasn't like a customer coming in and saying,
24 how can you -- it was more of a conversation piece.  Here's
25 when I bought the company.  Here's what Barney bought.  Let

Page 208

1  the cards fall where they may.  It was not used to coerce or
2  sell.  It was an information piece should somebody ask.
3       Q.  I want to make sure I understand.  Is Brad
4  Yocum an old friend of yours that was visiting from Florida?
5       A.  Correct.  He would buy advertising, that's
6  correct.  I remember specifically showing Brad.
7       Q.  Did Brad ask you something about the Amtel
8  name or mark?
9       A.  In conversation it was, you know, how can you
10 do this?  How can you do a phone book?  Didn't you have a
11 non-compete?  Just the same old buddy/buddy conversation.
12      Q.  Other than Brad Yocum, to whom did you show
13 this document?
14      A.  I couldn't tell you.
15      Q.  But other than Brad, you recall at least a few
16 other people that saw this?
17      A.  Certainly.
18      Q.  And it's your testimony that none of them were
19 customers?
20      A.  They could -- it was never showed to
21 somebody -- I never showed it to anybody as part of the
22 sales presentation.  This document, 21, in its entirety.
23      Q.  Now, as part of this document, you also had
24 included three exhibits; is that right?
25      A.  That's correct.

Page 209

1    Q.  And Exhibit A is the license agreement, right?
2    A.  That's correct.
3    Q.  And it's redacted a bit, right?
4    A.  I don't mean to be ignorant.  What's redacted
5    mean?
6    Q.  Blacked out.
7    A.  That's correct.  I'm sorry.
8    Q.  It looks like you redacted the money, the
9    sales price, right?
10   A.  That's correct.
11   Q.  And then you showed a contract for the sale of
12   assets, right?
13   A.  That's correct.
14   Q.  You also blacked out the dollar figures for
15   that, right?
16   A.  That's correct.
17   Q.  And then you put some arrows up there around
18   some language in paragraph one, right?
19   A.  That's correct.
20   Q.  And then you also put your State of Ohio
21   certificate with respect to the Amtel Directories name,
22   right?
23   A.  That's correct.
24   Q.  Is there any reason you didn't include Exhibit
25   A for the July 3rd, 2002, agreement with Mr. White and his

Page 210

1    company?
2    A.  Say that again.
3    Q.  Any particular reason why you didn't include
4    the rest of this agreement, the agreement with Mr. White?
5    A.  Excuse me.  You're pointing at B?
6    Q.  Yes.
7    A.  That's it.
8    Q.  Well, there's attachments to this agreement,
9    right?  There's exhibits to it, right?
10       MR. HECKMAN:  Oh, I didn't understand the
11   question.
12   A.  Yeah, I didn't understand that.  So you're
13   asking me why I did not attach --
14   Q.  The balance sheet that accompanies this
15   document.
16   A.  Again, this wasn't something that was put in
17   the newspaper.  It was just something that I prepared.
18   Q.  I understand that.  That wasn't my question.
19   My question is, why didn't you do that?  Why didn't you
20   include the whole document in its entirety?
21   A.  It never even crossed my mind.  And it would
22   have been a black piece of paper with the financial
23   statements.  It never crossed my mind.  It never crossed my
24   mind.  I did hand this to Dan Mangan, I believe, the
25   manager, probably, and you've got a copy of it from Mr.

Page 211

1    Mangan.
2    Q.  When did you give this to Mr. Mangan?
3    A.  I'm trying to think.  When they were doing
4    their canvass, after they were having such trouble selling.
5    Mr. Mangan, a manager and several other managers and a bunch
6    of people came to Urbana and tried to sell.  And he was
7    trying to convince the chamber to be on his side and -- so
8    the chamber called me and said, "Steve, we don't want to be
9    in the middle of it."  And I said, "Don't worry a bit about
10   me, just do whatever you have to do."  Whether they were
11   soliciting their support, I have no idea.  But I saw Dan and
12   I had a copy of it, because I did show the chamber.  So
13   there again, I showed the chamber president.
14   Q.  Well, which document did you show the chamber?
15   A.  21.
16   Q.  So this went to the chamber president.
17   A.  I didn't go to her.  I showed it to her,
18   that's correct.
19   Q.  Did it go to anybody else in the chamber other
20   than the president?
21   A.  I didn't go to her.  I showed it to her.  I
22   didn't leave a copy with her.  I gave a copy to Dan Mangan.
23   When I was walking out, he was coming in.
24   Q.  So you gave it to Dan Mangan or you gave it to
25   the chamber chair or chamber president?

Page 212

1    A.  I didn't give it to her.  I showed it to her.
2    Q.  Sorry.
3    A.  That's all right.
4    Q.  And you showed it to Mr. Yocum?
5    A.  That's correct.
6    Q.  Is there anybody else that you can recall
7    receiving Exhibit 21?
8    A.  Mr. Yocum didn't receive it.  I showed it to
9    several people, and I truly cannot remember any other
10   specific names.
11   Q.  When you came in contact with Mr. Mangan, what
12   was discussed?
13   A.  I said, "Hi, Dan."  I don't know there was a
14   discussion.  I don't know how it specifically went.  I said,
15   "Dan, I'd like to buy you lunch and talk to you sometime."
16   and he was very, probably, startled he saw me.  "I don't
17   want to have lunch with you."  I said, "Well, Dan, you've
18   got sales reps that are saying terrible things about me."
19   And this was early in their canvass.  I'm going to say
20   January.  I said, "You've got sales reps saying terrible,
21   terrible things about me", and I said, "I'd think you'd want
22   to know that."  Just kind of inquisitive that he -- I mean,
23   it's good to know that -- this was early January.  And I
24   said, you know -- he said, "Well, I'm sure they're not
25   saying anything they shouldn't say or nothing bad."  And,

## Page 213

1 "Well, they are." I said, "As a matter of fact, I want to
2 buy you lunch." And I was making a point that -- "well,
3 hey, I don't want lunch from you", he said, And I said,
4 "Well, I want to take you right across the street, because
5 the owner of Robert's Restaurant right across the street",
6 he could see it, "had called me and said that their sales
7 reps had said terrible things about me." And I said, "I
8 just want you to hear it from, right from his mouth."
9 And his name is Bob -- or Robert? What's his name? Robert,
10 Bob. Roberts on Miami, the owner of Roberts on Miami
11 restaurant. Of course, Dan didn't want to have lunch with
12 me, and I didn't want to have lunch with him. And I did
13 hand it to Dan. I said, "Dan, here, here's a copy of this.
14 This might help you. You won't have to find it from
15 somebody else", maybe that's what I said. That was it.
16    Q. Other than that conversation with Dan Mangan,
17 have you had any other conversations with him about your
18 publication of the book?
19    A. With him or anybody at Yellowbook?
20    Q. Let's start with him.
21    A. No, I never spoke to him again.
22    Q. Have you had any other conversations with any
23 employees of Yellowbook about the publication of your book?
24    A. Boy, I really have. It's kind of cute.
25    MR. HECKMAN: Can we take a break for a couple

## Page 214

1 of minutes?
2    MR. LENOX: That's fine.
3    (Break taken.)
4    MR. HECKMAN: Bryce, you were on the area of
5 who all he talked to from Yellowbook, and I think that would
6 be a good area to end on for from the day. But there are a
7 few more questions that you wanted to ask on that probably.
8 It is almost 4:00, and I need to get some copies. So I
9 suggest we ask a few more questions on that and then we
10 adjourn for the day and we'll talk about resetting.
11    MR. LENOX: I mean, I can go -- I've got more.
12 So, I mean, I could sit here as -- you know. Are you
13 telling me we're shutting her down at 4:00?
14    MR. HECKMAN: That's what I am proposing to
15 do.
16    A. We've got a two-hour trip, too. You've got to
17 respect that. We can come back.
18    (Off-the-record discussion.)
19    MR. LENOX: Go back on the record.
20    A. I would like to answer the question.
21    Q. Yeah, we'll go back into that.
22    MR. LENOX: We took a break and, I guess, for
23 the record, I want to -- I've got a few more questions in
24 this area. We're not going to finish today for a variety of
25 reasons, because we're not done, and because there's,

## Page 215

1 obviously, a lot of documents that need to be produced that
2 we haven't seen yet that will certainly produce more
3 questions on relevant topics. So with that said, I have the
4 agreement of counsel that we are going to reconvene at
5 another date; is that correct?
6    MR. HECKMAN: That's true. I mean, I'm not
7 foreclosing the fact that you can't have a guy in two times.
8 Sure you can, if it's necessary.
9    MR. LENOX: Well, we're going to leave it open
10 then. And with that, I'm going to ask a few more questions
11 and counsel has asked that, in light of the fact that we're
12 coming back, that we end for the day. I'm more than willing
13 to keep going, but if you want to stop, we can stop.
14    MR. HECKMAN: Well, this is the longest
15 deposition I've had in 35 years of practice, for the record.
16 So, yeah. So, yeah, that's part of my calculus, too. So go
17 ahead. But I understand, there's a lot of info here.
18    MR. LENOX: Could you read back the last
19 question for me?
20    (Pending question read back.)
21    A. Having talked to Dan Mangan, I received a
22 phone call from the gentlemen to your right, Mr. John
23 Butler, who represented himself as the senior counsel for
24 Yellowbook. He called me at the Red Rabbit. It was a
25 scathing phone call, rambling and, what the heck do I think

## Page 216

1 I'm doing printing a phone book with his name on it. So I
2 did speak to him. He was rambling quite weirdly. And I
3 said, "Sir, I'm not going to put up with this abuse. Why
4 don't you call my attorney." At which point he said, "I'm
5 not calling your attorney." I said, "Better yet, sir, let
6 me give you my attorney's -- or give me your phone number
7 and I'll have my attorney call you." I immediately called
8 my attorney who had had the original letter that was sent to
9 me from some lady as their counsel. I was informed that my
10 attorney had called this lady two or three times with no
11 response from her. And then maybe a week later, possibly a
12 week later, the gentleman which I mentioned, J.D. House that
13 works for me, after telling Mr. -- this gentleman down here.
14 I forget his name. -- that I was of counsel, he called back
15 to my Red Rabbit office asking for me and gave a -- rant and
16 raved to an employee that answered the phone, that, quote,
17 unquote, "They were going to bury me in court". And he told
18 my sales rep -- or not a sales rep. That was Mr. House that
19 works for the Red Rabbit. Other than that, I've had no
20 other conversation with anybody from Yellowbook.
21    Q. So other than Dan Mangan and Mr. Butler --
22    A. Yes.
23    Q. Those are the only two conversations you've
24 had with any Yellowbook employees about your publication?
25    A. A current Yellowbook and/or current at the

Page 217

1    time, that's right.
2         (Plaintiff's Exhibit 22 marked.)
3         Q.  Sir, you referenced receiving a letter; is
4    that right?
5         A.  That's correct.
6         Q.  This is marked Exhibit 22, and I want you to
7    take a look at that letter.
8         A.  Yep.
9         Q.  This is dated January 15th, 2010, and from
10   Laura Massaro at Yellowbook?
11        A.  Yep.
12        Q.  And that's to you, correct?
13        A.  Correct.
14        Q.  And you recall receiving this letter?
15        A.  Correct.
16        Q.  Once you received this letter, what did you do
17   with it?
18        A.  Immediately faxed it to my attorney that
19   handled my case against Barney White.  I'm not giving you
20   his name, I apologize, I can't think of it.
21        Q.  And what did that attorney -- do you have him
22   on a retainer of any sort?
23        A.  Do not.
24        Q.  Did you retain him in any way to represent you
25   in this matter?

Page 218

1         A.  No.
2         Q.  Did he give you advice with respect to this
3    letter?
4         A.  I did ask him, what do I do.
5         MR. HECKMAN:  Don't say --
6         A.  No, that's it.
7         Q.  How long was your telephone call with respect
8    to this letter?  Did you talk to him on the phone about this
9    letter?
10        A.  My attorney?
11        Q.  Correct.
12        A.  I'm sure I did.  I'm confident I did not talk
13   to him -- I left a message that I was going to fax this to
14   him.  And he probably called me in a couple of days or
15   something.  He was in a trial, I believe.  I did not speak
16   to him immediately.
17        MR. LENOX:  If you want to end for the day?
18        MR. HECKMAN:  Yeah, let's quit for the day.
19        MR. LENOX:  I'm at a breaking point.  I can
20   keep going if you guys want to keep rolling along, I'm
21   perfectly willing and able to do that.
22        MR. HECKMAN:  No.  Let's go off the record.
23        (Deposition stopped at approximately 4:00
24   p.m., to be continued.)
25

Page 219

1
2    _____
3         STEVEN M. BRANDEBERRY
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 220

1              C E R T I F I C A T E
2    STATE OF OHIO    :
3                       SS
3    COUNTY OF HAMILTON:
4         I, Julie Patrick, Notary Public for the State of
5    Ohio, duly qualified and commissioned, do hereby certify
6    that before giving of his deposition, the within-named
7    STEVEN M. BRANDEBERRY was by me, Julie Patrick, first duly
8    sworn to depose the truth, the whole truth, and nothing but
9    the truth; that the foregoing is the deposition given at
10   said time and place by the said STEVEN M. BRANDEBERRY; that
11   said deposition was taken in all respects pursuant to
12   agreement as to time and place; that said deposition was
13   taken by me in stenotype and transcribed into typewriting by
14   computer under my supervision; and that the signature of the
15   deponent was requested and can be affixed outside the
16   presence of the Notary Public.
17        I further certify that I am not counsel, attorney,
18   relative or employee of any of the parties hereto, or in any
19   way interested in the within action, and that I was at the
20   time of taking said deposition a Notary Public for the State
21   of Ohio.
22        IN WITNESS WHEREOF, I have hereunto set my hand and
23   Notarial seal this _____ day of _____, 2010.
24        _____
25   My commission expires        JULIE PATRICK
25   March 13, 2014        NOTARY PUBLIC - STATE OF OHIO

**A**

ability 63:6 73:2
129:1,6 200:23
201:4,10
able 93:10 166:20
218:21
absolute 132:25
absolutely 61:12
99:9 157:6
160:18
abuse 216:3
accelerated 60:10
60:12,17
accelerating 60:18
accept 120:15
accepted 41:8
access 50:18
105:23 113:3
accident 12:20
14:1,3,5
accommodate
153:3
accompanied 44:7
62:21 165:5
175:3,6
accompanies
210:14
accompany 43:25
44:16 175:9
account 18:7,10,13
18:16 19:8 153:6
173:7,11,12
201:20
accountant 24:12
24:13,14 33:5,6
33:15 98:23
100:19,20 101:2
101:5,8 112:18
accounts 19:1 55:6
99:23 120:23
195:22
accuracy 114:15
accurate 16:9,11
16:11 17:5 37:17
138:16 180:9
acquire 82:18,25
99:18,20 118:19
119:1 123:11,16
125:21 166:15,17

166:20
acquired 83:4 85:7
114:2 117:14
120:23 121:1,4
121:18 122:3
123:5,21 127:10
127:15
acquiring 76:20
120:17 128:12
act 60:3
acting 176:15
action 220:19
active 27:1 29:5
activities 30:25
33:12
actual 191:23
ad 35:4 38:6,8
82:15 86:15,19
86:22 141:18
153:8 176:4
186:18 189:14
190:4,5,12,13,20
190:22 191:14,15
192:5 193:11,15
193:18,21 194:1
197:15 203:22
adamant 183:18
206:3
adamantly 195:17
add 17:3
addenda 43:25
addition 85:10
additional 85:14
170:8 200:2
additions 17:8
address 5:11,14
21:19 24:3 26:10
26:12,14 113:23
114:10 142:16
143:17 158:3
162:25 167:10
168:4 169:22
172:17,21 186:19
186:23
addresses 5:16
63:6 166:10
167:1,2
adjourn 214:10
admit 78:8,18

admitted 78:7,9,18
admittedly 206:17
admitting 78:5,16
ads 35:10,23 36:16
39:21 175:24
201:10
advance 60:15
advances 121:4
advertise 175:20
201:7
advertised 175:18
175:23
advertisement
186:10 189:4,6
advertisements
34:16 189:18,19
advertisers 203:6
advertising 34:13
39:18 91:10
131:7 151:6
172:11 191:13
193:10,14 201:24
202:2 208:5
advice 131:6 218:2
advise 76:24
advised 128:25
129:14 145:25
advisor 98:25
100:23
affiliate 74:1
affiliated 194:19
195:5,8 197:2
198:13
affiliation 163:9
164:13 165:22
195:14 198:10
Affirmative
152:25
affixed 2:24
220:15
age 5:2
agent 50:5
ago 16:16 34:24
68:13 188:25
agree 39:8 46:1
49:11 52:12,25
56:16 61:15
62:25 63:5 72:17
72:22 74:9 97:6

111:25 118:25
121:20,23 122:15
123:4,10,20
124:8,12,14,17
127:14 128:15
149:11 168:15
206:13,16
agreed 2:15 8:11
11:11 39:11
60:17 94:16 97:5
97:9 109:15
115:10 123:11
124:1 128:11
174:1
agreement 1:17
2:20 6:20 11:11
11:12,15 42:16
44:5 48:2,5 52:11
52:16,17 53:2
54:4 58:7,24 59:3
59:6,11,14,21
60:24 61:10 62:7
62:17,22 63:1,6
63:13 70:17,18
71:10 74:19,19
74:20 98:15
101:8 102:16
103:14 104:7,9
104:24,24 108:21
108:25 112:23
118:16 120:2
121:25 122:12,17
122:20,21,25
123:6,22 124:3,9
125:3,12 127:9
130:14 134:7
136:18 209:1,25
210:4,4,8 215:4
220:12
agreements 6:23
6:24 7:1 43:23
50:19 60:9,22
63:17 100:6
102:17 108:22,23
108:24 110:14,14
130:11
ahead 15:1 54:13
54:13 62:11 73:2
89:15 106:13

109:13 119:7
123:19 142:1
157:14 206:6
215:17
al 1:5
Alease 198:6
Alexander 24:15
24:16,18 33:7
allocated 85:1
allows 187:3
alluded 135:17
alluding 37:6
amalgam 57:18
American 13:15
17:24 23:13 26:3
26:25 27:15 28:9
28:10,18 30:20
31:16 43:7,9
44:20 52:13
70:18 79:22 80:2
80:18 82:3 84:13
84:16,19 85:24
123:1,3 124:22
125:10 138:6
163:1,3,10,11,14
163:17 164:4,7
167:17 189:11
amount 78:1
121:24 122:16
124:5,24,25
135:10,12,15
193:11
Amtel 13:15,15
21:14,15,23 26:8
29:5 30:17,19
34:14 35:12,13
35:14,20,21,24
36:13 37:6,7,19
37:22,23 38:3,12
38:12,15,15 39:8
39:8 52:18 63:7,7
63:11,14,25
64:15 68:2,11,11
70:4 73:11,15,16
74:2,5,7 75:5
77:2 79:14,21,25
80:2,5,5,9,11
81:19,20,23,23
82:1 83:7,8 84:9

92:16 99:7,14
109:16,21 110:1
110:7 111:21
112:9,13 115:11
122:22,22 123:3
123:17 124:11,11
125:6,6 126:2,9,9
127:3,10,11
128:14 129:1
130:22,22 131:13
131:19 135:6
137:9,9,13,13
138:13 139:1,3
139:22 143:9
144:10 147:23
148:15 154:13
158:15,19,25
159:9,21 160:15
160:15 162:15
164:9 166:1,8
168:21 172:12
173:1,3,6 181:8,9
182:21,24 189:10
189:11,12,22
192:14 197:23
198:3,10,18
199:17,17 201:14
201:19 204:2,2,2
204:13,13 205:7
205:10,18 206:4
208:7 209:21
**Amteldirectories...**
166:18
**Amteldirectory....**
166:12 167:5
**Am-Tel** 83:15,18
83:22 106:17
107:7,10,14
108:4 109:22
110:6 118:20,21
125:22,23 131:24
132:3
**Am/Tel** 56:13
61:20 62:5,8 63:2
63:2 64:20 68:1,3
68:5 72:11,19
74:7,10,15,15
75:5,9,9 76:20,21
83:13 124:18,19

149:14
**and/or** 42:7 104:20
117:25 170:12
193:13 198:20
216:25
**Angela** 200:4,4,11
200:22 201:3,9
201:13,16,19,23
**animosity** 50:11
**Annalease** 175:13
179:24 198:5,7
200:12,19 201:22
201:23 202:22
**annual** 56:9
**annually** 40:18
**answer** 73:2 82:5
106:13 107:24
108:23 123:8,19
127:7,24,25
129:5 214:20
**answered** 9:23
68:13 81:22
127:22 216:16
**answers** 15:11,12
15:18,25 16:6
17:1,3
**anybody** 23:8
73:11,14 76:16
147:5 180:15,25
194:20 198:17
199:16,18 202:25
204:16,17,20
206:25 207:2
208:21 211:19
212:6 213:19
216:20
**anybody's** 71:3
195:18
**anyway** 156:22
**apologize** 15:10
31:16 71:8 72:14
113:6 137:10
152:5 167:13
193:25 217:20
**appear** 174:23
**APPEARANCES**
2:2
**appeared** 10:14
77:7

**appears** 45:12 46:7
46:13 55:17
56:11 68:2 202:7
206:11
**appease** 102:19
**applicant** 173:2
**application** 172:9
172:11
**applications**
173:24
**applied** 161:4
**appreciate** 48:16
**approach** 92:7
177:22,22
**approached** 8:8,12
34:15 35:6,21
36:21 38:2 39:11
92:4,4,6 94:7
95:5 150:15
156:16 177:24
**appropriate**
174:14
**approve** 191:17
**approximately**
59:25 121:2
157:23 169:18
177:7 179:15
218:23
**arbitration** 7:10
7:16 144:12,15
144:19 145:25
146:1
**area** 35:17,19
52:12 61:16,24
62:1 93:7,24
152:20 169:22
184:18 197:3
214:4,6,24
**areas** 152:16,18
181:2
**argumentative**
127:18
**arms** 199:12
**arranged** 93:6
**arrangement**
176:9 177:25
187:1,2
**arrangements**
170:24

**arrows** 209:17
**art** 167:4,6,7,8
186:11 188:19
**artist** 87:9,11,13
186:15,21 187:11
190:5,11,11,16
190:22,23 191:14
**art@amteldirect...**
186:16,20
**aside** 136:12
168:15
**asked** 11:5 17:3
40:2,4,9,12 69:4
69:23,25 82:14
102:17 113:6,7
115:23 127:1,22
151:20 153:5
167:13 173:19
183:5 193:24
194:7 195:6,8
196:12,16 197:1
197:9 198:9,12
199:16,18,19
205:8,9 215:11
**asking** 60:23 68:10
80:14 156:13
187:16 194:21
195:13 196:10
201:11 205:5
210:13 216:15
**asks** 150:6
**ass** 146:18
**asset** 11:11,15
27:23,24 42:15
44:5 52:11 55:22
62:22 71:9 74:19
102:16 121:18,18
121:21,21,24
122:3,12 123:21
124:2 127:16
134:7 135:6
**assets** 6:21 11:9
21:14,15 26:8
27:16,21 36:20
44:21 52:18 53:1
54:21 55:18
61:18,20 62:6
63:12 66:12
77:17 78:5,6

82:18,24 92:15
95:19 99:18
103:7 106:18
107:7 108:5,8
109:9,10 115:6
117:5,13 118:2
118:19 119:1
120:7,18,18,23
121:7,14 122:12
123:5,11,16
125:11,21 128:8
128:13,16,20
129:14 130:20
138:6 205:3
209:12
**asset/purchase**
6:20
**assigned** 86:3
**assist** 8:10 23:6
31:20 86:16
87:19 151:20
**assistance** 106:23
**assistant** 23:8
87:16
**assisted** 149:22
151:25
**assists** 23:3
**associated** 57:22
167:2 168:12
**assume** 43:9 45:5
55:6 95:19
117:10 120:11
133:15 136:5
159:24 163:2
**assumed** 113:17
137:21 160:2
**assuming** 17:5
202:20
**assumption** 135:5
**assure** 34:2
**ATT** 43:14,20
133:8
**attach** 210:13
**attached** 111:10
112:25 118:20
125:22 135:7
189:20
**attachment** 200:14
**attachments** 210:8

attempt 10:15
90:21 131:3
attempted 18:22
attempting 192:13
attend 145:2,3
151:6
attending 150:22
attention 70:16
77:4 106:3
attorney 7:17
10:13 14:16
31:20,25 33:3,4
41:20,25 42:2
43:20 48:6,21
51:2 71:6 72:5
98:21 101:13
102:18,18,19,21
102:24,25 104:19
104:21,23 131:7
133:15,16,17,17
134:10 143:23
149:3 216:4,5,7,8
216:10 217:18,21
218:10 220:17
attorneys 174:1
attorney's 30:5
216:6
AT&Ts 39:6
August 155:3
173:20 191:4
August-ish 178:4
August/Septemb...
171:25 172:3
auspices 110:13
126:14 180:8
auto 14:1,3,4 35:10
available 93:5
avenues 59:21
avoid 61:15
award 9:17
awarded 7:24 8:1
135:25
aware 13:1 38:6
70:12 73:16
83:23 90:5
113:11 150:13
172:22 194:20
196:24
awhile 184:17

**A-m** 35:20 65:15
68:6 83:20
126:18,18
**A-M-T-E-L** 79:15
79:16 80:23
139:6
**A-R-T** 167:4
**A-T-T** 139:11
**a.m** 1:20

---

**B**

**B** 135:7 136:5,6
210:5
**baby** 49:20
**back** 8:13,20 9:1,3
11:4 19:6 22:15
35:8,9 39:23
41:16 43:13
46:22 49:15,24
50:8 63:9 67:13
68:18 69:24
70:24 71:8 90:11
93:14 94:23,24
95:7,7,12,17,23
95:24 96:10,15
99:21 101:25
103:2 104:14
105:7 113:19
114:1,23 118:7
118:16 119:4
125:18 126:14,20
128:2,6,7 129:15
130:5,10 131:8
131:21 134:6
144:12 149:6
150:16 155:15,18
158:5 172:1
174:17 177:8
181:1,14,23
182:4,6 183:13
183:14,16 184:18
185:6 188:24
191:17 192:23,25
196:7 197:7,7,20
202:3 203:15
205:17 214:17,19
214:21 215:12,18
215:20 216:14
**background** 20:20

**bad** 212:25
**balance** 111:22,25
112:22 113:10
114:13,15 124:9
210:14
**bank** 55:6 173:9
173:10
**banker** 40:22 41:1
94:11,23 95:6
**bankruptcy**
135:21,22,23
**banks** 91:1
**Barney** 6:11 29:13
87:17,18 98:17
114:12 116:3
136:11,22 140:8
151:2 166:22
188:17 207:25
217:19
**base** 164:5
**based** 19:15 24:2
57:2,13 108:12
172:20 176:12
186:22
**bashful** 34:5
**basic** 41:17
**basically** 21:8 59:3
94:16 183:14
**basis** 10:12 89:1,3
89:4 93:3
**Beautiful** 174:25
**Beauty** 203:9
**beg** 29:4,4,7 33:5
67:14 133:25
145:13
**began** 31:9 36:19
89:8,17 90:15
**begged** 98:12
**begging** 98:14
155:14,18
**beginning** 33:25
89:22 92:23
115:9 123:11
143:22 154:25
163:15
**behalf** 2:3,9 147:6
**belief** 75:4,8
**believe** 13:23
14:25 16:9 17:6

19:16 26:12
28:11 33:19
35:17,22 39:10
43:11 46:2,24
47:11,21 65:1
67:5,7,9,12 69:5
69:7 74:25 86:12
89:8 90:7 93:22
99:3 110:18
111:6,10 112:6
120:12 122:10
133:22,23 134:19
140:20 145:11
147:14 152:24
153:22 164:8
165:4 171:20
176:24 193:23
206:2,2 210:24
218:15
**believed** 129:6
135:23
**belonged** 135:17
135:19
**bench** 145:16
**benefits** 23:5
**best** 71:15 73:2
80:4,21 81:7,10
81:13 93:15 95:8
96:19 141:9
146:4 193:10
198:12
**better** 27:12
102:18 154:9
178:15 180:16
196:5 204:8
206:1 216:5
**Betty** 29:17 88:8
88:10,11
**beyond** 61:11
**big** 29:25 197:6
**bigger** 88:17
**biggest** 185:22
**bill** 13:6,16 136:7
146:17 193:13
**billing** 172:21
**bills** 13:17 136:6
**bit** 9:8 10:25 21:7
65:6 88:21
106:21 125:19

131:23 154:21
206:12 209:3
211:9
**black** 73:10 80:23
111:7 210:22
**blacked** 209:6,14
**blah** 42:8,8,8 202:2
202:2,2
**blank** 102:22
**block** 64:4 153:17
**blow** 202:4
**blowup** 137:4
**board** 137:22,23
**Bob** 155:22 156:1
213:9,10
**book** 1:5 2:7 21:15
21:23 34:14 36:7
36:9 37:6,18,19
37:21,21,23 38:4
40:12,19 65:23
70:14 74:2 79:18
80:7,8,10,17 81:5
81:8,19,24 82:7
82:10,16,19,22
82:25 83:7 84:6,7
84:10 85:1,3,5
86:4,20 87:2,12
91:11 110:10
141:2,4,12 148:2
148:3,16 149:17
149:21,21 150:8
150:16 151:16,18
155:2,15,18,19
156:17 159:1,5,6
159:23 161:3
163:9 170:25
171:17,24 178:12
178:14,19 181:4
181:18,21 182:4
182:15,17,23
183:6,10,15,17
183:18,20,23,23
185:9,12,25
187:15,23 188:22
190:8 191:4
194:18 195:4,14
196:7 197:6,7,21
198:20,21 199:7
199:8 200:13,23

201:5,7,10,12,24
204:8,11,12,22
206:4,5,25
208:10 213:18,23
216:1
**booking** 181:6
**bookkeeper** 32:14
32:18
**bookkeeping**
32:20
**books** 24:9 32:3,5
32:8,11,13 33:10
37:24 38:18,19
46:17 64:20 70:8
70:13 81:25 83:6
83:12 84:2,19,23
84:25 85:18 86:3
86:6,8 88:1 91:12
105:18,23 113:5
134:23 138:17
139:14 148:8
150:17 152:15,18
152:20 154:13
164:11 171:4
178:21 183:3,22
185:19 186:5
188:12,13
**born** 20:9
**borrow** 90:25
**borrowed** 61:8
**bottom** 45:11
48:11 92:20
168:3 173:2
189:9
**bought** 28:16 38:7
40:4 41:10 50:9
54:14,18,25
68:12 69:20
73:23 105:19
114:12 140:25
207:25,25
**box** 2:12 80:23
149:7 165:9
172:14,16,18,20
**boxes** 30:2
**Boy** 213:24
**Boyd** 156:1
**bracket** 46:13
48:12 49:10

**bracketed** 46:20
**brackets** 45:21
46:3
**Brad** 207:16,17
208:3,6,7,12,15
**BRADBURY** 1:25
**brain** 200:20
**Brandeberry** 1:10
1:14 2:17 3:5 5:1
5:9 20:7,8 21:10
28:15 34:10 35:7
52:13 123:1
124:21 125:10
162:25 163:2
197:7,20 204:1
219:3 220:7,10
**breach** 6:17 7:8
10:2,4
**breached** 8:7
**breaches** 8:17
**break** 16:19 33:25
34:2 49:2 52:6,7
52:9 88:20
106:21 128:3,4,5
154:17,20 175:1
188:14 213:25
214:3,22
**breakfast** 94:8
**breaking** 218:19
**breath** 94:8
**Brenda** 71:4
**brief** 127:21
**briefly** 21:7
**bring** 18:22 155:18
197:6
**bringing** 196:7
197:7,20
**brings** 49:15
**broader** 69:25
**broke** 23:4
**brother** 153:7
**brought** 10:2,10
44:2 77:4 99:11
137:9,13 156:25
157:4,18 179:14
181:24 182:4,23
190:1 191:8
200:21 207:22
**Brown** 193:5,12

**Bruce** 188:7
**Bryce** 2:4 48:7
54:8 111:19
214:4
**bucks** 102:21
164:24
**buddy/buddy**
208:11
**building** 129:15
142:19,22
**bullet** 198:2
**bunch** 211:5
**bureau** 86:23 87:2
**Burkhalter** 34:7,9
34:10,12,14,21
35:6,7,16,20 36:2
36:21 37:5,21
38:3,9,11 40:1,17
41:25 42:7 43:22
44:11 47:5 48:2,4
48:6 49:15,17,17
49:19,24 50:5
52:17 57:6 59:6
59:18 66:12
67:11,24 68:1,5
69:8,21 70:19
71:11,13 72:10
72:18 74:14,17
74:23 75:16
76:19 77:10,16
83:17 85:8
121:25 122:17
124:17 149:11
165:20
**Burkhalter's** 34:18
35:17 68:11,21
69:3 71:6 73:19
108:22,24
**bury** 216:17
**business** 5:14,16
9:4 10:15 17:21
17:24 18:5,8,10
23:9,11,18,20,24
24:10 25:3,9,18
26:2,7,10 27:18
29:20 30:1,3,11
30:11 31:1,14
32:9 33:10 37:1,4
37:4 39:18,18

41:6 42:9 49:18
51:12,15,19,24
52:2 53:8,23,25
54:18 57:1 63:25
65:14 66:2,6,8
77:1 78:21 80:22
85:24 88:22 90:1
90:3 91:19 92:1,5
93:3 97:15,16
98:15 99:19,20
99:22 100:14
105:19 106:18,24
107:8 108:5,8,10
109:9 110:9,23
110:24 111:2
113:13,15,17,20
113:23 114:2,3
115:13,16,19
116:10,19 118:1
129:23 130:1,7
130:20,23 131:6
131:14,16 133:19
134:21 136:15,19
136:20 138:3,4,9
143:17 146:23
148:6 151:11,12
156:2,3,15
157:25 158:1,19
162:15,16 163:10
164:3,14 166:11
167:2 169:3
170:13,16,21
172:17 178:16
179:22 180:1
188:9 189:18
204:4,4,19
**businesses** 13:10
25:5,14,21 27:9
31:14 85:13
156:8 157:24
168:18 169:8,21
170:7 194:18
195:3
**businessmen**
155:14
**business/automo...**
20:25
**Butler** 2:6 89:12
128:3 215:23

216:21
**buy** 8:12,13,20
36:22 37:3 38:6
50:3,10 55:3 62:1
68:1 85:14,17
94:23,24 95:6,7
95:12,12,16,17
95:23,24 96:9,10
126:20 151:6
208:5 212:15
213:2
**buyer's** 49:19
**buying** 37:4,9
39:14 44:22 53:4
53:19,19,22
61:23 74:12
93:12 115:15,17
115:19,22 120:7
126:13 202:2
**bypass** 180:15
**B-R-A-N-D-E-B...**
5:10
**B.P** 125:17 142:14
143:15

**C**

**C** 26:16,17 220:1,1
**calculated** 10:15
**calculus** 215:16
**call** 11:10 43:24
85:12 89:1
111:25 114:20
139:10 140:3
146:23 162:17
164:5 171:10,23
194:21 195:24
196:3 205:3
215:22,25 216:4
216:7 218:7
**called** 2:17 21:23
36:8 44:13 50:5
70:14 81:20 84:6
84:6 86:21,22
107:14 110:9
146:18 149:17
153:21 164:22
175:19 203:14
204:22 211:8
213:6 215:24

216:7,10,14
218:14
**calling** 117:19
136:21 170:12
184:15 191:12
200:15 203:24
216:5
**calls** 66:3 155:13
170:22 173:14
175:2 183:11
204:1,7,11
**cancel** 203:16
**canvass** 211:4
212:19
**capacities** 134:22
**capacity** 20:15
59:18 60:4
**car** 39:16 50:10,10
109:2
**card** 66:2,6,8,13
80:22 131:6
148:6
**cards** 156:20
170:13,16,21
208:1
**care** 48:14 115:14
115:15 203:25
204:1,7,11
**career** 20:25
**caring** 204:22
**Carol** 155:22
**Carolina** 150:14
**cars** 21:11,11
55:11
**carve** 128:15,17
**case** 1:8 78:14,15
109:21 127:21
138:23 139:9
146:1 148:15
217:19
**cash** 8:10 27:25
41:5,6,6 55:3
87:23,25 90:24
91:7,9,22 106:25
107:4 111:3,8
112:20,20 179:8
179:14,14 187:3
**Cathy** 196:6
**cause** 60:7

**cautioned** 5:3
**cease** 148:12 199:8
**Center** 191:19
**CEO** 90:7
**certain** 6:22 21:14
36:19 44:21
52:18 56:12
61:18 74:18 85:7
86:3 135:5
**certainly** 12:2 17:2
18:23 27:22 30:6
34:1 51:7 94:20
101:1 105:24
107:25 140:23
150:20 155:19
184:4,7 197:24
208:17 215:2
**certificate** 162:13
209:21
**Certified** 151:5
**certifies** 162:14
**certify** 220:5,17
**CFO** 87:19
**chain** 205:3
**chair** 211:25
**chamber** 211:7,8
211:12,13,14,16
211:19,25,25
**Champaign** 6:15
21:15,21 36:2,4
36:13 37:5,7,13
37:22,23 38:4,16
40:18 52:19 70:4
70:12 72:19
73:11 74:11,17
83:7,24 84:2,7,9
85:3 124:20
139:20 141:3
152:21 155:14,16
155:20,22 156:4
178:13 182:24
197:21 204:8,20
**change** 16:12
65:25 66:15 70:5
78:23 91:14
118:15 121:2
129:21 140:16
**changed** 16:1
40:24 65:7,9,9,19

65:24 66:12,15
68:7,16 78:21,23
79:14,15,17,19
118:4 138:22,25
148:7
**changes** 49:20
71:17,18 191:17
**changing** 118:13
**charge** 113:19
153:8
**chart** 153:7
**chastised** 49:21
**chatting** 206:2
**check** 18:18 40:5
129:25 135:3
149:7 165:9
**checkbook** 40:3
**checked** 165:9,12
189:10
**checking** 120:23
173:6
**checks** 77:14
129:22 130:3,5
**children** 20:2
**chopping** 153:17
**chose** 149:8
**Chrysler** 21:10
28:15 34:11 41:7
**church** 188:2,3,3,5
188:6,16
**Cincinnati** 1:19,25
2:5
**circle** 148:23
155:20
**circled** 148:21,25
149:2,7
**circumstance**
196:25
**circumstances**
12:17 13:18
36:18 175:16
200:10
**Citizen** 189:5
193:11
**Civil** 1:16 2:19
**claim** 10:2,4,10,12
**claiming** 8:3,6,16
**claims** 13:5,9,17
78:10

**clarify** 32:12 74:8
**clarity** 18:22
111:20 136:21
145:24
**Clark** 152:21
200:6
**classifieds** 175:24
**clause** 60:17,19
**cleaned** 68:8
**clear** 11:8 18:23
32:3 48:24 60:2
67:22 75:7 99:17
112:21 125:1,2
145:7 151:9
161:5 164:13
181:3 183:17,18
193:15
**clearer** 32:5
**clearly** 120:14
**Cleveland** 150:9
150:16,17 151:17
151:18
**client** 85:17,20
**clients** 85:3 203:19
**close** 94:9 139:6
179:18
**closer** 151:2 172:4
**closing** 50:4,4,5
91:20
**Club** 94:1
**CMRs** 151:5
**Coca-Cola** 73:5
164:10
**coerce** 208:1
**coffee** 136:13
156:21 158:9
**Coke** 164:10
**collapses** 78:15
**collect** 13:17
154:12
**college** 20:25
**color** 66:23
**Columbus** 9:16
93:23
**Columbus/Dayton**
93:7
**com** 18:11
**combination** 38:1
**come** 10:22 39:5

59:21 78:16
82:21 117:2
126:17,18 130:14
141:11,14,16
149:6 156:20
165:18 177:10
180:13 195:4
200:8 202:3
203:15 214:17
**comes** 203:24
**comfortable** 80:20
**coming** 73:5 91:13
183:13,16 207:23
211:23 215:12
**comments** 76:22
**commission** 54:15
176:12,13 178:1
220:24
**commissioned**
220:5
**commitment** 93:12
**committed** 41:18
171:2
**committing** 42:6
**communications**
172:21
**community** 90:6
**companies** 82:25
83:5 138:13,18
**company** 6:12 8:9
8:12,13,19,20 9:1
11:10 13:14,16
13:21 21:19
22:15,19,21
23:15 24:5,7 28:6
28:23,25 30:19
31:21 32:4 33:9
35:17 36:22
37:19 40:4 41:10
43:22 49:21 50:8
55:3 79:16 84:13
86:7,21,22 87:24
88:3,9 91:14 93:4
93:7,10,13,20
94:9 95:7,12
105:2,7,16 106:1
107:14 109:18
110:1 111:9,11
114:8 116:3,5,5,8

117:15,15,20,23
118:2 122:1
123:5 126:19
131:8 137:12,21
138:9 140:24
146:4,11,21,23
146:24 148:5
149:17 150:13
163:17 164:10
186:1,4 191:3
193:6 200:16
201:3,14 207:25
210:1
**company's** 39:7
**compared** 60:10
**compete** 38:19
56:1,14 74:20
131:8
**competed** 38:22
**competitors** 69:22
70:2
**complete** 16:9
174:7
**completed** 173:16
173:24
**completely** 123:18
**completeness**
128:14
**computer** 18:4
19:1,6,7,17
220:14
**concept** 126:12
**concern** 48:1
200:23 201:4,10
201:11,25
**concerns** 201:24
**conducted** 31:14
**Conference** 191:19
**confident** 207:13
218:12
**confidential** 30:5
**confuse** 67:21
**confusion** 61:16
**connecting** 68:9
**consider** 109:6
159:4 206:24
**considered** 120:11
159:6
**consolidated** 84:22

**consult** 72:5
100:19 101:4
150:11
**consultant** 59:18
59:20 150:8
**consulted** 98:21,23
98:25
**consulting** 56:13
59:6,10,14 74:19
151:8,15
**consummated**
77:21
**contact** 161:21
170:7 171:12
188:6 197:16
212:11
**contacted** 189:21
**contacting** 169:5
**contemplated**
91:25
**contemplating**
37:4
**contest** 34:1
**continue** 126:19
137:25 148:9
206:25
**continued** 137:23
218:24
**continuing** 48:13
61:18 119:6
**continuously**
23:25
**contract** 6:18,18
6:19,20 7:2,3,9
10:2,3 11:2,6,6
11:13,16,18,21
57:2,19 60:11
92:15 93:11
98:15 102:13
103:6,21,22,24
105:6,8,10 106:7
106:10 107:17
115:6 124:14
125:9,19 129:2
134:13 135:18,20
135:24 136:4,16
136:17 171:19,21
172:2,9 176:22
181:2 184:5

209:11
**contracted** 171:17
**contractor** 60:6
176:7,11,16
177:13 178:3,6
186:24
**contractors** 28:21
175:11,12 179:4
187:9,11
**contracts** 57:5,21
57:22 86:24
98:19 101:3
173:24 174:4,5
180:13 205:15
**Contractually**
123:9
**control** 50:8,9
**convenience** 174:2
**conversation** 40:14
94:4,13 98:1,3
116:14,25 117:2
126:12,17,21
161:25 200:17
204:5,24 207:24
208:9,11 213:16
216:20
**conversations**
19:21 76:13 77:6
98:5 129:10
161:19 213:17,22
216:23
**convince** 211:7
**copied** 182:7,8,12
**copies** 12:1 44:15
48:10,17 58:12
64:22 68:10,15
69:6 85:20
105:15 112:17
119:24 157:9,10
158:8 173:15
186:17 214:8
**copy** 43:14,20
48:20,21,25 49:8
54:7,10 59:10
69:18 94:19
112:15 120:2
132:24,25,25
133:8,13,13,16
133:16,16 141:6

141:8 156:15
173:16 174:19,24
180:24 181:3,18
185:3 189:4
191:12 192:12
193:9 194:15
210:25 211:12,22
211:22 213:13
**copying** 48:13
**corner** 43:14
**corp** 26:16,17
164:5
**corporate** 23:12
26:12,15 52:11
62:22 71:9 80:18
107:20 121:24
**corporation** 26:11
27:15 35:19
61:17,24 84:20
117:6 125:4
163:21 164:1,2,6
164:9
**correct** 6:7,23,25
7:5,6,25 9:3,5,6
9:14,18 10:11
11:2,25 12:15,16
14:6 15:9,20
17:18,23 18:1,6,9
18:14,17 19:19
21:24 22:2,10,24
23:19 24:1,4,6
25:1,16 27:19
28:3,5,15,24,24
30:19,21,24 31:5
31:8,11,18,22
32:4,7,9,10,15,23
33:8,11,16,19
34:17 35:24,25
36:14,17 38:14
39:4,21,24 40:8
41:19 43:5,8,10
44:1,23 45:16
47:13,19 49:12
51:25 52:3,20,23
53:6,21,25 54:20
55:2,5,7,10,12,14
55:16,19 56:2
57:17,24 58:17
59:4 60:12,25

61:3,6,8,22 62:3
62:18,20 63:23
65:17 66:6,7
67:18 68:23 69:9
70:20,23 71:1
72:2,7,21 74:7
75:3 76:2,7,12
77:9,12 80:13
81:6,7,11,13 82:6
82:9,12,17,20
83:2,13,14 84:21
85:9 86:1 87:7
89:3 90:2,12,22
91:5,8,24 92:6,18
92:21 95:20
96:12,14 97:10
97:21 98:7 99:10
99:12,24 100:1,3
100:9,16 101:13
102:1,4,14 103:5
103:10,12,15,17
103:19,23 104:2
104:5,8,11,16
106:2,20 107:2
107:16,19 108:6
108:9,13 109:11
109:24 110:15,20
112:7 115:3,8
117:7 118:9
120:20,25 121:6
121:10,13,22
122:2,5,10,14,25
123:2,2,8 124:4,7
124:15,22 125:11
127:8 128:16,22
129:4,11,13,17
129:24 130:2,18
130:19 131:20
132:4 133:5,7
134:4 136:19,23
137:1,22 138:1,7
138:8,11 139:2
139:24 140:2
141:5,7 142:20
142:21,23,24
143:24 144:8,10
144:11,25 145:4
146:9,12 147:3
148:17,19 149:15

149:18 150:10
152:10 155:10,10
157:18,25 158:6
158:7,21,23,24
160:2,8,14,21
161:10 163:18,19
163:22,23 164:1
165:2,13,14,16
165:17,24 166:1
166:14,25 168:19
169:24 171:15,18
172:11,13,15
175:11 177:5,15
179:3,21 180:8
181:5 182:15,16
182:21,22,25
183:1 184:6,10
186:8,12,14,25
187:5 189:13,23
190:18,24 191:1
191:21,24 192:2
192:19 193:2,7
193:19,20 196:19
196:20,22 207:14
208:5,6,25 209:2
209:7,10,13,16
209:19,23 211:18
212:5 215:5
217:5,12,13,15
218:11
**correctly** 55:24
106:16 182:2
196:18
**correspondence**
77:25 80:2 115:1
147:1 192:17
**corresponding**
42:6
**cost** 40:13
**costs** 45:24
**counsel 1** 1:17 2:7,16
2:20 17:14
100:15 133:21
134:7,12 145:25
172:8 173:23
184:23 215:4,11
215:23 216:9,14
220:17
**counsel's** 49:8

**counter** 97:3
**counties** 36:1,3,5
37:10 148:18
**Country** 94:1
**county** 6:15 21:16
21:21 36:2,4,7,8
36:13 37:5,7,13
37:18,19,22,23
38:4,16,22 39:1,5
40:18 52:19 70:4
70:12 72:20
73:12 74:11,17
81:1,6,9,12,15,18
81:19,24 82:7,10
82:13,21 83:3,7
83:12,12,12,24
84:2,7,9,10,14
85:3 124:20
139:20,20,20,20
141:3 152:21,21
152:21 155:14,16
155:20,22 169:22
178:14 182:24
197:21 200:6
204:8,20 220:3
**couple** 16:3,15
36:24 39:12
149:23 151:22,25
176:17 213:25
218:14
**course** 42:5 84:4
113:7 120:1
137:11 213:11
**court** 1:1,24 2:22
12:23 24:17 32:2
135:22,23 216:17
**covenant** 56:1,14
74:19
**cover** 35:9 36:10
168:9,13 180:22
181:22,23 182:3
182:4,6,14,15,18
182:20 200:1
**covered** 109:1
**covers** 139:19
140:22
**covnovit** 58:3
**Cox** 143:20,23,25
144:1,4

**Craigslist** 175:19
175:21 176:2,3,4
**cramp** 142:2
**create** 86:25
190:22
**created** 86:25
148:4,6
**creation** 148:5
**credentials** 90:3
**credited** 56:9
**credits** 56:12
**cross** 3:4 166:6
**crossed** 77:5 166:3
210:21,23,23
**cross-examination**
1:15 2:18 5:5
**crowd** 198:24
**crying** 147:9
**culminate** 33:12
**cured** 47:16 76:5
**curiosity** 160:25
**current** 120:23
141:1,1 174:7
216:25,25
**currently** 25:19,20
25:24 51:13
172:19
**custody** 162:14
**customer** 34:10
35:7 45:2 53:5,19
54:13 85:7,10,17
153:6 190:12,14
191:11,16,21,23
192:4,25 207:23
**customers** 18:12
18:15 61:16
85:11 169:5
170:2,12 172:2
173:25 184:3
185:2 190:7
192:22 195:3,8
195:13,13 196:10
197:12,17 199:18
202:14,16,18
205:20,25 208:19
**customer's** 19:4
**cut** 40:5 203:9
**cute** 213:24
**cutoff** 178:17

**D**
**d** 3:2 58:1
**dad's** 36:15
**Daily** 189:5
**damage** 200:8
**damages** 7:24 14:4
**Dan** 154:5 210:24
211:11,22,24
212:13,15,17
213:11,13,13,16
215:21 216:21
**darker** 49:1
**Darrell** 2:10 12:4
64:2
**dash** 109:21
**date** 6:4 59:25
60:21 77:23
92:22 134:6
149:5 155:2
161:14 165:15,18
174:6 179:7
185:11,13 192:3
192:5 194:7
215:5
**dated** 52:21 54:12
60:24 62:19
92:19 157:20
167:23 191:25
199:24 202:8
206:9 217:9
**dates** 81:10 134:14
149:8 152:5
193:25
**Davidson** 31:24
32:1 101:15,16
101:19 102:9
105:4 110:17
145:1
**Davidson's** 102:6
102:12 105:3
**Davison** 101:16
**day** 1:20 36:21
42:18 50:4 52:21
87:21 89:6 98:13
103:16,18 104:3
104:7,10 113:16
115:24 118:22
125:24 131:25
144:23 159:2

203:19 214:6,10
215:12 218:17,18
220:23
**days** 14:15 76:4,5
94:15 98:11
144:22 218:14
**Dayton** 21:17 32:1
42:3 71:6 152:9
152:20 175:14
203:17
**dead** 150:18
185:13
**deadline** 178:13
**deal** 40:7 41:18,18
98:13 99:2,14
100:2,10,25
174:22 179:11
**dealers** 35:10
**dealership** 21:12
21:12 34:13,16
35:1 36:16 39:16
39:17
**dealings** 81:25
**deals** 63:1,6
**dealt** 63:14
**dear** 203:7,11
**Debbie** 29:14
87:15 147:7
**debts** 95:19
**decide** 158:25
**decided** 158:18
**decision** 7:23
169:12
**default** 47:16,25
48:1,2 50:6
**defaulted** 76:3
**defaulting** 48:3,4
**Defendant** 1:11,15
2:9,17 5:2 12:21
**Defendant's** 142:8
**definitely** 140:21
**definitions** 19:3
**defray** 45:24
**delayed** 185:15
**deliver** 188:12
**delivered** 188:16
**delivery** 181:2
**Denkewalter** 2:11
**denying** 78:7

department 167:7
depending 190:4
deponent 2:24
 220:15
depose 220:8
deposed 5:3 6:1,10
 6:12 144:24
 145:1,5,8
deposit 40:3 41:10
 41:13,16
deposition 1:14
 2:16,20 5:23
 12:14,18 14:8,21
 16:20 19:22
 60:20 144:19
 192:10 215:15
 218:23 220:6,9
 220:11,12,20
depositions 117:3
 117:25
deposits 32:20
derived 25:21
describe 13:12
 23:22 190:2
 196:25
design 186:18
 190:5,11
designated 143:15
designation 30:7
 174:14
designed 191:14
designs 87:13
desire 106:12
desist 199:9
desk 203:23
detail 9:7 12:13
 136:7 144:13
devastating 130:15
develop 155:1,11
 169:3 170:2,13
developed 72:10
 72:18 203:2
developing 37:15
 168:22
differ 139:3
difference 67:23
different 43:22
 44:13 54:5 67:19
 67:25 69:25 73:4

73:7 84:6 96:5,22
 108:23 109:18
 123:18 139:5,12
 141:16 178:24
 203:21 206:12
difficult 5:20
digging 84:12
digital 185:16,17
digitally 186:7
diligence 93:11
 105:16 156:14
 157:12
direct 3:4 164:4
directories 6:22
 9:4 17:25 21:14
 21:15,23 23:14
 26:3,8,25 27:15
 28:9,11,19 30:17
 30:19,20 32:9
 33:10 34:14 35:2
 35:12,13 37:9,12
 37:15,25,25 38:4
 38:15,19,22,25
 39:9,20 43:10
 44:20 52:2,13,14
 52:18 61:17,24
 62:2 63:3,7,14
 64:22,24 68:3,12
 70:4,9,11,19
 73:20 74:15 75:6
 75:9 76:21 77:2
 79:22 80:3,6,6,9
 80:11,19,25
 81:23 83:8 84:19
 85:24 87:5 88:22
 92:16,17 99:19
 106:17 107:7,11
 107:15 108:4
 109:16,16,22,22
 110:1,7,7,24
 111:21 112:9,13
 115:11,11,13
 116:7,11 117:1,9
 117:16,17,21
 118:12,19,21,22
 120:7 122:22
 123:1,3,3,17
 124:11,19,22
 125:6,10,20,22

125:23 126:9
 127:11 128:15
 130:22 131:24
 132:3 135:6
 137:9,13 138:6
 138:14 139:19,22
 140:25 141:14
 142:14 143:9,15
 144:10 148:10,13
 155:2,12 158:16
 158:19 159:1,5,9
 160:15 162:15
 163:1,3,9,11,12
 163:14,18 164:4
 164:8,9,14 166:1
 167:17 168:21
 172:12 173:1,3,6
 180:18 181:8,9
 188:9 189:11
 197:23 199:17
 201:19 209:21
directors 106:17
 107:6,10 108:3
directory 21:20,23
 24:25 25:14 31:2
 31:10 34:16 35:8
 35:11,18,24
 36:13 37:7 38:12
 39:15 52:19
 69:21 72:20
 73:19,21,23,24
 77:1 79:20,21
 81:16,18 83:24
 86:19 91:10 93:6
 99:20,22 110:10
 131:3,8 141:2,6,8
 151:10,11 154:23
 158:3 163:25
 164:3 166:3,8,11
 168:23 180:21
 182:21,25 183:6
 186:10
discuss 126:1
 128:10,23 129:3
 129:9 194:2
discussed 12:25
 34:3 68:22 95:25
 129:8,12 137:19
 141:21 149:10

159:22 194:18
 201:22 212:12
discussing 82:2
 96:6 126:23
 131:6 134:13
 145:18,19
discussion 7:14
 56:24 76:23
 126:4 129:4
 145:23 181:13
 212:14 214:18
discussions 99:14
 99:18 102:9
dishonest 97:14,23
displeased 156:24
distance 197:12
distinct 39:9
distinctive 72:10
 72:18
distribute 187:22
 207:2
distributed 188:8
distribution 47:10
 184:18
distributor 187:24
 188:10,18
DISTRICT 1:1,1
distrustful 97:20
 97:23,25
DIVISION 1:2
document 8:21
 10:5 15:16 17:13
 18:19 19:2,3
 42:22,24 43:25
 44:25 45:18
 54:12,21 62:15
 63:1 71:10,13,23
 71:23 77:3,7,24
 92:13,19 103:11
 103:20 108:17
 110:4,8 112:3
 114:14 119:15,24
 120:17 122:6
 123:23 132:6
 136:8 142:9
 143:22 144:7
 150:3 157:15,18
 159:17 162:10,12
 162:21,22 164:17

165:1,6 168:5
 172:8 181:24
 189:15 190:1
 191:2,8 192:11
 193:4,8 201:3
 202:19 206:23
 207:2 208:13,22
 208:23 210:15,20
 211:14
documentation
 10:17
documents 12:1,5
 14:7,10,12,14
 17:14,16,19
 18:19 19:2,3,4,7
 19:8,16 42:18
 44:4,6,9,16 53:8
 53:23,24 58:6,15
 62:21 63:13 64:7
 64:14,17 65:2,12
 71:5,25 72:4,4
 77:13,15,20,21
 83:21 100:18
 101:11,22 102:13
 103:3,4 105:19
 115:5,7 126:23
 136:24 143:1
 157:3,4 165:3
 168:11 174:4
 192:9,17 206:15
 215:1
doing 85:5 90:23
 138:9 161:3
 163:10 178:7
 179:2 183:25
 211:3 216:1
dollar 153:6,11
 209:14
dollars 8:5 93:10
 93:13 94:10 95:1
 95:13 179:16
domain 166:10,15
Door 156:5
doors 82:14
dormant 27:12
 30:23
doubt 73:9 112:25
 130:6 185:3
Downs 203:12

downtown 114:5
draft 42:17
drafted 48:5
    189:14 206:19,19
    206:20
drafting 189:17
drafts 42:15 71:10
    71:23,24 101:25
draw 64:4 98:19
    190:4
drawn 100:4,6
    101:11,13 102:8
drew 101:19
drive 19:7
driver 12:20
drug 146:18
due 61:10 74:18
    93:11 105:16
    106:16,22 156:14
    157:11 185:7
    193:13
duly 5:3 220:5,7
duration 69:16
dwelled 169:11
dye 86:15,22
D-O-W-N-S
    203:12
d/b/a 163:11 164:9

E
e 3:2 49:10 59:6
    139:10 220:1,1
earlier 51:16 55:20
    88:25 96:7
    124:23 132:2
    147:14 149:10
    151:4 159:22
    167:3 170:17
    173:19 205:9
early 89:13,16 92:8
    92:24 189:8
    194:3,9 212:19
    212:23
early/late 189:7
ease 174:17,21
    192:22 205:12
easier 156:6
    174:18 199:6
echo 59:2

economic 106:16
    106:22,23
education 20:23
    21:4
educational 20:20
effect 64:10,11
    131:10
effective 118:22
    125:23 131:24
eight 21:17 105:21
    149:25 150:6
    151:4 152:1
Eighty 205:25
either 36:3 46:9,11
    48:1 51:1,3 73:22
    77:22 92:3 101:8
    102:24 104:1,20
    132:22
elaborate 152:18
electronic 19:4
    185:24
electronically
    186:18
else's 166:22
employ 147:24
employed 21:9
    22:18 140:19
    151:1 154:6
employee 28:25
    60:6,7 88:12
    121:4 129:23
    167:6,10 216:16
    220:18
employees 22:25
    23:1 28:18,23
    29:7,8,11 30:9
    33:9 85:23 86:3,5
    137:24 141:19
    147:8 153:16
    154:9 213:23
    216:24
employment 7:2
    10:3 11:1,6,13,18
    11:21 22:17
    103:21,22,24
    104:9,24 105:6,8
    105:9 153:1
    177:13
endeavored 31:13

endurance 34:1
engineer 20:19
enjoy 49:17
enlarged 184:24
    185:3
enter 59:6 86:24
    171:19 176:22
entered 6:21
    121:25
entertain 94:12
entire 53:2 99:19
    100:14
entirety 55:23
    118:20 119:2
    123:12 125:21
    128:13 206:23
    208:22 210:20
entities 28:12 59:8
    73:17 84:24
    188:22
entitled 52:11
    62:17 72:11,19
entity 26:9,15 27:9
    27:11 31:7,15,16
    44:13 107:12
    117:6,8 159:7
enumerated 77:18
enunciated 68:3,4
envelope 158:4
    184:12 192:13,21
    192:25 193:2
envelopes 192:16
equal 56:10
equipment 55:9
    121:8,11
equity 50:1,2
equivalent 192:24
error 165:21,24
    166:8
errors 185:16,17
escrow 47:8
escrowing 45:23
ESQ 2:4,6,10
establishing 78:8
estimate 90:18
    179:15 180:3
et 1:5
Europe 90:9
event 47:16 49:23

eventually 117:4
    130:17 135:8
    181:17
everybody 86:7
    154:1 178:23
evidencing 77:13
    77:25
exact 94:13 121:23
    122:15 124:13
    143:8 194:10
exactly 22:4 41:12
    57:10,17 68:7
    82:23 84:7 94:20
    96:20 124:12,14
    125:11 126:19
    136:16 138:4
    160:1 204:9,18
examined 5:3
example 14:14
    49:21 53:5 54:15
    55:25 59:3 61:9
    85:15 109:2
    118:2,11 155:23
    155:24 166:18
    175:25 182:23
    186:9 190:17
    191:18,22
examples 53:18
excluded 55:1
excluding 70:4
exclusive 74:16
    124:19 126:16,18
    126:25
exclusively 126:6
excuse 67:18 74:8
    95:10 101:1
    145:13 191:4
    200:18 210:5
execute 71:5
executed 110:4
    122:9 133:4
    134:15
exhibit 15:2,4
    17:10,12 42:20
    42:21 52:10 54:2
    62:13,14,23 63:1
    66:4,5 68:8,17,25
    71:22 80:9 82:2
    92:11,13 100:8

103:7 104:4
    106:3 111:13,15
    111:16 118:20
    119:2,5,9,18,19
    119:21,22,23
    120:2,4,12 122:1
    122:17,24,25
    123:12,13 124:6
    124:16 125:22
    127:14,15 128:13
    128:16 131:22
    134:16 135:4,7
    136:5,6 139:16
    139:18 141:23
    142:8 147:22
    149:25 150:1
    157:16,17 162:6
    162:7 168:17
    170:19 172:6,7
    181:25 182:1,3
    182:17 184:9,20
    184:22,23 188:24
    189:24 190:1
    191:6,7,12 192:8
    193:3,4,22
    199:21,22 200:15
    202:6,7,13 206:7
    206:8,12,18,22
    209:1,24 212:7
    217:2,6
exhibits 3:10
    208:24 210:9
existed 116:4,9
    117:18
existence 117:1
existing 27:21
    65:10 151:18
    170:7
expanded 114:8
expectation 22:15
expected 185:11
expecting 174:3
expenses 85:1
experience 39:19
    97:22 110:24
expire 161:9,15
expired 159:17
    160:7,19,23
    161:2,4,16

**expires** 220:24
**expiring** 161:17
**explain** 27:4 50:7
  51:2 64:3,3 69:1
  76:17 86:18
  150:6 191:9
  199:9
**explained** 40:12,18
  183:24
**express** 200:23
  201:9,23
**extended** 185:22
  185:23
**extent** 10:16 30:5
  33:23 65:6 67:22
  77:24 78:2
**extra** 54:7
**eye** 161:20
**eyes** 30:5 170:5
  174:1
**e-mail** 18:4,7,10
  19:1,8,9,17 166:7
  166:10 167:1,1
  167:10 186:15,17
**e-mailed** 164:22
**e-mails** 18:12,15
  18:18 19:4,19,20
  200:18

**F**

**F** 220:1
**face** 29:19 185:6
**fact** 31:6 100:8
  116:15,16,17
  131:4 171:21
  203:1 213:1
  215:7,11
**facts** 201:18
  202:11
**fair** 34:6 38:11
  51:4 58:12,21
  61:23 63:24 64:7
  64:21 66:17 72:3
  74:9 79:5 84:18
  85:6 96:18 97:1
  100:13 115:4
  119:16 120:16
  125:5 131:14,18
  133:2 136:5

137:24 144:18
  156:4 158:19
  162:1
**faith** 171:22
**fall** 49:23 164:7
  208:1
**familiar** 200:13
**family** 89:19,24
  97:13 99:2
**far** 10:20 165:23
  167:1 168:7
  182:14 185:21
  193:17 197:12
**farm** 94:4 156:5
**farther** 94:17
**fashion** 68:2 93:6
  159:10
**fast** 169:7
**father** 21:9 25:25
  35:6,8,23 38:5,7
  94:4
**father's** 94:4
**fax** 200:1 218:13
**faxed** 217:18
**February** 178:9
  179:1 189:8
  194:3,9 202:8
**February/March**
  93:15
**Federal** 1:16 2:19
**feel** 80:20 183:22
**feeling** 198:16
**Fifteen** 14:19
**fifth** 203:21
**Fifty** 177:19
**figure** 174:12
  179:18
**figures** 209:14
**file** 6:14 19:12
  29:25 127:21
  162:22 164:20
  185:24 205:13
**filed** 6:11 8:22
  13:4,8 130:17
  133:20,23 134:3
  134:11 135:21,22
  144:15 163:2
  168:16
**files** 185:16,17,20

185:20,21
**filing** 134:9 142:11
  142:13,25 143:2
  162:16,17 168:12
  168:20
**fill** 164:25 165:3
  184:5
**filled** 164:23 168:8
  191:12
**filling** 168:10
**final** 42:15 77:25
**finally** 47:14 197:9
**financial** 26:1
  32:21 33:1,13,17
  33:20 84:12,16
  84:22,24 88:5
  98:25 100:23
  105:25 107:3
  112:12,16,17
  113:8,9 176:9
  177:25 210:22
**financially** 86:5
**financing** 87:19,22
  90:1,21 91:2,3
  93:5
**find** 87:21 146:19
  146:20 150:18
  194:11,13 213:14
**fine** 6:5 10:21
  16:19 50:3 52:8
  81:22 98:17
  106:11 142:3
  157:10 214:2
**finger** 136:2
**finish** 101:7 214:24
**fire** 200:8
**fired** 22:5 37:20
  130:9 131:4,16
  134:18 137:2,5
  152:6 153:17
  154:2
**fires** 199:10
**firm** 31:24
**first** 34:18 35:7
  38:5,7,9 41:9
  43:13 61:10
  65:23 72:9 77:4
  79:18 80:8,10,17
  84:15 88:13

106:7 114:23
  115:10 118:22
  130:25 148:2
  149:5 157:7
  165:15 172:2
  173:17,21 184:23
  185:14 195:18
  197:10 206:16
  220:7
**firsthand** 97:22
**fit** 191:15
**five** 8:14 30:2 43:1
  43:1 52:6 79:18
  94:10,24 95:1,7
  96:11 99:21
  126:14,20 171:5
  174:24 185:5
  197:3 202:16,18
  202:20
**five-year** 11:22,24
  95:13
**five-years** 95:18
**fix** 200:9
**fixed** 121:7
**fixtures** 121:8
**flat** 57:15
**flip** 63:9
**Floor** 1:19 2:5
**Florida** 12:19
  207:18,21 208:4
**flow** 8:10 87:23,25
  90:24 91:7,9,22
  106:25 111:3
  179:8 187:3
**fluctuate** 57:12
**fluctuated** 171:7
**focus** 131:23
**folks** 196:22
**followed** 57:10
**following** 118:23
  125:24
**follows** 5:4 109:17
  115:12
**font** 66:21
**force** 207:9
**Ford** 90:8
**foreclosing** 215:7
**foregoing** 220:9
**forever** 203:12

**forget** 12:8 216:14
**forgot** 33:24
**form** 19:4,11,12
  26:15 41:7 65:12
  77:7 168:4 170:1
  184:8
**format** 66:1 186:7
**formating** 186:5
**formation** 31:21
**formed** 26:5,7
  44:19
**forming** 25:15
  52:2
**forms** 164:23,25
  203:18
**forth** 1:18 101:25
  118:20 119:2
  125:21 128:13
  135:6
**forward** 109:17
  169:7 171:24
**found** 7:8
**four** 21:16 30:2
  34:24 46:13
  84:18,23,24,25
  86:2,6,8 87:3
  99:23 119:5,9
  148:9,18 153:25
  157:7 171:5
  178:20,21,22
  202:16,18,20
**franchise** 200:6
**fraud** 6:17 10:10
**frazzled** 203:18
**friend** 177:12,14
  203:7,11 208:4
**frivolous** 109:6
**front** 140:13
  181:17,21,23
  182:3,18,20
  191:15,20,25
**frustrated** 130:12
**fuck** 136:14,20
**full** 5:7 60:8,16,21
  61:7 74:18,21
  75:2,5,8 77:10,18
  77:25 124:23,25
  125:2 170:8
**full-size** 183:17

full-sized 197:6,21
full-time 22:23
  89:3,4
funds 45:24
funny 84:8
furniture 55:8
  121:8
further 220:17

**G**

Garage 156:4
gather 192:15
gears 88:21 154:21
general 2:7 57:3
  84:13 141:14
generally 14:10,13
  178:22
generate 33:17
  112:12 169:19
generated 19:4
  112:3 113:3,3
  179:16
generating 85:3,11
gentleman 9:16
  23:3 42:3 93:19
  143:19 146:3,19
  149:22 150:14
  151:3,7,9 167:11
  203:20,21 207:18
  207:21 216:12,13
gentleman's
  146:24
gentlemen 215:22
getting 22:15
  76:23 87:19
  118:14 125:11
  126:8 127:18
  160:3 174:16
  190:7
get-go 159:8
give 8:22 14:8
  33:15 41:5,5 85:4
  86:19 95:11
  109:1 133:16
  144:19 155:23,24
  184:12 186:14,17
  187:14 190:5,7
  190:11 192:13,21
  192:25 194:14

202:3,25 204:16
206:25 211:2
212:1 216:6,6
218:2
given 16:10,15
  64:9,17 156:15
  184:17 185:13
  190:16,23 220:9
giving 15:18 53:18
  127:3 194:15
  201:17 217:19
  220:6
glad 183:16
glance 14:14
gleaning 41:15
globe 139:11
go 7:12 10:20 15:1
  15:21 19:5 31:13
  43:13 44:25
  45:20 52:7 54:12
  54:13 55:2 56:21
  60:2 62:11 73:2
  74:13 89:14
  93:17 94:17
  98:10,15 102:17
  106:13 109:13,17
  110:14,16,16
  114:23 118:16
  119:7 120:22
  123:19 125:18
  136:10,14,19
  137:23 141:25
  143:4,7 144:12
  145:16,20 153:5
  153:10,12 156:10
  157:14 164:16
  169:13 173:14
  174:23 175:2,4,8
  180:13,14,17
  181:14 188:24
  194:17 203:6
  206:6 211:17,19
  211:21 214:11,19
  214:21 215:16
  218:22
goal 86:7
God 155:6 196:8
  197:14
goes 74:15 82:7,10

97:18 108:3
123:16
going 9:7 10:25
  34:2 36:24 49:7,7
  50:2,6,13 51:15
  52:5 56:12 61:14
  65:6 93:5 94:25
  95:16 96:24 99:5
  99:20 102:25
  103:1 104:23,25
  105:2,4,6,7 106:8
  109:4,5,9 118:18
  119:1 120:8
  125:18 126:19
  127:17,24 136:5
  136:15 142:4
  149:3 154:16,17
  158:2,3 159:8
  161:8,15 171:24
  173:25 174:2
  179:10 181:17,22
  181:24 183:15,21
  183:21,22 189:7
  197:10 206:4
  212:19 214:24
  215:4,9,10,13
  216:3,17 218:13
  218:20
good 78:15 88:16
  130:4 161:7
  171:22 198:16
  212:23 214:6
goodwill 54:18
grace 76:5
gracious 199:12
graduated 20:21
grand 40:25
grandmother
  20:18
grants 74:14
  124:17
graphic 87:9,11,13
  185:19,20,21
  186:15,21 187:10
  190:5,11,11,16
  190:22,23 191:14
graphics 87:14
great 154:13
greed 91:18

Greenville 152:14
ground 82:16
  150:16
grounds 106:10
group 58:15 86:9
  154:13
guarantor 43:4,6
guess 16:7 32:12
  80:21 112:19
  116:24 149:19
  171:23 214:22
guessing 165:21
guestimate 75:13
  161:7 169:20
  179:10
guilty 7:8
guy 153:10 215:7
guys 39:11 52:6
  218:20

**H**

hairs 79:3,9 84:11
half 93:14 94:3
  102:20 144:23
  155:20 184:25
  187:19
Hamilton 29:13
  50:23 51:9,11,14
  51:22,23 88:2
  113:1,2 135:20
  135:21 136:3
  220:3
hand 11:17 66:2
  68:17 98:16,18
  98:21 102:8
  112:20,20 113:16
  113:18 199:22
  202:16 207:4
  210:24 213:13
  220:22
handed 11:17 15:3
  17:11 77:2 92:12
  139:17 141:24
  162:7 172:7
  174:5 202:21,22
  206:8
handing 184:21
  189:25 192:9
handle 32:13

handled 217:19
handout 184:16
hands 71:11 99:13
  99:25 170:8
handshake 100:10
handwriting 17:7
  43:16 45:1,12,15
  45:17 46:23
  47:10,20 50:16
  50:21
handwritten 16:6
  16:8
handy 139:9
Hannah 29:14
  87:8
happen 196:19
  202:17
happened 65:21
  94:6 184:14
  196:21,23 203:6
happens 98:9
  191:10,14
happy 12:6 97:12
  156:17
hard 19:7 186:17
Harley 101:15
Harris 2:11
Harvester 90:6
hashed 41:17
Haynes 93:20,20
  93:21
head 13:2 136:11
  146:6 147:19
  152:25 154:5,5
  207:16
headaches 60:8
heading 158:15
health 23:5
hear 90:8 137:3
  197:22 213:8
heard 98:1 117:20
  117:23 196:24
  204:9,9,19
hearing 7:23 145:9
  145:11
Heather 203:12
heck 174:18
  215:25
Heckman 2:10,11

7:10,12 10:19,22
12:7,10 14:1 16:3
16:6,11,25 17:6
30:8,14 48:7,10
48:19,25 49:3
51:3,5 52:8 53:9
54:1,5,8,11 56:17
56:21 58:19
60:13,20 64:9,19
73:1 78:4,14 79:1
80:14 88:19
89:14 101:17
106:8,13 109:12
110:12 111:16,18
119:6 120:21
122:19 123:7,14
123:24 126:11
127:17,20 132:17
133:17 139:13
145:22 147:14,16
148:21 154:19
163:13 165:11
181:12,14 182:10
194:4,8 210:10
213:25 214:4,14
215:6,14 218:5
218:18,22
**Heintz** 29:15 86:12
**held** 21:8 159:18
**hello** 161:24
**hell's** 197:9
**help** 23:2,9 54:24
89:25 149:21
150:15 159:15
213:14
**helping** 175:10
**Herb** 34:19 42:8
50:1,1 59:6,23
88:13,13
**Herbert** 34:20
**hereinafter** 1:18
**hereto** 220:18
**hereunto** 220:22
**hey** 105:1 127:2
196:6 213:3
**he'll** 97:14
**hi** 42:8 183:12
197:5,20 207:19
212:13

**high** 20:21 21:8
180:9
**higher-ups** 154:9
**Hine** 1:18 2:4
**hired** 28:20 87:18
**history** 21:6 150:6
**hit** 153:9
**hold** 125:18 183:14
187:7
**holders** 173:11
**holding** 44:21
**home** 5:11 18:2
29:24 40:1 49:16
49:16 50:3
102:23 114:4
153:9
**honest** 154:18
**hope** 184:18
**horrendous** 199:11
**hour** 49:22 52:5,7
87:20,21 89:6
94:3 142:4
**hours** 5:20 23:6
42:14 197:8,8
**house** 36:23 49:25
50:4 98:13
136:13 167:15
216:12,18
**How's** 88:18
**huge** 199:12
**hundred** 17:5
156:14
**hundreds** 204:10
204:19
**hyphen** 35:15
126:18
**H-E-I-N-T-Z**
29:15
**H-E-R-B** 34:19

———————
**I**
———————
**idea** 39:7 42:11
45:7,10,19 46:5
46:21 47:2,12,22
58:22 66:22
105:17 112:4
113:4 115:24
117:19,24 118:5
140:18 146:14

154:2 160:16
174:20 189:14
211:11
**identified** 57:19,20
121:24
**identifies** 52:25
54:21 193:12
**Identifying** 133:12
**ignorance** 15:10
114:21 198:21
**ignorant** 209:4
**illegible** 48:17
**imagine** 73:9
198:25
**immediately** 9:20
65:20,21 76:4
216:7 217:18
218:16
**Implements** 156:5
**important** 161:14
**inaccurate** 151:1,2
**inactivated** 27:3,4
27:6
**inception** 191:3
**incident** 202:17
203:3,3,5
**include** 115:5
209:24 210:3,20
**included** 86:8
208:24
**includes** 78:2
**including** 47:8
53:24 78:1
**income** 25:17,22
26:1 29:1 44:14
113:10
**incorporate** 86:6
**incorporated**
23:14 26:19,22
27:23 28:16 29:2
108:16,20 116:13
116:18 163:3
**incorrect** 107:21
**increased** 87:20
**indebtedness**
135:5,7 136:5
**independent** 28:20
60:6 70:8 175:11
175:12 176:7,11

176:15 177:13
178:2,6 179:4
186:24 187:9,11
188:12
**Indiana** 49:18
152:22
**Indianapolis** 49:16
**indicate** 68:5
**individual** 115:18
**individually** 13:20
43:3 70:18 81:15
**individuals** 7:19
86:2,10 155:17
**industry** 40:19
171:6
**inflamed** 137:1
**info** 215:17
**information** 33:14
41:13,14,15
86:24 190:10,21
201:11 202:3,4
202:14 208:2
**informed** 216:9
**initial** 96:13 98:8
**initialed** 97:4,6,8
**input** 86:15 88:4
**inputting** 87:6
**inquire** 115:16
198:17
**inquisitive** 205:21
212:22
**inquisitiveness**
205:18
**inside** 182:6
**insignia** 56:13
61:19 62:5,8 63:2
63:7,11,15,25
65:2,13,15 66:13
67:23 68:11,16
68:21 72:10,18
72:22 74:10,15
74:22 75:6,9,15
75:22 76:21,25
78:11,21 79:4,10
80:11 81:24 83:8
83:18,22 99:7,15
122:21 124:10,18
125:6 126:3,9
127:3 148:16

168:5
**insofar** 74:23
75:15
**inspection** 46:16
**installments** 56:9
**instance** 80:1
86:13 178:23
**instances** 184:5
**Institute** 20:24
**instructions** 165:5
**insurance** 109:2
**Intan** 122:12
**intangible** 121:17
121:21 122:3
123:5,21 124:2,9
127:15 128:8
**integrity** 98:18
114:20
**intends** 61:19 62:4
**intention** 108:7
**intents** 97:8
**interested** 39:14
93:12 112:20
170:6 220:19
**interesting** 81:17
84:1
**interim** 34:3
**interlineated** 48:8
**International** 90:6
**interrogatories**
14:20,23 15:5,25
149:16 175:13
**interrogatory** 15:7
81:4 149:25
150:5 152:1
**interrupt** 10:7
**involved** 122:21
**involves** 47:25
**involving** 72:5
**in-house** 87:3,4
**irrespective** 110:6
110:8 133:2
**issue** 105:8 137:14
137:17 185:22
**issues** 87:23,25
**item** 184:14
**items** 96:22 109:7
**iteration** 65:8
160:17

iterations 147:23
i.e 108:25

**J**

J 2:6 116:3 147:12
Jane 147:14,15
Jania 29:15 86:14
January 189:7
 194:3,9 206:9
 212:20,23 217:9
Jeanie 147:20
Jenkins 29:14
 87:15 147:8
Jenny 116:3
Jersey 169:15
Jesus 155:6
job 21:6,10 22:11
 22:16,23 89:25
 90:20 91:1
 152:11
jobs 21:7
job-related 21:4
Joe 155:21
John 2:6 156:5
 167:15 215:22
Johnson 20:7,8,18
judge 145:15
judge/gentleman
 7:22
judgment 9:20
Julie 1:20 2:21
 220:4,7,24
July 92:19 111:22
 118:22 125:24
 131:25 134:15,20
 155:3,3,6 185:14
 209:25
jump 72:13
jumping 118:17
June 1:20 157:20
 158:22 171:8,8
jury 145:15
J.D 216:12

**K**

Kay 29:14 86:11
 147:8
keel 111:12
keep 17:21 32:3,5

32:8,11,21
 154:17 204:12
 215:13 218:20,20
keeps 24:9
Kelly 9:16
kept 29:23 129:20
 197:4
keying 86:16
keys 113:16,18
kind 81:1 102:2
 105:1 140:4
 151:20 154:6,14
 154:17 163:7
 198:16 201:16
 202:3,4 212:22
 213:24
Kinkos 23:23
knew 35:21 89:19
 89:23 93:2 105:5
 105:25 115:14,19
 115:23 153:17
 159:8,15 160:6
 171:6,7 183:13
 183:13 196:16
knocked 82:14
know 7:15 8:13
 9:21 13:3,6 14:23
 16:25 17:8 19:11
 22:3 23:18 28:14
 31:25 32:1,18
 34:1,19 35:19
 36:5,8,10,12 38:2
 40:16 42:14
 43:20 44:13,14
 45:17 46:11,20
 47:6,20 50:10
 53:16,17 54:3
 56:15 58:9,10
 60:17,18 63:17
 63:22 69:13,16
 71:2 72:24 73:3,5
 73:10,14,16 74:3
 79:4 81:21 83:19
 88:11 89:13,17
 90:13,14,17
 94:13 95:6 99:4
 102:25 104:25
 105:1 109:3
 110:21 111:18

113:24,25 114:20
 114:21 115:20,24
 116:2,8,21,21,22
 117:4,8 119:20
 119:23 123:8,9
 125:15 126:25
 128:1 130:13,17
 131:10 132:15,16
 132:19,24 135:25
 135:25 136:1,1
 137:7 138:12
 140:3,14 143:25
 144:2,4 146:6
 147:16,17 148:7
 149:4,5,8,19,20
 150:17 153:21,25
 154:16,25 156:13
 159:20 160:9
 162:17 164:9,22
 166:20 169:16
 170:6 172:18
 177:6,19 181:10
 182:14 187:25
 188:4,17 193:13
 197:11,19 198:13
 199:4 200:16
 201:20 202:1,23
 202:24 203:1
 204:25 206:2
 207:8,23 208:9
 212:13,14,22,23
 212:24 214:12
knowing 117:17
 171:5
knowledge 80:4
 195:13
known 89:21 105:5
 164:11 203:8,11
knows 181:10
Kurt 29:14 86:12
 203:20

**L**

l 2:10,14 139:10
lack 10:5 27:12
 40:2 44:10 154:9
 178:15 180:16
lady 154:11 200:13
 200:16 216:9,10

laid 41:2
language 106:6,9
 109:8 124:13
 126:2 128:12,19
 128:20 209:18
large 184:15
larger 114:6
lastly 167:20
late 21:21 22:5
 31:9 75:13
 131:11,19 132:15
 152:6 194:2,9
laughing 197:8
Laura 217:10
law 31:24
lawful 5:2
lawsuit 6:11,13,14
 6:16 7:4,7 8:17
 8:22 9:11,24
 10:18 11:19
 22:14 130:18
 133:18,20,23
 134:2,3,9,11
 137:8,11 144:5
 144:16 145:14
 161:22
lawsuits 13:4
lawyer 9:13,15
 42:7,25 71:11
 100:11 104:15
 137:6 146:15,19
lawyers 13:18
 19:22
lawyer's 132:23
 133:3
lay 205:2
lead 169:25
leads 28:11 169:12
 169:14,16,17,19
 170:10 180:11
 186:2
learned 160:19
 161:8
leave 153:1 184:1
 184:11 185:1
 203:15 211:22
 215:9
left 113:12,12,15
 130:8 153:15

158:11 185:4,5
 218:13
legal 26:9 50:12
legitimate 134:12
Lenox 2:4 3:6 5:6
 10:21,24 12:3,9
 15:1 17:9 30:3,10
 30:15 42:19 48:9
 48:16,21 49:2,4
 51:4 52:5 53:11
 54:7,10 56:23
 58:21 62:11
 64:13,21 78:10
 88:16 92:10
 106:11 127:19
 128:2,4,6 139:15
 145:20 157:14
 162:5 172:5
 192:7 199:20
 202:5 206:6
 214:2,11,19,22
 215:9,18 218:17
 218:19
lesser 135:15
letter 12:5 137:2
 156:14,16,25
 157:5,11 159:2,3
 168:9,13,18
 200:11,17 202:8
 202:10 203:25
 204:15,18 205:4
 206:9,12 207:9
 216:8 217:3,7,14
 217:16 218:3,8,9
letterhead 80:3
 82:1 118:2,11,14
lettering 66:21
letters 80:23 169:8
 202:12
let's 6:8 15:1 17:9
 22:17 42:12
 52:24 56:21
 64:19 66:3 74:13
 81:15 92:9 93:4
 94:14 98:12,12
 98:13 103:2
 110:16 111:13
 112:8 114:23
 118:16 120:11,22

125:18 127:21
128:3 139:15
150:24 154:19
155:3,21 157:14
157:14 162:5
164:16 165:8
172:5 177:10
181:20 182:12
184:19 192:7,10
199:20 202:5
205:17 206:6
213:20 218:18,22
**liabilities** 27:20
**Liability** 143:11
**Liberty** 171:11,16
171:24 187:21
**license** 44:5 54:4
62:17 63:1,6,12
70:17,17 74:23
75:16 76:1,4,8,14
77:19 78:2
122:12,16,20,20
122:25 123:6,21
124:2,9,10 125:3
125:12 209:1
**licensee** 74:14,16
74:22 124:18,19
**lie** 153:12,12
**lied** 154:12
**liens** 63:18
**life** 50:23 51:8
142:7
**light** 47:17 215:11
**Limited** 143:11
**line** 106:7 120:18
122:11 125:20
139:11
**lined** 97:6
**lines** 47:9 70:24
**lingo** 23:18
**lion's** 179:22
**Lisa** 186:21 187:11
**list** 51:17 54:13
85:10 94:15,16
94:18,18 95:21
96:3,6,16,19,21
96:23 97:3,5,7
98:8 99:5,8,9,11
108:13,15,16,20

108:24 109:1,3,5
109:6 115:2,6
120:22 121:7
136:6 156:10
170:10 186:2
187:14 205:12
**listed** 120:7 121:14
122:16 123:12,22
124:5,9 128:9
**listened** 7:23
**listing** 135:6
**listings** 87:1
**lists** 53:5,20 85:7
85:14,17,21
143:11
**literally** 113:16
130:15 169:1
186:6
**litigation** 120:1
137:16,18
**little** 9:8 10:25
12:13 21:7 48:24
49:1 55:20 64:4
65:6 69:24 70:1
88:21,25 106:21
125:19 139:25
144:13 147:25
154:21 155:8
158:16 159:23
206:12
**live** 20:13 207:20
**lives** 110:21
**living** 20:17 34:21
49:17 90:10,13
**LLC** 2:11 23:15,18
92:17 109:17
115:12,13 116:7
117:16,18,21
118:12,19 120:7
125:21 142:14
143:15
**LLP** 1:18 2:4
**local** 70:3,14
169:21 194:18
204:4
**located** 24:16
**location** 113:17,21
113:22 114:6,12
**Logan** 81:5,15,18

81:19,24 82:13
82:23 83:12
84:10,14 139:20
**logo** 56:13 61:19
62:5,8 63:2,7,11
63:15,25 65:2,13
65:15,24 66:13
67:18,18,19,23
68:6,6,7,11,16,21
72:11,19,23
74:10,15,22 75:6
75:15,22 76:21
76:25 78:11,21
78:23 79:4,10,13
79:14,15 80:11
80:22 81:20,24
82:2,3 83:8,13,15
83:17,22 99:15
122:21 124:10,18
125:6 138:22
139:1,1,3,22
148:4,16 168:5
186:11 190:8,12
190:13
**logos** 75:9
**long** 9:24 11:21
14:18 24:18 38:3
42:10,12 51:18
59:17 67:4 89:21
94:2 114:9 130:7
144:22 151:21
191:2 218:7
**longer** 159:18
**longest** 215:14
**look** 17:19 35:15
44:11 45:1 49:14
50:15,21 51:1
52:24 57:25 59:5
63:25 65:13
66:16 68:7 72:8
73:4 84:16 106:6
106:7 112:9
114:13 118:17
120:16 124:16
139:7,21 140:7
140:16 149:24
150:5 165:8,8
182:15,18 183:21
183:22 189:3

201:17 217:7
**looked** 36:10 67:13
67:16 68:12,16
77:3 109:18
139:8 147:22
159:18 160:23
161:3 170:17
184:8
**looking** 22:11 30:8
30:10 54:1,5
62:23 63:16
84:11 90:24,25
103:6 111:21
112:20 115:9
131:22 156:3
158:3 170:6,7,8
188:25
**looks** 47:8,16
48:18 64:15 69:7
209:8
**loosely** 87:19
190:12
**losses** 111:4
**lost** 8:14,23 37:20
156:20,21 195:1
**lot** 9:7 73:9 88:5
174:18 179:19
183:11 188:11
205:23 215:1,17
**Louis** 169:15
**love** 196:7
**low** 46:25 47:4
**lower** 138:23
**lump** 77:23
**lunch** 34:2 52:7
88:17,20 94:3
212:15,17 213:2
213:3,11,12
**luncheon** 93:8

_____

**M**
**m** 1:10,14 2:17 3:5
5:1 52:13 125:10
139:10 162:25
219:3 220:7,10
**Madison** 81:12
82:10 83:3,4,12
139:20
**mailed** 180:25

184:16
**mailing** 162:25
**main** 114:6 149:1
164:6
**major** 25:6
**making** 71:9 86:16
95:8,10 213:2
**man** 20:9 154:5
203:23
**managed** 21:12
**management**
154:15
**manager** 90:6,8
200:5 203:17
210:25 211:5
**managers** 153:23
153:24 204:19
211:5
**Mangan** 154:5
210:24 211:1,2,5
211:22,24 212:11
213:16 215:21
216:21
**manner** 17:7
**March** 165:15,20
165:21,22 220:25
**mark** 15:1 17:9
39:9 42:19 54:4
62:11 64:15 65:2
65:7,8,15 66:3
92:10 126:10
127:4 129:1,6
130:23 131:5,13
131:19 139:15
140:7,7,16
147:21,23,25
148:1 149:12,13
149:14 157:14
160:4 162:2,5
172:5 173:25
174:2 181:22,24
184:19 189:22
192:7 199:20
201:15 202:5
206:6 208:8
**marked** 3:10 15:2
15:3 17:10,11
42:20,21 45:8
47:12,22 48:22

62:13,14,23 66:4
66:5 77:15 92:11
92:12 120:14
133:16 139:16,17
141:23,24 142:8
157:16,17 162:6
162:7 172:6
174:3 182:1
184:20,21 189:24
189:25 191:6,7
192:8 193:3,4
199:21 202:6,7
206:7 217:2,6
**market** 79:20,21
79:22,25 152:20
**marketed** 74:4
**marketing** 35:18
35:19 52:12 60:3
61:17,24 62:1
151:5 180:18,20
184:12 201:18
**marketplace** 73:8
**marking** 133:3,6
**markings** 44:24
45:4,6
**marks** 65:4 80:6
99:7 126:3 137:9
137:13
**married** 19:25
**Massaro** 217:10
**material** 180:20
**materials** 30:6
180:18 184:12
**Matheson** 175:14
175:17 176:6,10
177:18 179:5,11
180:4 198:7,8,8
**matter** 67:24 95:9
171:21 175:7
213:1 217:25
**Maurice** 31:25
32:1
**Max** 35:6
**McGowan** 29:14
29:14 86:11 87:8
147:9
**mean** 10:7 14:24
19:3 27:22 32:17
38:19 40:24

41:11 42:8 43:18
47:5 48:14 50:20
63:17 67:21
72:13,24,24 73:4
75:18,19 88:10
89:5 91:25 101:1
110:5 128:17
130:14,15,21
132:19 133:13,14
146:16 148:19
152:14 153:4
160:23 162:24
165:11 185:18
198:23 207:4
209:4,5 212:22
214:11,12 215:6
**means** 19:4 43:9
79:1
**meant** 132:7
196:14
**Mechanicsburg**
156:5
**mediation** 7:11,11
7:16,18 145:16
145:18
**medications** 5:19
**medium** 175:20
**meet** 14:16,18 34:9
36:23 39:11,22
151:6
**meeting** 39:25 93:6
93:8,16,18,25
94:2 153:18
**memory** 49:14
**mental** 161:11
**mentally** 171:7
**mention** 33:24
197:22
**mentioned** 12:14
26:2 32:19 51:16
167:3 173:19
179:25 181:1
186:15 216:12
**mentioning** 77:23
**merely** 11:14 59:21
68:7 97:4 127:12
180:22 181:1
183:15 201:16
**message** 218:13

met 34:11,12,13
40:1 41:9 151:3,7
151:9,14 199:12
**Meyer** 2:11
**Miami** 36:7,8
37:17,19 213:10
213:10
**Miami/Shelby**
152:21
**Michael** 5:9
**Michigan** 20:25
**middle** 47:15
139:21 142:13
143:7,12 211:9
**Midland** 20:24
**mid-1990s** 6:3
**mid-2002** 151:3
**Mile** 5:12,12 26:13
**military** 177:12
**million** 8:5 93:10
93:13,13 94:10
94:10 95:1,13
**mind** 77:5 98:10
169:2 210:21,23
210:24
**mine** 43:17 51:6,7
132:13,17,19
154:6 203:7,11
**mini** 7:21 23:23
158:16
**minimum** 131:18
**minute** 65:11
142:15 145:21
**minutes** 14:19 16:4
34:4 52:6 188:25
214:1
**missing** 125:12
**misunderstanding**
145:14
**mock-up** 183:6
**model** 91:17
**Modestly** 9:20
**moment** 108:2
160:1
**moments** 68:13
**Monday** 14:17
**monetary** 44:1
**money** 35:3,5 50:2
50:2,6 61:8 86:6

98:17 187:4,15
209:8
**monies** 74:18
**Monroe** 90:7
**month** 57:13,16
96:2 131:5
168:17
**monthly** 56:9
77:22
**months** 8:9 16:15
21:18 45:12 93:3
96:2,15 105:21
131:2,14,15
134:10 137:7
150:7,12 151:4
152:2,24 176:17
176:18,19,20
178:19,20,20,21
178:22,23
**Monument** 2:11
113:24 114:7,9
142:16
**moot** 105:6 126:24
**moral** 132:22
**Morgan** 9:16
**Morman** 175:14
177:10,11,14,16
177:22,22,24
178:25 179:5,7
179:16 180:7
196:23 197:1,13
197:16,20,22
**morning** 94:7
**mortgage** 49:15,25
**Motor** 90:8
**motorcycle** 101:18
**mouth** 195:18
213:8
**moved** 90:11 114:5
114:6,6
**moving** 49:24
**multiple** 33:9
38:24 54:6,9
71:10 157:9
**M-A-U-R-I-C-E**
31:25

―――――――
**N**
―――――――
**N** 2:14 3:2 136:24

name 5:7 20:6
22:21 26:2,24
34:18 35:11
38:15 39:9 42:4
44:12 51:9,16
56:13 61:19 62:1
62:5,8 63:2,7,10
63:15 65:13,15
66:13,15 67:19
67:23 68:11,15
68:21 71:3 72:10
72:18,22 73:21
74:2,5,10,14,22
75:5,6,8,15,21
76:21,25 78:11
78:21,23 79:4,16
80:11,18 81:16
81:18,23,24 82:3
83:8,13,17,22
93:8,19 99:7,10
99:14 101:14
107:20 110:1
115:15,19 116:21
117:8 118:21
122:21 123:17
124:10,18 125:5
125:23 126:3,5,5
126:9,22 127:3
127:10 128:14
130:22 131:13,19
131:24 138:13
139:6 142:14
143:4,8,14,20
144:10 146:13
147:11,13 148:15
149:20 150:13,18
158:3,19 159:1,6
159:21 162:3
163:14 165:10,13
165:25 166:23
167:14,16 168:4
168:21 169:22
173:11 188:4,5
189:10 197:22
198:3,18 199:2
199:16 201:14
203:10 205:6,10
205:18 208:8
209:21 213:9,9

216:1,14 217:20
**names** 29:11 32:19
75:22 79:24
85:25 97:17
129:1 154:3
156:22 159:4
166:10,15 199:2
205:13 212:10
**Name/Original**
143:2 162:17
**narrow** 70:1
**native** 19:11
**nature** 6:16 13:12
**necessary** 215:8
**necessity** 106:16
106:22
**neck** 23:4
**need** 12:4 16:1,3
16:21 34:3 50:2
58:17 105:3
106:23 119:15,17
126:15 127:5
129:3,8 154:17
155:24 174:18
188:14 190:20
214:8 215:1
**needed** 109:2
177:13
**needs** 16:14
**negative** 60:18
**neglected** 8:20
11:14
**negotiate** 40:7
42:15 141:19,21
**negotiated** 11:7
40:23 41:2,5
100:18 101:23
**negotiating** 37:8
37:13 42:5
187:25 188:1
**negotiations** 36:19
42:10,11 76:14
76:20 92:23
**neither** 104:2
**net** 111:4,9
**never** 11:17 28:20
28:22 29:1 57:10
57:11,14 59:20
59:23,23,24 60:1

64:16 68:3 76:9
77:6 79:19 81:17
83:13 88:11 92:2
105:8 107:13
112:14 115:14
116:3,8,10,13,18
117:1,18 118:14
125:16 126:4,15
126:23,24,25
127:5 128:25
129:3,4,5,8,8,12
131:19 132:3
135:10 144:6,9
159:11 161:25
171:7 172:21
183:5,20 189:21
201:16,19 207:4
208:20,21 210:21
210:23,23 213:21
**new** 16:14 31:10
41:7 50:9,10
64:15 80:8 85:12
118:14 129:15
131:3 159:1
169:15 182:14
183:6 191:3
195:4 198:20,21
**newspaper** 170:5
175:24 210:17
**nine** 43:22,24 59:9
59:12 62:9 63:17
69:19 71:24,25
72:4 77:20,21
108:23 155:6
178:19,19 192:21
**nineteen** 79:17
**ninety** 79:17
**Ninety-nine** 196:5
**non** 128:25
**non-compete**
44:11 69:8,11,13
69:18 122:4,6,8
126:16 198:20
208:11
**non-exclusive**
126:8 127:10
**North** 114:6
**Northwood** 20:24
**Notarial** 220:23

**Notary** 1:21 2:21
2:25 220:4,16,20
220:25
**note** 58:3,8,17,23
58:24 161:11
**notes** 58:10,10,13
63:19,20 75:21
**notice** 107:20,23
110:3 132:5
**November** 199:24
**number** 45:1 46:6
70:17 81:4
121:21 136:2
143:12 149:25
150:5 152:1
169:23 172:8,23
172:25 192:12,21
202:12 216:6
**nutshell** 93:9
**NY** 2:8

_____

**O**

**O** 2:14
**object** 73:1 106:9
109:12 120:21
123:14 127:17
**objection** 106:12
110:12 119:7
122:19 123:7,24
126:11
**obligation** 56:10
**obligations** 43:6
**obtain** 58:20
**obvious** 126:19
**obviously** 16:6
48:3,22 71:21
74:4 100:7 113:4
123:17 178:17
192:12 202:14
215:1
**occasion** 127:23
**Occasionally**
183:11
**occasions** 6:5
196:9
**occur** 75:12
**occurred** 173:18
**October** 24:1
**offer** 47:5 92:25

94:22 96:13
**offered** 8:18,23 9:1
**offering** 8:12 91:11
**office** 17:20 32:17
55:8 102:6,12
105:3 117:24
137:4 152:23
154:12 169:16
197:3 203:14
207:4,14 216:15
**officers** 106:17
107:6,10 108:4
**offices** 1:18
**officially** 75:12
**Off-the-record**
7:14 56:24
145:23 181:13
214:18
**Oh** 20:9 43:11
53:12 54:4 67:14
80:16 151:24
155:6 157:10
181:11 210:10
**Ohio** 1:1,19,21,25
2:5,12 5:13,15
6:15 9:16 20:14
21:17 24:17
26:19 27:6 49:18
49:24 71:6 72:20
73:15 74:17
138:18,20 142:12
142:17 143:11
150:9 159:18
160:10 162:13,21
175:14,15 186:23
209:20 220:2,5
220:21,25
**okay** 6:9 12:12
19:14,21 21:22
30:15 34:8 45:25
46:10,25 49:7
50:25 51:4 52:4
53:4 56:18 57:25
58:2 61:13 62:10
68:9,18 69:20
75:1 78:18 80:10
87:15 88:19,24
89:14 93:25
94:21 99:25

101:22 105:12
111:20 116:1
118:25 120:3,13
121:14 128:4,8
142:8,15 143:13
150:4 154:24
157:13,17 170:13
178:8 182:9,12
192:6 195:24
201:8
**old** 20:8 64:22,24
65:2 90:15
177:16,18 181:8
181:9 182:21
183:6 208:4,11
**once** 65:9,10 75:8
82:24 110:3
138:17 169:12
217:16
**ones** 158:12
**on-line** 160:11
**open** 183:20
199:12 215:9
**operate** 18:2 25:14
114:3 142:20
**operated** 30:17,18
113:20 114:4
142:23
**operates** 17:25
163:20,25
**operating** 27:9
31:7
**operation** 86:23
**operational** 91:23
**operations** 31:14
90:8
**option** 8:19,23
10:8 11:12,16,19
11:20,23 102:20
102:22 108:25
**order** 145:24 173:3
180:14 194:14
199:9
**original** 133:12
148:22 216:8
**Originally** 114:4
163:16
**ought** 102:19
**outside** 2:24

220:15
oval 140:4
overall 44:4 63:14
overcharged
153:10
overwhelming
156:23
owe 179:8,9 187:4
187:6,15
owed 13:6,16
111:11 135:23
187:7
owned 13:10 21:11
37:10 51:20
114:7 125:5
126:25 136:15
148:5 149:22
151:11 159:23
178:18 188:9
owner 24:5 74:22
75:15 129:16,19
156:6 200:5
203:12 204:4,5
213:5,10
owners 157:25
158:1 204:19
ownership 137:8
137:12 148:3
189:9
owning 25:6
owns 78:5,6
166:24 203:9

**P**

P 2:14
page 15:21 35:9,9
42:25 43:1,13
45:20,20 46:13
47:14,15 48:11
49:1,9 61:10
68:18 72:9 79:8
86:25 87:1 88:6,6
102:20 111:24,24
114:23 119:5,10
120:8,17 123:22
124:14 131:22
139:22 140:7
141:13 142:13
143:4,7,12,19

149:7 150:2,3
151:6 163:16
164:16,19 165:1
165:8,11,12
167:20 168:2
175:18 182:6,8,9
182:11,17 184:23
189:3,3 191:15
191:18,25 193:22
199:23 200:2,15
pages 6:22 21:22
24:24 25:14
31:10 37:15,25
37:25 38:19,24
39:20 52:19
69:20 70:11,14
73:19 86:16,17
87:1,1 110:10
111:17 119:4,5,9
134:24,25 136:7
154:22 155:1,12
166:11 168:7,8
168:23 182:13
186:6,7,10
206:16
paid 50:7 55:18,21
55:23,25 56:7
57:10,11 59:24
60:6,8,16,16,21
61:1,4 75:2,5,8
77:10,15,20,22
78:12,12 89:3,4,7
124:23 125:2
135:2,8,10,11,18
146:17 150:19
177:8 179:7
187:2,8,18,19
193:18
panel 7:19
paper 19:3,11 40:3
41:14 42:6 49:22
164:24 190:3
193:16,19 204:11
210:22
papers 9:10 100:4
101:19 102:5,8
paperwork 131:10
paragraph 46:6
47:7,14 52:24,25

53:2,9,11,13,14
55:17 56:3,11
57:2,25 59:5
61:14 63:10
74:13 75:21,25
76:3 115:10
118:18 131:22,23
205:2 209:18
parcel 98:2
pardon 29:4,4,7
33:5 67:14
133:25 145:13
162:3 165:12
189:2 198:11
parked 26:13
part 6:24 7:1 8:17
10:18 13:9 18:4
18:25 44:4 48:1
48:13 52:16 56:6
58:7,15 59:12
63:13 75:14
76:14,20 78:10
82:18,25 83:8
85:6 93:1 95:11
98:2 107:14
118:14 126:8
185:20 191:15
197:25 203:2
204:5 208:21,23
215:16
participate 42:17
51:11,14,19,23
participating 52:1
particular 8:21
18:21 41:23 47:3
50:17 55:22
132:24 135:19
178:23 210:3
parties 2:16 61:15
220:18
partner 25:9 50:20
50:22,23,24 51:8
partners 24:7
37:19,20 115:20
115:23,24,25
partnerships 25:11
parts 32:20
party 198:25
part-time 23:2

89:1,3,4 167:6,9
pass 34:23
passed 25:25
passing 89:19
116:21 161:24
pasted 182:21
Pat 88:2
Patrick 1:21 2:22
29:13 50:23 51:9
51:11,14,18
135:19,23 220:4
220:7,24
pattern 198:2
pay 9:17,19 13:16
14:4 23:7 56:6
57:16 76:1 77:18
91:12 93:10
95:20 169:17
173:3 176:25
187:15,17,18,21
188:22
paying 91:11
102:21 171:6
payment 46:25
47:4 56:4 57:5,7
57:9,12,15,20
74:18 77:18,25
77:25 78:2
135:12
payments 57:19
61:10 74:21 76:4
76:11 77:14,22
91:12
payroll 88:12
130:2
pencil 49:4,4
penciled 120:2
penciling 120:4
pending 128:7
215:20
people 15:11 32:17
32:19 71:2 73:23
74:1 85:12 86:13
91:11 97:14,18
97:25 154:14
155:20,23,25
156:2,3,15,22
157:24 158:10
163:5,5 167:8

176:18 180:12,13
183:12 185:5,5
188:12 195:25
196:3,16 197:10
198:9,19,22,24
199:4,13 200:12
201:17 202:1,23
204:1,10,12,17
204:25 205:4,6
205:12,13,14
207:3,6,12,13
208:16 211:6
212:9
People's 173:10
perceived 128:24
percent 17:5 56:7
56:10 176:14
179:12,13,14,17
205:11,13,14,15
205:17,25
perfectly 218:21
period 21:13 27:8
27:11,14 29:9,21
30:4 32:22 33:6
33:21 64:18
69:25 76:5 79:11
85:2,25 95:13
104:17 113:8
118:10 129:12
131:4 154:1
172:3 175:5
178:8
permission 194:16
person 113:1
136:25 146:10
158:4 188:19
194:22,22 196:15
204:14
personal 24:14
26:14
personally 24:13
112:14,24 130:22
194:20 195:2
196:17 207:3,11
person's 146:13
167:14 203:10
pertinent 190:10
Peter 116:2
Phil 175:14 179:25

197:5,9,20 202:21,22,25 207:10
**phone** 21:15 34:14 37:5 39:7 40:19 64:20 70:8 79:18 80:7 81:25 84:2,7 149:17 150:8 154:13 155:13,19 156:17 161:3 164:11 169:23 172:25 178:14,19 183:11 194:21 195:23 196:14,15 196:19,23 197:4 197:6,7,21 198:21 204:8 206:25 208:10 215:22,25 216:1 216:6,16 218:8
**photos** 64:24
**physical** 172:21
**physically** 130:15 168:24,25 169:1 171:20 176:18 196:12 202:21 203:25
**pick** 145:15 158:1
**piece** 41:13 135:19 190:3 201:18 207:24 208:2 210:22
**pile** 174:17
**Piqua** 40:1
**place** 2:19 39:25 86:19 93:25 97:15 98:5 200:9 201:10 220:10,12
**placed** 35:23 45:17 117:14,18 141:18
**placement** 140:25 141:20
**places** 46:17
**placing** 35:4,5 36:16
**Plaintiff** 7:4
**Plaintiffs** 1:6,16 2:3,18 3:10 15:2 15:4 17:10,12

42:20,21 62:13 62:14 66:4,5 92:11,13 139:16 139:18,19 141:23
**Plaintiff's** 157:16 162:6 172:6,7 182:1 184:20,22 189:24 190:1 191:6,7 192:8 193:3 199:21 202:6 206:7 217:2
**plan** 56:4 169:3
**plant** 90:5
**play** 30:12
**player** 39:17
**playing** 136:14
**Plaza** 2:8
**plea** 198:14
**pleadings** 9:10 10:20
**please** 5:7 74:8 111:15 150:6 152:19 158:13 191:9 192:11
**plus** 95:1 96:10 135:5
**Plymell** 29:17 88:8
**Plymouth** 28:16 34:11
**point** 11:18 16:20 25:20 37:8 39:19 45:9 65:18,19 75:4 78:7,16 81:3 94:15 98:16,20 99:13 100:4,18 104:22 105:5,7 106:1 107:25 114:1 117:19 126:24 133:20 134:6 137:1,16 138:5 170:14,24 171:23 174:3 179:25 202:22 213:2 216:4 218:19
**pointed** 111:14
**pointing** 210:5
**points** 94:18 198:2

198:2
**poker** 136:14
**police** 203:24
**Polylogics** 86:22 169:15,16 185:19 185:24 186:1,4 187:17 188:20,21
**poorly** 11:5
**portion** 46:14 57:18,19
**positive** 206:24
**possess** 29:20
**possible** 16:17 112:25
**possibly** 21:16 33:22 50:12,21 147:9 216:11
**post** 192:18
**postcard** 180:24 180:24 181:1 184:15,16,24 185:1 202:13
**Postcards** 169:9
**post-high** 20:23
**potential** 169:5 170:2,25 171:12 195:13 196:10 197:16 205:20
**potentially** 168:22
**power** 109:15
**practice** 57:8 215:15
**practices** 153:2
**practicing** 110:17
**premises** 195:17
**preparation** 14:21
**prepare** 14:7 186:6
**prepared** 8:18,23 11:16 117:10 139:8 169:13,14 185:20 202:15 210:17
**prepares** 169:16 185:24
**presence** 2:23,25 89:23 220:16
**present** 7:19 21:8 22:17 23:25 28:22 29:3 93:16

93:17 101:20 145:12 154:22
**presentation** 208:22
**presented** 10:6 11:10 72:1 101:11 103:3 202:18
**presently** 25:1 28:19 32:8 52:1 66:9 179:2 199:17
**president** 2:7 37:18,20 163:1,3 211:13,16,20,25
**Press** 171:11,16 187:21
**presume** 179:20
**pretty** 39:9 57:6 130:14 138:2 174:10 195:17 200:15 205:19
**previous** 74:12 136:12 153:9
**previously** 12:24 69:23 135:1 147:21 171:5,6
**price** 86:19 95:23 135:4 141:22 153:11 171:7,7 209:9
**priced** 153:8 171:1 171:4
**pricing** 171:3
**print** 21:18 22:18 168:1 185:25 199:8 206:4,5
**printed** 79:16 112:14 202:16
**printer** 185:13 186:7 187:18,20 188:18
**printing** 45:24 47:9 87:4 112:22 186:8 199:7 216:1
**printout** 169:21
**prints** 23:21
**prior** 44:19 51:23

89:21 91:12 97:24 134:9 148:8 151:14 168:20,24
**probably** 6:3 13:5 13:16,17 19:16 29:22 34:19 40:11,11,11,14 41:4 50:13 58:11 63:18 70:8 75:13 77:5 79:18 80:21 82:2 85:22 91:18 92:8 93:15 96:22 107:22 110:5 112:19 113:4,11 113:12,12 114:22 131:9 132:15 141:10 150:8,12 150:24 152:5 154:25 155:19 160:24 161:24 162:4 165:7 166:22,25 168:9 171:1,8,25 172:4 181:17 185:4,14 202:15,15 205:11 207:5 210:25 212:16 214:7 218:14
**problem** 54:11 157:6
**problems** 90:25 91:7,9,22 106:25 107:3,4 111:3 179:8 185:24
**Procedure** 1:17 2:20
**proceed** 197:15
**proceeded** 169:12
**proceeding** 12:23
**proceedings** 50:12
**process** 24:25 86:18 97:11 100:14,17 126:5
**produce** 10:17 19:10 44:18 65:4 78:3 152:20 158:12 171:17 174:13 194:15

206:25 215:2
**produced** 42:25
64:14 122:7
152:15,18 172:8
173:24 192:10
193:5 199:23
205:16 206:23
215:1
**producing** 204:14
204:15
**product** 48:23 83:9
159:7 171:1,3
204:8,14
**production** 19:5
87:20
**products** 20:19
79:24
**professional** 8:4
**profit** 40:13
**profitable** 83:25
84:8,10,14,14,17
**profits** 40:15
**promises** 173:3
**promissory** 58:9
58:10,13
**prompted** 155:11
203:4
**pronounced** 79:1
**proof** 191:10,13
192:22,23 206:24
**proofing** 88:7
**proofs** 191:22
**proper** 17:7
**properly** 134:23
134:25,25
**property** 28:2
75:10 114:7
**propose** 92:25
**proposed** 93:4,9
**proposing** 214:14
**propounded** 15:5
123:18
**Preserve** 200:22
201:2,9
**protocol** 91:14
**prove** 78:6,17
**provide** 44:14 58:3
64:6,7 68:14
69:19 86:23

94:19 96:7,21,23
96:24 99:5
105:11 109:3
194:10
**provided** 64:2
83:21 113:2
184:22 186:2
**provider** 19:9
**providing** 112:22
**provision** 45:23
**provisions** 109:15
**PST** 19:12
**public** 1:21 2:21
2:25 10:20 61:16
70:7,13 220:4,16
220:20,25
**publication** 185:11
194:5 213:18,23
216:24
**publications** 82:1
193:25
**publish** 80:25
148:9 200:23
201:6
**published** 36:5
65:24 80:8,10,18
81:5,8 148:2
178:20 180:22
185:9 188:22
201:4
**publisher** 170:25
201:6
**publishers** 151:7
**publishing** 13:14
31:3 38:3 82:13
93:20 148:12
178:12 193:5,12
**pull** 50:13 157:4
**pulled** 136:12
**purchase** 8:8 9:1,3
36:19 37:7 42:11
42:16 44:5 52:11
54:22 56:13 57:1
61:20 62:6,7,22
63:11 71:9 74:19
82:24 93:1 95:23
121:18,21,25
134:7 135:4
**purchased** 6:12

21:14 26:9 35:8
36:4 37:22 43:21
63:24 65:14,20
65:21 66:12
67:10,24 68:2,4
77:17 80:7 87:2
117:5 141:1,3
**purchaser** 46:17
61:19 62:4
**purchasing** 8:10
11:9 34:15 35:1
39:21 44:21 53:1
53:7 77:1
**purpose** 44:21
163:5 190:7
**purposes** 23:13
97:9 112:23
141:19 164:7
**pursuant** 1:16 2:19
16:22 19:2 60:9
220:11
**put** 26:8 30:12
33:1 43:18,21
46:3 58:17 88:5
117:5 132:14
133:8,11 136:2
176:4 181:20
186:9 190:8,13
205:4 206:22
209:17,20 210:16
216:3
**putting** 49:22
97:15 199:10
**P&J** 147:12
**P-H** 24:15
**P-L-Y-M-E-L-L**
29:17
**P.B** 117:20 118:11
125:20
**P.B.J** 92:16 109:16
115:11,13 116:2
116:7,10 117:1,9
117:15,17 118:18
120:6
**p.m** 218:24
**P.O** 2:12 172:14,16
172:18,20

**qualified** 28:10
90:4 220:5
**quarter** 35:8,9
72:8 95:1,13
**question** 8:15,16
9:23 11:5 14:11
15:13,15 16:13
16:13 32:5 46:10
62:6 63:9,12
69:24 70:1 71:22
73:1 76:22 78:19
81:23 82:5 101:4
101:7 109:13,25
111:4 114:24
117:11,12 120:21
122:7 123:14,15
123:19 126:1
127:21,24 128:1
128:2,7 130:4
131:21 139:21
146:1 162:22
163:4 164:12
166:9 167:25
194:6 199:15,16
199:19 200:24,25
201:9 205:8,19
205:21 206:18
210:11,18,19
214:20 215:19,20
**questioning** 207:1
**questions** 15:19
40:2,4,9 106:9,14
127:22 214:7,9
214:23 215:3,10
**quick** 21:18 22:18
23:21
**quickly** 95:4
174:16
**quit** 154:1 218:18
**quite** 76:17 130:12
131:23 203:22
216:2
**quotas** 153:18
**quote** 11:9 32:18
136:14 171:9
172:19 216:16
**quotes** 171:10

**R** 138:15,17,21,24
139:25 158:16
159:23,24 160:2
161:1 220:1
**Rabbit** 22:22
24:22 25:15
27:13 28:14 31:4
31:6 32:6 51:24
140:24 162:20,22
163:4,8,11,20
164:6,7,14
167:11,12 193:9
215:24 216:15,19
**rack** 200:19
**radio** 146:21
**rambling** 215:25
216:2
**ran** 84:18 193:11
193:23 194:1
200:20
**random** 158:2
**range** 93:13
**rant** 216:15
**Rapid** 22:22 24:22
162:20 163:8
**rarely** 18:17
112:15 186:16
**rate** 153:7
**raved** 216:16
**Ray** 143:20,23
**read** 19:2 46:8
49:5 56:11 61:14
61:15 71:3,16
74:24 75:20
79:15 102:13,21
102:22 106:15,15
106:18 107:17
112:13 118:18,23
128:2,7 168:13
204:3 215:18,20
**reading** 16:18
53:17 72:14
168:11
**ready** 111:12
**real** 57:4 95:24
163:4
**really** 16:13 65:5
78:4 84:12 94:9
136:2 156:3

| Q | R |

161:1 170:7
199:15 213:24
**reason** 18:21,24
41:23 47:3,23
113:13 119:13
123:15 150:21
178:18 180:12
186:16 209:24
210:3
**reasonable** 46:17
**reasons** 59:22
153:5,13,14,15
160:25 214:25
**recall** 6:6 29:12
45:8 46:3 49:13
64:16 71:19
76:13,19 92:23
96:19 98:2 99:4,6
105:9,20 112:21
116:25 118:13
120:4 122:8
131:12,17 132:8
141:9 147:5,18
147:22 155:17
156:8 168:3,7,11
173:17 193:25
196:10 201:25
208:15 212:6
217:14
**recant** 120:11
**recapping** 12:5
**receipt** 162:18
**receivables** 28:4
55:13 90:25
121:1
**receive** 18:12
190:14 191:16
212:8
**received** 15:6
17:13 74:18
155:15 169:7
215:21 217:16
**receiving** 212:7
217:3,14
**recognizable** 38:16
**recognize** 42:22
62:15 92:13
**recollection** 37:18
71:15 81:5,7,10

81:13 93:15 95:9
132:7 198:12
**reconvene** 215:4
**recopying** 174:18
**record** 5:8 7:12
10:20 56:21
106:8 111:20
145:20 173:23
174:1,23 181:12
181:14 182:3
193:10 214:19,23
215:15 218:22
**recorded** 2:21
**recording** 162:16
**records** 17:22 24:9
29:20 30:1,4,11
32:4,5 33:18,20
53:7,22,24 54:15
55:15 68:4
105:18,23 112:5
112:7,8,19 113:8
113:9 162:15,16
**RECROSS** 3:4
**Red** 22:22 24:20
24:21 25:15
27:13 28:14 31:4
31:6 32:5 51:24
140:24 162:20,22
163:4,8,11,20
164:6,7,13
167:11,12 193:9
215:24 216:15,19
**redacted** 209:3,4,8
**REDIRECT** 3:4
**refer** 6:20 37:24
80:22 106:22
**reference** 48:12
92:22
**referenced** 48:12
119:10 191:20
217:3
**referred** 63:20
70:7 77:2 144:18
**referring** 67:20
79:5 80:23 84:3
116:6 136:17
157:5 165:1
204:24
**refers** 116:2

**reflect** 16:11
**refresh** 81:4
**refused** 11:14,15
**regarding** 19:22
42:9 99:9 204:21
**Regardless** 39:17
**regards** 90:23
**region** 153:20,21
**register** 159:19
162:2
**registered** 75:22
138:13,19,24
143:8 159:15,16
159:21,25 160:2
160:4,22 162:2
165:25 173:1
**registrant** 143:14
167:16
**registration** 143:5
143:12 144:10
159:14 160:24,25
**regular** 205:19
**reiteration** 202:11
202:13
**relate** 18:19
**related** 204:17,23
**relates** 203:13
**relating** 9:11 10:17
30:11 52:18 62:7
99:7 115:1,5
123:6
**relative** 220:18
**relevant** 215:3
**religiously** 50:7
**remaining** 136:7
**remark** 94:11
205:22,22
**remember** 15:18
47:1 59:13,22
69:10 97:17
102:25 105:2
116:23 118:4
147:9 153:24
154:3,8,11
163:13 173:21
188:5 208:6
212:9
**remorse** 49:19
**Remove** 66:18

**rented** 12:19
**rep** 88:12 175:18
190:9,10 203:14
203:16 204:25
216:18,18
**repeat** 95:3
**rephrase** 120:8
138:16 200:25
**reply** 197:13
**reported** 143:8
166:1
**reporter** 2:22
**REPORTING**
1:24
**represent** 15:4
17:12 42:24 44:3
64:13 139:18
142:11 168:1
217:24
**representative**
204:6,7
**represented** 41:20
41:25 49:9 144:5
183:18 215:23
**Reproduction**
22:22 162:20
163:8
**Reproductions**
24:22
**reps** 151:5 153:9
153:22 175:10
176:1 194:21,25
195:7 199:11
202:17 203:6
206:3 212:18,20
213:7
**repurchase** 7:3
8:21 10:1,8 11:2
11:6,12,16,19,20
11:23 102:20,23
103:13 104:7,24
108:25 136:18
**reputation** 97:13
97:19 98:18
**request** 18:25 30:3
30:14 65:12
155:25 192:14,15
193:12,13
**requested** 2:24

12:6 17:16
220:15
**requests** 18:19
19:11,16,18
**require** 71:17
102:21 168:10
**required** 12:21
14:4 56:6 58:3
60:11 75:25
96:22 153:10
164:8
**requirements**
95:22 168:12
**requires** 165:9
**reserved** 16:2
**resetting** 214:10
**residents** 155:14
204:20
**resolution** 109:15
**resolve** 9:24
**resolved** 7:7,15
**resource** 170:1,3
**respect** 6:21 33:10
36:19 47:4 56:3
72:3 87:12 95:22
105:16 128:16
134:7 168:21
196:25 209:21
214:17 218:2,7
**respectfully** 16:10
**respective** 2:16
**respects** 220:11
**response** 8:25 81:3
150:5 195:16
206:1 216:11
**responses** 14:20
15:6,7,8,25 16:8
16:15,21 17:13
156:19,23 158:5
158:10
**responsibility**
152:23
**responsive** 18:18
19:6,8,10,18
**rest** 210:4
**restaurant** 213:5
213:11
**retain** 9:13 100:11
217:24

**retained** 146:15,16
**retainer** 217:22
**retired** 22:13
90:11
**return** 163:13
193:2
**returned** 102:24
104:18
**review** 14:7,10,12
14:20 16:8,21
17:7 114:15,17
191:16
**revised** 192:5
**revision** 21:20
**revoked** 76:4,8,9
**rhyme** 178:18
180:12
**Richmond** 152:22
**right** 7:2 8:21 9:2
10:1 11:2,6,7
16:25 26:3 28:12
31:4,7,10 32:6
33:15 39:12,13
39:20 43:7,25
44:22 45:13 46:6
49:8 51:9 52:2,2
52:22 53:1,20,23
54:12,16,19,22
55:4,6,15,18,21
56:1,4,7,14,17,18
57:23 58:4,16
59:1,7 61:11,15
61:21,24 62:2,19
65:16,19 66:1,9
66:14,19 67:2
68:16,22 70:19
70:22 74:6,11,24
75:2,23 76:1,6,11
77:3,11 78:11,22
81:9 82:5,8,11
83:1 84:7,20 85:8
85:25 89:2,9 90:1
91:4 92:5,17
96:11 98:6 99:19
100:8 101:12
103:9,16,18
104:24 106:19
107:1 108:5,8,11
109:9,10,19,23

110:11 113:21
118:21,23 119:2
119:3 120:24
121:2,5,9,12,18
122:5,18,22
123:6,16 124:3,6
124:13,15,20,24
125:3,6,23 126:8
126:22,25 127:3
127:13 128:14,20
129:2,7,16
131:24 132:3,23
133:4 134:15
138:10 141:25
142:25 143:9,12
143:17 144:20
149:12,14 152:3
155:9 157:7
159:12,16 160:1
160:13,20,22
161:6 165:10
167:18,23 168:18
172:10 174:10
181:4,7,22 182:5
182:18 183:3
184:6,9,13 185:2
186:2,3 189:2,12
191:19 192:1
193:1,6,16,17
205:23 207:12
208:24 209:1,3,9
209:12,15,18,22
210:9,9 212:3
213:4,5,8 215:22
217:1,4
**rights** 126:16
189:10
**right-hand** 43:14
**road** 1:25 5:12
69:7
**Robert** 213:9,9
**Roberts** 213:10,10
**Robert's** 213:5
**role** 87:21,22
129:21
**rolling** 218:20
**room** 114:5
**roughly** 180:6
**routine** 192:17

**rule** 16:22 141:14
**Rules** 1:16 2:19
**run** 23:9 48:25
153:9 174:24
189:6 193:15,18
193:21 194:7
**running** 23:24
31:1 34:25 49:18
106:12 129:20
151:10
**RXR** 2:8

_____

**S**

**S** 2:14,14
**safe** 205:11
**sake** 174:2
**sale** 40:21 41:1
52:17 59:19
61:18 88:22 92:5
92:15 95:11
101:6,9 111:10
115:6 126:4,13
129:14 148:10
173:17,21 176:14
185:22 205:3
209:11
**sales** 6:18,19,19
40:13,17,20
54:15 56:7,10
57:13 60:3 84:25
88:12 100:17
103:6 134:22,24
152:12 153:2,22
153:22,24 154:5
169:13 170:22
173:14 175:2,10
175:18 176:1,12
176:25 177:2,6,9
178:8 179:12,16
180:1 185:21,23
187:10,21 190:9
190:10 194:21,25
195:7 196:21
199:11 201:21
203:16 204:6
207:9 208:22
209:9 212:18,20
213:6 216:18,18
**salesman** 190:15

190:21 191:11
**salespeople** 86:9
153:19 175:6
188:19
**salesperson** 198:4
**salesperson's**
54:15
**Salon** 203:9
**sat** 93:8 97:4
**Savings** 173:10
**saw** 71:16 138:15
153:7 159:22,24
160:1,24 199:13
208:16 211:11
212:16
**saying** 28:10 43:11
55:24 58:25
60:14 67:22
79:23 132:16
159:16 174:21
197:6 199:11
203:15 204:12
207:23 212:18,20
212:25
**says** 43:14 45:11
46:11 47:9 48:11
49:10 53:15,15
53:21 54:23,25
54:25 56:8,8 58:8
59:5 61:15 62:4
72:17 74:13,16
74:21 75:14,24
106:7,16,22
107:6 109:8,8,14
111:21 112:9
118:18 119:1,22
120:18 122:11
123:11 124:17
125:9,11,20,20
127:12 128:12
131:23 135:18
136:4 143:1,1,8
143:14 149:7,7
152:1 162:25
165:25 172:12
173:2 182:11
185:6 199:7
200:1,4 203:8,25
204:3,3

**scathing** 215:25
**schedule** 57:8,9
60:14,15
**scheme** 66:23
**school** 20:21,23
21:8
**Scioto** 5:15 17:20
21:19 24:2 26:11
162:20
**scope** 69:13 73:25
**Scott** 203:20,22
204:3,5,21,23
**scratch** 83:5
181:16
**scribbles** 48:18
**scribbling** 51:6
**script** 195:25
**seal** 220:23
**search** 17:16 19:1
19:6,7 159:12,13
161:5
**season** 178:16
185:22,23
**second** 7:13 47:7
49:15,25 56:22
84:15 135:12
143:4 147:20
149:6 165:1
167:20 203:19
**seconds** 174:24
183:23
**secretary** 26:19
27:6 142:12
156:6 160:13
162:14,23 164:20
168:2,16,20
174:24 182:7
**section** 46:4
**secure** 89:25 90:21
91:3
**secured** 91:2
**see** 10:22 12:10
29:18 36:24 43:4
43:11 45:2,21
46:14,18 47:17
48:19,23,23 49:3
49:5 54:13,23
64:19 66:24 69:6
70:25 72:15

75:16 83:21
92:20 101:7
102:17,18 105:18
111:22 112:10
119:23 121:15
122:4,13 131:25
132:9 138:17,21
139:22,22,25
140:4 142:14,16
142:25 143:2,5
143:20 150:24
155:21 157:11,20
158:16 161:1
166:4 168:3
173:4 185:7
199:24 200:2
202:8 204:14
205:4 206:9
207:18 213:6
**seeing** 16:7 44:10
56:15 118:13
170:5,12 172:2
**seek** 133:20 134:7
137:6
**seeking** 134:12
**seen** 15:6,10,15
17:14 58:8 64:16
101:2 120:1
126:23,24 140:22
142:9 144:6
162:10 215:2
**self-addressed**
192:25
**sell** 36:25 74:23
75:16 86:23
98:14 99:21
106:18 107:7
108:4,8 109:9
131:7 146:23
153:5,10 175:10
178:13,21,23
180:17 184:1,2
194:17 197:15
203:22 208:2
211:6
**selling** 8:19 21:11
34:13 40:20
91:10 93:4 97:12
100:14 110:9

159:7 178:7,11
178:12,16,25
179:19,23 195:3
211:4
**sells** 146:21
**semi-colon** 74:20
**send** 18:15 80:1
86:24 167:8
185:19 186:7,13
186:15 191:11,17
192:22,25 202:4
**sending** 200:11
**senior** 2:7 215:23
**sent** 48:17 137:2
156:14,19 157:23
164:23,23,24
168:17 191:23
192:3,17,22
194:14 200:17
201:3 202:15,15
207:5,7,9,10
216:8
**sentence** 106:15
123:15,18 125:2
**separate** 11:11,12
23:15 43:24
61:20 62:5,7
63:11 163:21
164:1,1
**September** 130:9
134:19,20 136:10
172:4 178:4,9
**September/Octo...**
176:8
**sequence** 96:9 97:2
**served** 36:4
**Servepro** 200:5,7
201:2,9
**server** 19:9
**service** 1:24 86:23
87:2
**services** 56:14
**set** 1:18 118:20
119:2 125:21
128:13 168:15
174:3 206:15
220:22
**sets** 56:4
**settle** 135:13,15

**settled** 135:11
**seven** 29:10 39:1,3
39:5 47:14 70:3,7
70:13 84:2 150:3
**seventh** 203:13,21
**shake** 98:21
152:25
**share** 179:22
**shareholder** 25:5,7
28:8,12,15
107:14
**shareholders**
23:11 28:6
**sheet** 111:22,25
112:22 114:13,15
124:10 169:25
191:10,12,13
210:14
**sheets** 113:10
**shipping** 21:18
22:18 23:21
**Shirt** 203:20
**Shock** 90:7
**shook** 98:16,18
99:13,25 102:7
**Shoot** 203:12
**short** 21:12 154:1
154:17
**shortly** 66:11
**shot** 70:9
**show** 48:14 49:9
64:17 102:12
111:24 136:24
150:15,22 151:3
151:4,5,8,10
162:16 183:15
184:17 207:15
208:12 211:12,14
**showed** 64:14,15
102:3 103:2
159:17 184:18
207:11,13 208:20
208:21 209:11
211:13,17,21
212:1,4,8
**showing** 65:2,12
68:8 208:6
**shown** 64:11 80:22
148:6 207:3

**shows** 53:4 54:14
135:4 143:17,23
162:20 167:16
168:2 172:23
**shutdown** 91:25
**shutting** 214:13
**sic** 142:9 200:22
**side** 145:10 206:16
206:16 211:7
**sign** 8:20 10:8
11:14,14,16,18
42:18 102:5
103:1,3,16
104:23 105:1,4,6
129:22 130:13
136:15 183:25
184:2 203:18
**signature** 2:23
15:22 43:1 70:21
167:21 220:14
**signed** 10:9 43:3
58:7 69:8 71:16
71:20,25 77:7
100:19 102:3,15
102:16 103:11,18
103:24 104:3,18
105:3 107:17
109:5 110:8
132:5 143:19
163:1 171:20
**signers** 173:12
**significance** 149:1
149:4
**signing** 10:5 11:15
101:21 105:2
130:11
**similar** 108:22
131:9 140:9,10
140:11,12,15
180:21 184:10
197:19 204:21
206:11
**simple** 57:4,6 68:7
94:11,14 95:24
109:1 120:10
**simplicity** 179:17
**simply** 99:11
184:18 191:15
**singular** 18:11

166:8
**sir** 5:11 11:3 15:3
17:11 42:21
62:14 66:5,10
67:19 72:12
83:20 88:21
92:12 119:8,25
139:17 141:24
142:8 154:21
157:2,7,17 172:7
174:4 189:25
191:7 192:9
193:4,17 195:22
199:22 202:7
206:8 216:3,5
217:3
**sit** 15:24 19:15
25:13 36:12
47:22 58:22
59:14 63:22 65:1
70:10 99:6 122:8
154:3 165:23
174:4 195:12
202:24 214:12
**site** 160:10,13
166:7,7,9 168:2
**sitting** 117:24
**situation** 8:10
**six** 21:17 29:10
93:3 105:21
151:4 152:2,24
185:5
**sixth** 203:21
**Sixties** 90:19
**size** 180:25 183:15
184:15,24,25
190:4
**slash** 35:14,17,22
65:15 66:18,19
67:15,16,20 68:6
68:22 73:10
78:22 79:5,10,16
79:17 80:12
83:20 108:24
126:18
**slightly** 67:19
**slip** 40:3 41:10,13
41:16
**Slow** 95:2

small 13:5,6,8,17
  13:17 114:5
  139:10,10,10,10
  195:22
smaller 135:12
smell 94:8
snotty 105:1
software 86:21,25
  87:2
sold 9:2,5 21:12,13
  21:16 29:6 39:16
  87:24 110:23
  111:2 114:2
  126:13 130:20
  131:14,16 133:19
  151:12 178:19,19
sole 28:8,15 89:25
solicit 159:1
  169:13 195:22,24
  196:3
solicitations
  195:20
solicited 146:22
  196:15
soliciting 197:4
  211:11
somebody 13:6,15
  13:15 40:20
  86:18 104:20
  112:15 133:13
  135:18 153:12
  166:22,24 187:22
  198:25 208:2,21
  213:15
somebody's 119:12
someplace 119:22
  155:21
son 20:3,4,13
  109:2 116:2
  151:19 177:14
son's 20:6 177:12
sorry 6:3 11:4 14:2
  14:11 15:14 29:5
  33:5 49:3 53:9,14
  54:8 64:4 72:13
  79:13 89:13 95:2
  95:5 100:5
  118:17 119:8
  122:23 137:4

141:25,25 145:18
  146:5 147:15,20
  148:19,23,24
  150:1,2 158:8
  165:12 181:15
  193:18 194:8
  209:7 212:2
sort 168:9 217:22
sorts 8:17
sounds 33:8 145:6
sources 25:17
South 150:14
SOUTHERN 1:1
space 35:1,10 87:1
  141:3 180:17
spawned 204:15
speak 194:24
  203:17 207:5
  216:2 218:15
speaks 53:15
  106:10 111:10
  125:9
special 73:19
specific 14:9,13
  47:23 76:22 85:5
  86:4 108:9
  109:12 116:24
  123:15 152:17
  165:24 199:2
  212:10
specifically 8:6
  40:16 43:21
  44:20 74:3 101:2
  108:18 116:25
  126:21 127:4
  136:13 195:10
  197:5 198:13
  199:1 204:10
  205:1,9 208:6
  212:14
specs 190:19
speech 197:18,25
  198:1
speed 145:24
spending 35:3
spent 183:23
  193:14,15 199:10
spilled 156:21
  158:9

split 79:3,9 180:10
splitting 84:11
spoke 58:24 95:4
  200:13 201:16,19
  213:21
spoken 161:22
spot 40:5 103:11
  184:3
spots 194:17
Springfield 20:14
  175:14 186:23
Square 2:11
  113:24 114:7,9
  142:16
SS 220:2
St 169:15
stack 157:5 173:24
  174:4,5 205:15
staff 87:3
stamp 174:19
stand 17:2,5
  133:14 147:12
standing 17:1
staple 49:22
stapled 174:22
start 30:18 42:12
  51:15 81:15
  88:13 91:11
  130:25 131:3
  155:15 163:15
  169:5 170:12
  171:3 176:6
  181:16 192:10
  197:8 198:21
  213:20
started 21:18,20
  27:13 31:6 37:14
  38:9 72:14 82:16
  82:22 83:5 88:12
  131:11 137:22
  149:11 155:1
  172:1
starting 82:19,25
  87:24 91:7
  131:11
startled 212:16
state 1:21 5:7 23:5
  26:20 27:6 81:8
  123:16 127:12

138:18,19 142:12
  142:12 150:7
  159:18 160:10
  162:13,14,23
  164:21 168:16,21
  209:20 220:2,4
  220:20,25
stated 11:5 17:4
  21:22 38:5 81:5
  145:9,11 160:6
statement 11:11,13
  33:13 84:12,25
  88:5 162:25
  193:9,10 194:10
statements 16:10
  32:21 33:1 84:16
  84:23 112:12,16
  112:18 113:10
  204:21 210:23
states 1:1 56:12
  72:9 143:9
  149:16 165:15
  166:1 189:9
State's 160:13
  168:2
stating 201:18
stationary 118:15
stations 146:21,22
stay 172:19
steal 10:15 97:15
  97:16 98:17,17
stenotype 2:21
  220:13
step 46:22 71:8
  96:1 97:11 114:1
  118:7 172:1
Stephen 24:15
steps 103:2 164:19
  168:22 169:10
Steve 56:17 89:14
  97:14 123:1
  124:21 125:9
  162:25 163:2
  196:6,8 197:7,20
  203:15 204:1,7
  211:8
Steveb@amteldi...
  18:11
SteveB@Amteld...

167:4
Steven 1:10,14
  2:17 3:5 5:1,9
  20:7,8 52:13
  219:3 220:7,10
Steve's 204:12
stipend 95:12
stipulate 30:7
stipulated 2:15
stipulation 94:23
  95:17
stipulations 1:17
  108:12,14
stock 25:6
stood 203:23
stop 155:22 178:11
  178:25 203:20
  215:13,13
stopped 79:11,13
  131:7 178:7,12
  218:23
stopping 28:13
story 40:12 132:22
  204:17
stragglers 174:8
  174:13
straight 134:15
strange 135:25
street 1:19 2:5 5:15
  17:20 24:2,17
  26:11 32:2 114:6
  162:20 180:13,14
  180:15 213:4,5
strictly 11:19
strike 30:17 75:6
  128:11
stuff 30:8,9 50:11
  73:10 121:12
Stupidity 41:24
styling 68:24 69:1
submit 168:4
subsequent 63:18
  129:1
subset 157:3
substantially
  139:5,11
sub-set 72:4
successful 84:13
  84:17

sued 6:17 11:1
  13:17,22 14:2
  199:8
suggest 214:9
suggested 10:14
suit 9:13 12:22,24
  13:3,8,24
Suite 2:11
suits 13:13
sum 77:23
summarize 30:16
summary 31:12
sums 55:25
supervision 220:14
supplemented 16:1
  16:14,22
support 87:3
  211:11
suppose 111:16
sure 9:9,12 10:19
  12:9,11 15:14,14
  15:14 29:17 35:9
  48:9 58:19 63:5
  63:16,20 78:12
  84:14 96:8 97:1
  119:9 125:14
  132:13 134:1,14
  134:23,24 137:11
  144:21,21 157:6
  160:12 161:13
  163:16 164:13
  171:4,21 197:19
  198:3 208:3
  212:24 215:8
  218:12
surrounding 12:17
  200:10
switch 88:17,21
  91:17 154:16,21
switched 71:11
  79:9,10 148:1
sworn 5:3 220:8
system 19:9,17
S-C-I-O-T-O 5:15

**T**

t 2:14,14 139:10
  220:1,1
table 11:8

take 8:25 9:24 11:4
  16:3 26:10 33:14
  33:25 34:2,4
  42:13 44:19 45:4
  46:22,22 50:6
  51:23 52:6,24
  55:8,11,13,15
  57:25 71:8 72:8
  75:1 79:10 81:14
  83:11 92:3 93:25
  102:19,22 103:2
  104:9,13,14
  113:13 114:1,25
  118:7 119:11,14
  125:17 128:3,4
  129:19 139:21
  142:13 149:24
  155:19 159:11
  164:20 170:21
  172:1 173:15,16
  174:14 180:18
  181:6 182:13
  183:5 188:14
  189:21 204:13
  213:4,25 217:7
taken 1:15 2:18
  5:19,23 29:1 52:9
  88:20 128:5
  154:20 168:22
  175:1 214:3
  220:11,13
talk 6:8 12:13 20:4
  21:6 22:17 34:6
  49:16 85:12
  88:22 94:14
  113:9 144:13
  154:22 155:21
  161:16 212:15
  214:10 218:8,12
talked 10:1 13:3
  24:20,21,24
  63:10 69:2 70:22
  74:5 85:23 99:2
  105:12 134:11
  144:9 146:18
  187:10 199:4
  214:5 215:21
talking 25:6,6
  28:14 50:1 52:10

53:12 76:19 85:4
99:23 111:19
113:9 139:1
194:24 196:16
198:2 205:15
tax 23:13 55:15
  59:22 112:19
  163:13 164:6
team 180:16
  187:10,22 201:21
tear 181:11
tears 203:14
tel 35:20 65:16
  66:24 67:1,8 68:6
  69:3
telephone 13:15
  17:25 21:20
  23:13 26:3,25
  27:15 28:9,11,19
  30:20 31:2,17
  35:18 37:7,9
  38:21 39:15 43:9
  44:20 52:14
  61:17,24 62:2
  70:3,18 72:20
  79:22 80:2,19
  81:18 82:3 84:13
  84:17,19 85:24
  93:6 123:1,3
  124:22 125:10
  138:6 158:2
  163:1,3,10,11,14
  163:17 164:3,4,8
  167:17 172:23
  180:21 182:24
  189:11 195:17,21
  195:25 196:4
  197:1 218:7
tell 20:20 21:7
  24:21 36:25
  40:12 44:12 57:7
  61:14 88:16
  90:23 94:20
  96:21,24 106:15
  116:12 119:15,17
  119:19 125:8
  126:7,10 127:2,4
  139:8 156:6,11
  156:12 160:4

183:16 192:11
195:7,11 196:4
197:13,17 198:9
199:1,6 202:14
208:14
telling 23:16 57:16
  59:2 77:8 80:12
  199:3 203:16
  214:13 216:13
Ten-plus 24:19
term 118:11
terminated 134:18
terms 40:23 41:2,8
  41:17 42:6 58:23
  59:3,14 69:10
  94:18 96:18
  101:8,9 102:10
  105:9 118:23
  125:24 134:8
terrible 20:9 89:11
  212:18,20,21
  213:7
territory 152:13
  180:10
testified 12:14,23
  30:22 60:13 61:1
  65:19 66:11 69:7
  75:1 78:20 88:25
  89:8 91:6 104:14
  111:3 124:2
  132:2 134:4
  138:5 144:6
  146:3,4,5,8 147:3
  147:5,8 152:8
  163:24
testify 5:21 12:21
  113:4 146:2,10
testimony 7:19 8:4
  37:14 44:19
  51:23 75:7 83:11
  107:13 108:19
  114:25 125:13,14
  125:16 144:19,22
  147:10 182:2
  208:18
thank 20:12 51:18
  128:10 164:16
  194:12 196:8
  197:14 198:8

they'd 93:10
thing 47:7 138:19
  195:18 197:10
things 30:12 43:25
  53:19 54:6 55:25
  67:25 97:5
  108:19 113:7,10
  199:11 212:18,21
  213:7
think 5:20 6:3
  12:11 13:1 24:15
  29:19 36:3,7 42:3
  47:23 48:13
  49:18 50:13,14
  60:5 61:4 65:18
  68:9,19 69:25
  70:14 79:1 80:14
  81:22 85:1 88:4
  89:7 91:6 93:7,24
  104:12 105:12
  111:2 116:14
  117:11 119:21
  124:1 130:16
  132:2 134:4
  136:11 138:5
  144:19 146:7
  147:17 149:10
  150:20,21 151:14
  151:19 152:8,22
  153:25 154:6
  156:1,15 163:24
  165:11 169:18
  175:19,22 176:14
  179:13 180:25
  183:4 186:23
  187:8 188:23
  194:4 200:8,24
  201:1 205:8
  211:3 212:21
  214:5 215:25
  217:20
thinking 8:9,11
  16:17 64:11
  130:13 136:12
  138:23 147:7,7
  161:2 165:19,19
  173:20 176:20
  188:15,16
third 103:20

120:17 122:11
165:1
**Thirty-nine** 177:20
**Thoma** 188:7,15
**Thompson** 1:18
2:4
**thought** 8:14 48:3
48:14 53:12
67:20 81:17 84:8
98:11 115:14
157:2 169:1
176:19 181:20
195:1
**thoughts** 8:4
**thousand** 111:11
150:24 153:6
155:4 156:9
**three** 5:12,12 9:25
26:13 40:19
45:20 46:6 67:25
83:6 85:18 87:3
91:1 103:3
110:14 111:17
114:11 119:4,5,9
121:17 123:22
131:4 153:22,25
157:7 168:3
178:20,22,22,23
183:23 202:23
205:2 207:6,12
208:24 216:10
**Thrifty** 12:20
**throw** 161:1 163:5
**time** 2:19 21:13,14
25:21 27:8,11
29:18,21 30:4
32:22 33:25
34:25 36:15
37:11,21 38:2,7
38:16,20,25
40:17 41:3,9
50:20,22 51:8
63:24 64:18
65:13 69:22,25
70:5 73:8,12,15
77:4 79:11 85:2
88:17 90:10,15
91:7,15,19 92:3
95:8 98:12

101:21 102:7,8
104:17 107:22
108:7 111:5,9
117:9 127:23
131:1 133:4
141:13 150:23
151:1 154:1
158:18 169:11
176:5 199:10
203:13,22 217:1
220:10,12,20
**timely** 76:10 93:5
**times** 40:19 46:17
141:16 178:22
193:23 195:2
202:16 215:7
216:10
**tired** 136:13
**today** 5:21 14:8,15
14:21 15:24 17:8
19:15,23 25:13
36:12 51:10
58:22 59:15 65:1
70:10,11 99:6
122:8 154:4
156:16 157:1,4
157:18 165:23
174:4 190:2
191:8 192:10
193:5 195:12
199:23 202:24
205:16 214:24
**toilet** 204:11
**told** 23:17,17 55:20
65:14 95:22
96:20 97:16,25
104:23,25 116:25
124:23 125:2
128:24 129:5
135:22 136:13
155:1 163:17
203:15,23 204:4
204:5,6 216:17
**Toledo** 149:22
**tomorrow** 36:23
**tongue** 24:20
**top** 13:2 53:12
111:21 112:9
133:8 146:6

147:18 158:15
162:19,21 172:12
182:21 199:23
200:1 207:16
**topic** 88:17
**topics** 154:16
215:3
**total** 78:1 120:18
134:22 180:1
**totaled** 120:24
**Totally** 158:2
**town** 97:18 188:2
203:7
**trade** 75:22 143:1
148:4 150:15,22
151:3,4,5,8,10
162:16 165:9,13
168:4,4,5
**trademark** 159:11
159:13,14
**trademarks** 75:23
**train** 8:14
**training** 21:4
**transaction** 30:13
34:7 37:16 41:21
44:4,7 47:4 63:14
72:5 85:7 93:1
94:14 98:6 102:2
115:1,5 117:12
118:8 133:21
**transcribed** 2:22
17:6 220:13
**transfer** 78:11
**transferred** 125:17
**transferring** 78:13
**transpire** 57:2
**transportation**
121:11
**tremendous**
174:21
**trial** 7:21 117:3,25
145:14 218:15
**trick** 56:19
**tricky** 60:24
**tried** 149:21 211:6
**trip** 214:16
**trivial** 49:24
**TRI-COUNTY**
1:24

**trouble** 151:19
211:4
**true** 36:3 138:15
200:18 215:6
**truly** 212:9
**truth** 101:15 220:8
220:8,9
**truthfully** 5:21
173:22
**try** 58:20 60:3
127:23 166:15,17
180:17
**trying** 56:19 60:23
76:17 79:3,8
131:7 151:16
156:1 175:22
188:23 192:14
200:19 211:3,7
**turn** 19:12 33:24
42:25 61:13
70:16 78:3 94:10
106:3 111:13
114:24,25 119:4
131:21 177:10
**turnkey** 86:23
**TV** 146:21
**twelve** 178:22
**Twenty-six** 20:11
20:12 177:17
**twister** 24:21
**two** 6:5,21 20:25
25:13,18 37:19
37:20 41:17
42:14 44:6 45:20
48:11 49:9,23
54:5 55:17 56:3
59:25 60:8 61:2
75:21 77:11 81:4
88:1 91:1 102:16
110:13 115:6
119:5 128:8
130:11 131:4
150:7,12,24
153:22 155:3
164:16,19 165:11
165:12 168:2,8
174:8,9,13
175:11 176:18,19
176:20 182:13

183:23 188:19
189:3,3,19
191:14,18 193:22
193:23 198:19,22
198:23 202:23
203:19 206:15
207:5,11 215:7
216:10,23
**two-hour** 214:16
**two-page** 191:10
**two-sided** 190:3
**type** 15:11 23:20
135:17
**typed** 15:11 16:7
160:15,16
**typewriting** 220:13
**typing** 158:3,4
**T-e-l** 65:16
**T-H-O-M-A** 188:7
**T-H-R** 5:12

───────────

**U**

**U** 2:14
**Uh-huh** 106:5
107:9 121:16
144:14
**ultimately** 21:11
187:17
**umbrella** 23:13
163:21,25
**unable** 91:3
**unchanged** 71:14
**underlined** 45:2
47:1,1,8,10
132:20,20
**underlining** 47:15
47:17 132:9,14
**understand** 55:24
75:18,19 78:4
79:23 85:6 95:4
96:8 99:6 105:22
125:14 128:17
159:14 172:9
181:21 182:2
191:18 194:23
196:18 201:8
208:3 210:10,12
210:18 215:17
**understanding**

57:1 110:8
115:12 117:13
120:6 190:6
**understood** 97:2
117:11
**Unemployed** 22:9
**unfair** 65:23
**unfamiliar** 202:1
**Union** 81:9 82:7,21
83:12 139:19
**Uniondale** 2:8
**unique** 72:23,24
73:3,6,23
**uniqueness** 73:24
74:1
**UNITED** 1:1
**universe** 115:4
155:24
**unpaid** 136:6
167:6,9
**unquote** 11:9
32:18 136:14
172:20 216:17
**unsigned** 115:7
**updated** 174:5
**upper** 138:23
139:9 154:14
**upset** 50:9 203:22
**Urbana** 2:12 5:13
5:15 20:19,21
21:19 24:17 32:2
50:3 90:10,11
94:1 110:19
114:5 142:17
152:15 156:1
162:21 173:10
189:5 191:19
193:11,16,19
200:6 202:17
203:3,3,5 207:20
207:21 211:6
**Urbana/Champ...**
169:22
**USA** 1:5
**use** 13:18 18:4 49:8
49:21 61:19 62:4
63:2,7,10 74:14
74:16 76:24 77:3
80:5 81:23 83:7

83:15,17 118:11
118:21 123:17
124:10,13,15,18
124:19 125:23
126:2,9,22 127:3
127:10,13 128:14
129:1,6 130:22
131:9,13,24
137:8,13 149:5,8
158:18,25 159:9
165:15 179:17
183:6 184:8
185:4 187:9,12
189:10 190:12
196:1 199:16
201:14 205:6,9
205:18
**useful** 182:10
**usual** 129:20 138:3
138:4
**usually** 141:11,13
**Utah** 171:11
187:21
**utility** 70:7,13
**U-R-B-A-N-A** 5:13

**V**

**V** 5:9
**vacation** 36:24
39:23
**vague** 48:12,19
49:10 50:17
76:17
**value** 41:8 44:1
146:4,11
**valued** 122:4,9,12
123:22 124:3
**variety** 173:25
214:24
**vehemently** 95:14
**vehicle** 12:19,20
**vendors** 171:12
187:14 188:21
**venues** 59:21
**verbally** 95:25
**verge** 91:20
**verification** 88:6
**version** 184:24
**Vice** 2:7

**VIDEOTAPE** 1:24
**view** 46:25
**virtue** 61:20 62:5
63:11
**visional** 180:23
**visit** 176:18
**visiting** 207:22
208:4
**visits** 155:13
**visual** 183:24
**vis-a-vis** 60:10
**volunteer** 23:6
**voted** 106:18 107:7
108:4
**vs** 1:8
**V-I** 46:7

**W**

**Wagner** 31:25
32:1
**Walk** 183:12
**walked** 104:3
113:19 129:15
145:15
**walking** 211:23
**Walnut** 1:19 2:5
**want** 12:4 21:6
33:25 34:6 36:22
37:3 44:25 48:22
49:8 52:6 58:19
59:13 60:1 61:13
70:16 71:7,8 75:7
78:5,8,12,17
81:14 88:21
93:11 94:25
95:14 96:8 97:1
106:21 112:21
116:23,24 119:14
125:14,17 131:23
134:14 135:14
144:12 145:7,16
146:23 151:14
153:12 154:16,21
154:22 156:10
158:12 163:15
164:5,12 172:1
174:13 175:19
180:2 181:16,18
188:24 189:2

197:10,14 198:15
204:11 208:3
211:8 212:17,21
213:1,3,4,8,11,12
214:23 215:13
217:6 218:17,20
**wanted** 36:25 37:6
40:20,21,21,25
41:7 50:8,9 76:24
78:18 82:14 95:3
126:22 150:15
164:7 182:15
188:12 193:13
198:13 199:13
200:16,20,25
201:1 202:1
214:7
**wants** 86:18
127:13 186:9
**warned** 97:14
**washing** 21:11
**wasn't** 28:13 73:4
93:5,11,11 94:4
94:13 97:12,15
99:11 104:25
105:5,7 109:4
133:12 134:12
136:15 139:5
150:12 154:6
170:6,8 176:21
184:16 199:15
200:13 202:22
205:21 207:23
210:16,18
**way** 63:21 68:4
72:9 74:4 79:2,19
97:23 123:20
129:21 131:12
180:14 181:21
200:22 217:24
220:19
**web** 160:10 166:7
166:9 168:2
**week** 23:6 41:4
89:6,7 95:10
102:23 159:2
185:14 216:11,12
**weeks** 21:1 36:24
39:12,22 96:17

98:11 149:23
151:22,25
**weirdly** 216:2
**Welded** 20:18
**went** 20:24 42:18
48:7,15 50:4 51:2
57:5 59:23 71:14
91:1 101:25
135:16 137:22
138:18 145:14,15
145:17 150:16
160:10,22 162:1
185:21 197:8
211:16 212:14
**weren't** 68:9
111:12 138:9
156:22 204:14
**West** 32:2
**WESTERN** 1:2
**we'll** 10:22 12:13
49:2 52:7 58:20
59:13 64:10
65:11 69:6
105:15 123:20
128:4 130:14
174:14 214:10,21
**we're** 9:7 13:24
34:2 65:5,5 68:18
78:5,15 79:8 82:2
120:8 127:24
131:6 163:16
171:24 174:3
178:12 181:1,24
183:14,16,24
185:6 187:25
191:12 196:6
197:6 204:2,2,2
204:13,13 214:13
214:24,25 215:9
215:11
**we've** 12:10,24
24:20,21 42:21
52:5 64:11,19
66:5 68:22 70:21
74:5 78:6 105:12
124:1 131:22
142:4 156:15
162:7 174:1
178:7 181:23

202:7 214:16
**whatsoever** 99:16
105:8
**WHEREOF**
220:22
**wherewithal**
105:25
**whichever** 158:12
174:12
**white** 6:12 7:8 8:8
8:18 9:17 11:9,13
11:15 12:24 13:4
22:14 29:6,14
37:25 67:1,8,10
69:3 86:17,25
87:17 88:6,6,23
88:25 89:17,23
90:10,15 92:4,4,6
92:7,16,23,25
93:2,8,16,18 94:7
95:5 96:9 97:3,12
97:23 98:12
99:17 100:14
102:9,18,24
103:18 104:1,18
104:20,22,23,25
105:5,16,20
108:1 109:3,16
110:11,23 112:6
113:2,16 115:11
115:13,15,18,20
116:2,7,10 117:1
117:4,9,13,15,17
117:20 118:1,8
118:12,19 120:17
123:4,21 125:17
125:20 126:2,22
127:2,10 128:11
128:23,24 129:15
130:10,21 133:18
133:19 134:3,24
135:16,17,22
136:22,22,24
137:12,21,25
138:2,12,25
140:8,16 142:14
142:22 143:15
144:5,9,24 146:5
147:2,2,22 148:5

148:7,9 149:5,8
151:13,15 159:15
159:21,23 160:3
161:17,20,23,25
183:5 186:6
209:25 210:4
217:19
**White's** 90:3 94:22
101:13 102:7,25
104:18 137:12
138:13 139:3
147:6 148:3
183:2
**wife** 116:3 147:9
**wife's** 147:11
**William** 6:11
136:24
**Williams** 186:21
**willing** 30:6 215:12
218:21
**wise** 88:12 94:12
204:13
**Wiseman** 29:15
86:14 87:6
**wish** 22:16 64:25
94:15,16,18
95:21 96:3,6,16
96:18,21,23 97:3
97:4,7 98:8,15
99:5,8,11 108:13
108:15,16,20,24
109:1,3,5,6 115:2
115:5
**within-named**
220:6
**witness** 2:23 3:4
220:22
**witnesses** 70:25
145:10,12 146:2
146:6
**won** 8:24
**wondered** 51:5
**word** 27:12 35:14
35:14 50:17
73:11,14 119:11
119:12,14 149:20
154:9 166:3
178:15 180:17
190:12

**words** 48:11,13,19
49:10 70:5 76:10
80:15 108:10
127:12,13 136:16
146:17
**work** 20:15 22:4
48:22 57:7 59:18
60:5 86:2 87:3
88:10 89:22
98:14 118:8
130:7 149:24
150:6,19 151:21
151:24 175:17
176:19 177:11
179:2 187:18
190:25
**worked** 21:17 22:1
22:5 57:8 59:20
59:23,24 60:1
86:5,7,10 87:20
88:11 89:6
118:10 149:17
150:7 152:2,4
154:12 176:17
**working** 24:25
89:1,9,17 90:16
90:20 93:2
105:20 110:25
137:22 151:19
153:20 154:10
176:6,20 177:23
178:2,5 183:19
202:22
**works** 20:18 23:3
163:7 167:11
216:13,19
**world** 109:4
**worries** 118:6
**worry** 211:9
**worth** 40:17,19
94:9 111:9
132:18
**wouldn't** 8:22
11:18 18:24 73:5
131:15 150:25
153:2 154:2
201:6
**wow** 73:6
**write** 41:13,14

148:19 190:10,19
190:21
**writing** 41:18
49:14 51:1,3
132:12 200:18
**written** 16:6,10
68:2,5 176:22
**wrong** 33:8 34:12
54:1 182:7,8
**wrote** 41:15 49:13
126:22 156:13
159:3
**W-2s** 30:9

---

**X**

X 3:2

---

**Y**

**yards** 197:3
**yeah** 6:2 12:7
13:25 15:14 16:5
38:22 46:2 48:25
49:3 52:8 54:8,23
54:23,24 56:23
58:19 66:16
72:24 73:3,23
79:7 111:18
116:14,18 127:20
132:15 134:9
144:17 145:22
148:8 149:19
151:24 154:11,19
155:6 156:3,4
161:15 162:9
170:4 178:6
185:4 191:4
194:2 205:24
210:12 214:21
215:16,16 218:18
**year** 9:21 84:15,15
85:4 89:10 93:3,4
93:4 95:1,3,8
145:17 153:9
155:4,9 162:2
181:9,10
**years** 8:14 9:25
24:19 34:24,24
50:10 54:18
59:25 60:8 61:2

65:7 72:20 74:6
74:11 77:11 85:4
89:24 94:24 95:1
95:7 96:11 99:21
114:11 126:14,20
146:22 171:5,5
188:5,17 203:8
215:15
**yellow** 1:5 2:7 6:22
21:22 24:24
25:14 31:10
37:15,25 38:19
38:24 39:20
52:18 67:1,6,10
69:3,20 70:11
73:9,19 86:16
87:1 110:10,10
134:25 141:13
151:6,6 154:22
155:1,11 166:11
168:23 175:18
186:7,10
**Yellowbook** 21:17
22:2,4,6 30:17
70:14 139:19
140:25 141:4,18
141:19 152:2,4
152:11 153:9
154:7,8 155:16
156:18,24 163:24
164:14 183:19,19
189:11,21 194:19
195:5,9,15,19,23
196:11,13,17
197:2,2,11,12,14
198:11,14,15,18
199:7,11,14,17
202:17 203:6,14
204:6,7,12,24
206:3 213:19,23
214:5 215:24
216:20,24,25
217:10
**Yep** 75:17 143:10
185:8 217:8,11
**Yocum** 207:16,17
208:4,12 212:4,8

---

S

**$1,600** 169:18
**$10,000** 177:9
  179:10,24
**$100,000** 50:1
  95:11,17 96:10
  135:5,8 179:17
**$12,783.60** 120:24
**$15,000** 121:12
**$150,000** 122:4,9
**$2,000** 177:8
**$205,000** 55:18
  56:4,7 121:21
**$25,000** 40:21 41:6
  135:23
**$250,000** 95:18
**$300,000** 40:17
**$380,000** 40:21
**$381,903** 121:2
**$480,000** 44:14
  59:22 77:21 78:1
**$497.80** 193:13
**$50,000** 76:1 77:18
  122:13,16 123:22
  124:3 125:3
  127:16
**$500** 27:23
**$528** 193:15
**$691,379.71**
  120:19
**$75,000** 9:17
**$8,000** 177:9

**0**
**02** 51:20
**04** 150:25
**05** 152:6
**08** 191:4
**09** 171:25 176:5,8
  191:4,5

**1**
**1** 3:11 15:2,4 43:14
  54:3,3 150:1
  200:1
**1st** 125:24 131:25
  165:15 167:23
**1,000** 27:23 188:13
**10** 3:20 40:14
  50:10 89:24

162:6,8 168:17
  185:5 192:1,12
  194:9,9 203:7
**10,000** 180:4
**10-minute** 52:6
**100** 158:5 169:8
  196:5
**100,000** 95:24
**101** 156:19
**1061** 5:12 26:13
**11** 3:21 172:6,8
  184:9
**11:45** 34:3
**11556-0398** 2:8
**12** 3:22 54:18
  181:25 182:1,3
  182:17 188:24
**12,000** 135:14
  203:8
**13** 3:23 184:20,22
  184:23 189:1,2
  193:22 200:15
  202:13 220:25
**137,000** 111:11
**139** 3:17
**14** 3:24 189:24
  190:1 191:12
**14th** 1:19 2:5
**141** 3:18
**15** 3:11,25 76:5
  179:13,17 191:6
  191:7
**15th** 217:9
**15,000** 135:14
  153:7,8 180:8
**15-minute** 40:14
**157** 3:19
**16** 4:1 192:8,9,10
  192:19
**16th** 1:20
**160** 156:18 157:24
  158:1 168:18
**162** 3:20
**17** 3:12 4:2 192:8,9
  192:20,21
**170** 180:2,3
**172** 3:21
**18** 4:3 193:3,4
**18,000** 135:14

**182** 3:22
**184** 3:23
**189** 3:24
**19** 4:4 153:16
  199:21,22 202:12
**191** 3:25
**192** 4:1,2
**193** 4:3
**1973** 20:21
**1982** 38:10,13 74:7
  88:14 149:8,12
**199** 4:4
**1990s** 12:15
**1992** 149:5
**1994** 21:10,23 26:6
  26:23 28:17,22
  29:2,4,21 30:16
  30:18 32:11,14
  33:9 51:15 52:21
  54:12 60:24
  62:19 65:8 69:21
  70:1,3 79:12
  113:8 114:2
**1995** 82:1
**1996** 61:5,11 77:23
**1998** 81:6 165:16
  165:22
**1999** 61:11 81:9

**2**
**2** 3:12 17:10,12
  57:2 149:25
**2(c)** 56:11
**2(e)** 45:21
**2,500** 187:8
**20** 52:5 56:7,10
  142:4 153:16,22
  155:13 179:13
  198:24 202:6,7
  206:12,15
**20th** 206:9
**20-by-20** 114:5
**20-some** 153:6
**200** 2:11
**2000** 81:12 87:18
  87:23 89:9
**2001** 89:12,13,16
**2002** 21:16,24 29:6
  29:21 30:4,16,18

32:11,14 33:9
  65:8 79:12 81:6,9
  81:12 87:24,25
  92:8,19,24 93:15
  111:22 113:9
  114:3 118:22
  125:24 131:25
  134:15,20 188:10
  209:25
**2003** 6:2,8,10
  21:16 22:1,4,4,5
  27:13,14 51:20
  130:9 131:17,19
  134:19,20 136:10
  148:3 150:8,25
  152:6
**2003-ish** 6:2
**2003-2004** 151:2
**2004** 22:7 134:3
  150:8 152:5,6
**2005** 9:22 152:2
**2006** 160:24 161:6
  161:8 182:11,24
**2008** 21:18 22:7
  23:25 24:1 27:13
  27:14 30:22,24
  30:25 31:6
  131:11 132:15
  159:17 160:7,19
  160:23 161:9,15
**2009** 21:21,21
  131:19 132:16
  141:2,4,10 155:7
  155:16 157:20
  158:22 162:4
  167:23 172:4
  173:20 178:4
  199:24
**2009/2010** 31:9
**2010** 1:20 31:2
  155:5 178:10,13
  179:1 180:22
  185:7 189:7,8
  194:3 202:8
  206:9 217:9
  220:23
**2014** 220:25
**207** 4:5
**21** 4:5 206:7,8,16

206:18,22 208:22
  211:15 212:7
**216** 4:6
**22** 4:6 217:2,6
**23rd** 199:24
**24** 5:20
**25** 176:14 179:12
**25,000** 41:1,8
  95:10 135:12,17
  136:2
**250** 95:20,25 96:10
**26** 45:12
**26(E)** 16:23
**27** 177:17

**3**
**3** 3:13 42:19,20,22
  52:10 59:5 62:23
  111:22 122:1
**3rd** 92:19 134:15
  134:20 157:20
  202:8 209:25
**3:10-CV-025** 1:8
**30** 23:6 76:4 96:22
  98:11 155:13
  203:8
**30-day** 76:5
**300** 102:21
**312** 1:19 2:5
**35** 64:14 142:16
  215:15
**380** 40:25
**38130** 2:12
**398** 2:8

**4**
**4** 3:14 62:13,14
  63:1 70:17 71:22
  72:14 75:25
  122:17,24,25
  124:6,16
**4:00** 214:8,13
  218:23
**40** 96:22
**42** 3:13
**43078** 5:13 162:21
**43078-8130** 2:12
**45202** 1:19 2:5
**45245** 1:25

**480,000** 41:6 44:2
  55:23 77:22
**489,000** 55:21
**497.80** 193:17,18
**499** 196:6

———————————
**5**
**5** 3:6,15 66:4,5
  68:8,17,25 76:3
  80:9 82:2 170:19
**5,000** 187:8
**50** 164:23 205:17
  206:1,2
**50,000** 94:25 95:3
  95:8 128:9
**50/50** 179:24,25
**500** 89:7 95:10
  169:20 170:9
  188:12 196:6
  199:4
**513** 2:1

———————————
**6**
**6** 3:16 92:10,11,13
  100:8 103:7
  104:4 106:3
  131:22 134:16
  135:4 176:5
**6th** 52:21 54:12
  62:19 71:15
**6(d)** 46:13,14
**6(e)** 46:25 47:7
**6/10** 192:1
**60s** 154:15
**62** 3:14
**66** 3:15
**682** 5:15 17:20
  21:19 24:2 26:11
  162:20 172:19

———————————
**7**
**7** 3:17 139:16,18
  147:22
**7,000** 187:7
**73** 21:3,9
**732-1477** 2:1
**74** 21:3
**75,000** 8:2 135:11

———————————
**8**

**8** 3:18 61:14 63:10
  141:23 142:8
**8/4/83** 20:9
**80** 205:11,13,14,15
**80s** 28:17
**80,000** 180:6,9
**80-some** 111:11
**82** 38:9
**86** 156:19
**88** 165:19,21
**886** 1:25

———————————
**9**
**9** 3:19 43:14
  157:16,17
**9/11** 89:10
**9:30** 1:20
**90-day** 172:3
**92** 3:16
**93** 21:13
**94** 21:13 26:9 29:5
  30:4 36:21 51:20
  80:7 150:7 188:9
**95** 80:8
**96** 75:13,13

# EXHIBIT 1

HARRIS, MEYER, HECKMAN & DENKEWALTER, L.L.C.

RICHARD A. MEYER

DARRELL L. HECKMAN

WILLIAM F. DENKEWALTER
——

RICHARD O. HARRIS
RETIRED

ATTORNEYS AT LAW

ONE MONUMENT SQUARE, SUITE 200
URBANA, OHIO 43078
(937) 653-7186
FAX: (937) 653-3293
www.urbanalegal.com

HAROLD W. HOUSTON
1886-1951
——

RUSSELL B. HOLDING
1909-1990
——

HENRY W. HOUSTON
1918-1998

April 8, 2010

Bryce A. Lenox
Attorney at Law
THOMPSON HINE LLP
312 Walnut Street, 14th Floor
Cincinnati, Ohio 45202

                Re:    Yellow Book USA, Inc. et al v. Brandeberry
                         Case No 3:10 cv 025

Dear Mr. Lenox,

    Enclosed are Mr. Brandeberry's Answers to Plaintiff's First Set of Interrogatories.

    I hope to have the Production of Documents to you shortly.

                    Sincerely,

                    **HARRIS, MEYER, HECKMAN**
                    **& DENKEWALTER, L.L.C.**

                    Darrell L. Heckman
                    Attorney at Law

DLH:ch
Enclosure


PLAINTIFF'S
EXHIBIT

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION (DAYTON)**

| | | |
|---|---|---|
| YELLOW BOOK USA, INC. et al. | : | Case No.: 3:10-cv-025 |
| Plaintiffs, | : | Judge Thomas M. Rose |
| | : | |
| v. | : | |
| | : | **PLAINTIFFS' FIRST SET OF** |
| STEVEN M. BRANDEBERRY | : | **INTERROGATORIES DIRECTED TO** |
| | : | **DEFENDANT** |
| Defendant. | : | |

Pursuant to Fed. R. Civ. P. 33, Plaintiffs Yellow Book USA, Inc. and Yellow Book Sales and Distribution Company, Inc. (collectively, "Yellow Book"), by and through their attorneys, hereby serve the following interrogatories to be answered separately and fully in writing and under oath by Defendant Steven M. Brandeberry.

## DEFINITIONS AND INSTRUCTIONS

The following interrogatories are subject to the definitions set forth below:

A.     "Yellow Book" shall mean Plaintiffs Yellow Book USA, Inc. and Yellow Book Sales and Distribution Company, Inc., and its officers, agents, servants, employees, attorneys, and related companies.

B.     "You," "your," or "Brandeberry" shall mean Steven M. Brandeberry, his predecessors, officers, agents, employees, subsidiaries, affiliates or and other related company, to the extent that any such persons or entities materially participate in the design, planning, development, marketing, sale, manufacture, distribution or delivery of his yellow pages directory or directories.

C.     The term "document" shall have the broadest meaning permitted by the Federal Rules of Civil Procedure, and shall include any and all means of conveying, storing or memorializing information, whether in paper, electronic or other tangible physical form in your possession, custody or control.

D.     The term "person" shall be construed as both singular and plural, and include, but is not limited to, any natural person; business or corporation, whether for profit or not; firm; partnership or other non-corporate business organization; charitable, educational, governmental, or other non-profit institution, foundation, body or other organization; or employee, agent or representative of any of the foregoing.

E.     As used herein, "identify," or to state the "identity" of, means, in general, to give the fullest description known to or ascertainable by you, whether or not in your possession, and specifically:

1.     In the case of a natural person or entity, to state

- name;
- current or last known addresses and telephone numbers;
- current or last known employer or business affiliation; and
- relationship to you and current or last known title or occupation.

2.     In the case of a company or other business organization, to state

- its full name and its telephone number;
- other names under which the organization does business;
- the address of its principal place of business; and
- current or last known addresses and telephone numbers.
- relationship to you and current or last known title or occupation.

- 2 -

3.    In the case of a document or thing, to state

- its title or a description of the general nature of its subject matter;

- the identity of the person(s) preparing it and the person sending it;

- the identity of the addressee(s), if any;

- the date it was prepared, if known;

- the date(s) and manner of distribution or publication, if any;

- location and original and each copy;

- identity of the present custodian of the document;

- identity of persons who can identify and authenticate the document; and

- if privilege is claimed, the specific basis for such claim pursuant to Fed. R. Civ. P. 26(b)(5).

F.    "State" or "state all facts" means to state all relevant facts discoverable under Fed. R. Civ. P. 26(b), relating to a particular matter that is known to you.

G.    When used in reference to a contention, "state," "state all facts," "identify," "identify all documents" and "identify all communications" shall include all facts, documents, and communications negating, as well as supporting, the contention.  When used in reference to a contention, "identify each person" shall include persons having knowledge of facts negating, as well as supporting, the contention.

H.    The term "Amtel Mark" shall include the word marks "Amtel" or "Amtel Directories" (in capital or small letters or a mixture thereof).

- 3 -

I.     The term "Amtel Directories" shall mean the yellow pages directories presently published, marketed and distributed by Yellow Book in Champaign County, Logan County, Union County and Madison County, Ohio.

J.     The phrase "your yellow pages directory" shall refer to any and all yellow pages directories developed, planned, published, marketed or distributed by you or your affiliates, and which bears the Amtel Mark.

K.     Each separately numbered or lettered sub-part of each interrogatory requires a separate answer thereto.

L.     The singular of any word shall include the plural, and the plural of any word shall include the singular.

M.     Unless otherwise specifically noted, Yellow Book's discovery requests seek information and documents from you that pertain to the time period January 1, 1994 to the present.

## INTERROGATORIES

**INTERROGATORY NO. 1:**     Identify all of the persons answering or assisting in the preparation of answers to these Interrogatories.

**ANSWER:**

**Steve M. Brandeberry with assistance of counsel.**

**INTERROGATORY NO. 2:**     Identify each and every yellow pages directory, and each other product and service you have promoted, marketed or sold which has used, or is using, the Amtel Mark, and the time period during which each such product or service was promoted, sold, or offered.

- 4 -

**ANSWER:**

I began publishing the **Champaign County Am-Tel Directory in 1994 and continued to do so until 2002. I am now promoting a 2010 book for Champaign County.**

I began publishing the **Logan County Am-Tel Book in approximately 1998 until 2002.**

I began publishing the **Union County Am-Tel Book in approximately 1999 until 2002.**

I began publishing the **Madison County AM-Tel Book in approximately 2000 until 2002.**

**INTERROGATORY NO. 3:** Identify all persons involved in your decision to design, develop, market and distribute your yellow pages directory, including all persons involved in the decision to use the Amtel Mark, and describe their role.

**ANSWER:**

**Just myself**

**INTERROGATORY NO. 4:** Identify the persons most knowledgeable about the design, planning, development, marketing, distribution, or delivery of your yellow pages directory. For each person identified, describe his or her involvement in the design, planning, development, marketing, distribution, manufacture, or delivery of your yellow pages directory.

**ANSWER:**

Self

**INTERROGATORY NO. 5:**     List and identify each print, broadcast, or Internet media (including but not limited to newspapers, magazines, newsletters, trade journals, brochures, flyers, signs, printed displays, billboards, price lists, boxes, containers, direct mailing, labels, packaging, catalogs, radio, and television advertising, etc.) in which you have advertised products or services bearing the Amtel Mark.  Provide the date of each such advertisement.

**ANSWER:**

**I had business cards and I advertised in the Urbana Daily Citizen's newspaper, dates unknown.**

**INTERROGATORY NO. 6:**     Identify all yellow page directories published by you or by a business owned or controlled by you which bore the Amtel or Am/Tel Mark.

**ANSWER:**

**All books listed in interrogatory #2.**

**INTERROGATORY NO. 7:**     Provide the expected date of publication of your yellow pages directory.

**ANSWER:**

**May 2010**

**INTERROGATORY NO. 8:**     Explain in detail your employment history since 1994.

**ANSWER:**

| | |
|---|---|
| **1994-2002** | **American Telephone Directories Inc.** |
| **2002-2003** | **Worked for PBJ White LLC** |
| **2005** | **Yellow Book 6 months** |
| **2009 to date** | **Red Rabbit Reproduction** |

**I also worked about two months probably 2003-2004 as a consultant for "The Phone Book" out of Cleveland, Ohio.**

**INTERROGATORY NO. 9:**     Explain the bases for your claim that you retained the right to use the Amtel Mark.

**ANSWER:**

**I acquired the rights from Herb Burkhalter on May 6, 1994 (hereinafter Burkhalter contract) and never gave them up. I gave up a non-exclusive right only.**

**INTERROGATORY NO. 10:**   Explain in reasonable detail where and how you obtained your customer list for purposes of promoting, marketing and selling advertising space in your yellow pages directory.

**ANSWER:**

**We used a Poly Logic Service Bureau**

- 7 -

**INTERROGATORY NO. 11:**   Identify the date you first used the Amtel Mark in the promotion, marketing and distribution of your yellow pages directory.

**ANSWER:**

    **1994 Campaign County Am-Tel Book**

**INTERROGATORY NO. 12:**   Identify (by client, client's address, date and contact person) each person you have solicited to advertise in your yellow pages directory.  Please provide the most accurate dates available, even if such date is an estimate, and identify the basis for each date provided.  For each solicitation that resulted in the placement of advertising in your yellow pages directory, provide the date of placement and total amount of revenue to you.

**ANSWER:**

    **OBJECTION – This would involve trade secrets, not needed or relevant to this case.**

**INTERROGATORY NO. 13:**   Explain all bases for your claim that you have entitlement to use the Amtel Mark as opposed to Am/Tel.

**ANSWER:**

    **I acquired AM/TEL from Herb Burkhalter and never gave it up.  I created AMTEL myself and never gave it up.**

- 8 -

**INTERROGATORY NO. 14:** Describe in reasonable detail each instance in which a person has been confused or mistaken about, or made inquiry about a relationship, connection, association or affiliation of any kind between: you and Yellow Book; your yellow pages directory and Yellow Book; the Amtel Directories and you; or your yellow pages directory and the Amtel Directories. List the names of all such persons.

**ANSWER:**

**My customers never confused my book with Yellow Book.**

**INTERROGATORY NO. 15:** Identify each yellow pages directory publisher you have been associated with in any capacity including as employee, sales representative, consultant, partner, owner, stock holder member, and identify all directories published. Also state which directories used the Amtel Mark. Identify your association with each entity.

**ANSWER:**

**American Telephone Directories Inc. - owner**

**PBJ White Directories LLC – employee/sales manager**

**Yellow Book – employee (6 months)**

**INTERROGATORY NO. 16:** Explain in reasonable detail all bases supporting your contention that the Amtel Mark is non-exclusive or that Yellow Book's rights in the Amtel Mark are limited, as alleged in your Answer.

**ANSWER:**

It is clear from the contract of sale of July 3, 2002 to PBJ White Directories LLC, hereinafter "White contract", which was prepared by White's lawyer, that while certain assets were sold in their entirety, the name was not and there was no mention at all of the insignia or logo.  Mr. White could not sell to Yellow Book that which he did not own and he did not own <u>exclusive</u> rights to the name, insignia or logo.

**INTERROGATORY NO. 17:**  Explain in reasonable detail each and every fact supporting your contention alleged in paragraph 3 of your Counterclaim that Yellow Book employees "have made statements that are willfully false relating to defendant Steven M. Brandeberry's honesty, reliability, trustworthiness and ability to use the Amtel name."

**ANSWER:**

Without limitation most of my customers have reported to me that Yellow Book sales people and manager have told my customers that:

A.     I was a thief.
B.     I was a con artist.
C.     I would steal their money.
D.     I would never publish a Book.
E.     I was under indictment.
F.     That a court had already enjoined me from publishing.

**INTERROGATORY NO. 18:**  Explain in reasonable detail the damages that you contend were caused by any action of Yellow Book, including the amount and method of calculation.

**ANSWER:**

The calculation of damages to reputation is a jury issue.

**INTERROGATORY NO. 19:** Describe the structure of your sales force and identify all representatives who are or were responsible for the promotion, planning, marketing or sale of advertising in your yellow pages directory.

**ANSWER:**

**I have two salespersons. Phil Moorman and Anne Matheson**

Respectfully submitted,

_____
Robert P. Johnson (0040109)
Trial Attorney
Bryce A. Lenox (0069936)
THOMPSON HINE LLP
312 Walnut Street, 14th Floor
Cincinnati, Ohio 45202
Telephone: 513-352-6700
Facsimile: 513-241-4771
Robert.Johnson@ThompsonHine.com
Bryce.Lenox@THompsonHine.com
ATTORNEYS FOR PLAINTIFFS

**CERTIFICATE OF SERVICE**

I hereby certify that on March ___, 2010, a copy of the foregoing was served by regular United States Mail, postage prepaid, upon the following:

Darrell L. Heckman
Harris, Meyer, Heckman & Denkewalter, LLC
One Monument Square, Suite 200
Urbana, Ohio 43078
Attorney for Defendant

_____
Attorney for Plaintiffs

763500.1

## ACKNOWLEDGMENT

STATE OF OHIO,
Champaign County, ss:

      STEVEN M. BRANDEBERRY, being duly cautioned and sworn according to law, deposes and says that he is the Defendant in the within matter, and further states that his answers to Interrogatories herein given are true.

_____
STEVEN M. BRANDEBERRY

Sworn to before me and subscribed in my presence this ___8___ day of April, 2010.

_____
Notary Public

My commission expires: _no Expiration_



**DARRELL L. HECKMAN**
Attorney at Law – 0002389
Notary Public, State of Ohio
My Commission has no expiration
date pursuant to section 147.03
of the Ohio Revised Code

# EXHIBIT 2

# HARRIS, MEYER, HECKMAN & DENKEWALTER, L.L.C.

RICHARD A. MEYER

DARRELL L. HECKMAN

WILLIAM F. DENKEWALTER

RICHARD O. HARRIS
RETIRED

### ATTORNEYS AT LAW
ONE MONUMENT SQUARE, SUITE 200
URBANA, OHIO 43078
(937) 653-7186
FAX: (937) 653-3293
www.urbanalegal.com

HAROLD W. HOUSTON
1886-1951

RUSSELL B. HOLDING
1909-1990

HENRY W. HOUSTON
1918-1998

April 30, 2010

Bryce A. Lenox
Attorney at Law
THOMPSON HINE LLP
312 Walnut Street, 14th Floor
Cincinnati, Ohio 45202

> Re: Yellow Book USA, Inc. et al v. Brandeberry
> Case No 3:10 cv 025

Dear Mr. Lenox,

Enclosed is our response to your Request for Production of Documents.

Where a document was referenced more than once I did not attach multiple copies of the same document.

I wish to discuss your response to our document production request at the May 11, 2010 conference.

Sincerely,

**HARRIS, MEYER, HECKMAN**
**& DENKEWALTER, L.L.C.**

*Darrell L. Heckman/ch*

Darrell L. Heckman
Attorney at Law

DLH:ch
Enclosure



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION (DAYTON)

| | | |
|---|---|---|
| YELLOW BOOK USA, INC. et al. | : | Case No.: 3:10-cv-025 |
| Plaintiffs, | : | Judge Thomas M. Rose |
| v. | : | |
| | : | **PLAINTIFFS' FIRST REQUEST FOR** |
| STEVEN M. BRANDEBERRY | : | **PRODUCTION OF DOCUMENTS** |
| Defendant. | : | |

      Pursuant to Fed. R. Civ. P. 34, Plaintiffs Yellow Book USA, Inc. and Yellow Book Sales and Distribution Company, Inc. (collectively, "Yellow Book"), by and through their attorneys, hereby request that Defendant Steven M. Brandeberry ("Defendant") produce for inspection and copying the following documents and other tangible things within the possession, custody or control of Defendant. These documents and things (or copies of them) should be made available at the offices of Thompson Hine, 312 Walnut Street, 14th Floor, Cincinnati, Ohio 45202, within thirty days after service of this request, or at such other time and place as may be mutually agreed to by the parties.

## DEFINITIONS AND INSTRUCTIONS

      A.     The definitions and instructions set forth in Yellow Book's First Set of Interrogatories are incorporated herein by reference. In addition, to the extent you withhold any document or thing responsive to any of the following requests on the basis of privilege or other exemption from discovery, provide a log or list identifying all such documents and things. This log or list shall include (where available) the date of each such document or thing, the addressee, the author, the title, and a description of the subject matter of the document or thing. The log or

list also shall identify the specific ground or grounds upon which each document or thing is withheld.

## REQUESTS

**REQUEST FOR PRODUCTION NO. 1:** All documents identified in your responses to Yellow Book's First Set of Interrogatories.

> **License agreement between Herb Burkhalter and Steve Brandeberry/Am-Tel Directories (hereinafter Burkhalter contract).**

> **Contract for sale of assets between Am-Tel Directories Inc. and PBJ White Directories (hereinafter White contract).**

> **Corporate Asset Purchase Agreement.**

**REQUEST FOR PRODUCTION NO. 2:** All documents provided to, created by or relied upon in connection with this case by any expert witness you expect to call to testify in this litigation.

> **None.**

**REQUEST FOR PRODUCTION NO. 3:** Documents relating to when you first became aware of Yellow Book's use of the Amtel Mark.

> **Letter from Laura J. Massaro dated January 15, 2010 enclosed.**

**REQUEST FOR PRODUCTION NO. 4:**     All documents referring or relating to your use of the Amtel Mark, including all documents showing why, how and when you decided to use the Amtel mark to market and promote your yellow pages directory.

**Contract with Burkhalter.**

**REQUEST FOR PRODUCTION NO. 5:**     All documents referring or relating to sales of advertising in your yellow pages directory, including but not limited to customer contracts.

**Sample contract enclosed.**

**REQUEST FOR PRODUCTION NO. 6:**     All documents referring or relating to advertising or promotion, or intended advertising or promotion, of your yellow pages directory.

**Ad in the Urbana Daily Citizens and postcard handout.  Copies are enclosed.**

**REQUEST FOR PRODUCTION NO. 7:**     Documents sufficient to show the scope and nature of marketing, advertising and promotion of your yellow pages directory, including copies of all advertisements and promotional items, logs or records showing where, when, and for how long, each advertisement or promotional item was used, and the amount you spent on each marketing, advertisement or promotional item.

**See # 6.**

**REQUEST FOR PRODUCTION NO. 8:**     All documents in your possession discussing, referencing, depicting, or showing the Amtel Mark.

      **Burkhalter contracts. I created the current "look" by removing the slash in 1995.**

**REQUEST FOR PRODUCTION NO. 9:**     All documents referring or relating to development, marketing and distribution of your yellow pages directory.

      **None.**

**REQUEST FOR PRODUCTION NO. 10:**     All documents containing, referring to or relating to customer or consumer comments you have received that mention Yellow Book or the Amtel Mark.

      **Letters from customers. (Tim Hetico letters dated January 22, 2010 and February 2, 2010.)**

**REQUEST FOR PRODUCTION NO. 11:**     All documents that refer to or relate to instances of actual or possible confusion or mistake of customers or consumers or other persons as to a possible relationship, association, connection, or affiliation:  a) between you and Yellow Book; b) between your yellow pages directory and the Amtel Directories; (c) between your yellow pages directory and Yellow Book; and/or (d) between you and the Amtel Directories.

      **None.**

**REQUEST FOR PRODUCTION NO. 12:**    Provide a copy of your business plan and all documents related to your business plan.

**None.**

**REQUEST FOR PRODUCTION NO. 13:**    All documents constituting, referring or relating to searches, investigations, or other studies regarding your use of the Amtel Mark, including but not limited to those conducted or prepared to determine your purported ability to use the Amtel Mark, or to determine the existence of any possible conflicts, legal or otherwise, that might result from your use of the Amtel Mark.

**I do not have a trademark search. The contract from Burkhalter covers this issue.**

**REQUEST FOR PRODUCTION NO. 14:**    Provide a copy of all documents you have given to investors or potential investors.

**None.**

**REQUEST FOR PRODUCTION NO. 15:**    All documents containing or relating to complaints about, or comments showing dissatisfaction with, your yellow pages directory.

**None.**

**REQUEST FOR PRODUCTION NO. 16:**     All documents relevant to (i.e., that tend to support or refute) your claim that Yellow Book has limited rights in the Amtel Mark.

    **Burkhalter and White contracts, infra.**

**REQUEST FOR PRODUCTION NO. 17:**     Provide copies of all documents you have given to customers and potential customers.

    **Objection. This request is overboard, not calculated to lead to discoverable material and would reveal trade secrets.**

**REQUEST FOR PRODUCTION NO. 18:**     All documents relevant to (i.e., that tend to support or refute) your claim that Yellow Book's right to publish the Amtel Directories is non-exclusive.

    **Burkhalter and White contracts.**

**REQUEST FOR PRODUCTION NO. 19:**     All documents you intend to use at trial to prove your entitlement to use the Amtel Mark.

    **Burkhalter and White contracts.**

**REQUEST FOR PRODUCTION NO. 20:**    A fully executed copy of the Contract for

Sale of Assets by and between P.B.J. White Directories, LLC and Amtel Directories, Inc. dated

July 3, 2002, including all documents and communication relating to same.

     **Attached.**

**REQUEST FOR PRODUCTION NO. 21:**    All documents relating to any prior

ownership interest by you in the Amtel Marks or any yellow pages directory business utilizing

the Amtel Marks, including but not limited to all purchase agreements, license agreements, or

other documents relating to same.

     **Burkhalter contract.**

**REQUEST FOR PRODUCTION NO. 22:**    All documents you believe prove your

entitlement to use the Amtel Mark rather than the Am/Tel Mark.

     **None.  I created AMTEL (not Am/Tel).**

**REQUEST FOR PRODUCTION NO. 23:**    A copy of all contracts for advertising in

your yellow pages directory.

     **Objection for reasons stated in request #17.**

**REQUEST FOR PRODUCTION NO. 24:**    All documents in your possession or control that bear the word Amtel or Amtel Directories.

**Burkhalter contract. White contract. Contract for sale of assets, dated July 1, 2002.**

**REQUEST FOR PRODUCTION NO. 25:**    All communications you have had with Yellow Book.

**Letters from Yellow Book previously mentioned. I received a phone call from a man identifying himself as John Butler, Yellow Book's counsel. He continued to call even though I told him to call my lawyer. A copy of a note taken by an employee is enclosed.**

**REQUEST FOR PRODUCTION NO. 26:**    A copy of all tax returns and supporting documents from 1994 to present for all companies, corporations and businesses in which you have had any ownership interest. If separate tax returns are not available please produce copies of schedule C to your personal tax returns from 1994 to present.

**Objection.**

**REQUEST FOR PRODUCTION NO. 27:**    All correspondence to or from third parties referring or relating to your yellow pages directory, Yellow Book or the Amtel Directories.

**See # 10. Also letter from D'wight Peirson dated January 28, 2010.**

**REQUEST FOR PRODUCTION NO. 28:**    All documents that refer or relate to correspondence between you and any other person concerning the quality of the Amtel Directories.

**See # 10.**

**REQUEST FOR PRODUCTION NO. 29:**    All records relating to use of the Amtel Mark by Herbert E. Burkhalter.

**Burkhalter contract.**

**REQUEST FOR PRODUCTION NO. 30:**    A fully executed copy of the License Agreement dated May 6, 1994 between Herbert E. Burkhalter and American Telephone Directories, Inc. and you, including but not limited to all documents and communications relating to same.

**Enclosed.**

**REQUEST FOR PRODUCTION NO. 31:**    All documents describing market share for sales of yellow pages directories as between you, Yellow Book and any other party that sells yellow pages directories.

**None.**

- 9 -

**REQUEST FOR PRODUCTION NO. 32:**  Documents sufficient to identify all customers who have purchased advertising in your yellow pages directory.  The documents produced should provide the name, address and phone number of these customers.

> **Objection.**

**REQUEST FOR PRODUCTION NO. 33:**  Invoices to all of your customers for advertising placed in your yellow pages directory.

> **Objection.**

**REQUEST FOR PRODUCTION NO. 34:**  All documents supporting your assertion in paragraph 3 of your Counterclaim that Yellow Book employees "have made statements that are willfully false relating to defendant Steven M. Brandeberry's honesty, reliability, trustworthiness and ability to use the Amtel name."

> **See # 10 and #27.**

**REQUEST FOR PRODUCTION NO. 35:**  All documents that support your claim for damage to your reputation as alleged in your Counterclaim.

> **See # 10 and #27.**

Respectfully submitted,

_____

Robert P. Johnson (0040109)
Trial Attorney
Bryce A. Lenox (0069936)
THOMPSON HINE LLP
312 Walnut Street, 14th Floor
Cincinnati, Ohio 45202
Telephone: 513-352-6700
Facsimile: 513-241-4771
Robert.Johnson@ThompsonHine.com
Bryce.Lenox@THompsonHine.com

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on March __, 2010, a copy of the foregoing was served by regular

U.S. mail, postage prepaid, upon the following:

Darrell L. Heckman
Harris, Meyer, Heckman & Denkewalter, LLC
One Monument Square, Suite 200
Urbana, Ohio 43078
Attorney for Defendant

_____
Attorney for Plaintiffs

763493v1

# EXHIBIT 3

ATT COPY 199
+ATT

# CORPORATE ASSET PURCHASE AGREEMENT

This agreement executed this __6th__ day of May 1994 by and between Area Marketing Telephone Directories, Inc., 1150 East State Route 36, Piqua, Ohio 45356 (hereinafter referred to as Seller) and Steve M. Brandeberry and American Telephone Directories, Inc., 953 N. Main Street, Urbana, Ohio (hereinafter referred to as Purchaser);

## WITNESSETH

WHEREAS Area Marketing Telephone Directories Inc., desires to sell certain assets of said corporation to purchaser; and

WHEREAS purchaser desires to purchase certain assets from seller upon the terms herein specified;

NOW THEREFORE, the parties agree as follows:

1. Seller hereby agrees to sell to purchaser for the price and terms hereinafter set forth all of the customer lists of Area Marketing Telephone Directories, Inc. used in the selling, promoting, billing and printing of advertisements for the most recent Edition of the Champaign County Telephone Directory, including all records and documents used in the business and also salespersons record of sales and commissions earned and paid and the goodwill of said business established over the last 12 years in Champaign County Ohio, but excluding cash, bank accounts, office furniture and equipment, vehicles, current receivables, and excluding records required to be retained for tax purposes of Seller.

2. Purchaser agrees to purchase said assets from seller for the total price of $205,000.00 on the following terms and conditions:

(a) $25,000.00 down payment payable upon date of closing. Closing shall be no later than May 2, 1994.

(b) Monthly payments as follows:

```
$    58.33 beginning June 1, 1994 for 12 months
    225.00 beginning June 1, 1995 for 12 months
  1,000.00 beginning June 1, 1996 for 24 months
  1,020.00 beginning June 1, 1998 for  5 months
  2,500.00 beginning Nov  1, 1998 for  7 months
  5,000.00 beginning June 1, 1999 until purchase
                              price is fully paid;
```

said monthly installments to be credited against an annual obligation equal to 20% of sales;

PLAINTIFF'S EXHIBIT 3


1

(c) An annual obligation equal to 20% of sales of the Champaign County Telephone Directory beginning with the 1995-96 edition payable in full on the paging of each year's directory, or on the first and each succeeding annual anniversary of this agreement, whichever first occurs after crediting toward this obligation the monthly payments made pursuant to paragraph 2b above and after crediting payments made to Herbert E. Burkhalter personally for purchase of the AM/TEL name, insignia and logo, consulting services and covenant not to compete during the same annual period involved, until the sum of $205,000.00 has been paid in full. The amounts owing pursuant to Paragraph 2(c) shall be calculated by the Company's independent accountants. The Company shall allow Seller or Herbert E. Burkhalter the opportunity to review such of the Company's records as are reasonably necessary to verify the independent accountant's report. The parties acknowledge that certain Internal Revenue Regulations may require that imputed interest be computed and the parties agree that said interest rate shall be 6% per annum, but the note shall not be considered paid in full until the sum of $205,000.00 has been paid, and that the interest calculation is for tax purposes only. In the event purchaser desires to pre-pay the promissory note there shall be a pre-payment penalty equal to the unpaid interest, as calculated for tax purposes, for the entire term of the note, whether or not the time has elapsed.

(d) Purchaser agrees to execute a cognovit promissory note to seller evidencing the purchase price and terms as set forth above, and containing an additional provision that said note shall become a demand note due and payable immediately upon the resale, franchising, merger or other disposition of the business. In the event purchaser grants an option to buy the business or resells the business directly or indirectly before May 2, 1999 for a higher price, purchaser agrees that in consideration of the low down payment herein, seller shall be entitled to and purchaser agrees to pay to seller one-half (50%) of any increased sales price over the $480,000.00 set forth above, and in other agreements between seller's President, Herbert E. Burkhalter and purchaser, whether the sales price be for assets, stock, covenants not to compete, consulting fees or other continuing compensation, or any combination thereof.

(e) Purchaser acknowledges the importance of escrowing revenue for the purpose of having sufficient funds to defray the cost of printing (approximately 10% of sales). In order to maintain the financial strength necessary to establish and maintain good credit with printing firms and have year to year continuity, purchaser agrees to escrow sufficient monies to guarantee that funds will be

2

available when needed for printing and distribution of
each year's directory. Purchaser agrees to use the
financial plan used by Seller or similar method which
involves depositing sufficient funds in a separate bank
account for use in funding the printing expense.

3. Seller represents that as a part of this transaction, it
will see that it's president, Herbert E. Burkhalter will enter into
a consulting agreement with purchaser as set forth in a separate
agreement executed contemporaneously herewith. In consideration of
this effort purchaser agrees to provide a new Chrysler automobile
for the use of Mr. Burkhalter in making calls upon customers to
introduce the new owner of the business, to assist in following-up
on customer orders and to generally try to maintain customer
satisfaction and loyalty. If said Chrysler automobile is a leased
vehicle purchaser agrees that upon the end of the lease period a
clear and unencumbered title will be delivered to Herbert E.
Burkhalter and Mr. Burkhalter agrees to credit the original price
which will be agreed upon in writing and the dollar amount will be
inserted in this agreement when the exact cash purchase price is
known. This purchase price is $_____ (to be initialed
upon delivery of the selected automobile).
_____ seller's initials
_____ purchaser's initials
Purchaser agrees to pay the sales tax. Seller shall pay insurance
and general maintenance of the vehicle during any lease term, and
until a clear title with sales tax paid by Steve M.
Brandeberry/American Telephone Directories, Inc. is delivered to
Herbert E. Burkhalter.

4. Purchaser warrants that it will continue the high
standards of representation to the public of the accurate contents
of each year's directory to be published, and generally to maintain
a high standard of advertising as well as accurate directory
listings. To insure in the area of graphics, printing and vendors
to be used, in the early phase of the transition of the business to
the Purchaser, Purchaser agrees to seek the approval of Herbert E.
Burkhalter as to choice of vendors in these important areas
necessary to maintain the highest standards possible.

5. Purchaser agrees that upon receipt of a list of
receivables due the seller that the first monies received from each
customer on the receivables list shall be the property of the
seller until each account receivable has been paid. Purchaser
agrees to send and/or deliver to seller any and all of seller's
receivables coming into the possession/control of purchaser
immediately upon receipt without charge to seller. Purchaser
agrees that he will not extend credit nor include advertising in
current directories for customers while any funds are still owing
from such customers to seller.

3

6.   Purchaser agrees to pledge all of the capital stock of American Telephone Directories, Inc. to seller as security for the timely performance of purchasers' obligations under this agreement, and in order to provide as much security as possible purchaser agrees:

(a)   provide a good and sufficient third mortgage for Steve M. Brandeberry's real estate located at 953 N. Main Street, Urbana, Ohio and

(b)   provide a good and sufficient second mortgage for Steve M. Brandeberry's real estate located at 339 N. Ridgeview, Indianapolis, Indiana and

(c)   purchaser agrees to provide at purchaser's expense a life insurance policy on the life of Steve M. Brandeberry to secure the payments herein as well as payments required by separate agreements between Herbert E. Burkhalter and purchaser in an amount not less than $500,000.00 payable to seller and purchaser and Herbert E. Burkhalter and Elois Burkhalter as their interest may appear.

(d)   seller shall have the right to inspect the books of purchaser at reasonable times and places. Purchaser agrees to provide full and complete access and copies, if required by seller, of weekly sales reports, bank statements, deposit slips, contracts with customers, payroll records, itemized lists of accounts receivable and accounts payable of purchaser, and any other records required by seller.

(e)   In view of the low down payment herein purchaser agrees that the compensation of Steve M. Brandeberry and other employees of purchaser will be limited to commissions only based upon the commission schedule formerly used by the seller, so long as any part of the purchase price, consulting fees, covenant not to compete and logo payments to Herbert E. Burkhalter has not been paid, the compensation paid to all employees (including independent contractors) excluding Steve M. Brandeberry, excluding commissions, shall be limited to $1,300.00 per month (on an annualized basis).

If Steve M. Brandeberry works full-time in the business (minimum of 40 hours per week), compensation shall still be limited to funds available after all current payables including payments to Herbert E. Burkhalter, individually, are current, including the escrow of funds necessary for printing and distribution (paragraph 2(e) above) and if funds are still available after these provisions, the compensation paid to all employees (including independent contractors) and  Steve

4

M. Brandeberry, excluding commissions, shall be limited to $2,500.00 per month.

7.  Default Provisions. A default herein is defined to mean the non-payment of any installment of the purchase price not paid when due or within thirty (30) days thereafter, or any other failure of the purchaser to timely comply with the terms of this agreement. In the event of a default that is not cured within 15 days thereafter the purchaser agrees to turn over all assets of the business to seller, including the pledged stock of purchaser's said corporation and agrees to resign as officer and director of such corporation and agrees to cooperate fully with the transition of the business back to seller with the least amount of confusion, difficulty, or loss of goodwill.

8.  Both parties agree to avoid confusion to the customers and the public, in that Area Marketing Telephone Directories, Inc., is a corporation continuing after the within sale of certain assets, while purchaser intends to use the name, insignia and logo of Am/Tel by virtue of a separate purchase of said assets. Both parties agree that they will not incur financial obligations of any nature to the other party or corporation owned or controlled by the other party, and in the event of an erroneous billing the party receiving the benefit shall be solely liable and agrees to indemnify and save harmless the other party from any credit disparagement as well as the monetary amount involved.

9.  Purchaser acknowledges that they are entering into this agreement and other agreements entered into contemporaneously herewith after their own inspection and investigation and not upon any representations of seller as to earnings or profit or any potential earnings or expansion that may be possible.

IN WITNESS WHEREOF, the parties have executed this agreement on the date first stated above.

WITNESSED BY:                          AREA MARKETING TELEPHONE DIRECTORIES, INC.

_____                _____ PRES.
                                       Herbert E. Burkhalter, President


                                       AMERICAN TELEPHONE DIRECTORIES, INC.

_____                _____
                                       Steve M. Brandeberry, President

                                       _____
                                       Steve M. Brandeberry, Individually, and as
                                       Guarantor of obligations of American

5

# EXHIBIT 4

Att. Cop

## LICENSE AGREEMENT (AM/TEL)

This agreement made and executed this 6th day of May, 1994, by and between American Telephone Directories, Inc. and Steve M. Brandeberry (Licensee) and Herbert E. Burkhalter (Burkhalter);

WITNESSETH:

WHEREAS, Burkhalter has developed a distinctive name, insignia and logo, entitled AM/TEL which has been used in the Champaign County, Ohio, telephone directory for years, and

WHEREAS, licensee has agreed to pay a stipulated fee for the license to use said name, insignia/logo.

NOW, therefore the parties agree as follows:

1.  Burkhalter hereby grants to licensee the use of the name, insignia and logo:

AM/TEL

AM/TEL
DIRECTORIES

for the exclusive use of licensee throughout Champaign County, Ohio, until Burkhalter has received payment in full of all monies due him on a certain asset purchase agreement, consulting agreement and covenant not to compete agreement; after which time all payments have been paid in full licensee shall be the owner of said name, insignia and logo, in so far as Burkhalter can license or sell same.

2.  Licensee acknowledges that said name, insignia and logo are not registered trade names nor trade marks.

3.  This agreement is non-assignable without the written consent of Burkhalter first being obtained.

4.  Licensee agrees to pay the sum of Fifty Thousand Dollars ($50,000) to Burkhalter for the above license in monthly payments as follows:

$   275.00 beginning June 1, 1994, for 24 months
  1,500.00 beginning June 1, 1996, for 24 months
  1,480.00 beginning June 1, 1998, for 5 months or
                                    until fully paid

5.  In the event of a default in any monthly payment for thirty days, this license shall automatically expire and licensee shall no longer have the lawful use thereof, unless



PLAINTIFF'S
EXHIBIT
4

the default is cured within 15 days after the thirty day grace period.

6. In the event of the death of Burkhalter the payments are to be made to Elois Burkhalter, if she survives him, otherwise to his estate.

WITNESSED BY:                        AMERICAN TELEPHONE DIRECTORIES, INC.

By: _____
        President

Steve M. Brandeberry

_____
Herbert E. Burkhalter

# EXHIBIT 5



AMTEL
AMERICAN TELEPHONE
DIRECTORIES, INC.

**Steve M. Brandeberry**
Office: 937-484-7718
Fax: 937-652-0451
**Cell: 937-631-2213**

P.O. Box 8
Urbana, Ohio 43078

steveb@AMTELdirectory.com
www.AMTELdirectory.com



PLAINTIFF'S
EXHIBIT
5
PENGAD 800-631-6989

# EXHIBIT 6

A TT COPY

## CONTRACT FOR SALE OF ASSETS

Due to economic necessity, the Directors and Officers of
AM-TEL DIRECTORIES, INC. have voted to sell the assets of the
business. Accordingly, under the provisions and power of such
resolution, it is hereby agreed by AMTEL DIRECTORIES, INC. and
P.B.J. WHITE DIRECTORIES, LLC., as follows:

(1) P.B.J. WHITE DIRECTORIES, LLC. will acquire the assets, in
their entirety, as set forth on the attached Exhibit "A", of AM-
TEL DIRECTORIES, INC. and the right to use the name AM-TEL
DIRECTORIES effective as of the __1ST__ day of __July__, 2002
under the following terms:

(a) The purchase price shall be ONE HUNDRED THOUSAND AND 00/100
DOLLARS ($100,000.00) plus the assumption of the specified
indebtedness of AM-TEL DIRECTORIES, INC. as set forth on the
listing of such indebtedness that is attached hereto as Exhibit "B".
The ONE HUNDRED THOUSAND and 00/100 DOLLARS ($100,000.00) shall be
paid as follows:  a) $75,000.00 on or before __8th__ of
__July__, 2002; b)$25,000.00 on or before __8th__ of
__July__, 2004.  AM-TEL DIRECTORIES, INC. shall remain
obligated and shall hold P.B.J. WHITE DIRECTORIES, LLC. harmless
from all other indebtedness.

(b)  P.B.J. WHITE DIRECTORIES, LLC. shall secure, by its own
independent line of finance, all outstanding debts and
obligations of AM-TEL DIRECTORIES, INC.;

(2)  P.B.J. WHITE DIRECTORIES, LLC. has the right to assign its
interest in this agreement.

(3) After the purchase of the assets, P.B.J. WHITE DIRECTORIES,
LLC. may offer employment to the employees of AM-TEL DIRECTORIES,
INC., but is under no obligation to do so.

IN WITNESS WHEREOF, the parties have hereunto set their hands to
this agreement on the __3rd__ day of __July__, 2002.

SIGNED IN THE PRESENCE OF:

_Pamela Nemsel_                    AMTEL DIRECTORIES, INC.

_July A Dolin_                     BY: _Steve M. Brandeberry_
                                       Steve M. Brandeberry

_Pamela Nemsel_                    P.B.J. WHITE DIRECTORIES, LLC.

_July A Dolin_                     BY: _____

PLAINTIFF'S
EXHIBIT
6
PENGAD 800-631-6989

State of Ohio
County of _____Champaign_____ , SS:

Before me, a Notary Public, in and for said County and State,
personally came **Am-Tel Directories, Inc., by Steve M. Brandeberry**,
its _____President_____ , who acknowledged the signing of the
foregoing agreement to be the voluntary act and deed of the said **Am-
Tel Directories, Inc.** and the voluntary act and deed of the said
**Steve M. Brandeberry**, personally and as such officer.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal on
this ___3rd___ day of ___July___ , 2002.

HARLEY A. DAVIDSON, Attorney at Law
Notary Public, State of Ohio
My Commission has no expiration date.
Section 147.03 O.R.C.                    Notary Public

State of Ohio
County of _____Champaign_____ , SS:

Before me, a Notary Public, in and for said County and State,
personally came **P.B.J. WHITE DIRECTORIES, LLC.**, by
_William N. White_ its _____President_____ , who
acknowledged the signing of the foregoing agreement to be the
voluntary act and deed of the said **P.B.J. WHITE DIRECTORIES, LLC.**
and the voluntary act and deed of the said _William N. White_
personally and as such officer.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal on
this ___3rd___ day of ___July___ , 2002.

HARLEY A. DAVIDSON, Attorney at Law
Notary Public, State of Ohio
My Commission has no expiration date.
Section 147.03 O.R.C.                    Notary Public

This instrument prepared by:
HARLEY A. DAVIDSON, Attorney at Law
117 W. Court St., Urbana, OH 43078

AMTEL Directories Inc.
## Balance Sheet
### As of July 3, 2002

07/03/02

| | Jul 3, '02 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| Checking/Savings | |
| 102 Champaign Op 647160 | 10,609.59 |
| 103 Payroll 636215 | 151.21 |
| 105 Petty Cash | 2,022.80 |
| **Total Checking/Savings** | 12,783.60 |
| Accounts Receivable | |
| Accounts Receivable | 381,903.60 |
| **Total Accounts Receivable** | 381,903.60 |
| Other Current Assets | |
| 131 Employee Advances | 240.00 |
| **Total Other Current Assets** | 240.00 |
| **Total Current Assets** | 394,927.20 |
| Fixed Assets | |
| 146 Fixtures & Equipment | |
| 147 Fixt. & Equip Accum Depr. | -20,000.33 |
| 146 Fixtures & Equipment - Other | 43,686.57 |
| **Total 146 Fixtures & Equipment** | 23,686.24 |
| 148 Transportation Equipment | |
| 149 Trans Equip. Accum. Depr. | 1,179.98 |
| 148 Transportation Equipment - Other | 14,586.29 |
| **Total 148 Transportation Equipment** | 15,766.27 |
| **Total Fixed Assets** | 39,452.51 |
| Other Assets | |
| 181 Intan. Asset Asset Purchase | 205,000.00 |
| 182 Intan. Non Compete | 150,000.00 |
| 183 Intan. Asset License Agrmnt | 50,000.00 |
| 185 Accum Amort Asset Purchase | -77,446.02 |
| 186 Accum Amort Non Compete | -56,666.98 |
| 187 Accum Amort License Agrmnt | -18,887.00 |
| Deposits | 5,000.00 |
| **Total Other Assets** | 257,000.00 |
| **TOTAL ASSETS** | 691,379.71 |
| **LIABILITIES & EQUITY** | |
| Liabilities | |
| Current Liabilities | |
| Accounts Payable | |
| 205 Accounts Payable | 137,402.00 |
| **Total Accounts Payable** | 137,402.00 |
| Credit Cards | |
| AmEx SBS 61009 | 5,000.00 |
| **Total Credit Cards** | 5,000.00 |
| Other Current Liabilities | |
| 203 Accrued Publish Exp-Union | |
| Printing | 4,662.66 |
| yellow page tapes/leads | 628.07 |
| **Total 203 Accrued Publish Exp-Union** | 5,290.73 |
| 204 Accrued Publish Exp Logan | |
| Printing | -2,500.00 |
| yellow page tapes/leads | 707.44 |
| **Total 204 Accrued Publish Exp Logan** | -1,792.56 |
| 206 Accrued Publish Exp Champ | |
| Pageing/Graphics | 4,246.02 |

AMTEL Directories Inc.
## Balance Sheet
### As of July 3, 2002

07/03/02

|  | Jul 3, '02 |
|---|---|
| Printing | 45,000.00 |
| white page tapes | 183.99 |
| 206 Accrued Publish Exp Champ - Other | 462.18 |
| Total 206 Accrued Publish Exp Champ | 49,892.19 |
| 210 Peoples 603847-50 | |
| 210 Peoples 604127-50 | -184.54 |
| Payroll Liabilities | 308.88 |
| 232.1 FICA er | -0.01 |
| 232.2 FICA ee | -0.01 |
| 235 Federal Unemployment | -0.20 |
| Group Medical | 0.03 |
| Total Payroll Liabilities | -0.19 |
| Total Other Current Liabilities | 53,514.51 |
| Total Current Liabilities | 195,916.51 |
| Long Term Liabilities | |
| 267 Note Pay CNB LOC 7017 | 100,000.00 |
| 268 Note Pay Delta Hamilton | 7,000.00 |
| 269 Note CNB 8669 Business | 144,367.52 |
| 270 Note John & Anne Hahn | 15,000.00 |
| 275.1 Note Pay Amer Ex LOC | 7,943.07 |
| 275.2 Note Pay Peoples 99 Chrys | 13,136.54 |
| 275.3 Peoples DIAD | 4,924.60 |
| 275.4 Peoples Computer EQT/Acce | ~ 5,904.78 |
| 275.5 Peoples Ofc Furn/phones | 11,589.81 |
| Total Long Term Liabilities | 309,866.32 |
| Total Liabilities | 505,782.83 |
| Equity | |
| 262 Equity Steve Brandeberry | 74,300.14 |
| 263 Officer Equity & Draws | 923.11 |
| 266 Equity P. Hamilton | 72,956.20 |
| 280 Equity Skipp Weithman | 21,000.00 |
| 281 Capital Stock | 500.00 |
| 283 Retained Earnings | 787.14 |
| Opening Bal Equity | 10,804.24 |
| Net Income | 4,326.05 |
| Total Equity | 185,596.88 |
| TOTAL LIABILITIES & EQUITY | 691,379.71 |

07/03/02

# AMTEL Directories Inc.
## Unpaid Bills Detail
### As of July 3, 2002

| Type | Date | Num | Due Date | Aging | Open Balance |
|------|------|-----|----------|-------|--------------|
| **Access Computers, Inc.** | | | | | |
| Bill | 2/28/2002 | 13233 | 3/30/2002 | 125 | 344.50 |
| Bill | 2/28/2002 | 13234 | 3/30/2002 | 125 | 2,177.13 |
| Bill | 4/10/2002 | 13250 | 5/10/2002 | 84 | 438.63 |
| Bill | 5/14/2002 | 13338 | 6/13/2002 | 50 | 138.06 |
| Total Access Computers, Inc. | | | | | 3,098.32 |
| **Alpha Graphic Services** | | | | | |
| Bill | 3/22/2002 | 2904 | 4/6/2002 | 103 | 1,062.87 |
| Total Alpha Graphic Services | | | | | 1,062.87 |
| **American Express Centurion Bank** | | | | | |
| Bill | 6/26/2002 | | 7/6/2002 | 7 | 9,180.29 |
| Total American Express Centurion Bank | | | | | 9,180.29 |
| **Bellefontaine Steel and Fabricating** | | | | | |
| Bill | 3/7/2002 | 12638 | 3/17/2002 | 118 | 455.28 |
| Total Bellefontaine Steel and Fabricating | | | | | 455.28 |
| **Boldman Printing Co.** | | | | | |
| Bill | 3/15/2002 | 14985 | 4/14/2002 | 110 | 344.52 |
| Bill | 4/30/2002 | 15139 | 5/30/2002 | 64 | 459.68 |
| Bill | 5/10/2002 | 15206 | 6/9/2002 | 54 | 114.27 |
| Total Boldman Printing Co. | | | | | 918.47 |
| **BP** | | | | | |
| Bill | 6/19/2002 | 81206 | 7/9/2002 | 14 | 149.67 |
| Total BP | | | | | 149.67 |
| **Business Equipment Company** | | | | | |
| Bill | 6/3/2002 | | 6/18/2002 | 30 | 199.72 |
| Total Business Equipment Company | | | | | 199.72 |
| **Champaign County Chamber Of Commerce** | | | | | |
| Bill | 4/1/2002 | | 5/1/2002 | 93 | 10.00 |
| Bill | 4/24/2002 | 1088 | 5/24/2002 | 70 | 300.00 |
| Total Champaign County Chamber Of Commerce | | | | | 310.00 |
| **Champaign County Historical Society** | | | | | |
| Bill | 2/21/2002 | | 3/3/2002 | 132 | 75.00 |
| Total Champaign County Historical Society | | | | | 75.00 |
| **Champaign Nat'l Bank and Trust** | | | | | |
| Bill | 6/14/2002 | | 6/29/2002 | 19 | 625.00 |
| Bill | 6/17/2002 | | 7/2/2002 | 16 | 683.71 |
| Total Champaign Nat'l Bank and Trust | | | | | 1,308.71 |
| **Citizens National Bank** | | | | | |
| Bill | 3/8/2002 | | 3/18/2002 | 117 | 1,000.00 |
| Total Citizens National Bank | | | | | 1,000.00 |
| **Duro-Last** | | | | | |
| Bill | 4/17/2002 | 431529 | 4/27/2002 | 77 | 225.00 |
| Total Duro-Last | | | | | 225.00 |
| **FedEx** | | | | | |
| Bill | 6/12/2002 | 42744... | 6/27/2002 | 21 | 50.17 |
| Bill | 6/19/2002 | 42748... | 7/4/2002 | 14 | 81.99 |
| Bill | 6/26/2002 | 42752... | 7/11/2002 | 7 | 41.80 |
| Total FedEx | | | | | 173.96 |
| **Franke's Wood Products, LLC** | | | | | |
| Bill | 3/25/2002 | 5028 | 4/24/2002 | 100 | 1,000.00 |

Page 1

AMTEL Directories Inc.
# Unpaid Bills Detail
### As of July 3, 2002

07/03/02

| Type | Date | Num | Due Date | Aging | Open Balance |
|------|------|-----|----------|-------|--------------|
| Total Franke's Wood Products, LLC | | | | | 1,000.00 |
| **Hatton & Enright Pharmacy, Inc** | | | | | |
| Bill | 4/20/2002 | | 5/5/2002 | 74 | 55.10 |
| Bill | 4/20/2002 | | 5/5/2002 | 74 | 163.01 |
| Bill | 5/20/2002 | | 6/4/2002 | 44 | 153.96 |
| Bill | 6/20/2002 | | 7/5/2002 | 13 | 68.91 |
| Total Hatton & Enright Pharmacy, Inc | | | | | 440.98 |
| **I O S Capital** | | | | | |
| Bill | 6/11/2002 | 55359... | 6/26/2002 | 22 | 100.70 |
| Total I O S Capital | | | | | 100.70 |
| **Ikon** | | | | | |
| Bill | 2/25/2002 | 17083... | 3/12/2002 | 128 | 671.27 |
| Total Ikon | | | | | 671.27 |
| **Indian Lake Area Chamber of Commerce** | | | | | |
| Bill | 6/26/2002 | | 7/26/2002 | 7 | 75.00 |
| Total Indian Lake Area Chamber of Commerce | | | | | 75.00 |
| **John & Anne Hahn** | | | | | |
| Bill | 3/1/2002 | | 7/22/2002 | 124 | 2,250.00 |
| Total John & Anne Hahn | | | | | 2,250.00 |
| **Liberty Press** | | | | | |
| Credit | 2/28/2001 | State... | | | -56.08 |
| Bill | 8/31/2001 | | 9/30/2001 | 306 | 56.08 |
| Bill | 2/27/2002 | 12234 | 3/29/2002 | 126 | 34,793.74 |
| Bill | 5/30/2002 | 5824 | 6/29/2002 | 34 | 42,594.54 |
| Total Liberty Press | | | | | 77,388.28 |
| **MainNet** | | | | | |
| Bill Pmt -Check | 6/2/2000 | 10383 | | | -38.50 |
| Total MainNet | | | | | -38.50 |
| **My Yellow Source, Inc.** | | | | | |
| Bill | 3/29/2002 | 1216 | 4/13/2002 | 96 | 1,785.00 |
| Bill | 5/2/2002 | 1230 | 5/17/2002 | 62 | 300.00 |
| Bill | 5/31/2002 | 1248 | 6/15/2002 | 33 | 200.00 |
| Total My Yellow Source, Inc. | | | | | 2,285.00 |
| **Peoples Savings Bank** | | | | | |
| Bill | 6/5/2002 | | 6/25/2002 | 28 | 415.69 |
| Bill | 6/5/2002 | | 6/25/2002 | 28 | 337.88 |
| Bill | 6/5/2002 | | 6/25/2002 | 28 | 393.25 |
| Bill | 6/15/2002 | | 7/5/2002 | 18 | 290.56 |
| Bill | 6/25/2002 | | 7/15/2002 | 8 | 201.42 |
| Total Peoples Savings Bank | | | | | 1,638.80 |
| **Pitney Bowes Credit Corporation** | | | | | |
| Bill | 6/14/2002 | jn02 | 6/29/2002 | 19 | 250.16 |
| Total Pitney Bowes Credit Corporation | | | | | 250.16 |
| **PitneyBowes Purchase Power** | | | | | |
| Bill | 4/16/2002 | | 5/16/2002 | 78 | 307.00 |
| Bill | 5/16/2002 | | 6/15/2002 | 48 | 1,762.55 |
| Bill | 6/18/2002 | | 7/18/2002 | 15 | 508.62 |
| Total PitneyBowes Purchase Power | | | | | 2,578.17 |
| **Platinum Plus** | | | | | |
| Bill | 3/4/2002 | | 4/3/2002 | 121 | 4,741.79 |
| Bill | 4/1/2002 | | 5/1/2002 | 93 | 2,433.92 |
| Bill | 4/8/2002 | | 5/8/2002 | 86 | 4,820.12 |

ANTEL Directories Inc.
# Unpaid Bills Detail
### As of July 3, 2002

07/03/02

| Type | Date | Num | Due Date | Aging | Open Balance |
|------|------|-----|----------|-------|--------------|
| **Total Platinum Plus** | | | | | 11,995.83 |
| **Polylogics Consulting, Inc.** | | | | | |
| Bill | 5/20/2002 | W5807 | 6/19/2002 | 44 | 637.94 |
| Bill | 6/5/2002 | c0416 | 7/5/2002 | 28 | 25.22 |
| Bill | 6/13/2002 | 0207... | 7/13/2002 | 20 | 522.25 |
| Total Polylogics Consulting, Inc. | | | | | 1,185.41 |
| **Polylogics Services LLC** | | | | | |
| Credit | 10/25/2001 | | | | -500.00 |
| Bill | 10/31/2001 | 68 | 11/10/2001 | 245 | 75.00 |
| Bill | 3/29/2002 | 1207 | 4/28/2002 | 96 | 763.23 |
| Bill | 6/11/2002 | 1406 | 7/11/2002 | 22 | 1,117.03 |
| Total Polylogics Services LLC | | | | | 1,455.26 |
| **SBC Ameritech** | | | | | |
| Bill | 4/15/2002 | 1176 | 5/15/2002 | 79 | 150.00 |
| Bill | 6/15/2002 | | 7/15/2002 | 18 | 40.03 |
| Total SBC Ameritech | | | | | 190.03 |
| **SBC Directory Listings Products** | | | | | |
| Bill | 2/15/2002 | 1132 | 2/25/2002 | 138 | 500.24 |
| Total SBC Directory Listings Products | | | | | 500.24 |
| **Shawn Clark** | | | | | |
| Bill | 6/26/2002 | | 7/31/2002 | 7 | 140.00 |
| Total Shawn Clark | | | | | 140.00 |
| **Skelley Lumber Co** | | | | | |
| Bill | 2/28/2002 | | 3/30/2002 | 125 | 2,353.55 |
| Total Skelley Lumber Co | | | | | 2,353.55 |
| **SmartLease by GMAC** | | | | | |
| Bill | 5/30/2002 | | 6/19/2002 | 34 | 628.20 |
| Bill | 6/28/2002 | | 7/18/2002 | 5 | 628.20 |
| Total SmartLease by GMAC | | | | | 1,256.40 |
| **Speedway SuperAmerica LLC** | | | | | |
| Bill | 6/15/2002 | | 6/30/2002 | 18 | 408.30 |
| Total Speedway SuperAmerica LLC | | | | | 408.30 |
| **Springfield Museum Of Art** | | | | | |
| Bill | 3/14/2002 | | 3/24/2002 | 111 | 1,000.00 |
| Total Springfield Museum Of Art | | | | | 1,000.00 |
| **Sprint** | | | | | |
| Bill | 5/31/2002 | | 6/30/2002 | 33 | 1,283.56 |
| Total Sprint | | | | | 1,283.56 |
| **Staples** | | | | | |
| Bill | 6/3/2002 | | 7/3/2002 | 30 | 3,047.37 |
| Total Staples | | | | | 3,047.37 |
| **Thersa Cammer** | | | | | |
| Bill | 6/28/2002 | | 7/8/2002 | 5 | 64.50 |
| Total Thersa Cammer | | | | | 64.50 |
| **Tracy Graphical** | | | | | |
| Bill | 3/30/2002 | 1108 | 4/29/2002 | 95 | 1,229.60 |
| Bill | 5/10/2002 | 1105 | 6/9/2002 | 54 | 1,144.80 |
| Total Tracy Graphical | | | | | 2,374.40 |
| **Urbana Daily Citizen** | | | | | |

07/03/02

# AMTEL Directories Inc.
# Unpaid Bills Detail
## As of July 3, 2002

| Type | Date | Num | Due Date | Aging | Open Balance |
|------|------|-----|----------|-------|-------------|
| Bill | 4/11/2002 | | 5/11/2002 | 83 | 10.00 |
| Total Urbana Daily Citizen | | | | | 10.00 |
| **Wagner Maurice Davidson & Gilbert Co LPA** | | | | | |
| Bill | 4/15/2002 | | 4/25/2002 | 79 | 275.00 |
| Total Wagner Maurice Davidson & Gilbert Co LPA | | | | | 275.00 |
| **YPPA** | | | | | |
| Bill | 1/26/2002 | 00291... | 2/25/2002 | 158 | 280.00 |
| Bill | 4/1/2002 | | 5/1/2002 | 93 | 1,250.00 |
| Bill | 4/25/2002 | 00297... | 5/25/2002 | 69 | 285.00 |
| Bill | 7/1/2002 | | 7/31/2002 | 2 | 1,250.00 |
| Total YPPA | | | | | 3,065.00 |
| **TOTAL** | | | | | 137,402.00 |

# EXHIBIT 7



# yellowbook™

## Union County

### Business and Residential Listings for all of Union County



Orange portion of map reflects distribution area of directory





UNION COUNTY
OHIO

937.642.6279
800.642.0087
www.wherepriderresides.com

**Chamber of Commerce
Convention & Visitors Bureau
Economic Development Partnership**



COSI
Center of Science and Industry
333 West Broad Street
Columbus, Ohio 43215
614.228.COSI (2674)
www.cosi.org



UNION COUNTY
COVERED BRIDGE
FESTIVAL

**HELD
ANNUALLY
IN
SEPTEMBER**

For more information visit:
www.unioncountycvb.com

*Nationwide local search on* **yellowbook.com**
To promote your business call 1-800-YB-YELLOW





*Eco-friendly size - Packed with content*

PLAINTIFF'S
EXHIBIT
7
PENGAD 800-631-6989



# yellowbook™

## Madison County

**Business and Residential Listings for all of Madison County**

Plus Residential & Business
White Page Listings For:
Catawba, Harrisburg, Mechanicsburg,
Plain City, South Charleston,
South Vienna, Woodstock



Orange portion of map
reflects distribution
area of directory





Cultivating your county

Phone: 740.852.2250
Fax: 740.852.2250
740 Keny Blvd., London, OH 43140
www.madisoncountychamber.org



**London Public Library**
Celebrating Library Services

20 E. First Street
London, OH 43140
www.london.lib.oh.us

For more information
call 740-852-9543



For Tickets & Information:
**614-462-5250**
www.clippersbaseball.com



Nationwide local search on *yellowbook.com*

To promote your business call 1-800-YB-YELLOW





*New eco-friendly size - Still packed with content*



# yellowbook™

## Logan County

Business and Residential Listings
for all of Logan County



Orange portion of map
reflects distribution
area of directory





**DONATOS**
PIZZA SUBS SALADS
Bellefontaine 937-592-1100 • 815 S. Main St.



937-599-2016



Logan County Area
CHAMBER OF COMMERCE
937-599-5121
100 South Main St.
Bellefontaine, OH 43311
www.logancountyohio.com



Nationwide local search on **yellowbook.com**
To promote your business call 1-800-YB-YELLOW



*New eco-friendly size - Still packed with content*



# Champaign County

| | |
|---|---|
| Cable | North Lewisburg |
| Christiansburg | Rosewood |
| Fountain Park | St. Paris |
| Grandview Heights | Urbana |
| Mechanicsburg | Westville |
| Mutual | Woodstock |

...and surrounding areas



Orange portion of map reflects distribution area of directory



**LINCOLN**
PROFESSIONAL SERVICES

*Commercial and Industrial Services*
**Carpet & Upholstery Cleaners**

## 937-653-8772

Terry L. Rittenhouse
1906 N. Ludlow Road • Urbana, OH 43078



**Champaign**
CHAMBER OF COMMERCE
& VISITORS BUREAU
• **937-653-5764** •
www.champaignohio.com
113 Miami Street, Urbana, OH 43078



Clark State Community College
**Performing Arts Center**
**1-800-PAC-TIXS**
(1-866-722-8497)
937-328-3874



*Nationwide local search on* **yellowbook.com**
To promote your business call 1-800-YB-YELLOW



*New eco-friendly size - Still packed with content*

# EXHIBIT 8

Doc ID -->        200330201484

| DATE: | DOCUMENT ID | DESCRIPTION | FILING | EXPED | PENALTY | CERT | COPY |
|-------|-------------|-------------|--------|-------|---------|------|------|
| 10/29/2003 | 200330201484 | TRADE NAME/ORIGINAL FILING (RNO) | 50.00 | 100.00 | .00 | .00 | .00 |

### Receipt
This is not a bill. Please do not remit payment.

RAY A COX, ATTY.
267 REGENCY RIDGE DR.
DAYTON, OH 45459

# STATE OF OHIO

### Ohio Secretary of State, J. Kenneth Blackwell

#### 1419690

It is hereby certified that the Secretary of State of Ohio has custody of the business records for

**AMTEL DIRECTORIES**

and, that said business records show the filing and recording of:

Document(s)                                           Document No(s):

TRADE NAME/ORIGINAL FILING                             200330201484



Date of First Use:        05/01/1992        B.P. WHITE DIRECTORIES, L.L.C.
Expiration Date:          10/27/2008        35 MONUMENT SQ.
                                            URBANA, OH 430780825

Witness my hand and the seal of
the Secretary of State at Columbus,
Ohio this 27th day of October, A.D.
2003.

*J. Kenneth Blackwell*

United States of America                    Ohio Secretary of State
State of Ohio
Office of the Secretary of State

PLAINTIFF'S
EXHIBIT
8
PENGAD 800-631-6989

# EXHIBIT 9

**AMTEL DIRECTORIES®**
682 Scioto Street
Urbana, Ohio 43078
Office: 937.484.5585
Fax: 937.652.0451

06/03/2009

As former publisher of **AMTEL Directories®,** the Champaign County Telephone Directory, I am *very disappointed* in the recently delivered 2009/2010 Champaign County **Yellow Book™** phone book.

*I'll make this quick and simple.* I have been contacted by *several* individuals as well as business owners and managers and asked to *'revive'* the original **AMTEL** Champaign County Telephone Directory to its original size, content and glory.

*I am interested in publishing the AMTEL Champaign County Telephone Directory again,* beginning with a March 2010 edition with proposed rates that are *at least* 20% less than the current Yellow Book™ Champaign County rates and with rates *guaranteed* not to increase for 10 years!

*Point blank...*would you consider shifting your Champaign County Yellow Book™ advertising dollars to a new Champaign County AMTEL Telephone Directory...*a much more desired directory and with lower rates?* I am NOT necessarily asking you for a commitment at this time. If I get the positive response that I believe I will, I will begin a sales campaign in July of this year for an **AMTEL** Champaign County Telephone Directory to be published in March of 2010.

If you would be interested or want to hear more **or** *if you are not interested...*I would like to hear from you! I have enclosed a prepaid post card for your quick easy response. *Either way, I would like to hear from you.*

If you have any questions, concerns *or suggestions*, please call, email or stop in to see me.

Most Respectfully,

Steve M. Brandeberry
steveb@RedRabbitOnline.com


**PLAINTIFF'S EXHIBIT**
9

# EXHIBIT 10

**Doc ID -->**      200913401528

| DATE:<br>05/15/2009 | DOCUMENT ID<br>200913401528 | DESCRIPTION<br>TRADE NAME/ORIGINAL FILING (RNO) | FILING<br>50.00 | EXPED<br>.00 | PENALTY<br>.00 | CERT<br>.00 | COPY<br>.00 |
|---|---|---|---|---|---|---|---|

### Receipt
This is not a bill. Please do not remit payment.

RED RABBIT RAPID REPRODUCTION
682 SCIOTO STREET
URBANA, OH 43078

# STATE OF OHIO
# CERTIFICATE
### Ohio Secretary of State, Jennifer Brunner

**1857502**

It is hereby certified that the Secretary of State of Ohio has custody of the business records for

**AMTEL DIRECTORIES**

and, that said business records show the filing and recording of:

Document(s)                                                          Document No(s):
**TRADE NAME/ORIGINAL FILING**                                       **200913401528**
    Date of First Use:      03/01/1998            AMERICAN TELEPHONE DIRECTORIES,
    Expiration Date:        05/14/2014            INC.
                                                 682 SCIOTO ST
                                                 URBANA, OH 43078



Witness my hand and the seal of
the Secretary of State at Columbus,
Ohio this 14th day of May, A.D.
2009.

United States of America
State of Ohio
Office of the Secretary of State

Ohio Secretary of State

PLAINTIFF'S
EXHIBIT
10
PENGAD 800-831-6989

Doc ID --> 200913401528



Form 534A Prescribed by the:
Ohio Secretary of State

Central Ohio: (614) 466-3910
Toll Free: (877) SOS-FILE (767-3453)

www.sos.state.oh.us
Busserv@sos.state.oh.us

Expedite this form: (select one)
Mail form to one of the following:

☑ Expedite     PO Box 1390
               Columbus, OH 43216

*** Requires an additional fee of $100 ***

☑ Non Expedite  PO Box 670
               Columbus, OH 43216

## NAME REGISTRATION
### Filing Fee $50

(CHECK ONLY ONE (1) BOX)

☑ Trade Name (167-RNO)    Date of first use: MARCH 1 1998

☐ Fictitious Name (169-NFO)

Name being registered or reported: AMTEL ~~Directory~~ Directories

Name of the Registrant: AMERICAN TELEPHONE DIRECTORIES, INC

NOTE: If the registrant is a foreign corporation licensed in Ohio under an assumed name, provide the assumed name and the name as registered in its jurisdiction of formation.

The Registrant is a(n): (Check only one (1) box)

☐ Individual

☐ Partnership
   Registration # , if any _____

☐ Limited Partnership
   Registration # _____
   If foreign, Jurisdiction of Formation _____

☐ Limited Liability Partnership
   Registration # _____
   If foreign, Jurisdiction of Formation _____

☐ Limited Liability Company
   Registration # _____
   If foreign, Jurisdiction of Formation _____

☑ Ohio Corporation
   Charter # 871486

☐ Foreign Corporation
   Ohio license # _____
   Jurisdiction of Formation _____

☐ Unincorporated Association

☐ Professional Association

☐ Other

Form 534A                    Page 1 of 3                    Last Revised: 12/01/08

Doc ID --> 200913401528

---

**All registrants must complete the information in this section**

Business address:  _682 Scioto St_
Mailing Address

_URBANA_        _OH_        _43078_
City          State        Zip Code

The general nature of the business conducted by the registrant:

_PUBLISHING / PRINTING_

---

**Complete the information in this section if registrant is a partnership not registered in Ohio**

Provide the name and address of at least one general partner:

Name                           Address

NOTE: Pursuant to OAG 89-081, if a general partner is a foreign corporation, it must be licensed to transact business in Ohio; if a general partner is a foreign corporation licensed in Ohio under an assumed name, please provide the assumed name and the name as registered in its jurisdiction of formation.

---

**By signing and submitting this form to the Ohio Secretary of State, the undersigned hereby certifies that he or she has the requisite authority to execute this document.**

REQUIRED
Must be authenticated
(signed) by the registrant or
an authorized
representative

Signature _____        Date _5/1/09_

Print Name _STEVE M BRANDEBERRY_
_PRESIDENT AMERICAN TELEPHONE DIRECTORIES, INC_

Signature _____        Date _____

Print Name _____

---

Form 534A                    Page 2 of 3                    Last Revised: 12/01/08

# EXHIBIT 11

| A |  |
| B |  |
| C |  |
| FOR OFFICE USE ONLY |  |

AMTEL Directories
P.O. Box 8
Urbana, OH 43078
937-484-7718

| LOCAL | | FOREIGN | |
| PREMISE | | TELEPHONE | |
| OTHER | | NATIONAL | |

# APPLICATION FOR ADVERTISING

**APPLICANT:**

**PHONE:**

**SEQUENCE AS:**

**MAIL TO:**

## ACCOUNT CONTROL

ACCT. NO:

GROUP WITH:

PAGE:

COPY DATE:

CHECK NO:

N/R

| DIR. CODE | HOME DIRECTORY | ISSUE | TERR/SLS | CONTACT |
|---|---|---|---|---|

| ITEM | | CLASSIFICATION | DIR 1 RATE | DIR 2 RATE | DIR 3 RATE |
|---|---|---|---|---|---|
| | 1 | | | | |
| | 2 | | | | |
| | 3 | | | | |
| | 4 | | | | |
| | 5 | | | | |
| | 6 | | | | |
| | 7 | | | | |
| | 8 | | | | |
| | 9 | | | | |
| | 10 | | | | |
| | 11 | | | | |
| | 12 | | | | |
| | 13 | | | | |
| | 14 | | | | |
| | 15 | | | | |
| | 16 | | | | |
| | 17 | | | | |
| | 18 | | | | |
| | 19 | | | | |
| | 20 | | | | |
| | 21 | | | | |
| | 22 | | | | |
| | 23 | | | | |
| | 24 | | | | |
| | 25 | | | | |
| | 26 | | | | |
| | 27 | | | | |

THE APPLICANT PROMISES TO PAY TO THE ORDER OF:
AMTEL Directories

THE ANNUAL SUM OF $ _____ PAYABLE $ _____

WITH THIS APPLICATION AND _____ INSTALLMENTS OF $ _____

BEGINNING ON_____20____ AND ENDING ON _____20____

The applicant, acting through the undersigned, who represents that he is duly authorized by the applicant, agrees to the payments stated above. The undersigned has read this application including the terms and conditions on the reverse side, and by his signature acknowledges that he has received a copy of this application and agrees to the terms and conditions as stated. The applicant understands and agrees that this contract is subject to acceptance by the home office of the publisher. All payments to the publisher hereunder shall be made at its corporate offices. THIS AGREEMENT CANNOT BE CANCELLED EXCEPT AS STATED HEREIN.

Applicant Signature: _____ Date: _____

Applicant Printed Name: _____ Title: _____

Applicant Tax ID / SS # _____

Publisher's Rep: _____ Rep # _____

| SUB TOTAL | |
| PROMO DISCOUNT | |
| OTHER | |
| DISCOUNT TOTAL | |
| NET | |
| TAX | |
| TOTAL | |
| DEPOSIT | |
| BALANCE DUE | |

PLAINTIFF'S EXHIBIT

PENGAD 800-631-6989

**DIRECTORY**

AMTEL Directories
937-484-7718

| NAME / ADDRESS / PHONE | CLASSIFICATION | DIR / COST |
|---|---|---|
| | | |

Your **FREE** listing will be included in the forthcoming Directory under:

POLYLOGICS SERVICES LLC REV. 2002

**ACCOUNT STATUS**

☐ ALL INFORMATION IS CORRECT    ☐ OUT OF BUSINESS    ☐ PLEASE EXCLUDE-REASON _____

☐ ACCOUNT HAS MOVED  ⬅ NOTE CHANGE ABOVE ➡  ☐ CHANGE PHONE # ⬅ NOTE CHANGE ABOVE ➡  ☐ CHANGE CLASSIFICATION

T-04

# EXHIBIT 12





We're Back!

Champaign County

Area Code 937

www.AMTELdirectory.com

# AMTEL
## American Telephone Directories

# 2010



PLAINTIFF'S
EXHIBIT
_12_

PENGAD 800-631-6989

**Complete Residential & Business Listings for all of Champaign County**
Plus Residential & Business White Page Listings for
West Liberty, DeGraff, Quincy, Lena/Fletcher, East Liberty, Catawba & North Hampton

GOVERNMENT

CIVIC SECTION

BUSINESS WHITE

RESTAURANT MENUS

COUPONS

©AMTEL Directories® 2006



# CALLING WITHIN THE COUNTY



To identify local (L), extended local (EL) or long distance exchanges, locate the circle containing the first 3 digits of 7 digit telephone number. Your local (L or EL) calling areas include all telephone numbers within your circle, all telephone numbers which overlap your circle plus any area joined by an appropriate arrow. ALL LONG DISTANCE PHONE CALLS REQUIRE 1 + A 3 DIGIT AREA CODE.

A ONE WAY ARROW INDICATES A TOLL FREE LOCAL CALL FROM ONE AREA INTO (as shown by the arrow) ANOTHER AREA.

THIS ONE WAY ARROW INDICATES AN EXTENDED LOCAL CALL FROM ONE AREA INTO (as shown by the arrow) ANOTHER AREA WHICH WILL RESULT IN A REDUCED FEE. IT IS NOT NECESSARY TO DIAL "1"

### DIALING WITHIN THE COUNTY CHART

**L = LOCAL CALL** Simply dial the 7 digit telephone number you desire.

**LD = LONG DISTANCE** This indicates a Toll Call which requires you to dial "1" + (area code) + 7 digit number.

**EL = EXTENDED LOCAL CALL** There is a reduced charge to dial this exchange. It is not necessary to dial "1" simply dial the 7 digit telephone number you desire.

## calling within the county

| FROM \ TO | CATAWBA | CHRISTIANSBURG | DEGRAFF/QUINCY | FLETCHER/LENA | MECHANICSBURG | TERRE HAUTE | N. LEWISBURG | ROSEWOOD | THACKERY-N. HAMPTON | ST. PARIS | URBANA | W. LIBERTY | WOODSTOCK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CATAWBA | L | LD | LD | LD | L | LD | LD | LD | LD | LD | LD | LD | LD |
| CHRISTIANSBURG | LD | L | LD | L | LD | LD | LD | LD | LD | L | LD | LD | LD |
| DEGRAFF-QUINCY | LD | LD | L | LD | LD | LD | LD | L | LD | LD | LD | LD | LD |
| FLETCHER/LENA | LD | L | LD | L | LD | LD | LD | LD | LD | L | LD | LD | LD |
| MECHANICSBURG | L | LD | LD | LD | L | LD | LD | LD | LD | LD | LD | LD | LD |
| NORTH LEWISBURG | LD | LD | LD | LD | LD | LD | L | LD | LD | LD | L | L | L |
| ROSEWOOD | LD | LD | L | LD | LD | LD | LD | L | LD | L | EL | LD | LD |
| TERRE HAUTE | LD | LD | LD | LD | LD | L | LD | LD | LD | EL | L | LD | LD |
| THACKERY-N. HAMPTON | LD | L | LD | LD | LD | LD | LD | LD | L | LD | LD | LD | LD |
| ST. PARIS | LD | L | LD | L | LD | LD | LD | LD | LD | L | LD | LD | LD |
| URBANA | LD | LD | LD | LD | LD | L | LD | LD | LD | LD | L | EL | L |
| WEST LIBERTY | LD | LD | LD | LD | LD | LD | L | LD | LD | LD | LD | L | LD |
| WOODSTOCK | LD | LD | LD | LD | L | LD | L | LD | LD | LD | L | LD | L |

## FOR YOUR LOCAL TELEPHONE COMPANY, SEE "TELEPHONE COMPANIES" IN THE YELLOW PAGES

| YOUR PREFIX | LOCAL TELEPHONE SERVICE PROVIDER | LOCAL DIRECTORY ASSISTANCE | LONG DISTANCE DIRECTORY ASSISTANCE | OPERATOR ASSISTED CALL (Collect, Verification) | REPAIR PROBLEMS | BURIED CABLE |
|---|---|---|---|---|---|---|
| 652, 653, 484, 788 | 653-4000 | 1411 | 1-(area code)-555-1212 | O - (Operator) | 652-1777 | 1-800-362-2764 |
| 663 | 800-260-7919 | 1411 | 1-(area code)-555-1212 | O - (Operator) | 1611 | 1-800-362-2764 |
| 362, 465, 585, 666 | 800-407-5411 | 1411 | 1-(area code)-555-1212 | O - (Operator) | 1611 | 1-800-362-2764 |
| 747 | 800-407-5411 | 1411 | 1-(area code)-555-1212 | O - (Operator) | 1611 | 1-800-362-2764 |
| 964 | 800-660-1000 | 1411 | 1-(area code)-555-1212 | O - (Operator) | 800-572-4545 | 1-800-362-2764 |
| 826, 828, 834 | 800-621-2723 | 1411 | 1-(area code)-555-1212 | O - (Operator) | 800-336-3144 | 1-800-362-2764 |
| 857 | 800-660-1000 | 1411 | 1-(area code)-555-1212 | O - (Operator) | 800-572-4545 | 1-800-362-2764 |

# EXHIBIT 13

# WE'RE BACK!

**Due May 2010**

## ...By Popular Demand

# 50%* LARGER DISTRIBUTION AREA

# 50%* MORE PHONE NUMBERS

Your 2010 **AMTEL** Champaign County Telephone Directory will include all these telephone exchanges and will be distributed to this entire area.

About 10,000 MORE homes and businesses than Yellowbook™, shown on lower map.

- **FULL SIZE**
- **READABLE PRINT**
- **MORE ACCURATE**
- **LOWER RATE\*\***

**Distribution 29,000 & Telephone Exchange Map**

UNION CO. · MADISON CO. · Plain City · LOGAN CO. · De Graff · CHAMPAIGN CO. · CLARK CO. · Springfield · SHELBY CO. · MIAMI CO. · Piqua

**Yellow Book Distribution: 19,000 & Telephone Exchange Map**

UNION CO. · MADISON CO. · Plain City · Milford Center · LOGAN CO. · West Liberty · De Graff · CHAMPAIGN CO. · Urbana · Mechanicsburg · St Paris · CLARK CO. · Springfield · SHELBY CO. · Pleasant Lane · MIAMI CO. · Piqua

**AMTEL**
AMERICAN TELEPHONE DIRECTORIES, INC.

# WE'RE

**AMTEL**
AMERICAN TELEPHONE DIRECTORIES, INC.

**Proudly Serving Champaign County Since 1982**

*The Original Champaign County Telephone Directory*

## The Timing Couldn't Be Better!

Call Today for an Early Bird Additional Discount!

**937-484-7718**

**AMTEL 2010**
www.AMTELdirectory.com

Champaign County



PLAINTIFF'S EXHIBIT 13

(PENGAD 800-631-6989)

\*Estimates may be slightly higher or lower.
\*\*2010 AMTEL rates are 15-50% lower than Yellow Book 2010 proposed rates.
1 Based on Yellow Book 2010 Distribution proposed in September 2009.
Yellow Book Distribution proposed in September 2009.
© 2009 Yellow Book USA, Inc. All Rights Reserved. Yellowbook™ is a trademark of Yellow Book USA, Inc.

# ADVANTAGE



AMERICAN TELEPHONE
DIRECTORIES, INC.

We **WILL BE** publishing a **desired**, comprehensive **full** size
**AMTEL** Champaign County Telephone Directory in May 2010!

*Don't be misled by false and malicious claims made out of desperation by other sale representatives.*

To be included in the May 2010 edition we must have your advertising information by Friday February 26.
If we have missed you, please give us a call at our office 937-484-7718 or call me personally at 631-2213

*Steve M. Brandeberry*
Steve M. Brandeberry
President, American Telephone Directories, Inc.

## KNOW THE FACTS

|  | AMTEL | yellowbook / Amtel |
|---|:---:|:---:|
| • Distributed to 100% of Champaign County | ✓ |  |
| • 100% Listings of telephone numbers in Champaign County | ✓ |  |
| • West Liberty DeGraff & Quincy telephone numbers included | ✓ |  |
| • Distribution to West Liberty, DeGraff & Quincy | ✓ |  |
| • Cross reference (find a name by looking up a phone number) | ✓ |  |
| • Inclusion of P.O. boxes in white pages where required by post offices | ✓ |  |
| • Urbana / Champaign County owned and operated | ✓ |  |
| • Serving Champaign County for over 25 years | ✓ |  |
| • The original Champaign County Telephone Directory since 1982 | ✓ |  |
| • Has ownership rights to use the name 'AMTEL' | ✓ | ✓ |

American Telephone Directories, Inc. commonly known as AMTEL Directories 682 Scioto Street Urbana, Ohio
Facts based on Yellow Book 2010 Champaign County phone book
Yellow Book is the registered trade name of Yellow Book
AMTEL Directories is registered in Ohio as the trade name of American Telephone Directories. Inc.

# EXHIBIT 14

# COPY SHEET

**AMTEL**

AMERICAN TELEPHONE
DIRECTORIES

# DISPLAY AD
# COPY SHEET

Including White Pages, Logos, Ads and Coupons

**DIRECTORY:** ☐ CHAMPAIGN ☐ LOGAN ☐ UNION ☐ MADISON ☐ ☐     **ISSUE DATE:** _____

**FIRM NAME:** _____

**ADDRESS:** _____ **CITY:** _____ **ZIP:** _____

**CLASS HDG: (1)** _____

**(2)** _____

**(3)** _____

**ITEM:** _____ **SALESPERSON:** _____ **TYPE COPY:** **NEW** ☐

*\*SPECIAL PROOF REQUEST/RETURN PROOF TO:*

_____

_____

_____

PLAINTIFF'S EXHIBIT

**ɪHIS IS NOT A RENEWAL.** **This is a new advertisement for a new directory.**

**CUSTOMER APPROVAL:** THE CUSTOMER, BY APPROVING THIS COPY, WARRANTS THAT HE IS DULY AUTHORIZED TO USE THE DIRECTORY DISPLAY ADVERTISING COPY WHICH APPEARS HEREINABOVE AS WELL AS ANY ADVERTISING COPY, CUTS OR ILLUSTRATIONS FURNISHED BY HIM TO APPEAR IN THE ABOVE NAMED DIRECTORY.

**Signed:** _____ **Date:** _____

# COPY SHEET

**AMTEL**
AMERICAN TELEPHONE
D I R E C T O R I E S

## HALF SPACE (HS) ADS and TRADE MARKS

**DIRECTORY:** ☐ CHAMPAIGN ☐ LOGAN ☐ UNION ☐ MADISON ☐ ☐

**ISSUE DATE:** _____

**NAME OR TM FINDING LINE:** _____

**FIRM NAME (FOR TM ONLY):** _____

**ADDRESS:** _____ **CITY:** _____ **ZIP:** _____

**CLASS HDG: (1)** _____

**(2)** _____

**(3)** _____

**ITEM:** _____ **SALESPERSON:** _____ **TYPE COPY:** **NEW** ☐

**NAME** _____

(¾") MS _____

(1") 2HS _____

(1½") 3HS _____

(2") 4HS _____

(2½") 5HS _____

(3") 6HS _____

(3½") 7HS _____

(SPACE LISTING OR SPACE LISTING DIRECTIONAL)

(TRADE MARK)

(CUSTOM TRADE MARK)

**\*SPECIAL PROOF REQUEST/RETURN PROOF TO:** _____

**THIS IS NOT A RENEWAL. This is a new advertisement for a new directory.**

**CUSTOMER APPROVAL:** THE CUSTOMER, BY APPROVING THIS COPY, WARRANTS THAT HE IS DULY AUTHORIZED TO USE THE DIRECTORY DISPLAY ADVERTISING COPY WHICH APPEARS HEREINABOVE AS WELL AS ANY ADVERTISING COPY, CUTS OR ILLUSTRATIONS FURNISHED BY HIM TO APPEAR IN THE ABOVE NAMED DIRECTORY.

**Signed:** _____ **Date:** _____

# EXHIBIT 15

# PROOF

## OF YOUR ADVERTISING

# IMPORTANT

**This proof of your ad will be working for your business 24 hours a day, 7 days a week, 365 days a year!**

*Carefully check ALL information, including color and classification!*

• Color(s), if any shown, will vary. Final printing wil be on newsprint paper with 4-color process.

• **If corrections are necessary** – Print carefully, sign below and fax or mail within 5 days of receipt or about:_____

• Corrected proofs will only be sent out upon request. **Limit ONE PROOF PER REVISION.**

• **No verbal changes accepted.**

*AMTEL assumes no responsibility for any errors not brought to our attention immediately.*

## *ALL PROOFS MUST BE SIGNED & RETURNED WITH OR WITHOUT CORRECTIONS!*

PUBLISHER: AMTEL Directories
DIRECTORY: CHAMPAIGN COUNTY
CUSTOMER NAME: Urbana Conference Center
CLASSIFICATION: Inside Back Cover
TRANSMITTAL #: 52
AD NUMBER: 386-7
AD SIZE: IBLR
LAST DATE REV.: 06/10/10
PAGE: 1 of 2

NOTES: Ad on following sheet



PLAINTIFF'S EXHIBIT 15

## CHECK ONE

| | | |
|---|---|---|
| ☐ **Correct as Shown** | **Authorized signature** _____ | |
| ☐ **Correct with above corrections** | **Title** _____ | **Date** _____ |

# FAX OR MAIL THIS PROOF TO:



## AMTEL TELEPHONE DIRECTORY & GUIDEBOOK

P.O. BOX 8  URBANA, OH 43078 • 937-484-7718 • FAX 937-652-0451 • art@amteldirectory.com

# The Urbana
## Conference Center

### If you are looking for the perfect place to host your wedding, look no further.

*With seating and catering capacity of up to 400 of your closest friends, The Urbana Conference Center would be proud to be part of your special day. You'll find that there is virtually no end to the attention to detail we have thought of to ensure your special day is as smooth as you would hope. From a dedicated bride preparation room (yes, with your own bathroom) to the ability to completely control the lighting and sound in all areas, we insure your day is one to remember.*



Call us Today at 937-652-1528
or visit our website at
www.rentucc.com
for more
information.

386-7 Trans. 52

# EXHIBIT 16





**AMTEL**

**American Telephone Directories**

P.O. Box 8 • Urbana, OH 43078

# EXHIBIT 17



**AMTEL Directories**
**P.O. Box 8**
**Urbana, Ohio  43078**

**PROOF**

# EXHIBIT 18



PLAINTIFF'S EXHIBIT
PENGAD 800-631-6989

## BPC
**Brown Publishing Company**
*Commitment to the Community Since 1926*

3120 Woodman Drive • Suite A • Kettering, OH 45420
Phone: 1-800-273-8830

## ADVERTISING INVOICE AND STATEMENT

| | Billing Period | | Advertiser / Client Name |
| --- | --- | --- | --- |
| | 05/03/10 - 05/30/10 | | RED RABBIT |
| | Unapplied Amount | | Terms of Payment |
| Total Amount Due | | | NET 30 DAYS |
| 528.28 | | | |
| Current Net Amount Due | 30 Days | 60 Days | OVER 90 Days |
| | 10.36 | 10.16 | 9.96 | 497.80 |
| Advertiser / Client Number | | | Billing Account Number |
| | | | 149044 |

| Invoice Number | Page # | Billing Date |
| --- | --- | --- |
| 894486 | 1 OF 1 | 05/30/10 |

CLB1P1213**AUT0**3-DIGIT 430
1213 1 AT 0.357
RED RABBIT
STEVE BRANDEBERRY
682 SCIOTO ST
URBANA OH 43078-2135

REMITTANCE ADDRESS

**BROWN PUBLISHING COMPANY**
P.O. Box 182940
Columbus, OH 43218

0100894486000052828L

# EXHIBIT 19

11/23/2009

Angela,

My name is Steve M. Brandeberry, president and publisher of American Telephone Directories, Inc. an Ohio based corporation known as **AMTEL.**

Annalies Matheson, a senior sales executive for AMTEL, has asked me to provide you with the following information. If you need any additional information feel free to contact Annie or myself.

AMTEL Directories was started in 1988 by a gentleman and his wife, Herb and Lois Burkhalter from Piqua Ohio and was *the **only and ORIGINAL** Champaign County Telephone Directory.*

In 1994, I purchased AMTEL from my friends Herb and Lois and *continued* the successful AMTEL Champaign County Telephone Directory until 2002 when I sold specific assets of AMTEL Directories to BP White Directories LLC who in turn sold certain assets to YellowBook.

*Since 1988, for 25 years, the Champaign County public has been **exposed to and faithfully used** the FULL SIZE, comprehensive AMTEL Champaign County Telephone Directory.*

In May of this year YellowBook *reduced* the size of their Champaign County phone book which in return reduced the ad sizes and type size to less than readable, *reduced* the listings to *exclude* many Champaign County residents and businesses and *reduced* distribution by about 30%. (You will see from the brochure following this cover letter)

Over the past few months I have been asked by hundreds, *yes hundreds*, of business owners and residents to revive the Champaign County Telephone Directory to its original size and quality. **Champaign County business owners and residents *want* the AMTEL Champaign County Telephone Directory like the one they have relied upon and used faithfully *for over 2 decades.***

Because of the overwhelming requests, I am very excited and proud to once again be publishing beginning with a new, full size and complete **May, 2010 AMTEL Champaign County Telephone Directory**. I hope to have you and your company represented to your liking in the new May 2010 AMTEL Champaign County Telephone Directory!

Most Respectfully,

Steve M. Brandeberry



PLAINTIFF'S
EXHIBIT
19

# EXHIBIT 20

02/3/2010

On May 6, 1994, I, Steve M. Brandeberry, as president of American Telephone Directories, Inc., an Ohio corporation, purchased specific assets of a telephone book publishing company that was established in 1982 commonly known as **AMTEL Directories**. In this transaction I purchased the *EXCLUSIVE* rights to the logo and name **AMTEL DIRECTORIES**.

On July 3, 2002, I sold specific assets of AMTEL to Barney White of Urbana and his company, known as P.B.J. White Directories, LLC owner William 'Barney White'. Among the specific assets sold to Mr. White were the rights *TO USE* the name AMTEL Directories. PLEASE NOTICE THAT MR. WHITE BOUGHT *THE RIGHTS TO USE* THE NAME; *HE DID NOT BUY THE EXCLUSIVE RIGHTS!* I still own the exclusive rights to the AMTEL name and logo.

In August 2007, Barney White sold his company to YellowBook. *It appears* that YellowBook believes they have purchased the exclusive rights to use the name AMTEL Directories from Mr. White. *Unfortunately for YellowBook*, Mr. White did not have the exclusive rights to sell! Hence, *I will be publishing* a full-size, comprehensive 2010 AMTEL Champaign County Telephone Directory in May of this year, due to very popular demand!

Sadly Yellow Book has chosen to file a lawsuit attempting to stop me from publishing a superior telephone directory. Had Yellow Book not provided such an inferior inaccurate product we wouldn't be having this conversation!.....I owned and sold Brandeberry Chrysler Plymouth in Urbana about 16 years ago...you will notice in the current Champaign County Yellow Book my company that I sold 16 years ago is still listed in their yellow pages!  WOW what a great product!?

## *Regarding the name 'AMTEL'* ....
Recently a local business owner told me apart of the conversation he had with his YellowBook sales representative. He told the YellowBook representative "I don't care what Steve *calls* his new Champaign County Telephone book, *it's just a better product!"* This is exactly what I have heard from *HUNDREDS* of business owners, managers, and residents of Champaign County that are very excited to once again receive a telephone book that they have loved and used for over 25 years!

If you have any other questions or concerns, please feel free to call me personally!


Steve M. Brandeberry
President
American Telephone Directories, Inc. AMTEL
Cell   937.631.2213



# EXHIBIT 21

01/20/2010

On May 6, 1994, I, Steve M. Brandeberry, as president of American Telephone Directories, Inc., an Ohio corporation, purchased specific assets of a telephone book publishing company that was established in 1982 commonly known as **AMTEL Directories**. In this transaction I purchased the *EXCLUSIVE* rights to the logo and name **AMTEL DIRECTORIES**. (See attached document 'A').

On July 3, 2002, I sold specific assets of AMTEL to Barney White of Urbana and his company, known as B.P.J. White Directories, LLC. Among the specific assets sold to Mr. White were the rights *TO USE* the name AMTEL Directories. PLEASE NOTICE THAT MR. WHITE BOUGHT *THE RIGHTS TO USE* THE NAME AND LOGO; *HE DID NOT BUY THE EXCLUSIVE RIGHTS!* I still own the exclusive rights to the AMTEL name and logo. (See attached document 'B')

**In August 2007, Barney White sold his company to YellowBook. *It appears* that YellowBook believes they have purchased the exclusive rights to use the name AMTEL Directories from Mr. White. *Unfortunately for YellowBook*, Mr. White did not have the exclusive rights to sell! Hence, I will be publishing a full-size, comprehensive 2010 AMTEL Champaign County Telephone Directory in May of this year, due to very popular demand!**

You will also see in attachment 'C' the registration filed in the State of Ohio showing American Telephone Directories, Inc. has the legal right to AMTEL DIRECTORIES. I, Steve M. Brandeberry, am the president and owner of American Telephone Directories, Inc. a corporation located in Urbana, Ohio.

### *Regarding the name 'AMTEL'*.... Recently a local business owner told me a part of the conversation he had with his YellowBook sales representative. He told the YellowBook representative "I don't care what Steve *calls* his new Champaign County Telephone book, *it's just a better product!*" This is exactly what I have heard from *HUNDREDS* of business owners, managers, and residents of Champaign County that are very excited to once again receive a telephone book that they have loved and used for over 25 years!

If you have any other questions or concerns, please feel free to call me personally!

Steve M. Brandeberry
Cell   937.631.2213



LICENSE AGREEMENT (AM/TEL)

This agreement made and executed this 6th day of May, 1994, by and between American Telephone Directories, Inc. and Steve M. Brandeberry (Licensee) and Herbert E. Burkhalter (Burkhalter);

WITNESSETH:

WHEREAS, Burkhalter has developed a distinctive name, insignia and logo, entitled AM/TEL which has been used in the Champaign County, Ohio, telephone directory for years, and

WHEREAS, licensee has agreed to pay a stipulated fee for the license to use said name, insignia/logo.

NOW, therefore the parties agree as follows:

1. Burkhalter hereby grants to licensee the use of the name, insignia and logo:

AM/TEL

AM/TEL
DIRECTORIES

for the exclusive use of licensee throughout Champaign County, Ohio, until Burkhalter has received payment in full of all monies due him on a certain asset purchase agreement, consulting agreement and covenant not to compete agreement; after which time all payments have been paid in full licensee shall be the owner of said name, insignia and logo, in so far as Burkhalter can license or sell same.

2. Licensee acknowledges that said name, insignia and logo are not registered trade names nor trade marks.

3. This agreement is non-assignable without the written consent of Burkhalter first being obtained.

4. Licensee agrees to pay the sum of ▓▓▓▓▓▓ ▓▓▓▓▓▓ to Burkhalter for the above license in monthly payments as follows:

$ ▓▓▓▓ beginning June 1, 1994, for 24 months
beginning June 1, 1996, for 24 months
beginning June 1, 1998, for 5 months or
until fully paid

5. In the event of a default in any monthly payment for thirty days, this license shall automatically expire and licensee shall no longer have the lawful use thereof, unless

1

$B$

## CONTRACT FOR SALE OF ASSETS

Due to economic necessity, the Directors and Officers of **AM-TEL DIRECTORIES, INC.** have voted to sell the assets of the business. Accordingly, under the provisions and power of such resolution, it is hereby agreed by **AMTEL DIRECTORIES, INC.** and **P.B.J. WHITE DIRECTORIES, LLC.**, as follows:

(1) **P.B.J. WHITE DIRECTORIES, LLC.** will acquire the assets, in their entirety, as set forth on the attached Exhibit "A", of **AM-TEL DIRECTORIES, INC.** and the right to use the name **AM-TEL DIRECTORIES** effective as of the ___1ST___ day of ___July___, 2002 under the following terms:

(a) The purchase price shall be ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ plus the assumption of the specified indebtedness of **AM-TEL DIRECTORIES, INC.** as set forth on the listing of such indebtedness that is attached hereto as Exhibit "B". The ▓▓▓▓▓▓▓▓▓▓▓▓▓ DOLLARS (▓▓▓▓▓▓▓▓▓▓) shall be paid as follows: a) $▓▓▓▓▓▓▓ on or before ___8th___ of ___July___, 2002; ▓▓▓▓▓▓▓▓ on or before ___8th___ of ___July___, 2004. **AM-TEL DIRECTORIES, INC.** shall remain obligated and shall hold **P.B.J. WHITE DIRECTORIES, LLC.** harmless from all other indebtedness.

(b) **P.B.J. WHITE DIRECTORIES, LLC.** shall secure, by its own independent line of finance, all outstanding debts and obligations of **AM-TEL DIRECTORIES, INC.**;

(2) **P.B.J. WHITE DIRECTORIES, LLC.** has the right to assign its interest in this agreement.

(3) After the purchase of the assets, **P.B.J. WHITE DIRECTORIES, LLC.** may offer employment to the employees of **AM-TEL DIRECTORIES, INC.**, but is under no obligation to do so.

IN WITNESS WHEREOF, the parties have hereunto set their hands to this agreement on the ___3rd___ day of ___July___, 2002.

SIGNED IN THE PRESENCE OF:

_Pamela Nemec_                      AMTEL DIRECTORIES, INC.

_July A. Dalen_                     BY: _____
                                    Steve M. Brandeberry

_Pamela Nemec_
                                    P.B.J. WHITE DIRECTORIES, LLC.
_July A. Dalen_
                                    BY: _____

"C"

# STATE OF OHIO
## CERTIFICATE
### Ohio Secretary of State, Jennifer Brunner

1857502

It is hereby certified that the Secretary of State of Ohio has custody of the business records for

 **AMTEL DIRECTORIES**

and, that said business records show the filing and recording of:

| Document(s) | Document No(s): |
|---|---|
| **TRADE NAME/ORIGINAL FILING** | **200913401528** |

Date of First Use: 03/01/1998
Expiration Date: 05/14/2014

 AMERICAN TELEPHONE DIRECTORIES, INC.
682 SCIOTO ST
URBANA, OH 43078

OWNER/PRESIDENT
STEVE M. BRANDEBERRY

Witness my hand and the seal of the Secretary of State at Columbus, Ohio this 14th day of May, A.D. 2009.



United States of America
State of Ohio
Office of the Secretary of State

*Jennifer Brunner*

Ohio Secretary of State

# EXHIBIT 22



**Yellow Book USA, Inc.**
**398 RXR Plaza**
**Uniondale, NY 11556-0398**
*516-730-1920 (direct)*
*516-730-1910 (fax)*

**Laura J. Massaro**
**Attorney**

laura.massaro@yellowbook.com

January 15, 2010

**VIA OVERNIGHT MAIL**

Mr. Steve M. Brandeberry
682 Scioto Street
Urbana, OH 43078

Dear Mr. Brandeberry:

It has come to our attention that you are using the Amtel Directories name, holding yourself out as the owner of Amtel Directories and informing advertisers and potential advertisers that you are starting a new directory in Champaign County, Ohio. In fact, you are soliciting Yellow Book customers, purportedly on behalf of Amtel Directories, utilizing Amtel Directories business cards.

As you are well aware, in August 2007 Yellow Book acquired all assets of Amtel Directories relating to the publication and distribution of the Champaign County, Logan County, Union County and Madison County directories, including all right and title to the name Amtel Directories and all trademarks, trade names and URLs. As such, you are holding yourself out as the owner of a company in which you have absolutely no interest. You are providing false, misleading and deceptive information to advertisers and potential advertisers and attempting to gain financially from your deception.

Your tactics constitute deceptive trade practices in violation of the Lanham Act and other federal and state laws governing competition and prohibiting unfair trade practices.

We demand that you cease utilizing the Amtel Directories name and cease making false and misleading statements to advertisers and potential advertisers, and that you confirm to us in writing when you have done so. We reserve all of our rights and remedies against you, including our right to injunction, money damages, attorneys' fees, punitive damages and an accounting for all sales made by you and others in connection with these activities.

Sincerely, yours,

Laura J. Massaro

PLAINTIFF'S
EXHIBIT
22
PENGAD 800-631-6989

Doc ID --> 200330201484

10-28-03  16:46  COX GINGER     ND          ID=9374347681          P.02



Prescribed by **J. Kenneth Blackwell**
Ohio Secretary of State
Central Ohio: (614) 466-3910
Toll Free: 1-877-SOS-FILE (1-877-767-3453)

www.state.oh.us/sos
e-mail: busserv@sos.state.oh.us

| Expedite this Form: (Select One) |
|---|
| **Mail Form to one of the Following:** |
| ● Yes   PO Box 1390    Columbus, OH 43216 |
| — Requires an additional fee of $100 — |
| ○ No    PO Box 670    Columbus, OH 43216 |

## NAME REGISTRATION
*(For Domestic/Foreign Profit or Non-Profit)*
Filing Fee $50.00

THE UNDERSIGNED HEREBY STATES THE FOLLOWING:

**(CHECK ONLY ONE (1) BOX)**

| (1) ☑ Trade Name (167-RNO) | (2) ☐ Fictitious Name (169-NFO) | (3) ☐ Name Reservation (168-NRO) |
|---|---|---|
| Date of first use  05/01/1982 MM/DD/YYYY | | ☐ Original ☐ Renewal Registration No. |

**Complete the information in this section if box (1) or (2) is checked.**

The exact name being registered or reported is                AAMTEL Directories

The Registrant is (Check Appropriate Box)

☐ Individual
☐ Limited Partnership: Reg. No. _____
☑ Ohio Limited Liability Co., Reg. No. __1328327__
☐ Ohio Corporation, Charter No. _____
☐ General Partnership
☐ Other

☐ Foreign Corporation incorporated in the state of _____ holding Ohio license no. _____
☐ Unincorporated Association
☐ Foreign Limited Liability Co. holding Ohio Reg. No. _____ organized in the state of _____

The name of the registrant designated above is

__B.F. White Directories, L.L.C.__

NOTE: Where the registrant is a partnership, the name of the partnership must appear on this line. If the registrant is a foreign corporation licensed in Ohio under an assumed name, both the assumed name and actual corporate title of such corporation must appear on this line.

The business address of the registrant is

__35 Monument Square,__
(Street)                NOTE: P.O. Box Addresses are NOT acceptable.

__Urbana__          __Champaign__          __Ohio__          __43078-0825__
(City)            (County)              (State)            (Zip Code)

55A                    Page 1 of 2                    Last Revised: May 2002

Page 2

Doc ID --> 200330201484

10-28-03  16:41  COX GINGER    ND         ID=9374347581         P.03

---

*Complete the information in this section if box (1) or (2) is checked Cont.*

Complete only if registrant is a general partnership
NAME OF ALL GENERAL PARTNERS          COMPLETE RESIDENTIAL ADDRESSES (including zip code)

N/A

NOTE·  Pursuant to OAG 89-081, if a general partner is a foreign (out-of-state) corporation, it must be licensed to transact business in Ohio; if a general partner is a foreign corporation licensed in Ohio under an assumed name, please note both the assumed name and actual corporate title of such general partner.

The nature of the business conducted by the registrant under the trade or fictitious name is (please be specific)

**Publish telephone directories.**

---

*Complete the information in this section if box (3) is checked.*

☐ Please reserve the name listed below. (only one name per form)

☐ Please reserve the first name available in the order of my preference.

I understand that I am not guaranteed the reservation UNTIL I RECEIVE WRITTEN CONFIRMATION FROM THE SECRETARY OF STATE'S OFFICE STATING THAT THE NAME HAS BEEN REGISTERED TO ME

The name reservation is valid for a period of 180 days.

_____
(First Choice)

_____
(Second Choice)

_____
(Third Choice)

_____
(Applicant)                    (Print Name)

_____
(Address)

_____
(City, State and Zip Code)

---

**REQUIRED**
Must be authenticated (signed)
by an authorized representative
(See Instructions)

Authorized Representative
Ray K. Cox

Date 10/23/03

Authorized Representative          Date

Page 2 of 2          Last Revised: May 2002

---