## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION (DAYTON)

| | | |
|---|---|---|
| **YELLOW BOOK USA, INC. et al.** | : | **Case No.: 3:10-cv-025** |
| **Plaintiffs,** | : | |
| | : | **Judge Thomas M. Rose** |
| **v.** | : | |
| | : | **PLAINTIFFS' MOTION FOR** |
| **STEVEN M. BRANDEBERRY** | : | **PARTIAL SUMMARY JUDGMENT** |
| | : | |
| **Defendant.** | : | |

Pursuant to Federal Rule of Civil Procedure 56, Plaintiffs Yellow Book USA, Inc. and Yellow Book Sales and Distribution Company, Inc. (collectively "Yellow Book") hereby move for summary judgment upon their claims for federal, state and common law trademark infringement, as well as their claim for tortious interference with business relations against Defendants Steven M. Brandeberry and American Telephone Directories, Inc. The Motion is supported by (1) the deposition transcripts of Steven Brandeberry, Phil Moorman and Barney White, and (2) the Affidavits of Maria Mitchell, Harley Davidson, Esq. and Barney White. A Memorandum in Support is attached.

Respectfully submitted,

/s/ Bryce A. Lenox
Robert P. Johnson (0040109)
Trial Attorney
Bryce A. Lenox (0069936)
THOMPSON HINE LLP
312 Walnut Street, 14th Floor
Cincinnati, Ohio 45202
Telephone: 513-352-6700
Facsimile: 513-241-4771
Robert.Johnson@ThompsonHine.com
Bryce.Lenox@THompsonHine.com

**ATTORNEYS FOR PLAINTIFFS**

<u>**MEMORANDUM**</u>

I.      <u>**INTRODUCTION**</u>

The Plaintiffs, Yellow Book USA, Inc. and Yellow Book Sales and Distribution Company, Inc. (collectively, "Yellow Book") filed their Complaint in this action to stop Steven Brandeberry's and American Telephone Directories, Inc.'s (collectively, "Brandeberry")[1] unauthorized and improper use of Yellow Book's "Amtel Directories" name and marks.

Brandeberry does not dispute that he is using the Amtel name and marks[2] to solicit Yellow Book's customers and promote a competing directory in Champaign County, Ohio.  In fact, Brandeberry does not dispute any elements of infringement. Rather, Brandeberry's sole defense  in this case is that his use of the Amtel name and marks is justified because he purportedly retained a non-exclusive right to use those marks when Brandeberry sold his yellow pages directory business several years ago to P.B.J. White Directories, LLC ("White"), who in turn sold the business to Yellow Book.

However, a cursory glance at the agreement between Brandeberry and White demonstrates that Brandeberry's defense is entirely specious.  Unfortunately for Brandeberry, the clear and unambiguous language of the contract states just the opposite, and demonstrates that Brandeberry transferred his <u>entire</u> interest in the Amtel name and

---

[1] Brandeberry is the sole shareholder and manager of Defendant American Telephone Directories, Inc. See 6/16/10 Deposition of Steven Brandeberry ("6/16/10 Brandeberry Dep."), pp.27-28, a copy of which has been separately filed with the Court, with excerpts attached as Exhibit 1.  As such, and for simplicity, the two will be referenced collectively as "Brandeberry."

[2] For purposes of this Motion, the "Amtel name and marks" include "Amtel Directories" and any derivation thereof, including "Am/Tel Directories" or "Am-Tel Directories."

marks to White, which in turn transferred them to Yellow Book.  Thus, because Yellow Book has the exclusive right to use the Amtel name and marks, and since Brandeberry abandoned any right to use the Amtel name and marks, Brandeberry's entire defense fails, and Yellow Book is entitled to summary judgment on its claims.

## II.   FACTS AND PROCEDURAL HISTORY

### A.   Yellow Book

Yellow Book is an independent publisher of print and Internet-based yellow-pages directories in the State of Ohio and elsewhere throughout the United States. Affidavit of Maria Mitchell ("Mitchell Aff."), ¶ 2 (attached as Exhibit 1 to Yellow Book's Memorandum in Opposition to Motion for Summary Judgment filed on March 29, 2010 and incorporated by reference herein).  The company's online directory, yellowbook.com, reaches millions of users via computers and mobile phones through organic web searches and through Yellow Book's network of partner sites. Id. at ¶ 3. Since 2007, Yellow Book has published a yellow pages directory in Champaign County, Logan County, Union County and Madison County, Ohio under the name "Amtel Directories" through rights it acquired as outlined below. Id. at ¶¶ 4 and 5.

### B.   Brandeberry's Acquisition of the Amtel Name and Marks Through The 1994 License Agreement

From 1982 to 1994, Herb Burkhalter marketed a yellow pages directory in Champaign County known as the Amtel Directory. 6/16/10 Brandeberry Dep., pp. 35, 38. The name "Amtel" was derived from the term "Area Marketing Telephone Directory," which was the name of Mr. Burkhalter's company. Id. at p. 35.  In 1994, Mr. Burkhalter approached Brandeberry about purchasing his Champaign County Amtel Directory. Id. at pp. 36-37.

The parties began negotiations, and on May 6, 1994, Brandeberry entered into a Corporate Asset Purchase Agreement with Mr. Burkhalter's company, Area Marketing Telephone Directories, Inc. ("AMTD") to buy certain assets relating to AMTD's Champaign County Amtel Directory. 6/16/10 Brandeberry Dep., p. 35, 42-43; Dep. Ex. 3. Pursuant to the agreement, Brandeberry acquired certain assets of the company, including customer lists, records and goodwill. Id. at pp. 52-53; Dep. Ex. 3.  In exchange, Brandeberry agreed to pay $205,000 in installments over several years, which Brandeberry paid in full two years later. Id. at p. 55, 60-61; Dep. Ex. 3.

On that same day, Brandeberry entered into a License Agreement with Herbert Burkhalter ("License").  Id. at pp. 62-63; Dep. Ex. 4. The License notes that "Burkhalter has developed a distinctive name, insignia and logo, entitled AM/TEL which has been used in the Champaign County, Ohio telephone directory for years." Paragraph 1 of the License states:

> "Burkhalter hereby grants to licensee the use of the name, insignia and logo:
>
> AM/TEL
>
> AM/TEL DIRECTORIES
>
> for the exclusive use of licensee throughout Champaign County, Ohio, until Burkhalter has received payment in full of all monies due him on a certain asset purchase agreement, consulting agreement, and covenant not to compete agreement; after which time all payments have been paid in full licensee shall be the owner of said name, insignia and logo, in so far as Burkhalter can license or sell same"

In exchange for the license to use the Amtel name and marks, Brandeberry agreed to pay $50,000 in installment payments, and if Brandeberry failed to make payment, the license would expire.  License, ¶¶ 4, 5.  Brandeberry paid Burkhalter the $50,000 associated with

3

the License, and therefore became the owner of the Amtel name and marks. 6/16/10

Brandeberry Dep., p. 75.

> ### C. Brandeberry's Sale of The Amtel Directories Business and Transfer of the Amtel Name and Marks to P.B.J. White Directories, LLC

Beginning in 1995, Brandeberry continuously marketed the Amtel Directory in

Champaign County.[3]  In addition, he developed a yellow pages directory for Logan

County in 1998, for Union County in 1999 and for Madison County in 2000.  Id. at p. 81.

For each of these directories, Brandeberry used the Amtel name and marks.  Id. at p. 81-

82.

However, beginning in 2002, Brandeberry's yellow pages directories business

began to develop cash flow problems, Id. at pp. 87, 91. Consequently, in early 2002,

Brandeberry and William "Barney" White began negotiations for Mr. White's potential

purchase of Brandeberry's yellow pages directories business. Id. at p. 92.  Brandeberry

developed a "wish list" of things he would require in any such sale, and the parties

negotiated a potential transaction. Id. at p. 94-95; 9/13/10 Deposition of Steven

Brandeberry ("9/13/10 Brandeberry Dep."), p. 240; Dep. Ex. 26 (a copy of which has

been separately filed with the Court, with excerpts attached as Exhibit 2).

The parties' negotiations ultimately culminated in a Contract for Sale of Assets

dated July 1, 2002 between AMTEL Directories, Inc.[4] and White (the "2002 Contract").

---

[3] After acquiring the company and the right to use the Amtel name and mark from Burkhalter, Brandeberry changed the look of the logo by removing the slash from AM/TEL, thereby making the logo AMTEL. Id. at p. 66-67.

[4] Brandeberry testified that he signed the contract "as is," and did not notice that his company was misnamed AMTEL Directories, Inc. and AM-TEL Directories, Inc. therein.  6/16/10 Brandeberry Dep., p. 107-10.  Nevertheless, Brandeberry acknowledged that it was his understanding that he was indeed selling his entire yellow pages directories business to Mr. White. Id.

6/16/10 Brandeberry Dep., p. 92; Dep. Ex. 6. The 2002 Contract states "P.B.J. White Directories, LLC will acquire the assets, in their entirety, as set forth on the attached Exhibit 'A', of AM-TEL DIRECTORIES, INC. and the right to use the name AM-TEL DIRECTORIES effective as of the 1st day of July , 2002 . . ." Exhibit A to the 2002 Contract is a balance sheet which identifies, among other assets, "Intang. Asset License Agrmnt" valued at $50,000. Notably, $50,000 is the exact amount paid by Brandeberry to Burkhalter for the License. Brandeberry himself acknowledges transfer of this asset:

> Q. Now, there's a third line, it says, "Other Assets, Intan. Asset License Agreement", and that's valued at $50,000; do you see that?
>
> A. Correct.
>
> Q. And you'd agree with me that that is the exact same amount, $50,000, that is listed on the license agreement between you and Mr. Burkhalter that's Exhibit 4, right?
>
> MR. HECKMAN: Objection.
>
> Q. And that license agreement was the license agreement that involved the name, insignia and logo for AmTel and AmTel Directories, right?
>
> A. Which one? I'm sorry.
>
> Q. Exhibit 4.
>
> A. Exhibit 4, correct, is the license agreement to Steve Brandeberry and American Telephone Directories, correct, it was to both of us; that is correct. And American Telephone Directories. I said Amtel Directories.
>
> Q. So you would agree with me that Mr. White, through his company, acquired all of the intangible assets relating to that license agreement, right?
>
> MR. HECKMAN: Objection.
>
> A. I don't know the correct answer. Contractually, I don't know, but I could say yes.
>
> ****

5

Q. We'll do it this way. Would you agree with me that Mr. White acquired the intangible asset license agreement valued at $50,000 that's listed on page three of this document?

MR. HECKMAN: Objection.

A. Yes.

Q. And I think we've already agreed and you've already testified that that intangible asset license agreement was valued at $50,000, right?

A. Correct.

Q. And that's the same amount that is listed on Exhibit 4, right?

A. Correct.

Id. at pp. 122-124.

**D.      Yellow Book Acquires The Amtel Name and Marks in 2007**

Thereafter, from 2002 through 2007, White published annual telephone directories in Champaign County, Logan County, Union County and Madison County, Ohio, known as the Amtel Directories.[5]  Affidavit of William White ("White Aff."), ¶ 11 (attached as Exhibit 3).  In August 2007, Yellow Book acquired from White[6] all assets relating to the Amtel yellow pages directories in these four Ohio counties.  Mitchell Aff., ¶ 4, Exhibit A; White Aff., ¶ 12.

Specifically, the asset purchase agreement transferred to Yellow Book all of White's right, title and interest in, among other things, the names "Amtel Directories," "Champaign County," "Union County," "Logan County," and "Madison County." Id. at ¶

---

[5] After purchasing the business from Brandeberry, White changed the look of the logo to its current appearance. 1/26/11 Deposition of William White ("White Dep."), pp. 32-33; Dep. Ex. 7 (excerpts attached as Exhibit 4 with a copy separately filed with the Court).

[6] Mr. White changed the corporate name from P.B.J. White Directories, LLC to B.P. White Directories, LLC shortly after the transaction with Brandeberry. White Dep., pp. 9, 30.

1(a). The asset purchase agreement further transferred to Yellow Book all trademarks, trade names, URLs, customer lists, mailing lists, and all other rights related to the publication and distribution of the directories. Id. Since the acquisition, Yellow Book has continued to use the Amtel name and marks in publishing its yellow pages directories. Mitchell Aff., ¶5. The directories published by Yellow Book in these counties contain the Amtel Directories name and marks. Id.

> ### E. Brandeberry Markets a Competing Yellow Pages Directory Using the Amtel Name and Marks

In July 2009, Brandeberry began marketing a competing yellow pages directory in Champaign County. 6/16/10 Brandeberry Dep., p. 154-155. Brandeberry sent letters to approximately 160 businesses in Champaign County inquiring as to their interest in a new yellow pages directory in that market. Id. at pp. 156-59; Dep. Ex. 9. In those letters, Brandeberry stated that he is "interested in publishing the AMTEL Champaign County Telephone Directory again," and asked these potential customers whether they would be willing to shift their advertising dollars "to a new Champaign County AMTEL Telephone Directory." See Dep. Ex. 9.

Brandeberry then began actively soliciting customers for his competing directory. He developed a mock-up of a book which he showed to potential customers during sales calls, and which used the Amtel name and marks. 6/16/10 Brandeberry Dep., p. 182-83. He generated business cards, envelopes, business documents, contracts and other stationery that used the Amtel name and marks. Id. at pp. 170, 172, 189-90, 191, 192-93; Dep. Exs. 5, 11, 14, 15, 16, 17. Brandeberry created marketing materials for potential customers using the Amtel name and mark. Id. at p. 184-85; Dep. Ex. 13. In Brandeberry's correspondence with clients, he represented himself as the "publisher of

American Telephone Directories, Inc. an Ohio based corporation known as AMTEL" and further asserted that he would be publishing a "full size and complete May, 2010 AMTEL Champaign County Telephone Directory." Id. at p. 199-200; Dep. Ex. 19.

In August 2010, Brandeberry began distribution of his competing yellow pages directory in Champaign County. 9/13/10 Brandeberry Dep., p. 261.  On the cover and throughout the directory, Brandeberry uses the Amtel name and marks. Id. at pp. 261-63; Dep. Ex. 28.

### III.   ARGUMENT

**A.    Summary Judgment Must Be Granted As To Yellow Book's Federal Trademark Infringement Claim (Count I), Ohio Trademark Infringement Claim (Count II) and Common Law Trademark Infringement Claim (Count III)**

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides a federal cause of action for infringement of marks and trade dress that have not obtained federal registration. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 120 L. Ed. 2d 615, 112 S. Ct. 2753 (1992); *ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 921 (6th Cir. 2003); *Gray v. Meijer, Inc.*, 295 F.3d 641, 645 (6th Cir. 2002). When evaluating a Lanham Act claim for infringement of an unregistered mark, courts must determine whether the mark is protectable, and if so, whether there is a likelihood of confusion as a result of the would-be infringer's use of the mark. *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760-61 (6th Cir. 2005).

In determining whether there is a likelihood of confusion, the following eight factors should be considered: (1) strength of plaintiff's mark; (2) relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing of channels used; (6) degree of purchaser care; (7) defendant's intent in selecting the mark; and (8)

likelihood of expansion in selecting the mark. *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1186-90 (6th Cir. 1988); *Frisch's Restaurants v. Elby's Big Boy*, 670 F.2d 642, 648 (6th Cir. 1982). Actual confusion need not be affirmatively proven. *Wynn Oil Co.*, 839 F.2d at 1190; *Daddy's Junky Music Stores v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 284 (6th Cir. 1997) ("Due to the difficulty of securing evidence of actual confusion, a lack of such evidence is rarely significant…").

Likewise, Ohio's Deceptive Trade Practices Act, O.R.C. § 4165.02, mirrors federal law, holding that a person is liable where he (1) passes off goods or services as those of another; (2) causes likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services; or (3) causes likelihood of confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another. Because the Lanham Act and the Ohio Deceptive Trade Practices Act are substantially similar, "an analysis appropriate for a determination of liability under section 43(a) of the Lanham Act is also appropriate for determining liability under the Ohio Deceptive Trade Practices Act." *Worthington Foods, Inc. v. Kellogg Co.*, 732 F. Supp. 1417, 1431 (S.D. Ohio 1990).

Brandeberry concedes nearly all of these elements. He acknowledges that the Amtel name and mark are strong and distinct, as they have been used for years to promote a yellow pages directory distributed in the Champaign, Logan, Union and Madison Counties. 6/16/10 Brandeberry Dep., p. 39 (admitting Amtel name and mark are distinctive). In fact, the License between Burkhalter and Brandeberry expressly states that the Amtel name and mark are distinct, having been "used in the Champaign County Telephone directory for years." Dep. Ex. 4.

Likewise, it is undisputed that Brandeberry is using Yellow Book's Amtel name and mark to market and sell advertising in a yellow pages directory that directly competes with Yellow Book's Amtel Directory in Champaign County. 9/13/10 Brandeberry Dep., pp. 301-302. Moreover, the marks are **identical**, with only slight, insignificant changes by Brandeberry to the color and font. Compare Dep. Exs. 7, 28. Brandeberry's use of the Amtel name and marks was not accidental. He testified that he specifically and intentionally chose the Amtel name and mark because he believed Yellow Book's right to use the mark was non-exclusive based upon his contracts with White. Moreover, Brandeberry did not consider any other trade names or marks. 6/16/10 Brandeberry Dep., pp. 158-59.

Finally, Brandeberry admits that there is actual confusion in the marketplace. Specifically, over 50% of his customers inquired as to his ability to use the Amtel and Amtel Directories' name and mark:

> Q.  Now, in paragraph three [of Dep. Exhibit 20], you lay out what I would call the chain of the sale of assets, at least as you see it. Why did you put this in this letter? Were people asking you about that?
>
> A.  A few people would ask, how can I use the name Amtel.
>
> Q.  And my question, and I think I asked it earlier is, who specifically asked you how you can use the name Amtel?
>
> A.  It would be safe to say probably 80 percent of the people on that list would have said that, for ease of names of people, 80 percent of the file.
>
> Q.  So when you say 80 percent of the people, you're talking about 80 percent of the stack of contracts that you have produced to us today?
>
> A.  Let's back it up to 50 percent just out of inquisitiveness, well, how can you use the name Amtel.
>
> Q.  So that was a pretty regular question amongst potential customers?
>
> A.  It wasn't a question. It was an inquisitive remark. It was a remark.

10

Q.  But it came up a lot, right?

A.  Yeah.

Id. at p. 205.

Oftentimes, Mr. Brandeberry's sales associates would be asked if Brandeberry "was

Yellow Book":

Q.  As you sit here today, do you have any knowledge of any customers
or potential customers asking whether there was an affiliation between
your book and Yellowbook?

A.  The response I gave you was, not when we were on premises, but on
the telephone, adamantly, pretty much the first thing out of anybody's
mouth was, "Are you Yellowbook?"

Q.  How often did you get solicitations by telephone?

A.  No, sir, we would solicit some small accounts by phone, and they
would ask us, "Are you Yellowbook?"

Id. at p. 195.

Brandeberry's sales representative, Phil Moorman, similarly testified regarding actual

confusion as to affiliation between Brandeberry and Yellow Book:

Q:  Did anybody express any confusion as to Yellowbook's affiliation
with you?

A.  Yes.

Q.  Who?

A.  I couldn't tell you.

Q.  Describe what they – how they expressed that confusion?

A.  We told them that we were AMTEL Directories and they had
signed up a contract with AMTEL Directories, and then, apparently, their
Yellowbook representative had gone in to solicit them as well and the
Yellowbook representative told them, the customer, that they were
AMTEL Directories.

Q.  Did that customer call you back and ask about that?

11

A.      Yes.

Q.      Do you know who that customer was?

A.      No.  I mean, there was a few of them, but I couldn't remember who they are.  When Yellowbook started going around saying that they were AMTEL Directories, that we were not AMTEL and they were AMTEL, a few people were confused and they called back to just verify that they signed up with the person that they wanted to sign up with.

Q.      And you say that happened a few times?

A.      Yeah.

December 9, 2010 Deposition Phillip Moorman ("Moorman Dep."), pp. 44-45

(excerpts attached as Exhibit 5 and a full copy separately filed with the Court).

Thus, Brandeberry is clearly passing off his directory as a new Amtel directory. He is knowingly making false representations as to the source, sponsorship, and approval of the directory, and knowingly making false representations as to the affiliation, connection, or association of his product with Yellow Book.  Brandeberry's conduct is particularly egregious considering he is using an <u>identical</u> trade name in an <u>identical</u> market to sell a nearly <u>identical</u> product.  As there are no genuine issues of material fact as to whether Brandeberry is infringing upon Yellow Book's Amtel name and marks, Yellow Book is entitled to summary judgment.

**B.      Summary Judgment Must Be Granted as to Yellow Book's Intentional Interference Claim (Count IV)**

Tortious interference with contract claims arise where a defendant "intentionally and improperly interfere[s] with the performance of a contract…between another and a third person by inducing or otherwise causing the third person not to perform the contract…"  *Siegel v. Arter & Hadden*, 85 Ohio St. 3d 171, 176 (Ohio 1999). In order to state a claim for tortious interference with contract, a party must allege: (i) the existence

of a valid contract; (ii) the defendant was aware of the existence of the contract; (iii) the defendant intentionally procured a breach of the contract; (iv) the defendant lacked justification for his conduct; and (v) the plaintiff suffered damages as a result of the defendant's conduct. *Ament v. Reassure Am. Life Ins. Co.*, 2009 Ohio 36, ¶61 (Ohio Ct. App. 2009) (citing *Kenty v. Transamerica Premium Ins. Co.* (1995), 72 Ohio St.3d 415, 1995 Ohio 61, 650 N.E.2d 863). Tortious interference with business relations claims are similar, but involve interference with a prospective business relationship rather than a contract. *See Tomazic v. City of Sandusky*, 2008 Ohio 6167, ¶¶8-9 (Ohio Ct. App. 2008).

Summary judgment on Yellow Book's intentional interference claims is appropriate for all of the same reasons as its trademark infringement claims. Brandeberry was well-aware of Yellow Book's business relations and advertising contracts with its customers in Champaign County, as Brandeberry himself sought to re-enter that market to sell a competing yellow pages directory. Brandeberry approached a significant number of Yellow Book's customers, and sold them advertising in his competing yellow pages directory while representing that his directory was the "new" Amtel directory in Champaign County. Brandeberry competed improperly by passing off his directory as that of Yellow Book. Finally, Yellow Book suffered damages through lost contracts and customers. Yellow Book is entitled to summary judgment on this claim.[7]

### C. Brandeberry's Defenses to Yellow Book's Claims Fail As A Matter of Law

Brandeberry's entire defense rests upon whether White obtained from Brandeberry the exclusive right to use the Amtel name and marks. However, the very

---

[7] A damages hearing on all of Yellow Book's claims can be held after liability is determined.

contracts Brandeberry cites in support of his position clearly and unambiguously demonstrate that White, and subsequently Yellow Book, acquired all right, title and interest in the Amtel name and mark.  Alternatively, Brandeberry abandoned any purported interest in the mark due to non-use. As Brandeberry has no right in the Amtel name and marks, his defense fails, and Yellow Book is entitled to summary judgment.

> **1.    The Clear and Unambiguous Language of the 2002 Contract Reveals That Brandeberry Retained No Rights in the Amtel Marks**

Under Ohio law, the interpretation of written contract terms is a matter of law for initial determination by the court.  *Parrett v. Am. Ship Bldg. Co.*, 990 F.2d 854, 858 (6th Cir. 1993) (applying Ohio law); *Potti v. Duramed Pharmaceuticals, Inc.*, 938 F.2d 641, 647 (6th Cir. 1991) (applying Ohio law).[8]  The role of courts in examining contracts is to ascertain the intent of the parties.  *Savedoff v. Access Group, Inc.*, 524 F.3d 754, 763 (6th Cir. 2008) (quoting *City of St. Marys v. Auglaize Cty Bd. of Commrs.*, 115 Ohio St. 3d 387, 2007 Ohio 5026, 875 N.E.2d 561, 566 (Ohio 2007)). "The intent of the parties is presumed to reside in the language they choose to use in their agreement." *Savedoff*, 524 F.3d at 763 (quoting *Graham v. Drydock Coal Co.*, 76 Ohio St. 3d 311, 1996 Ohio 393, 667 N.E.2d 949, 952 (Ohio 1996)).

"Where the terms in a contract are not ambiguous, courts are constrained to apply the plain language of the contract." *Savedoff*, 524 F.3d at 763, (quoting *City of St. Marys*, 875 N.E.2d at 566); *accord Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St. 2d 241, 374

---

[8] *See also, Inland Refuse Transfer Co. v. Browning Ferris Indus. of Ohio, Inc.*, 15 Ohio St. 3d 321, 15 Ohio B. 448, 474 N.E.2d 271, 272-73 (Ohio 1984) ("If a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined. However, if a term cannot be determined from the four corners of a contract, factual determination of intent or reasonableness may be necessary to supply the missing term.").

N.E.2d 146, 150 (Ohio 1978) ("[W]here the terms in an existing contract are clear and unambiguous, this court cannot in effect create a new contract by finding an intent not expressed in the clear language employed by the parties."). As noted by this Court in *Thomas & Marker Constr., Co. v. Wal-Mart Stores, Inc.*, No. 3:06-cv-406, 2008 U.S. Dist. LEXIS 79072, at *31-32 (S.D. Ohio Sept. 15, 2008) (Rose, J.) (attached as Exhibit 3), "a plain and unambiguous contract does not become ambiguous simply because its operation will work a hardship upon one of the parties thereto and a corresponding advantage to the other."

Here, the clear language of both the License and the 2002 Contract demonstrate that Brandeberry retained no interest in the Amtel name and marks, as those assets were transferred first to White, and then from White to Yellow Book. Pursuant to the License, Brandeberry obtained from Burkhalter the "exclusive use" of the "AM/TEL" and "AM/TEL DIRECTORIES" name, logo and insignia for Champaign County until such time as Brandeberry paid sums due under an asset purchase agreement, at which point Brandeberry would own them free and clear.

Pursuant to the 2002 Contract, Brandeberry's company transferred all of Brandeberry's interest in the Amtel name and marks to White. The 2002 Contract states "P.B.J. White Directories, LLC. will acquire the assets, in their entirety, as set forth on the attached Exhibit 'A', of AM-TEL Directories, Inc. and the right to use the name AM-TEL DIRECTORIES effective as of the 1st day of July , 2002 . . ." Exhibit A expressly identifies the Amtel name and marks as an "Intang. Asset License Agrmnt" valued at $50,000. As Brandeberry paid $50,000 to Burkhalter for the License, it is undisputed that the asset identified in Exhibit A to the 2002 Contract constitutes the exclusive License in

15

the Amtel name and marks originally acquired from Burkhalter. As such, there can be no question that Brandeberry transferred to White his entire interest in the Amtel name and marks.

Recognizing this fatal flaw, Brandeberry asserts that because the 2002 Contract states in its second clause that White obtained "the right to use the name AM-TEL DIRECTORIES", rather than "the exclusive right to use" the name, then necessarily the rights obtained by White were non-exclusive. Brandeberry's interpretation, if accepted, would render meaningless the previous provision of the 2002 Contract, which states that White acquired the assets on the attached exhibit "in their entirety." The latter provision identifying White's "right to use the name AM-TEL DIRECTORIES" can only be interpreted as an exclusive right. This interpretation comports with longstanding rules of contract construction, which require that "where two interpretations can be given to a term in a contract, one will make a provision meaningless, and one which will give full force to all provisions, the latter must be adopted." *Aho v. Cleveland-Cliffs, Inc.*, 219 Fed. Appx. 419, 423 (6th Cir. 2007); *Nilavar v. Mercy Health Sys.*, 142 F. Supp. 2d 859, 892 (S.D. Ohio 2000) ("[A] court must read the contract as a whole and must attempt to give effect to each and every part of it; the court should avoid any interpretation of one part that will annul another part."). As the 2002 Contract clearly and unambiguously transfers all of the assets to White, including the Amtel name and marks, Brandeberry's argument fails.

### 2. Alternatively, Extrinsic Evidence Demonstrates That the Parties Did Not Intend for Brandeberry to Retain Any Interest in the Amtel Name and Marks

However, even if this Court were to determine that the terms relating to White's right to use the Amtel mark were ambiguous, extrinsic evidence in this case demonstrates

16

that Brandeberry did not retain any interest in the Amtel marks.  *See, Corporate Commun. Servs. of Dayton, LLC*, Case No. 3:08-CV-046, 2009 U.S. Dist. LEXIS 105045, at *31 (S.D. Ohio Nov. 9, 2009) (Rose, J.) ("If the terms of the contract are not clear and unambiguous, the court may consider extrinsic evidence.").  Brandeberry testified that when negotiating the terms of the sale of assets to White, the Amtel name and marks were never specifically mentioned, and a non-exclusive right was certainly never discussed.  6/16/10 Brandeberry Dep., p. 99.  Brandeberry further acknowledges that the Amtel name and marks were not specifically identified on the "wish list" he provided to Barney White. Id.; 9/13/10 Brandeberry Dep., p. 240; Dep. Ex. 26.  Nor did Brandeberry discuss the Amtel name and marks with Barney White after the deal was committed to a written contract:

> Q:   Now, the next line says -- after that it says, "P.B. White Directories, LLC, will acquire the assets in their entirety, as set forth  on the attached Exhibit A, of AM-TEL DIRECTORIES, INC., and the right to use the name AM-TEL DIRECTORIES effective as of the 1st day of July, 2002, under the following terms"?
>
> A.   Yes.
>
> Q.   My question is, did you ever discuss this language with Mr. White about the use of any of the Amtel name, insignia or marks?
>
> A.   There was never a discussion through the sale process of him using the name or having the name exclusively.

Brandeberry never told White that Brandeberry believed he had the right to use the Amtel name and mark after the sale:

> Q.   Now, did you ever discuss with Mr. White any perceived -- let me ask you this.  You told me Mr. White never had advised you that you had a non -- or you had an ability to use the Amtel names and mark subsequent to this contract, right?
>
> A.   There was never a need to discuss it, and there was never a discussion, correct.

17

Q.  The answer is no.  And you never told him that you believed that you had the ability to use the mark,  right?

A.  Never discussed it and there was never a need to discuss it.

Q.  No conversations ever about that?

A.  Correct.

Q.  It was never discussed, period?

A.  Correct.

6/16/10 Brandeberry Dep., pp. 99, 125-26, 128-29.

Similarly, both White and his lawyer, Harley Davidson, Esq., testified that a non-exclusive right to use the Amtel name and marks was never discussed during negotiations, and instead it was always the intent of the parties that all of the assets be transferred in their entirety to White. 1/26/11 White Dep., pp. 25-26; White Aff., ¶¶ 4, 5, 10; Affidavit of Harley Davidson, Esq. ("Davidson Aff.") (attached as Exhibit 6).  ¶¶ 4-8. In fact, White testified that had he believed that Brandeberry would retain any right in the Amtel name and marks, then he would not have consummated the transaction.  White Aff., ¶ 6; 1/26/11 White Dep., p. 26.

Thus, it is undisputed that the Amtel name and marks were never discussed outside of White's acquisition of <u>all</u> of the assets of the company.  Since the parties **<u>never</u>** discussed a non-exclusive use of the Amtel name and mark by White, such an interpretation cannot be read into the contract.  Rather, the contract must be interpreted to mean that White, and subsequently Yellow Book, acquired exclusive rights in the Amtel name and marks.

Brandeberry's actions after the sale further demonstrate his belief that he sold all rights in the Amtel name and marks.  For example, Brandeberry testified that after the

18

sale of his yellow pages directories business to White in 2002, American Telephone

Directories, Inc. held no assets. 6/16/10 Brandeberry Dep., p. 138-39.  If Brandeberry

retained some right or interest in the Amtel name and marks, then presumably his

company would have shown an asset on its books.  Id. at pp. 27-28.  Similarly, had

Brandeberry believed that he had some right or interest in the Amtel name and mark, then

presumably he would have objected when White registered the mark with the State of

Ohio, or when White changed the look of the logo after he acquired the business.  See,

1/26/11 White Dep., pp. 30-33; Dep. Ex. 8.  Brandeberry, however, did nothing.

      In sum, to the extent that this Court looks to extrinsic evidence, that evidence

clearly demonstrates that the parties intended for White to obtain the exclusive rights to

the Amtel name and marks.  Therefore, Yellow Book's Motion for Summary Judgment

must be granted.

      **2.**      **Brandeberry Abandoned Any Purported Rights in the Amtel Marks**

      Even assuming Brandeberry somehow retained a non-exclusive right in the Amtel

marks, those rights were abandoned years ago due to non-use. 15 U.S. C. § 1127 states:

> "[a] mark shall be deemed to be 'abandoned' . . .when its
> use has been discontinued with intent not to resume such
> use. Intent not to resume may be inferred from
> circumstances. Nonuse for 3 consecutive years shall be
> prima facie evidence of abandonment."

See also *Dominic's Rest. of Dayton, Inc. v. Mantia*, 2009 U.S. Dist. LEXIS 37215 (S.D.

Ohio 2009).  The United States Supreme Court has stated "[t]here is no such thing as

property in a trademark except as a right appurtenant to an established business or trade

in connection with which that mark is employed."  In fact,

> A trademark is a symbol of existing good will.  Thus, if for
> any reason, the good will of a business or product comes to

> an end, there is nothing left for a mark to symbolize. Such a mark should be officially declared "abandoned." If there is no good will or reasonable prospect of it, a "trademark" symbolizes nothing.
>
> When a company permanently goes out of business with no intent to resume, good will is ended and the marks are abandoned. No rights arise by succession by a later sale of good will and/or trademarks as a separate item.

Brandeberry himself admits that from 2003 to 2009, he never used the Amtel name and marks after he sold the assets to White:

> Q. So is it fair to say that, at a minimum, from 2003 until late 2009, you never used the Amtel name or mark?
>
> A. Correct.

6/16/10 Brandeberry Dep., p. 131. Brandeberry further testified that his company had no assets after his sale of the directories business to White from 2003-2008. Id. at pp. 27-28.

Thus, because Brandeberry cannot establish that his "use of the mark was 'deliberate and continuous, not sporadic, casual or transitory,'" any purported interest in the Amtel name and marks was abandoned. *Circuit City Stores, Inc. v. Carmax, Inc.*, 165 F.3d 1047, 1054-55 (6th Cir. 1999). As Brandeberry's defenses fail, Yellow Book is entitled to summary judgment.

**IV.    <u>CONCLUSION</u>**

For the foregoing reasons, Plaintiffs Yellow Book USA, Inc. and Yellow Book Sales and Distribution Company, Inc. hereby request that the Court grant in its entirety their Motion for Partial Summary Judgment.

Respectfully submitted,


 /s/ Bryce A. Lenox
Robert P. Johnson (0040109)
Trial Attorney
Bryce A. Lenox (0069936)
THOMPSON HINE LLP
312 Walnut Street, 14th Floor
Cincinnati, Ohio 45202
Telephone: 513-352-6700
Facsimile: 513-241-4771
Robert.Johnson@ThompsonHine.com
Bryce.Lenox@THompsonHine.com

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on February 18th, 2011, a copy of the foregoing was served

by the Court's electronic filing system upon the following:

> Darrell L. Heckman
> Harris, Meyer, Heckman & Denkewalter, LLC
> One Monument Square, Suite 200
> Urbana, Ohio 43078
> Attorney for Defendant

_/s/ Bryce A. Lenox_
Attorney for Plaintiffs

802685.2