# EXHIBIT 1

1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF OHIO
2                  WESTERN DIVISION

3

4

5   YELLOW BOOK USA, INC., et al., :

6                Plaintiffs,

7

8   vs.                        :      CASE NO. 3:10-CV-025

9

10   STEVEN M. BRANDEBERRY,

11                Defendant.        :

12

13

14                Deposition of STEVEN M. BRANDEBERRY, the

15   Defendant herein, taken as upon cross-examination by the

16   Plaintiffs, and pursuant to the Federal Rules of Civil

17   Procedure, agreement of counsel, and stipulations

18   hereinafter set forth, at the offices of Thompson Hine, LLP,

19   312 Walnut Street, 14th Floor, Cincinnati, Ohio, 45202, on

20   the 16th day of June, 2010, at 9:30 a.m., before Julie A.

21   Patrick, a Notary Public for the State of Ohio.

22

23

24        TRI-COUNTY COURT REPORTING AND VIDEOTAPE SERVICE

25              886 BRADBURY ROAD
             CINCINNATI, OHIO 45245

EXHIBIT
1

1    Q.    Is it still active?

2    A.    Yes.

3    Q.    Has it ever been inactivated?

4    A.    Explain "inactivated".

5    Q.    Well, as -- have you ever -- has it ever been

6    inactivated by the Ohio Secretary of State?

7    A.    No.

8    Q.    Has there ever been a period of time where

9    there's been no businesses operating under that entity?

10    A.    Yes.

11    Q.    From what period of time was that entity

12    dormant, for lack of a better word?

13    A.    2003 until 2008, when I started Red Rabbit.

14    Q.    And during that period from 2003 to 2008, did

15    that corporation, American Telephone Directories, Inc., have

16    any assets?

17    A.    No.

18    Q.    And it did no business?

19    A.    Correct.

20    Q.    Did it have any liabilities?

21    A.    No.  It would have had the existing assets,

22    whatever it might have been.  I mean, it certainly had an

23    asset of whatever it was incorporated at, $500 or 1,000, it

24    would have had that asset.

25    Q.    Did it have any cash?

1    A.    No.

2    Q.    No property?

3    A.    Correct?

4    Q.    No receivables?

5    A.    Correct.

6    Q.    Who are the shareholders of that company?

7    A.    Myself.

8    Q.    Have you always been the sole shareholder?

9    A.    Of American Telephone Directories, yes.

10   Q.    You qualified that by saying "of American

11   Telephone Directories", which leads me to believe that you

12   have been a shareholder in other entities; is that right?

13        A.    My stopping wasn't for that.  I just didn't

14   know if you were talking about Red Rabbit or whatever.

15   Correct, I was a sole shareholder of Brandeberry Chrysler

16   Plymouth, Incorporated, from, again, whenever I bought it in

17   the '80s to 1994.

18        Q.    How many employees are there of American

19   Telephone Directories presently?

20        A.    I have never hired.  I've had independent

21   contractors.

22        Q.    So from 1994 to the present, you've never had

23   employees of that company?

24        A.    Correct.  That's correct.

25        Q.    Have you been an employee of that company?

1   your dealership, where were you purchasing space in

2   directories?

3          A.   Where was I spending my money or where was I

4   placing my ad?

5          Q.   Well, where were you placing your money?

6          A.   Mr. Burkhalter had approached my father, Max

7   Brandeberry, as the first customer Mr. Burkhalter ever had

8   for his directory, and my father purchased a back quarter

9   page, a back cover quarter page.  And then I'm sure we had

10  ads within the space as well under auto dealers.

11         Q.   What was the name of that directory?

12         A.   Amtel Directories.

13         Q.   When you say "Amtel Directories", was that --

14  was the word Amtel, was it one word?  Was it a slash?  Did

15  it have a hyphen in it?  How did it look?

16         A.   Mr. Burkhalter would be -- it always had a

17  slash, I believe.  Mr. Burkhalter's company was an area

18  marketing telephone directory.  Whether it was a

19  corporation, I don't know.  So an area marketing is where

20  Mr. Burkhalter came up with Am -- and then A-M tel, Amtel.

21  I just knew it as Amtel because that's how he approached us.

22  And I believe it had a slash in it.

23         Q.   And so your father and you placed ads in the

24  Amtel Directory, correct?

25         A.   Correct.

1    Q.    For what counties?

2    A.    Mr. Burkhalter only had Champaign County.

3  That's not true either.  I think he did have other counties.

4  When I purchased, it served Champaign County.

5    Q.    Do you know what other counties he published

6  in?

7    A.    I think he had a Miami County book.

8    Q.    Do you know what he called the Miami County

9  book?

10    A.    No.  I don't even know what the cover looked

11  like.

12    Q.    So all you know as you sit here today is,

13  there was an Amtel Directory in Champaign County?

14    A.    Correct.

15    Q.    And, at that time, your dad's and your

16  dealership was placing ads in there?

17    A.    Correct.

18    Q.    So what were the circumstances whereby you

19  began negotiations with respect to the purchase of certain

20  assets from him?

21    A.    Mr. Burkhalter approached me one day in '94

22  and said, "You want to buy my company?"  I said, "Yes."  He

23  said, "Meet me at my house tomorrow."  And I said, "I can't.

24  I'm going on vacation.  I'll see you in a couple of weeks."

25    Q.    Did he tell you why he wanted to sell that

1    business?

2              A.    Did not.

3              Q.    And when he said, "Do you want to buy my

4    business?", what business were you contemplating buying?

5              A.    Mr. Burkhalter had the Champaign County phone

6    book, Amtel, and that's what he was alluding to, if I wanted

7    to purchase his Amtel Champaign County telephone directory.

8              Q.    And that was my point.  Were you negotiating

9    buying any other telephone directories for any other

10   counties that he owned?

11             A.    At that time, he did not own other

12   directories.  So -- and, no, I was not.  I was just

13   negotiating the Champaign County.

14             Q.    So is it your testimony that he started

15   developing other yellow pages directories after your

16   transaction with him?

17             A.    No.  To be more accurate, he had -- the Miami

18   County book, from recollection, he was the president of that

19   company, Miami County Amtel book.  He got two partners, and

20   the two partners, they fired the president.  So he lost that

21   book.  So the only book that Mr. Burkhalter had at the time

22   that I purchased it is his Amtel Champaign County -- was the

23   Champaign County Amtel book.

24             Q.    And these books that you refer to, were these

25   yellow pages directories or white pages directories or both?

1      A.    A combination of both.

2      Q.    At the time he approached you, do you know for

3  how long Mr. Burkhalter had been publishing his Amtel

4  directories book in Champaign County?

5      A.    As I stated, my father was the first one to

6  buy an ad, so, yes, I was well aware.

7      Q.    When was the first time your father bought an

8  ad?

9      A.    When Mr. Burkhalter first started in '82,

10  1982.

11      Q.    And so, is it fair to say that Mr. Burkhalter

12  had been using the same Amtel and Amtel Directory since

13  1982?

14      A.    Correct.

15      Q.    Was that name, Amtel and Amtel Directories,

16  recognizable in Champaign County at that time?

17      A.    It was to me.

18      Q.    Were there any other books?  And when I say

19  "books", I mean yellow pages directories, that would compete

20  with him at that time?

21      A.    Was not.  Well, there were other telephone

22  directories within that county.  So, yeah, they competed

23  with it.

24      Q.    So there were multiple yellow pages

25  directories at that time?

1      A.    There were seven that came into the county,

2  yes.

3      Q.    Seven?

4      A.    Correct.

5      Q.    When did those seven come into the county?

6      A.    They were all AT&Ts. -- they were all the

7  phone company's.  I have no idea.

8      Q.    So would you agree that Amtel and Amtel

9  Directories is a pretty distinct name and mark?

10      A.    I would believe so.

11      Q.    So he approached you.  You guys agreed to meet

12  in a couple of weeks, right?

13      A.    Right.

14      Q.    Why were you interested in buying this

15  telephone directory?

16      A.    I had sold the dealership, the car

17  dealership.  Regardless, I would have been a player, because

18  I like the business.  I like the advertising business.

19      Q.    And you had no experience, at that point, with

20  yellow pages directories, right?

21      A.    Other than purchasing, correct, ads.

22      Q.    And did you indeed meet him a few weeks later

23  after you got back from vacation?

24      A.    Correct.

25      Q.    What took place at that meeting?

1          A.    He was.

2          Q.    Who was his attorney?

3          A.    A gentleman out of Dayton.  I can't think of

4     his name.

5          Q.    Now, during the course of negotiating those

6     terms and committing it to paper, were you corresponding

7     with Mr. Burkhalter and/or his lawyer?

8          A.    No.  I mean, hi, Herb, blah, blah, blah.

9     Nothing regarding the business.

10          Q.    For how long did these negotiations last?

11          A.    I have no idea.  The negotiations to purchase?

12          Q.    Well, let's start with that.  How long did

13     that take?

14          A.    You know, two hours.

15          Q.    Did you negotiate drafts of the final asset

16     purchase agreement?

17          A.    I did not participate in any draft other than

18     the day I went to sign the documents.

19               MR. LENOX:  Mark this as 3.

20               (Plaintiffs' Exhibit 3 marked.)

21          Q.    Sir, we've marked this as Plaintiffs' Exhibit

22     3.  Do you recognize this document?

23          A.    I do.

24          Q.    I can represent to you that this is a document

25     that was produced by your lawyer.  If you could turn to page

1    five, is that your signature on page five?

2           A.    It is.

3           Q.    And you signed both individually and as a

4    guarantor; do you see that?

5           A.    Correct.

6           Q.    And that's a guarantor of the obligations of

7    American, right?

8           A.    That's correct.

9           Q.    I assume that means American Telephone

10   Directories, Inc.; is that correct?

11          A.    Oh, I see what you're saying.  Yes, I believe

12   so.

13          Q.    Now, if you go back to the first page.  Up in

14   the right-hand corner it says "ATT copy, 1 of 9".

15          A.    Yes.

16          Q.    Whose handwriting is that?

17          A.    Mine.

18          Q.    What did you mean when you put that down

19   there?

20          A.    ATT would be the attorney copy.  I don't know

21   why I specifically put that, but when I purchased the

22   company from Mr. Burkhalter, there were nine different

23   agreements.

24          Q.    So there were nine separate, what I would call

25   addenda or things that would accompany this document, right?

1    Q.    And he's not presently participating in your

2    directories business that you're forming right now, right?

3    A.    That's correct.

4    Q.    Okay.

5          MR. LENOX:  We've been going an hour and 20

6    minutes.  You guys want to take a five- or 10-minute break,

7    and then we'll go another hour and then break for lunch?

8          MR. HECKMAN:  Yeah, that's fine.

9          (Break taken.)

10   Q.    We are talking about Exhibit 3 here, which is

11   entitled the Corporate Asset Purchase Agreement.  Would you

12   agree with me that that was between Area Marketing

13   Directories, Inc., and Steven M. Brandeberry and American

14   Telephone Directories, Inc.?

15   A.    Yes.

16   Q.    And this was the agreement or at least part of

17   the agreement between you and Mr. Burkhalter for the sale of

18   certain assets relating to his Amtel Directories yellow

19   pages directory in Champaign County?

20   A.    Correct.

21   Q.    And this is dated the 6th day of May, 1994,

22   right?

23   A.    Correct.

24   Q.    Now, let's take a look at paragraph one.  Now,

25   would you agree with me that this paragraph identifies at

1     least some of the assets that you were purchasing, right?

2            A.    The entire agreement does, yes, not paragraph

3     one.

4            Q.    Okay. So it shows that you were buying

5     customer lists, for example?

6            A.    Correct.

7            Q.    And you were purchasing the records and the

8     documents of the business?

9            MR. HECKMAN: I'm sorry, you're on paragraph

10     one?

11            MR. LENOX: Paragraph one.

12            A.    Oh, I thought you were talking about the top.

13            Q.    No, no, no. Paragraph one.

14            A.    No, you said one. I'm sorry. Paragraph one

15     speaks for itself. What it says, it says.

16            Q.    Well, I know.

17            A.    But I'm not reading it and, you know --

18            Q.    I'm just giving you some examples of some of

19     the things you were buying. You were buying the customer

20     lists, right?

21            A.    It says that, correct.

22            Q.    And you were buying the records and the

23     documents of the business, right?

24            A.    "Including all records and the documents used

25     in the business", correct.

```
 1    excluded" --

 2              A.    There you go, correct.

 3              Q.    So you didn't buy the cash of the company,

 4    right?

 5              A.    That's correct.

 6              Q.    You didn't assume its bank accounts, right?

 7              A.    Correct.

 8              Q.    You didn't take any of its office furniture or

 9    its equipment?

10              A.    Correct.

11              Q.    You didn't take its cars?

12              A.    Correct.

13              Q.    You didn't take its receivables?

14              A.    Correct.

15              Q.    You didn't take its tax records, right?

16              A.    Correct.

17              Q.    Now, it appears from paragraph two that you

18    paid $205,000 for those assets, right?

19              A.    That's correct.

20              Q.    Now, a little earlier, you told me that you

21    paid 489,000 for those; is that right?

22              A.    I did not say for this particular asset.   I

23    paid 480,000 for the entirety.

24              Q.    So if I understand correctly, you're saying

25    you paid other sums for other things?   For example, such as
```

1    Q.   You say he never worked for you.  So I want to

2  be clear.  Did he do anything for you?  Did he go out and

3  try to make some sales calls, do some marketing?  Did he act

4  for you in any capacity?

5    A.   When you say "work for me", I think of an

6  employee.  He was not an independent contractor nor a paid

7  employee.  He did nothing for me other than cause me

8  headaches.  Hence, I paid him off in two years, in full.

9    Q.   Is that -- pursuant to these agreements, would

10  that have been accelerated compared to what you -- vis-a-vis

11  what this contract required?

12    A.   It was accelerated, that's correct.

13    MR. HECKMAN:  You testified that everything

14  else was in accordance with that schedule.  So you're saying

15  that was in advance of the schedule?

16    A.   Well, until I paid him in full, I paid as

17  agreed.  I don't know that there was an accelerated clause

18  or anything of that -- you know, a negative accelerating

19  clause.

20    MR. HECKMAN:  It's your deposition.

21    A.   Up to the date that I paid him in full, I did

22  everything according to the agreements.

23    Q.   All I'm asking, and I'm not trying to be

24  tricky here, this agreement is dated in 1994?

25    A.   Correct.

1      Q.   You testified that you paid him off in about

2   two years?

3      A.   That's correct.

4      Q.   So you think you paid him off somewhere in

5   1996?

6      A.   That's correct.

7      Q.   In full?

8      A.   I had borrowed money, that's correct.

9      Q.   And at least according, for example, to the

10   first page of this agreement, you had payments that were due

11   well beyond 1996 into 1999 and thereafter, right?

12      A.   Absolutely, yes.

13      Q.   Okay.  I get it.  Now, I want you to turn to

14   paragraph 8.  Now, I'm going to read it, and tell me if I

15   read this right.  It says, "Both parties agree to avoid

16   confusion to the customers and the public in that Area

17   Marketing Telephone Directories, Inc., is a corporation

18   continuing after the sale of certain assets, while the

19   purchaser intends to use the name, insignia and logo of

20   Am/Tel by virtue of a separate purchase of said assets",

21   right?

22      A.   Correct.

23      Q.   So is it fair to say that you were not buying

24   the corporation Area Marketing Telephone Directories, right?

25      A.   I was not.

1          Q.    And you didn't buy the name Area Marketing

2   Telephone Directories, right?

3          A.    That's correct.

4          Q.    And it says, "purchaser intends to use the

5   name, insignia and logo of Am/Tel by virtue of a separate

6   purchase of said assets", and my question to you is, was

7   there a separate agreement relating to the purchase of the

8   name, insignia and logo of Am/Tel?

9          A.    That would be one of the nine, yes.

10         Q.    Okay.

11         MR. LENOX:  Why don't we go ahead and mark

12   this.

13         (Plaintiffs' Exhibit 4 marked.)

14         Q.    Sir, I've marked Plaintiffs' Exhibit 4.  Do

15   you recognize this document?

16         A.    I do.

17         Q.    It's entitled License Agreement?

18         A.    Correct.

19         Q.    And it's dated May 6th, 1994, right?

20         A.    Correct.

21         Q.    Is this one of the documents that accompanied

22   the corporate asset purchase agreement that we were just

23   looking at and which is marked as Exhibit 3?

24         A.    Yes.

25         Q.    Now, would you agree with me that this

1    document, Exhibit 4, the license agreement, deals with your

2    use of the name, insignia and logo of Am/Tel and Am/Tel

3    Directories?

4         A.    Say that again.

5         Q.    Sure.  Would you agree with me that the

6    license agreement addresses or deals with your ability to

7    use the Amtel and Amtel Directories name, insignia and logo?

8         A.    Yes.

9         Q.    And my question to you is, if you flip back to

10    paragraph 8, when it talked about your use of the name,

11    insignia and logo of Amtel by virtue of a separate purchase

12    of said assets, my question is, other than the license

13    agreement, were there any other documents as part of this

14    overall transaction that dealt with the Amtel Directories

15    name, insignia and logo?

16         A.    I'm not sure.  Without looking at them, I

17    don't know.  I mean, the only agreements were these nine and

18    probably subsequent liens or --

19         Q.    Notes?

20         A.    Notes.  I'm not sure if any others referred to

21    them in any way.

22         Q.    You just don't know as you sit here?

23         A.    Correct.

24         Q.    Fair enough.  Now, at the time you purchased

25    this business, what did the Amtel insignia and logo look

1      A.   To the format that it's in right now that you

2   have in your hand as my business card.

3      Q.   Well, let's mark that.

4           (Plaintiffs' Exhibit 5 marked.)

5      Q.   We've just marked Plaintiffs' Exhibit 5.  Sir,

6   this is your business card, correct?

7      A.   Correct.

8      Q.   And this is the business card that you are

9   presently using, right?

10     A.   Yes, sir.

11     Q.   Now, you just testified that shortly after you

12  purchased the assets from Mr. Burkhalter you changed the

13  name, insignia and logo to that which is on your card now,

14  right?

15     A.   I did not change the name.  I changed the

16  look, yeah.

17     Q.   That's fair.  To --

18     A.   Remove the slash.

19     Q.   You took the slash out, right?

20     A.   Yes.

21     Q.   Was the font of the lettering the same?

22     A.   I have no idea.

23     Q.   Was the -- there's a color scheme here of the

24  Am and Tel; do you see that?

25     A.   I do.

1      Q.   The Am is in yellow and the Tel is in white,

2   right?

3      A.   Yes, it is.

4      Q.   How long has it been like that?

5      A.   I believe it's always been like that.

6      Q.   So the Am has always been yellow?

7      A.   I believe so.

8      Q.   The Tel has always been white?

9      A.   I believe so.

10     Q.   Was it yellow and white when you purchased it

11  from Mr. Burkhalter?

12     A.   I believe so.

13     Q.   So it even looked like that back then?

14     A.   Oh, I beg your pardon.  It would have had a

15  slash in it.

16     Q.   But for the slash, it would have looked the

17  same?

18     A.   Correct.  Excuse me, no.  His logo -- the logo

19  or the name, sir?  His logo was slightly different.  We were

20  referring to the slash I thought.

21     Q.   Well, I didn't mean to confuse you.  And maybe

22  I was not clear in what I was saying.  To the extent there's

23  a difference between the name and the logo, or the insignia,

24  for that matter, when you purchased it from Mr. Burkhalter,

25  were those three things different?

1        Q.    Okay.  And I take it you testified that you

2  paid him in full; is that right?

3        A.    That is correct.

4        Q.    So is it your belief that, at the point you

5  paid him in full, the Am/Tel name, as well as the Amtel

6  Directories name, insignia and logo -- well, strike that.  I

7  want to be more clear.  So is it your testimony and is it

8  your belief that, once you paid him in full, the name,

9  insignia and the logos, Am/Tel and Am/Tel Directories,

10  became your property?

11       A.    Yes.

12       Q.    And when did that officially occur?

13       A.    A guestimate of '96, probably late '96.

14       Q.    Now, as part of that, it says that, "you will

15  be the owner of said name, insignia and logo, insofar as

16  Burkhalter can license or sell same"; do you see that?

17       A.    Yep.

18       Q.    What did you understand that to mean?

19       A.    I didn't understand it to mean anything.  I

20  just read it.

21       Q.    Now, paragraph two notes that the name,

22  insignia and logo are not registered trade names or

23  trademarks, right?

24       A.    That's what it says.

25       Q.    And you, under paragraph 4, were required to

1    kind in any other county?

2         A.    Yes.

3         Q.    And I can point you to your response to

4    interrogatory number two, if that would refresh your

5    recollection, and you stated you published a book in Logan

6    County from 1998 to 2002, correct?

7         A.    That was my best recollection, correct.

8         Q.    And you state that you published a book in

9    Union County from 1999 to 2002, right?

10        A.    Those dates are my best recollection and

11    that's correct.

12        Q.    And then Madison County from 2000 to 2002?

13        A.    My best recollection and, correct.

14        Q.    Now, I want to take each one of these

15    individually.  Let's start with Logan County.  What was the

16    name of that directory?

17        A.    Interesting you say that.  I never thought of

18    a name of a directory.  It was the Logan County telephone

19    book by Amtel.  It would say Logan County on it and would

20    have the Amtel logo on it.  What it was called, I don't

21    know.

22        Q.    That's fine.  And I think you answered my

23    question.  Did you use the name Amtel or Amtel Directories

24    name, insignia and logo on the Logan County book?

25        A.    Any dealings I had with phone books,

1     publications, letterhead, from 1995 on always had the Amtel

2     logo as we're discussing it in Exhibit 5, probably without

3     the name American Telephone below it.  So, yes, that logo

4     was used.

5            Q.    So the answer to my question was yes, right?

6            A.    That's correct.

7            Q.    And the same goes for the Union County book,

8     right?

9            A.    That is correct.

10            Q.    And the same goes for the Madison County book,

11     right?

12            A.    That is correct.

13            Q.    How did you begin publishing in Logan County?

14            A.    I knocked on doors and asked if they wanted an

15     ad and they said yes.

16            Q.    So you started that book from the ground up?

17            A.    Correct.

18            Q.    You did not acquire any assets as part of

19     starting that book?

20            A.    That is correct.

21            Q.    What about Union County, how did it come to be

22     that you started that book?

23            A.    Exactly the same as Logan.

24            Q.    Once again, you did not purchase any assets or

25     acquire any companies as part of that, starting that book,

1    pages and yellow page pages and listings for space for the

2    book.  I purchased the software from the service bureau and

3    did their work in-house.  So three or four support staff, we

4    did everything in-house, other than printing the

5    directories.

6         Q.   So Ms. Wiseman would do this inputting?

7         A.   Correct.

8         Q.   What about Hannah McGowan?

9         A.   She was a graphic artist.

10        Q.   What did she do?

11        A.   She was a graphic artist.

12        Q.   What did she do with respect to the book?

13        A.   She was a graphic artist.  She designs the

14   graphics.

15        Q.   Okay.  Debbie Jenkins?

16        A.   Was an assistant to myself.

17        Q.   Barney White, what did he do?

18        A.   Barney was hired in maybe 2000, and I say this

19   loosely, as a CFO to assist me in getting financing because

20   of our increased production.  So he worked maybe an hour --

21   maybe an hour a day to get -- his only role was to find

22   financing.  That was his only role.

23        Q.   Were you having cash flow issues around 2000?

24        A.   I sold the company in 2002.  I was starting to

25   have cash flow issues in 2002, yes, after the several -- the

1    that was his job.  He went to two or three banks and could

2    not get financing secured.

3              Q.    So he was unable to secure financing for you,

4    right?

5              A.    Correct.

6              Q.    And I think you testified that, around this

7    time, you were starting to have cash flow problems?

8              A.    That's correct.

9              Q.    Why were you having cash flow problems?

10             A.    We were selling directory advertising and

11   offering people to start paying for it when the book came

12   out.  So we had to pay for books prior to the payments

13   coming in.

14             Q.    Was that a change of protocol for your company

15   at that time?

16             A.    Yes.

17             Q.    Why did you switch to that model?

18             A.    Probably greed.

19             Q.    So was your business, around this time, on the

20   verge of closing?

21             A.    No.

22             Q.    You were having cash flow problems, but you

23   were still operational?

24             A.    Correct.

25             Q.    I mean, was there a contemplated shutdown of

1    the business?

2            A.    Never.

3            Q.    Well, I take it at some time either you

4    approached Mr. White or Mr. White approached you about a

5    sale of the business; is that right?

6            A.    Mr. White approached me, correct.

7            Q.    When did Mr. White approach you?

8            A.    Probably, maybe, early 2002.

9            Q.    Let's do this.

10           MR. LENOX:    Mark this as 6.

11           (Plaintiffs' Exhibit 6 marked.)

12           Q.    Sir, I've handed you what's been marked as

13   Plaintiffs' Exhibit 6.    Do you recognize this document?

14           A.    Yes.

15           Q.    And this is the Contract for Sale of Assets

16   between Amtel Directories, Inc., and P.B.J. White

17   Directories, LLC, right?

18           A.    Correct.

19           Q.    Now, this document is dated July 3rd, 2002; do

20   you see that at the bottom?

21           A.    Correct.

22           Q.    Now, with that date as a reference, when do

23   you recall beginning the negotiations with Mr. White?

24           A.    Early 2002.

25           Q.    What did Mr. White propose as his offer to

1          A.    The Urbana Country Club.

2          Q.    How long was this meeting?

3          A.    It was a lunch and maybe a half hour

4 conversation out at my father's farm.  My father wasn't

5 there.  Nobody was there.

6          Q.    What happened next?

7          A.    The next morning Mr. White approached me.  I

8 could smell on his breath what he had for breakfast he was

9 so close to me.  He said, "If this company is really worth a

10 million dollars, you and I can turn it into five million.

11 I'll be your banker."  It was a simple remark.  I said,

12 "Well, I'd entertain that, but it would be wise" -- and I

13 don't know what the exact conversation was, and it wasn't a

14 simple transaction.  I said, "Well, let's talk about it."

15 At one point, several days later, I gave him a wish list.

16 He, basically, agreed to the wish list.

17          Q.    Before you go any farther.  What was on your

18 wish list?  What points or what terms were on your list?

19          A.    I have a copy of that and I'll provide it to

20 you.  I certainly couldn't tell you exactly.

21          Q.    Okay.

22          A.    And Mr. White's -- in his offer to be my

23 banker, there was a stipulation that I had to buy it back,

24 just had to buy it back within five years, because he didn't

25 want anything to do with it, but he was going to make 50,000

1  a year for five years, plus a quarter of a million dollars.

2      Q.   Slow down.  I'm sorry.  So he said -- when you

3  say he said he wanted to make 50,000 a year -- repeat that.

4  You spoke very quickly.  I didn't understand it.

5      A.   I'm sorry.  When Mr. white approached me to be

6  my banker, he said, you know, that I would have to buy the

7  company back within five years, just had to buy it back.

8  Well, at that time, he was making 50,000 a year, to the best

9  of my recollection, and -- no.  It doesn't matter.  He was

10  making 500 a week, would have been 25,000.  Excuse me.  But

11  as a part of the sale, he would give me $100,000 just as a

12  stipend to buy my company, but I had to buy it back for a

13  quarter of a million dollars within a five-year period, had

14  to, just vehemently had to.  He didn't want anything to do

15  with it.

16      Q.   So he was going to buy it from you for

17  $100,000 with a stipulation that you had to buy it back from

18  him within five-years for $250,000?

19      A.   I had to assume all of the assets and debts

20  and pay him 250, that's correct.

21      Q.   So you gave him the wish list.  You -- and he

22  told you what his requirements were with respect to the

23  purchase price and buy back?

24      A.   Real simple, 100,000, and I had to buy it back

25  for 250, that was all we discussed verbally.

1       A.   I had not.

2       Q.   Had you talked to your family about this deal?

3       A.   I don't believe so.

4       Q.   Now, I know you said you don't recall what was

5  on your wish list and you're going to provide it, I

6  understand that, but as you sit here today, do you recall

7  anything relating to the Amtel name, insignia or marks being

8  on that wish list?

9       A.   Absolutely nothing was on that list regarding

10  the name, correct.

11      Q.   It simply wasn't brought up in the wish list?

12      A.   Correct.

13      Q.   Up until the point where you shook hands on

14  your deal, was there any discussions about the Amtel name,

15  insignia or logo?

16      A.   Nothing whatsoever.

17      Q.   Now, so I'm clear, when you and Mr. White were

18  having these discussions, this was to acquire the assets of

19  your entire directories business, right?

20      A.   He was going to acquire the directory business

21  and sell it back to me within five years, yes.

22      Q.   And when I say "the directory business", I'm

23  talking about all four accounts?

24      A.   Correct.

25      Q.   Okay.  So you shook hands?

1    right?

2         A.    Correct.

3         Q.    Were you having other financial problems other

4    than just cash problems?

5         A.    No.

6         Q.    Now, it says, "The Directors and Officers of

7    Am-Tel Directories, Inc., have voted to the sell the assets

8    of the business."

9         A.    Uh-huh.

10        Q.    You were the directors and officers of Am-Tel

11   Directories, Inc.?

12        A.    There was no such entity.

13        Q.    So it's your testimony that you were never

14   part of or a shareholder in any company called Am-Tel

15   Directories, Inc.?

16        A.    Correct.

17        Q.    Did you read this contract before you signed

18   it?

19        A.    Correct.

20        Q.    You notice that the corporate name was

21   incorrect?

22        A.    Probably at the time I did not.

23        Q.    You didn't notice it?

24        A.    That was my answer.

25        Q.    So you certainly didn't point it out to Mr.

1    White?

2            A.    At the moment of this, I did not.

3            Q.    Now, it goes on to say that, "the Directors

4    and Officers of Am-Tel Directories, Inc., have voted to sell

5    the assets of the business", right?

6            A.    Correct.

7            Q.    So it was your intention, at that time, to

8    sell all of the assets of the business, right?

9            A.    Specific, that's correct.

10           Q.    In other words, he was taking the business as

11   is, right?

12           A.    Based on the other stipulations we had,

13   correct, on the wish list.

14           Q.    What were the other stipulations you had?

15           A.    Those that were on the wish list.

16           Q.    Well, is your wish list incorporated into this

17   document?

18           A.    It is not.  Well, it specifically is not, no.

19           Q.    So is it your testimony that those things that

20   were on your wish list are somehow incorporated into this

21   agreement?

22           A.    Similar to Mr. Burkhalter's agreements with

23   me, there were nine different agreements which answer all of

24   Mr. Burkhalter's and my, slash, wish list.  The agreements

25   -- the other agreement, i.e., the option to repurchase would

1    have covered the wish list.  May I give you a simple

2    example?  I needed car insurance for my son.  That was on

3    the wish list.  You know, if Mr. White didn't provide that,

4    that wasn't going to be the end of the world, but I had it

5    signed that he was going to, so that -- on the wish list --

6    the wish list was maybe what you could consider frivolous

7    items.

8         Q.    Now, as we said, it says -- the language says

9    you're going to sell the assets of the business, right?  It

10   doesn't say some assets, right?

11        A.    Correct.

12        MR. HECKMAN:  Object to that specific

13   question, but go ahead.

14        Q.    Now, it says, "Accordingly, under the

15   provisions and power of such resolution, it is hereby agreed

16   by AMTEL DIRECTORIES, INC., and P.B.J. WHITE DIRECTORIES,

17   LLC, as follows".  Now, before we go forward, we have yet

18   another company that is different from what we looked at

19   above, right?

20        A.    Yes.

21        Q.    In this case, it's Amtel, with no dash,

22   Directories, Inc., and above it was Am-Tel Directories,

23   Inc., right?

24        A.    Yes.  Correct.

25        Q.    And my question to you is, did you have a

1    company by the name of Amtel Directories, Inc.?

2         A.    No.

3         Q.    Once again, did you notice this when you

4    executed this document?

5         A.    Probably not.  I mean --

6         Q.    Irrespective of whether it was Am-Tel

7    Directories, Inc., Amtel Directories, Inc., it was your

8    understanding when you signed this document, irrespective of

9    what they called it, that you were selling your business for

10   your yellow book or your yellow pages directory to Mr.

11   White, right?

12        MR. HECKMAN:  Objection.

13        A.    Again, under the auspices that there were two

14   other agreements, three other agreements that would go with

15   it, that's correct.

16        Q.    Now, let's go to -- before we go on.  Is Mr.

17   Davidson still practicing?

18        A.    I believe so.

19        Q.    Is he in Urbana?

20        A.    Correct.

21        Q.    Do you know where he lives?

22        A.    No.

23        Q.    Now, when you sold your business to Mr. White,

24   had he had any experience in the directories business other

25   than working with you?

1    and his company on Exhibit 3?

2         A.    Correct.

3         Q.    Now, he also acquired an intangible asset

4    non-compete valued at $150,000; do you see that?

5         A.    Correct.  Right.

6         Q.    Now, we don't have a non-compete document

7    because it hasn't been produced.  But my question to you is,

8    as you sit here today, do you recall that the non-compete

9    that you -- that was executed was valued at $150,000?

10        A.    I would believe so, that would be correct.

11        Q.    Now, there's a third line, it says, "Other

12   Assets, Intan. Asset License Agreement", and that's valued

13   at $50,000; do you see that?

14        A.    Correct.

15        Q.    And you'd agree with me that that is the exact

16   same amount, $50,000, that is listed on the license

17   agreement between you and Mr. Burkhalter that's Exhibit 4,

18   right?

19             MR. HECKMAN:  Objection.

20        Q.    And that license agreement was the license

21   agreement that involved the name, insignia and logo for

22   AmTel and AmTel Directories, right?

23        A.    Which one?  I'm sorry.

24        Q.    Exhibit 4.

25        A.    Exhibit 4, correct, is the license agreement

1   to Steve Brandeberry and American Telephone Directories,

2   correct, it was to both of us; that is correct.  And

3   American Telephone Directories.  I said Amtel Directories.

4          Q.    So you would agree with me that Mr. White,

5   through his company, acquired all of the intangible assets

6   relating to that license agreement, right?

7                MR. HECKMAN:  Objection.

8          A.    I don't know the correct answer.

9   Contractually, I don't know, but I could say yes.

10         Q.    Well, you would agree with me, at the

11  beginning of this, it says he agreed to acquire the assets

12  in their entirety as listed on Exhibit A, and that's what's

13  on Exhibit A, isn't it?

14               MR. HECKMAN:  I'll object to that question for

15  the specific reason that the sentence in question does say

16  acquire all the assets.  It goes on to state, and the right

17  to use the name Amtel Directories, which, obviously is a

18  completely different sentence than what you propounded, but

19  go ahead and answer the question.

20         Q.    We'll do it this way.  Would you agree with me

21  that Mr. White acquired the intangible asset license

22  agreement valued at $50,000 that's listed on page three of

23  this document?

24               MR. HECKMAN:  Objection.

25         A.    Yes.

1    Q. And I think we've already agreed and you've

2 already testified that that intangible asset license

3 agreement was valued at $50,000, right?

4    A. Correct.

5    Q. And that's the same amount that is listed on

6 Exhibit 4, right?

7    A. Correct.

8    Q. And so, would you agree with me that the

9 intangible license agreement that's listed on the balance

10 sheet was for the license to use the name, insignia and logo

11 of AmTel and AmTel Directories?

12    A. I would agree with exactly what you said, has

13 the right to use it, because that's his exact language on

14 page one of his contract.  Yes, I would agree with exactly

15 what you said, he has the right to use it, correct.

16    Q. Well, but if you look at Exhibit 4, you would

17 agree with me that it says, "Burkhalter hereby grants to

18 licensee the use of the name, insignia and logo:  AM/TEL,

19 AM/TEL DIRECTORIES for the exclusive use of the licensee

20 throughout Champaign County", right?

21    A. It does say that, to Steve Brandeberry and

22 American Telephone Directories, that is correct.

23    Q. You told me earlier that you paid the full

24 amount for this, right?

25    A. The full amount for what?

1          Q.    Let me be more clear because that was not a

2    very clear sentence.  You told me that you paid the full

3    $50,000 under the license agreement, right?

4          A.    The corporation did, yes.

5          Q.    So it's fair to say that you owned the name,

6    insignia and logo, Amtel and Amtel Directories, right?

7          A.    Who's I?

8          Q.    Well, you tell me.

9          A.    The contract speaks for itself.  It says Steve

10   M. Brandeberry and American Telephone Directories are

11   getting those assets.  It says exactly that.  Am I correct?

12   Am I missing something on the license agreement?

13         Q.    So let me ask you this.  Is it your testimony

14   that -- and I want to make sure I understand your testimony.

15         A.    I know you do.

16         Q.    Is it your testimony that you have never

17   transferred to B.P. White -- actually, I want to take that

18   back.  I'm going to hold off on that actually.  Let's go

19   through a little bit more of this contract.  Now, the next

20   line says -- after that it says, "P.B. White Directories,

21   LLC, will acquire the assets in their entirety, as set forth

22   on the attached Exhibit A, of AM-TEL DIRECTORIES, INC., and

23   the right to use the name AM-TEL DIRECTORIES effective as of

24   the 1st day of July, 2002, under the following terms"?

25         A.    Yes.

1      Q.    My question is, did you ever discuss this

2  language with Mr. White about the use of any of the Amtel

3  name insignia marks?

4      A.    There was never a discussion through the sale

5  process of him using the name or having the name

6  exclusively.

7      Q.    Well, let me ask you this.  Did you ever tell

8  him as part of this that he is getting a non-exclusive right

9  to use the Amtel or Amtel Directories name, insignia and

10  mark; did you ever tell him that?

11          MR. HECKMAN:  Objection.

12      A.    Because of the whole concept and conversation

13  of the sale of him buying it from me -- and I only sold him

14  on the auspices that I would get it back in five years.

15  There would never have been the need for him to have

16  exclusive rights.  I didn't even have a non-compete.  So

17  that would have not even come up in the conversation.  It

18  would have come up as exclusive A-M, hyphen, A-M slash.  It

19  was obvious he was going to continue the company exactly as

20  it was.  I was to buy it back in five years.  So there was

21  no conversation specifically about -- other than what he

22  wrote that he wanted the right to use the name.  Mr. White

23  had never seen any of those documents that you're discussing

24  whether that -- that's a moot point, but he's never seen

25  them to know that I owned an exclusive right.  And he never

1          A.     I don't even know what the question was.

2                 MR. LENOX:  Would you read the question back?

3                 MR. BUTLER:  Let's take a break.

4                 MR. LENOX:  Okay.  We'll take a break.

5                        (Break taken.)

6                 MR. LENOX:  Back on.

7              (The pending question was read back.)

8          A.     Well, okay.  There's two intangible assets,

9     one of which is listed at 50,000.

10         Q.     Thank you.  Now, did you ever discuss with Mr.

11    White your -- strike that.  And you had agreed with me that

12    where the language says that it's -- you were acquiring the

13    assets in their entirety as set forth in Exhibit A, and for

14    completeness, and the right to use the name Amtel

15    Directories, you would agree that there was no carve out

16    with respect to any of the assets on Exhibit A, correct?

17         A.     I don't understand what you mean by "carve

18    out".

19         Q.     There was no language in there that said

20    except for these assets, right?  There's no such language in

21    there, is there?

22         A.     There's no "except for" in there, correct.

23         Q.     Now, did you ever discuss with Mr. White any

24    perceived -- let me ask you this.  You told me Mr. White

25    never had advised you that you had a non -- or you had an

1   ability to use the Amtel names and mark subsequent to this

2   contract, right?

3           A.   There was never a need to discuss it, and

4   there was never a discussion, correct.

5           Q.   The answer is no.  And you never told him that

6   you believed that you had the ability to use the mark,

7   right?

8           A.   Never discussed it and there was never a need

9   to discuss it.

10          Q.   No conversations ever about that?

11          A.   Correct.

12          Q.   It was never discussed, period?

13          A.   Correct.

14          Q.   Now, after this sale of assets, you advised

15  Mr. White -- walked back to the building and he was the new

16  owner, right?

17          A.   Correct.

18          Q.   He took over?

19          A.   He was the owner.  He didn't take over.  I

20  kept running it as usual.

21          Q.   Did your role change in any way?

22          A.   I didn't sign checks.  That's about it.

23          Q.   Were you still an employee of the business?

24          A.   Correct.

25          Q.   You were still taking a check from the

1    time?

2          A.   Well, I may have used it several months

3    afterwards in an attempt to start a new directory after the

4    fact, after I was fired, for a period of maybe two or three,

5    maybe a month.  I may have used that -- the same mark that

6    we're discussing on the business card.  But at the advice of

7    my attorney, I stopped trying to sell advertising for a

8    directory to compete against a company I was to get back.

9    So I probably did use it then, or something similar, I don't

10   know.  I have no paperwork to that effect, but I may have.

11   And then, I used it starting in late 2008, started using it.

12         Q.   So you don't recall one way or the other

13   whether you did or did not use the Amtel name and mark those

14   few months after the business was sold; is that fair?

15         A.   It wouldn't have been months after the

16   business was sold.  It would have been after I got fired in

17   2003.  And I do not recall if I did.

18         Q.   So is it fair to say that, at a minimum, from

19   2003 until late 2009, you never used the Amtel name or mark?

20         A.   Correct.

21         Q.   I have another question.  If you turn back to

22   Exhibit 6, page one.  We've been looking at paragraph one

23   quite a bit, and I want to focus on the paragraph that says,

24   "and the right to use the name Am-Tel Directories effective

25   as of the 1st day of July, 2002"; do you see that?

1      A.    Correct.

2      Q.    And after Mr. White took over, was it pretty

3  much business as usual?

4      A.    It was exactly business as usual.

5      Q.    Now, I think you testified, at that point,

6  American Telephone Directories was without any assets,

7  correct?

8      A.    Correct.

9      Q.    You weren't doing business with that company,

10  right?

11      A.    Correct.

12      Q.    Do you know whether Mr. White or one of Mr.

13  White's companies ever registered the name Amtel

14  Directories?

15      A.    No, I do not.  That's not true.  I saw an R or

16  something on -- to rephrase that, that's not accurate.  I

17  did see an R or something on one of his books once.  And I

18  went to the State of Ohio and, yes, one of his companies had

19  registered, yes.  If that's the same thing, the State of

20  Ohio.

21      Q.    What did you see that had an R on it?

22      A.    He had -- he had changed the logo again to an

23  upper and lower case, and that's what I'm thinking had a

24  registered R.

25      Q.    Did Mr. White -- and when you say he changed

1   the logo, are you talking about the Amtel logo?

2          A.   Correct.

3          Q.   How did Mr. White's Amtel logo differ from

4   yours?

5          A.   Substantially different.  It wasn't even

6   close, other than the name A-M-T-E-L.

7          Q.   What did it look like?

8          A.   I'm not prepared to tell you what it looked

9   like.  Well, I don't have that handy.  It was upper case A,

10  small m, small t, small e, small l, with a, what I call

11  A-T-T globe line around it.  So it was substantially

12  different.

13               MR. HECKMAN:  Have you got one of those other

14  books there?

15               MR. LENOX:  No.  Let's mark this.

16               (Plaintiffs' Exhibit 7 marked.)

17          Q.   Sir, I've handed you what's been marked as

18  Plaintiffs' Exhibit 7.  I can represent to you that these

19  are Plaintiffs' Yellowbook directories covers from Union

20  County, Madison County, Logan County, and Champaign County.

21  And my question is, if you take a look in the middle of the

22  page, you see the Amtel Directories logo there; do you see

23  that?

24          A.   Correct.

25          Q.   And it's got a little R on it; do you see

1    in a short period of time because everybody quit or got

2    fired.  I wouldn't have any idea.

3            Q.   You don't remember their names as you sit here

4    today?

5            A.   Dan Mangan was the head man or head of sales.

6    He wasn't mine, but I kind of think I was employed by

7    Yellowbook and him.

8            Q.   Do you remember any of the other Yellowbook

9    employees that were higher-ups, for lack of a better word,

10   when you were working there?

11           A.   Yeah, I can remember one lady that came into

12   my office and lied to me about who she worked for to collect

13   some of my Amtel phone books.  It was a great group of

14   people.  She's still there now.  She's kind of upper

15   management.  She's there now.  She would be in her 60s.

16           Q.   I was going to switch topics.  I know you want

17   to keep going, but I kind of need a short break, to be

18   honest.

19               MR. HECKMAN:  Yeah, let's do that.

20                   (Break taken.)

21           Q.   Sir, I want to switch gears a little bit here

22   and I want to talk about your present yellow pages

23   directory.

24           A.   Okay.

25           Q.   And I know, probably at the beginning of this,

1    you told me when you started to develop your yellow pages

2    directories book, and what date was that?

3            A.    Maybe July or August -- let's say July of two

4    thousand and -- what year is this?

5            Q.    This is 2010.

6            A.    Nine?  Oh, God, Jesus.  Yeah, it was July of

7    2009.

8            Q.    So you've been at this for a little under a

9    year now, right?

10           A.    Correct.  Correct.

11           Q.    What prompted you to begin to develop a yellow

12   pages directories?

13           A.    I had many, 20, 30, phone calls or visits from

14   residents and businessmen in Champaign County begging me to

15   start the book back up after they had received their May

16   2009 Yellowbook for Champaign County.

17           Q.    Do you recall any of those individuals that

18   were begging you to bring this book back?

19           A.    Certainly.  Probably take the phone book and

20   circle half of the people in Champaign County.  If I didn't

21   see them someplace or talk to them.  So let's say Joe,

22   Carol, Bob of Champaign County.  So I couldn't stop.

23           Q.    Give me an example of some people that -- I

24   don't need the whole universe, but give me an example of

25   some people that had made this request of you.

1        A.    Bob Boyd of Urbana.  I'm trying to think of

2  some business people.  Is that what you're --

3        Q.    Yeah, I'm really looking for business people.

4        A.    Yeah, that's fair enough.  Champaign Garage

5  Door, John something.  Mechanicsburg Farm and Implements,

6  whoever the secretary is or the owner.  It's easier to tell

7  you who didn't.

8        Q.    Any other businesses that you can recall?

9        A.    Well, again, there would be a thousand of

10  them.  So just to go down the list -- and I don't want to

11  tell you something that maybe they didn't, but there was

12  just so many, I couldn't begin to tell you all of them.  I

13  know you're not asking for all of them.  I wrote -- to do my

14  due diligence, I sent a letter to a hundred and some

15  business people and said -- I think we've given you a copy

16  of that letter today -- that I had been approached, would

17  they like me to do another phone book?  Were they happy with

18  Yellowbook?  Would they like me to do it?  Out of the 160 I

19  sent, I got 101 responses, and 86 of them said, yes, they

20  would come with me.  And those cards have been lost -- or

21  not lost, but coffee spilled all over them and I don't have

22  those people.  And their names weren't on them anyway.  I

23  didn't have their responses on it.  So it was overwhelming

24  that they were displeased with Yellowbook.

25        Q.    You said you brought that letter with you

1    today?

2              A.    I did, sir, I thought.

3              Q.    Well, here's the documents, at least a subset

4    of the documents that you brought today.  Pull out of that

5    stack which letter you're referring to.

6              A.    Sure, absolutely.  Not a problem.

7    Right there, sir, the first one.  You've got three or four

8    of them.

9              Q.    These are multiple copies?

10             A.    Oh, you made copies.  That's fine.  That's the

11   letter.  Let me see it, if I may?  Yes, that was my due

12   diligence, if you will.

13             Q.    Okay.

14             MR. LENOX:  Let's go ahead and let's mark this

15   document.

16             (Plaintiff's Exhibit 9 marked.)

17             Q.    Okay.  Sir, we just marked Exhibit 9, this is

18   a document you brought today, correct?

19             A.    Yes.

20             Q.    And this is dated June 3rd, 2009; do you see

21   that?

22             A.    Yes.

23             Q.    And you said you sent this to approximately

24   160 people or businesses?

25             A.    Business owners, correct.

1        Q.    How did you pick those 160 business owners?

2        A.    Totally random, going through a telephone

3 directory, looking at a name and address, typing it, going

4 on to the next person.  Typing an envelope.

5        Q.    And you said you got about 100 responses back,

6 correct?

7        A.    Correct.

8        Q.    Do you have copies -- well, I'm sorry.  You

9 said you spilled coffee on them so you don't have the

10 responses from these people?

11       A.    I have a few of them left.

12       Q.    Whichever ones you have, I want you to produce

13 those, please.

14       A.    I will.

15       Q.    Now, the heading at the top of this is Amtel

16 Directories with a little mini R; do you see that?

17       A.    I do.

18       Q.    So by this time you had already decided to use

19 Amtel Directories as your business name; is that fair to

20 say?

21       A.    Correct.

22       Q.    And that's as of June of 2009; is that

23 correct?

24       A.    That's correct.

25       Q.    When did you decide to use the Amtel

1  Directories name to solicit your new book?

2      A.   Within a week of this letter, or the day I

3  wrote the letter.

4      Q.   Did you consider using any other names for

5  your directories book?

6      A.   It's not considered a name of the book.  It

7  was just an entity selling the product.  No, I did not.

8      Q.   So you knew from the get-go you were going to

9  use Amtel Directories?

10     A.   In some fashion, yes.

11     Q.   And I take it you never did a trademark

12 search, right?

13     A.   I had not done a trademark search.  Well,

14 again, I don't understand trademark and registration.  So

15 maybe help me with that.  I knew Mr. White had registered --

16 am I saying that right, registered it?  Or with this

17 document you showed us.  And it expired in 2008.  And after

18 that, I looked up the State of Ohio and he no longer held it

19 and so I did register it.

20     Q.   Let me ask you this.  How did you know that

21 Mr. White had registered the name Amtel?

22     A.   Well, we discussed this earlier.  I saw the

23 little R on the book when Mr. White owned it.

24     Q.   Well, you saw the R, so did you assume that he

25 registered it?

1    any other form of -- or any other resource from which to

2    develop potential customers?

3            A.    A resource?

4            Q.    Yeah.

5            A.    My eyes, the newspaper, seeing other -- you

6    know, I wasn't interested in looking for others.  I was

7    looking for the existing businesses to contact.  So I really

8    wasn't looking for additional.  I had my hands full with the

9    500.

10           Q.    So you get this list of leads, and what do you

11   do with it?

12           A.    I start calling and/or seeing customers.

13           Q.    Okay.  Now, did you develop business cards at

14   this point?

15           A.    Yes.

16           Q.    And are those the business cards that we

17   looked at earlier?

18           A.    Yes.

19           Q.    Exhibit 5?

20           A.    Yes.

21           Q.    Do you take these business cards with you out

22   on your sales calls?

23           A.    Yes.

24           Q.    And, at this point, had you made arrangements

25   for a potential publisher of a book?

1          Q.    Now, I want to take a step back. You started

2   seeing customers. When did you get your first contract?

3          A.    Within a 90-day period of August/September of

4   2009. Probably closer to September.

5          MR. LENOX: Let's mark this.

6          (Plaintiff's Exhibit 11 marked.)

7          Q.    Sir, I've handed you Plaintiff's Exhibit

8   Number 11, and this is a document that your counsel produced

9   to me. I understand this to be your contract application;

10   is that right?

11          A.    Application for advertising, correct.

12          Q.    And at the top it says Amtel Directories?

13          A.    Correct.

14          Q.    And it's got a P.O. box?

15          A.    Correct.

16          Q.    Why do you have a P.O. box rather than your

17   business address?

18          A.    I always had a P.O. box. I just didn't know

19   if I would stay at the 682 where I'm currently, quote,

20   unquote, "based out of". But I always had a P.O. box. I

21   never had a physical address on communications, on billing,

22   that I'm aware of.

23          Q.    And it shows a telephone number there?

24          A.    Yes.

25          Q.    Whose phone number is that?

1          (Plaintiff's Exhibit 12 marked.)

2          Q.   Now, if I understand your testimony correctly

3    -- and, for the record, Exhibit 12 is the front cover and

4    the back cover of the book that you brought with you; is

5    that right?

6          A.   No, the back cover -- that's an inside page.

7          Q.   My secretary copied it wrong.

8          A.   She copied it wrong.  Here's the page.

9          Q.   Okay.  She did page one.

10         MR. HECKMAN:  It's still useful to you because

11   that page says 2006 on it.

12         Q.   Okay.  Well, let's do this.  So she's copied

13   pages one and two.  Now, so what you would take with you, as

14   far as I know, you took a -- you made a new cover for this

15   book, or what you wanted your cover to look like, correct?

16         A.   Correct.

17         Q.   And page one of Exhibit 12 is what your book

18   would look like on it's front cover, right?

19         A.   About, yes.

20         Q.   And what you did is you took this front cover

21   and pasted it on top of an old Amtel Directory, correct?

22         A.   Correct.

23         Q.   And, for example, the book that you brought

24   with you, it was a 2006 Amtel, Champaign County, telephone

25   directory, correct?

1          A.     Correct.

2          Q.     Now, that would have been one of Mr. White's

3    books, right?

4          A.     Well, yes.  Yes, it was.  I think, yes.

5          Q.     I take it you never asked Mr. White if you

6    could use his old book as a mock-up for your new directory,

7    did you?

8          A.     I did not.

9          Q.     And so what you would do is, you took this

10   book around, and what would you do with it?

11         A.     Occasionally -- we did a lot of phone calls as

12   well.  Walk in, say hi to the people that we -- because they

13   knew me, and most of them knew we were coming back.  And I

14   would say, "We're back", and I would just basically hold the

15   book merely to show them what size it's going to be.  And

16   they would tell me how glad that we're coming back in a

17   full-size book.  They were very clear who I was and what

18   book I represented.  They were very clear and adamant that I

19   was not working for Yellowbook or with Yellowbook.  Would

20   never open the book up or say other than, well, what's it

21   going to look like?  Is it going to be like that?  Yes, it's

22   going to look and feel just like the books you used to have.

23   If you spent two or three seconds on the book -- the book

24   was just still for a visual, explained to them what we're

25   doing, just like we did before, like I had done, and sign

1   and sell them and then leave.

2         Q.   Now, did you sell some -- or sign some

3   customers up on the spot?

4         A.   Certainly.

5         Q.   In some instances you'd fill a contract out

6   right there, correct?

7         A.   Certainly.

8         Q.   And you'd use that form that we looked at

9   which was Exhibit 11, right?

10        A.   Similar to that, correct.

11        Q.   And then you said you would leave them with --

12   you would give them some marketing materials in an envelope;

13   is that right?

14        A.   No.  This was an item we made which happened

15   to be the size of a large postcard.  I'm calling it a

16   postcard.  It wasn't mailed out, but it was a handout that

17   we would show them that -- it's been given to you awhile

18   back, I hope, that showed simply the distribution area.

19        Q.   Let's mark this.

20        (Plaintiff's Exhibit 13 marked.)

21        Q.   I'm handing you what's been marked as

22   Plaintiff's Exhibit 13.  This was provided to us by your

23   counsel.  Now, what is the first page of Exhibit 13?

24        A.   It is an enlarged version of a postcard size,

25   which would have been half of that size.

1        Q.    So this is the postcard that you would leave

2   with customers, right?

3        A.    That is an enlarged copy of -- I doubt if we

4   ever left it.  We would use it -- yeah, it probably have

5   been left with five or six people, 10 people, over the --

6        Q.    Now, on the face of this it says, "We're back!

7   Due May 2010"; do you see that?

8        A.    Yep.

9        Q.    Have you published a book yet?

10       A.    No.

11       Q.    Is there an expected date of publication of

12   the book?

13       A.    The printer hasn't given a dead date, but

14   probably the first week in July.

15       Q.    Why has it been delayed?

16       A.    My errors in digital files.

17       Q.    When you say "errors in digital files", what

18   do you mean by that?

19       A.    We send the books to graphic, to Polylogics,

20   and the files that we prepared, the graphic files -- part of

21   it's graphic files, and we did -- our sales went too far.

22   We extended our sale season.  The biggest issue would be the

23   sales season, we extended it.  But we are having some

24   electronic file problems with Polylogics which prepares the

25   book for print.

1       A.      13.

2       Q.      You're right, 13.  Pardon me.  I want you to

3   look at page two.  What is page two?

4       A.      That is a copy of an advertisement in the

5   Urbana Daily Citizen.

6       Q.      When did this advertisement run?

7       A.      I'm going to say early/late January 2010 or

8   early February 2010.

9       Q.      Now, at the bottom it states, "Has ownership

10  rights to use the name AMTEL", and you've checked both

11  Amtel, American Telephone Directories, Inc., and Yellowbook

12  Amtel; is that right?

13      A.      That's correct.

14      Q.      Was this your idea to ad this or who drafted

15  this document?

16      A.      I did.

17      Q.      Who did all of the drafting of your

18  advertisements for your business?

19      A.      The only advertisements we had are the two

20  that are attached here, and I did.

21      Q.      I take it you never contacted Yellowbook about

22  your using the Amtel mark?

23      A.      Correct, I did not.

24              (Plaintiff's Exhibit 14 marked.)

25      Q.      Sir, I'm handing you what's been marked as

1    Plaintiff's Exhibit 14.  This is a document that you brought

2    with you today.  Would you describe for me what this is?

3              A.    It's a two-sided piece of paper from which you

4    would draw a customer's ad, depending on the size of it, to

5    give to a graphic artist for them to design the ad.

6              Q.    So I'm understanding it.  This is something

7    you give your customers for the purpose of getting their

8    logo to put in your book?

9              A.    The sales rep. would have this and -- the

10   sales rep. would write on this the pertinent information to

11   give to a graphic artist so the graphic artist could design

12   an ad for the customer.  You use the word logo loosely, and

13   they put more than a logo.  It would be their ad.  And, no,

14   the customer would not receive this.  This would be

15   something that the salesman used.

16             Q.    So this would be given to a graphic artist,

17   for example?

18             A.    Correct.

19             Q.    And they would write out all of the specs or

20   whatever they need for the ad in there?

21             A.    No, the salesman would write the information

22   on here for the graphic artist for her to create an ad.

23             Q.    And then this is given to the graphic artist?

24             A.    Correct.

25             Q.    And then they would do their work?

1         A.    Correct.

2         Q.    How long have you been using this document?

3         A.    Since the inception of the company.  The new

4  book rather.  August of '08.  Or, excuse me, '09.  Yeah,

5  '09.

6              (Plaintiff's Exhibit 15 marked.)

7         Q.    Sir, I've marked Plaintiff's Exhibit 15.  This

8  is also a document that you brought today.  And I would ask

9  that you please explain what this is for me.

10        A.    This happens to be a two-page proof sheet that

11  would -- that I would send to a customer after my salesman

12  had filled out the sheet we're calling Exhibit 14, the copy

13  sheet.  This is the proof of the advertising, which was the

14  ad that the graphic artist designed.  It happens to be a two

15  part simply because this ad won't fit on the front page by

16  itself.  So the customer would receive this, review it and

17  approve or ask for more changes and send it back to me.

18        Q.    So if I understand, page two, for example, is

19  for the Urbana Conference Center; is that right?

20        A.    Which is referenced on the front as the

21  customer, correct.

22        Q.    So this is an example of one of the proofs

23  that you have sent to an actual customer?

24        A.    Correct.

25        Q.    And this is dated on the front of page one

1      6/10 of '10; is that right?

2                A.    That is correct.

3                Q.    And is that the date you actually sent it to

4      the customer?

5                A.    That the date that the ad was revised.

6                Q.    Okay.

7                      MR. LENOX:  Let's mark these together.

8                (Plaintiff's Exhibit 16 and 17 marked.)

9                Q.    Sir, I'm handing you documents 16 and 17 which

10     you produced today at your deposition.  Let's start with 16.

11     Could you please tell me what this document is?

12               A.    Well, that's a copy of, obviously, a number 10

13     envelope that I was attempting to give you anything that I

14     had with Amtel on it at your request.  I was just trying to

15     gather anything per your request.

16               Q.    So that's the envelopes you used for all

17     correspondence or any routine documents that you've sent via

18     post?

19               A.    On 16 is correct.

20               Q.    Now, what is 17?

21               A.    17 is a number nine envelope, which we give to

22     customers when we sent them a proof for ease of them to send

23     their proof back to us.

24               Q.    So this is the equivalent of a

25     self-addressed envelope to give to a customer to send back

1    to you, right?

2          A.    A return envelope, correct.

3          (Plaintiff's Exhibit 18 marked.)

4          Q.    Sir, we've marked Exhibit 18.  It's a document

5    that you produced today also.  It's from Brown Publishing

6    Company; is that right?

7          A.    Correct.

8          Q.    What is this document?

9          A.    It's a copy of a statement to Red Rabbit for

10    advertising.  It's a statement that -- it's the best record

11    of the amount of the one ad I ran in the Urbana Citizen or

12    with Brown Publishing at your request.  It identifies the

13    $497.80 due and/or bill at your request.  You wanted to know

14    how much I spent on advertising.

15          Q.    So I'm clear.  You spent $528 to run an ad in

16    the Urbana paper, right?

17          A.    No, sir, the far right, 497.80.

18          Q.    I'm sorry.  So you paid 497.80 to run an ad in

19    the Urbana paper; is that correct?

20          A.    That's correct.

21          Q.    And which ad did you run?

22          A.    It would be page two of Exhibit 13.  And it

23    ran two times, I believe.

24          Q.    And I may have asked you this, and if I did, I

25    apologize.  Do you recall what dates or what publications

1        Q.    I thought I had you, but you just lost me.

2    Let me ask you about you personally.  In any of the times

3    that you were selling to any businesses or customers for

4    your new book, did any of them ever come up to you or ask

5    you if you were affiliated with Yellowbook?

6        A.    Nobody asked me that.

7        Q.    Did any of your sales reps ever tell you that

8    customers had asked them whether they were affiliated with

9    Yellowbook?

10       A.    No, they specifically did not ask me that --

11   or tell me that.

12       Q.    As you sit here today, do you have any

13   knowledge of any customers or potential customers asking

14   whether there was an affiliation between your book and

15   Yellowbook?

16       A.    The response I gave you was, not when we were

17   on premises, but on the telephone, adamantly, pretty much

18   the first thing out of anybody's mouth was, "Are you

19   Yellowbook?"

20       Q.    How often did you get solicitations by

21   telephone?

22       A.    No, sir, we would solicit some small accounts

23   by phone, and they would ask us, "Are you Yellowbook?"

24       Q.    Okay.  And when you would call and solicit

25   these people by telephone, did you have a script that you

1    tell you specifically.

2         Q.   So you can't name specific names for me, is

3    that what you're telling me?

4         A.   Of the 500 people I talked to, you know,

5    almost every one of them would have said, how can you do

6    this?  It would be easier to tell you who didn't.  Several

7    would ask, well, Yellowbook says you're not printing a book.

8    We can't print a book, we've sued you.  You've got a cease

9    and desist order.  So I would have to explain to them --

10   that's what I spent more time putting fires out because

11   Yellowbook, the sales reps were saying horrendous things.

12   We were met with huge, gracious open arms.  There was no --

13   again, the people we saw wanted nothing to do with

14   Yellowbook.

15        Q.   Well, that wasn't really my question.  My

16   question is, has anybody asked you how you can use the name

17   Amtel or Amtel Directories when Yellowbook is presently

18   using it; has anybody asked you that, customers?

19        A.   No, nobody has asked me that question.

20             MR. LENOX:  Let's mark this.

21             (Plaintiff's Exhibit 19 marked.)

22        Q.   Sir, I've hand you Exhibit 19.  This was just

23   produced by you today.  And at the top of this page it's

24   dated November 23rd, 2009; do you see that?

25        A.   Yes.

1          Q.    And at the top it also says, "Fax cover 1

2   additional page"; do you see that?

3          A.    Yes.

4          Q.    And it also says, "Angela." who is Angela?

5          A.    She's a manager or owner of a Servepro

6   franchise in Urbana or Clark County.

7          Q.    What is Servepro?

8          A.    I think, you have fire damage, they come in

9   and fix your place up.

10         Q.    What were the circumstances surrounding you

11  sending this letter to Angela?

12         A.    This was one of the few people that Annalease

13  had spoke with.  The lady wasn't familiar with our book.

14  And the attachment to this would have been what you're

15  calling page one of this Exhibit 13.  That's pretty much it.

16  The lady wanted to know about our company.  And this is the

17  only letter I ever sent -- or any conversation I had -- or,

18  excuse me, that's not true.  Any writing or e-mails that I

19  ever had for Annalease.  And, again, just in trying to rack

20  my brain, you wanted anything that I had, and I ran across

21  this and I brought it.

22         Q.    Did Proserve (sic) or Angela in any way

23  express concern about their ability to publish in your book?

24         A.    I don't think your question said what you

25  wanted to say.  Rephrase your question.

1  specifically.

2          Q.    Now, in paragraph three, you lay out what I

3  would call the chain of the sale of assets, at least as you

4  see it.  Why did you put this in this letter?  Were people

5  asking you about that?

6          A.    A few people would ask, how can I use the name

7  Amtel.

8          Q.    And my question, and I think I asked it

9  earlier is, who specifically asked you how you can use the

10  name Amtel?

11          A.    It would be safe to say probably 80 percent of

12  the people on that list would have said that, for ease of

13  names of people, 80 percent of the file.

14          Q.    So when you say 80 percent of the people,

15  you're talking about 80 percent of the stack of contracts

16  that you have produced to us today?

17          A.    Let's back it up to 50 percent just out of

18  inquisitiveness, well, how can you use the name Amtel.

19          Q.    So that was a pretty regular question amongst

20  potential customers?

21          A.    It wasn't a question.  It was an inquisitive

22  remark.  It was a remark.

23          Q.    But it came up a lot, right?

24          A.    Yeah.

25          Q.    Eighty percent of your customers?

# EXHIBIT 2

1            UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF OHIO
2               WESTERN DIVISION

3

4

5  YELLOW BOOK USA, INC., et al., :

6            Plaintiffs,

7

8  vs.                 :    CASE NO. 3:10-CV-025

9                     VOLUME II

10 STEVEN M. BRANDEBERRY,

11            Defendant.    :

12

13

14        The continued deposition of STEVEN M.

15 BRANDEBERRY, the Defendant herein, taken as upon

16 cross-examination by the Plaintiffs, and pursuant to the

17 Federal Rules of Civil Procedure, agreement of counsel, and

18 stipulations hereinafter set forth, at the offices of

19 Thompson Hine, LLP, 312 Walnut Street, 14th Floor,

20 Cincinnati, Ohio, 45202, on the 13th day of September, 2010,

21 at 10:30 a.m., before Julie A. Patrick, a Notary Public for

22 the State of Ohio.

23

24      TRI-COUNTY COURT REPORTING AND VIDEOTAPE SERVICE

25             886 BRADBURY ROAD
           CINCINNATI, OHIO 45245

**EXHIBIT 2**

1    by your lawyer.  And if you could flip through them, please,

2    and tell me if this is the sum total of all of the contracts

3    involved in that transaction with Mr. Burkhalter?

4           A.    It appears to be, yes.

5           Q.    You can set that aside.  At your last

6    deposition, you also talked about a wish list that you had

7    composed and had provided to Barney White; is that correct?

8           A.    Yes.

9                 (Plaintiffs' Exhibit 26 marked.)

10          Q.    This is Exhibit 26.  Is this the wish list

11   that you provided to Mr. White?

12          A.    Well, I don't know I provided it to him or he

13   provided it to me after conversations.

14          Q.    Irrespective of who provided it to who, is

15   this the wish list that you referenced at your last

16   deposition?

17          A.    That's correct.

18          Q.    Once again, you would agree with me that this

19   document in no way discusses use of the AMTEL name, insignia

20   or logo, correct?

21                MR. MEYER:  May I have a moment just to look

22   at something before he answers that?  Have we anything on

23   the -- never mind.  Strike that.  Okay.  Thank you.

24          A.    It does not.

25          Q.    Thank you.  Now, I take it, outside of the

1    printed price information?

2              A.    No, it was just -- and these people knew what

3    they were paying.

4              Q.    So to summarize.  You had preprinted contracts

5    from Polylogics for every customer of either Yellow Book or

6    CT Communications that had a bold listing or better in one

7    of their respective books?

8              A.    Correct.

9              Q.    And they sent you just a stack of those; is

10   that right?

11             A.    Boxes, that's right.

12             Q.    Boxes of them.  And those are the documents

13   you would use or take out to the customer when you would

14   solicit them?

15             A.    Correct.

16             Q.    Now, I understand that, since your last

17   deposition, you have distributed your book; is that correct?

18             A.    Yes.

19             Q.    When did you begin distribution of that book,

20   what date?

21             A.    August.  Mid August.

22                   (Plaintiffs' Exhibit 28 marked.)

23             Q.    I'm handing you Plaintiffs' Exhibit 28.  Sir,

24   I can represent to you these are excerpts of a book that we

25   received.  And before we start, do you agree that this is

1    the cover of your Yellow Pages directory?

2           A.    Correct.

3           Q.    I've got a copy of the original book here, if

4    you would like to cross-reference it, certainly.  Now, if

5    you could go to page two of this document?

6           A.    Uh-huh.

7           Q.    There is a page and there's a caption "AMTEL

8    American Telephone Directories", and what looks to be the

9    equivalent of a letter underneath it; do you agree with

10   that?

11          A.    Yes.

12          Q.    And that's your signature?

13          A.    Yes.

14          Q.    And this was published in all of the books in

15   Champaign County, correct?

16          A.    Correct.

17          Q.    Did you draft the information contained on

18   page two?

19          A.    Yes.

20          Q.    Now, if you could, go to pages three and four

21   of this document.  I can represent, if you look in the upper

22   left-hand corner, this is page two of the directory?

23          A.    Yes.

24          Q.    Do you see where I am?

25          A.    Yes.

Page 263

1      Q.    This is an advertisement, for lack of a better

2   word, that was found in the directory, correct?

3      A.    Yes.

4      Q.    Now, if you go to page four, which would be

5   page four of the directory?

6      A.    I don't have that in this one.

7      Q.    That's why it didn't get stapled.  There's

8   page four.  There are a couple of AMTEL advertisements there

9   also, correct?

10     A.    Yes.

11     Q.    Is it fair to say you interspersed within that

12  book multiple AMTEL advertisements?

13     A.    They're filler spacers.

14     Q.    How much filler did you have to use in this

15  book?

16     A.    I never counted it.

17     Q.    Any idea how many times AMTEL is referenced or

18  used as a filler in that book?

19     A.    I would have to count them for you.

20     Q.    I'm not going to make you do that because

21  that's a thick book.  Now, if you go to the front cover.

22  This notes it's a "Complete Residential & Business Listing

23  for all of Champaign County Plus West Liberty, DeGraff,

24  Quincy, Lena/Fletcher, East Liberty, the Catawba, and North

25  Hampton"; did I read that right?

1        Q.   So the mark on your present book, this book is

2  in Champaign County?

3        A.   Yes.

4        Q.   Do you know how many individuals reside in

5  Champaign County?

6        A.   I should, but I don't.

7        Q.   It's a pretty small county relatively

8  speaking?

9        A.   Yes.

10       Q.   Urbana is the biggest city?

11       A.   Correct.

12       Q.   How big is Urbana?

13       A.   12,000.

14       Q.   A pretty rural county?

15       A.   You'll have to beat me up on that.  Is it

16  30-some thousand?

17           MR. MEYER:  Off the record.

18            (Off-the-record discussion.)

19           MR. LENOX:  Back on the record.

20       A.   30,000.

21       Q.   About 30,000 is your estimate of how big

22  Champaign County is?

23       A.   Yes.

24       Q.   Would you agree that your Yellow Book -- do

25  you agree that your Yellow Pages directly competes with

1    Yellow Book's directory?

2              A.    Sure.

3              Q.    In Champaign County?

4              A.    Correct.

5                    MR. BUTLER:  Do you want to break for lunch?

6                    (Off-the-record discussion.)

7                          (Lunch break.)

8              Q.    Mr. Brandeberry, we talked a little bit about

9    what you estimate your revenue to be from your Yellow Pages

10   directory?

11             A.    Correct.

12             Q.    Have you written off any bad debt?

13             A.    I have not.

14             Q.    Do you expect to write off some bad debt?

15             A.    I anticipate -- I don't expect to, but I

16   anticipate it may be 10 percent, just real high because of

17   the economy.

18             Q.    But as it stands now, you have not actually

19   made that calculation yet?

20             A.    Correct.

21             Q.    Have you analyzed it at all to date?

22             A.    I have not.

23             Q.    Now, does the $50,000 profit that you

24   estimated take into account that bad debt or no?

25             A.    It does not.

# EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION (DAYTON)

YELLOW BOOK USA, INC. et al.      :     Case No.: 3:10-cv-025

       Plaintiffs,        :     Judge Thomas M. Rose

        v.             :     **AFFIDAVIT OF WILLIAM N. WHITE**

                   :

STEVEN M. BRANDEBERRY      :

       Defendant.        :

---

STATE OF OHIO        :
                   : SS.
COUNTY OF CHAMPAIGN:   :

     I, William N. White, after being duly sworn and cautioned, state that the following is based on my personal knowledge, understanding and belief, and that I am competent to testify to matters stated herein.

     1.     In 2002, Steven Brandeberry owned and marketed yellow pages directories in Champaign County, Logan County, Union County, and Madison County, Ohio. Mr. Brandeberry used the name, insignia, logo and marks "Amtel" and "Amtel Directories" to market his yellow pages directory in each county.

     2.     In 2002, Mr. Brandeberry approached me about purchasing his yellow pages directory business.

     3.     Mr. Brandeberry and I negotiated an agreement whereby I would purchase all of the assets and assume certain liabilities of the business.

     4.     Mr. Brandeberry and I never discussed or negotiated any terms whereby Mr. Brandeberry would retain any right, title or interest in the Amtel or Amtel Directories name, insignia, logo or marks. In fact, the Amtel and Amtel Directories name, insignia,

EXHIBIT
3

logo and marks were not discussed outside of the context of my purchase of all of the assets of the yellow pages directory business.

5.      I intended that all of the assets, including the Amtel and Amtel Directories name, insignia, logo and marks, be transferred to me as part of the sale.

6.      Due to the value and strength of the Amtel and Amtel Directories name, insignia, logo and marks, if I had believed that Mr. Brandeberry would retain any right to use them, I certainly would not have consummated the transaction and I would not have paid the $100,000 purchase price and assumption of debt.

7.      After Mr. Brandeberry and I agreed to terms, I retained Harley Davidson, Esq. to prepare the written contract. A fully-executed copy of the contract is attached as Exhibit 1.

8.      Mr. Brandeberry did not negotiate or request changes to any of the terms in the written contract. Instead, he signed the document exactly as it was presented to him. He never objected to the language in the contract which clearly states that my company would acquire all of the assets of his business, nor did he claim to retain any interest in the name, insignia, logo or marks "Amtel" and "Amtel Directories."

9.      The 2002 contract states "P.B.J. White Directories, LLC will acquire the assets, in their entirety, as set forth on the attached Exhibit 'A', of AM-TEL DIRECTORIES, INC. and the right to use the name AM-TEL DIRECTORIES effective as of the 1st day of July , 2002 . . ." Exhibit A to the 2002 contract is a balance sheet which identifies, among other assets, "Intang. Asset License Agrmnt" valued at $50,000, which was the license for the Amtel and Amtel Directories name, insignia, logo and marks.

10. Mr. Brandeberry did not retain any right to use the Amtel and Amtel Directories name, insignia, logo and marks. Those assets were transferred in their entirety to me and my company.

11. After the contract was executed, I took over the business, and continuously published a yellow pages directory in each of the four counties using the Amtel and Amtel Directories name, insignia, logo and marks.

12. On August 7, 2007, I sold the yellow pages directory business to Yellow Book, USA, Inc. Yellow Book acquired all of the trademarks and tradenames associated with the business which I acquired from Mr. Brandeberry.

FURTHER AFFIANT SAYETH NAUGHT.

_____
William N. White

Sworn to and subscribed in my presence on December 22 , 2010.

_____
Notary Public

My commission expires:

ALLEN R. MAURICE, ATTORNEY AT LAW
Notary Public, State of Ohio
My Commission has no expiration date
Section 147.03 O.R.C.

795116v1

3

# EXHIBIT 4

1    IN THE COURT OF COMMON PLEAS, CHAMPAIGN COUNTY, OHIO

2  YELLOW BOOK                    *

3        Plaintiff,              *

4  vs.                           *    Case No. 3:10CV-025

5  STEVE BRANDEBERRY             *

6        Defendant               *

7                                - - - - -

8        Deposition of WILLIAM WHITE, called as if on

9  cross-examination by the Defendant, taken before me the

10  undersigned, Kathryn A. Lander, a duly qualified and

11  commissioned Notary Public in and for the State of Ohio

12  and a Court Reporter, at the office of Darrell Heckman

13  in Urbana, Ohio, commencing at 1:00 p.m. on January 26,

14  2011, and concluding at 1:50 p.m. on that same date by

15  Notice of Counsel.

16

17

18

19

20

21

                        OFFICIAL REPORTING AGENCY
22                           P O BOX 608
                          URBANA, OHIO 43078
23                    937-652-1772, 339-4992

24

25

EXHIBIT
4

1    A.          That's correct.

2    Q.          And it was prepared by your lawyer,

3    Mr. Harley Davidson; is that correct?

4    A.          That's correct.

5    Q.          Okay.  The contract appears to be between

6    AM/TEL Directories, Inc. and P.B.J. White Directories,

7    LLC.  Was that the correct name of your company?

8    A.          It was correct.  And it was changed.

9    Q.          You changed it later?

10    A.          Yes.

11    Q.          And what did you change the name to later?

12    A.          P.B.  Just dropped the J.

13    Q.          You just dropped the J.  So it became P.B.

14    White Directories, LLC?

15    A.          Yes.

16    Q.          Okay.  And Mr. Brandeberry signed on

17    behalf of his corporation and you signed on behalf of

18    your corporation; is that correct?

19    A.          Correct.

20    Q.          And the contract was not between

21    individuals but was between the two companies; is that

22    correct?

23    A.          To my knowledge, yes.

24    Q.          You paid $100,000 for the company; is that

25    your recollection?

1    Q.          Now, in the course of the negotiations

2    with him were the name, insignia, logo, or trademarks

3    AM/TEL or AM/TEL Directories specifically discussed?

4                MR. HECKMAN:  Objection.  You can answer.

5                THE WITNESS:  Not to my knowledge.

6    CONTINUING BY MR. LENOX:

7    Q.          Were they ever discussed outside the scope

8    of you acquiring all the assets of the business?

9    A.          Again, I don't recall any conversations

10   about that.

11   Q.          Do you ever recall a conversation with

12   Mr. Brandeberry where a license or a nonexclusive use

13   of the trademark were discussed?

14   A.          No.

15   Q.          Do you ever recall any discussions whereby

16   Mr. Brandeberry would somehow retain any interests in

17   the AM/TEL or AM/TEL Directories name, insignia, or

18   logo?

19               MR. HECKMAN:  Objection.

20               THE WITNESS:  No.

21   CONTINUING BY MR. LENOX:

22   Q.          Is it fair to say that, from what I've

23   heard today, it was your intent that all of the assets

24   from his Yellow Pages directory business would be

25   transferred to you?

1          MR. HECKMAN:  Objection.

2          THE WITNESS:  Yes.

3     CONTINUING BY MR. LENOX:

4     Q.          In their entirety?

5     A.          Yes.

6     Q.          And it was your intent that the AM/TEL and

7     AM/TEL Directories marks would be transferred in their

8     entirety to you?

9     A.          Yes.

10         MR. HECKMAN:  Objection.

11    CONTINUING BY MR. LENOX:

12    Q.          We've talked about the purchase price of

13    $100,000 plus the assumption of some liabilities; is

14    that right?

15    A.          Yes.

16    Q.          Would you have paid the $100,000 and

17    assumed the liabilities if you thought Mr. Brandeberry

18    was retaining some interest in the AM/TEL and AM/TEL

19    Directories name, insignia, and logo?

20    A.          No.

21    Q.          Did you think the marks had value?

22    A.          Certainly.

23    Q.          In what way?

24    A.          It was an established phone book and I

25    think the name had a value to it.  It would have been

1  where it would normally fall in most businesses.  In

2  the goodwill piece.

3  Q.          And you noted that this document was

4  originally in the name of P.B.J. White Directories and

5  the name was changed; is that right?

6  A.          Yes.

7  Q.          How long afterwards was the name changed?

8  A.          A week.  I can't tell you for sure.  Maybe

9  about a week or two weeks.

10  Q.          Were you one of the shareholders of P.B.

11  White Directories, LLC?

12  A.          Yes.

13  Q.          Now, after you acquired the business from

14  Mr. Brandeberry did you register the AM/TEL and AM/TEL

15  Directories name, insignia, and logo with the Secretary

16  of State?

17  A.          That's correct.

18  Q.          Right?

19  A.          That's correct.

20  Q.          Sir, I'm going to hand you a document that

21  was previously marked in another deposition --

22              MR. COX:  Let me see.  Thank you.

23  CONTINUING BY MR. LENOX:

24  Q.          -- as Plaintiff's Exhibit 8.  If you could

25  take a quick look at that.  Have you ever seen that

1   document before?

2   A.          Yes.

3   Q.          Is that the registration of the

4   intellectual property for your business?

5   A.          That's correct.

6   Q.          Now, when you registered that document,

7   did Mr. Brandeberry ever contact you and tell you that

8   you're not allowed to register it because he owns it?

9   A.          No.

10  Q.          And you registered that because you

11  believed you owned free and clear that intellectual

12  property; is that fair to say?

13              MR. HECKMAN:  Objection.

14              THE WITNESS:  That was my understanding.

15  CONTINUING BY MR. LENOX:

16  Q.          Now, after the sale did you market these

17  books in these four counties continuously until you

18  sold to Yellow Book?

19  A.          Yes.

20  Q.          Did you use the AM/TEL and AM/TEL

21  Directories name, insignia, and logo for that entire

22  period?

23  A.          Yes.

24  Q.          Was there a period you ceased using it?

25  A.          Yes.

1    Q.          Is that when you stopped using it?

2    A.          Yes.

3    Q.          And is that the only time you stopped

4    using it was after you sold it to Yellow Book, right?

5    A.          Yes.

6    Q.          Now, I want to show you -- let me ask you

7    this.  After you acquired the business did you change

8    the look of the AM/TEL or AM/TEL Directories logo in

9    any way?

10   A.          No.

11   Q.          You kept it just as Mr. Brandeberry had it

12   before?

13   A.          Basically.  It was sizes, you know.  But

14   it wasn't -- I'm sure there was color changes or maybe

15   the size of the text.  But in essence, no.  I think we

16   may have modernized it a little bit.  There was no

17   fundamental changes to the name.  Script or text may

18   have changed a little.

19   Q.          I wanted to show you what has been marked

20   as Plaintiff's Exhibit 7.  Pardon me.  This is a Union

21   County book from 2009-2010.  Is that what it looked

22   like when you owned business?

23   A.          We made it a little more modern looking

24   than the original.  But, yeah.

25   Q.          So that's the logo that you used?

1    A.          Right.

2    Q.          Is that different than the logo that

3    Mr. Brandeberry used?

4    A.          Yes.

5    Q.          So that was something that came into

6    effect when you owned the business, right?

7    A.          That's correct.

8    Q.          Did Mr. Brandeberry ever tell you that you

9    had no right to change the logo to look like that?

10   A.          No.

11               MR. HECKMAN:  Let me look at that page

12   when everybody is done with it.

13               MR. LENOX:  Absolutely.

14               MR. HECKMAN:  Okay.  I understand.  I see.

15   CONTINUING BY MR. LENOX:

16   Q.          Now, you discussed some litigation you had

17   with Mr. Brandeberry.  And I don't want to go into the

18   details of any of that.

19               MR. COX:  Good.

20   CONTINUING BY MR. LENOX:

21   Q.          I want to ask you one question though.  In

22   the course of that litigation was the name, insignia,

23   or logo for AM/TEL or AM/TEL Directories or any of

24   those intellectual property rights ever discussed?

25   A.          Not to my knowledge.  I can't remember it

# EXHIBIT 5

1  UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
2  WESTERN DIVISION

3

4

5  YELLOW BOOK USA, INC., et al., :

6  Plaintiffs,

7

8  vs.  :  CASE NO. 3:10-CV-025

9

10  STEVEN M. BRANDEBERRY,

11  Defendant.  :

12

13

14  The deposition of PHILLIP MOORMAN, a witness

15  herein, taken as upon cross-examination by the Plaintiffs,

16  and pursuant to the Federal Rules of Civil Procedure,

17  agreement of counsel, and stipulations hereinafter set

18  forth, at the offices of Thompson Hine, LLP, 10 W. 2nd

19  Street, Dayton, Ohio, on the 9th day of December, 2010, at

20  9:00 a.m., before Julie A. Patrick, a Notary Public for the

21  State of Ohio.

22

23

24  TRI-COUNTY COURT REPORTING AND VIDEOTAPE SERVICE

25  886 BRADBURY ROAD
CINCINNATI, OHIO 45245

**EXHIBIT
5**

1    question.

2            Q.    So customers did ask that question, you just

3    can't sit here and recall which customers; is that fair to

4    say?

5            A.    Yes.

6            Q.    Could you estimate about how many customers

7    asked that question?

8            A.    I could not.

9            Q.    Was it more than 10?

10           A.    I couldn't tell you.  It's been awhile ago.

11           Q.    Did you ever contact a business or go into a

12    business and that business confuse you for a Yellowbook

13    representative?

14           A.    No.

15           Q.    Did you ever go into a business or call a

16    business and that business tell you, hey, we've already paid

17    you for advertisements?

18           A.    No.

19           Q.    Did anyone express confusion as to you or Mr.

20    Brandeberry's affiliation with Yellowbook?

21           A.    No.

22           Q.    Did anybody express any confusion as to

23    Yellowbook's affiliation with you?

24           A.    Yes.

25           Q.    Who?

1        A.    I couldn't tell you.

2        Q.    Describe what they -- how they expressed that

3 confusion?

4        A.    We told them that we were AMTEL Directories

5 and they had signed up a contract with AMTEL Directories,

6 and then, apparently, their Yellowbook representative had

7 gone in to solicit them as well and the Yellowbook

8 representative told them, the customer, that they were AMTEL

9 Directories.

10       Q.    Did that customer call you back and ask about

11 that?

12       A.    Yes.

13       Q.    Do you know who that customer was?

14       A.    No.  I mean, there was a few of them, but I

15 couldn't remember who they are.  When Yellowbook started

16 going around saying that they were AMTEL Directories, that

17 we were not AMTEL and they were AMTEL, a few people were

18 confused and they called back to just verify that they

19 signed up with the person that they wanted to sign up with.

20       Q.    And you say that happened a few times?

21       A.    Yeah.

22       Q.    Do you recall that ever happening with a

23 dentist?

24       A.    A dentist?

25       Q.    A dentist, any dentist?

# EXHIBIT 6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION (DAYTON)

| | | |
|---|---|---|
| YELLOW BOOK USA, INC. et al. | : | Case No.: 3:10-cv-025 |
| Plaintiffs, | : | |
| | : | Judge Thomas M. Rose |
| v. | : | |
| | : | **AFFIDAVIT OF HARLEY** |
| STEVEN M. BRANDEBERRY | : | **DAVIDSON, ESQ.** |
| | : | |
| Defendant. | : | |
| | : | |

STATE OF OHIO       :
                 : SS.
COUNTY OF CHAMPAIGN:      :

     I, Harley Davidson, Esq., after being duly sworn and cautioned, state that the following is based on my personal knowledge, understanding and belief, and that I am competent to testify to matters stated herein.

     1.    I am an attorney licensed to practice in the state of Ohio.

     2.    In 2002, I was retained by William N. White to draft a contract whereby Mr. White's company would purchase from Steven Brandeberry Mr. Brandeberry's yellow pages directory business in Champaign County, Logan County, Union County, and Madison County, Ohio.

     3.    Mr. Brandeberry and Mr. White negotiated an agreement whereby Mr. White would purchase of all of the assets and assume certain liabilities of the business.

     4.    Mr. White relayed those agreed-upon terms to me. I understood that all of the assets of the business, including all intellectual property, was being transferred as part of the sale.

**EXHIBIT
6**

5. Mr. Brandeberry and I never discussed any terms whereby Mr. Brandeberry would retain any right, title or interest in the Amtel or Amtel Directories name, insignia, logo or marks. In fact, the Amtel and Amtel Directories name, insignia, logo and marks were not discussed outside of the context of Mr. White's purchase of all of the assets of the yellow pages directory business.

6. A fully-executed copy of the contract I drafted is attached as Exhibit 1.

7. Mr. Brandeberry did not negotiate or request changes to any of the terms in the written contract. Instead, he signed the document exactly as it was presented to him. He never objected to the language in the contract which clearly states that Mr. White's company would acquire all of the assets of his business, nor did he ever claim to retain any interest in the name "Amtel" and "Amtel Directories."

8. Mr. Brandeberry did not retain any right to use the Amtel and Amtel Directories name, insignia, logo and marks. Mr. White acquired all of the intellectual property associated with Mr. Brandeberry's business, including the Amtel and Amtel Directories name, insignia, logo and marks.

FURTHER AFFIANT SAYETH NAUGHT.

Harley Davidson, Esq.

Sworn to and subscribed in my presence on December 22 , 2010.

Notary Public

My commission expires:

ALLEN R. MAURICE, ATTORNEY AT LAW
Notary Public, State of Ohio
My Commission has no expiration date
Section 147.03 O.R.C.

2