UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION (DAYTON)

| | | |
|---|---|---|
| YELLOW BOOK USA, INC. et al. | : | Case No.: 3:10-cv-025 |
| Plaintiffs, | : | |
| | : | Judge Thomas M. Rose |
| v. | : | |
| | : | **PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| STEVEN M. BRANDEBERRY | : | |
| Defendant. | : | |

## I. INTRODUCTION

In his Memorandum in Opposition, Brandeberry does not dispute that he is using the Amtel name and marks[1] to solicit Yellow Book's customers and promote a competing directory in Champaign County, Ohio. Instead, he once again argues that his use is justified because he purportedly retained a non-exclusive right to use those marks when Brandeberry sold his yellow pages directory business several years ago to P.B.J. White Directories, LLC ("White"), who in turn sold the business to Yellow Book.

However, the clear and unambiguous language of the contract demonstrates that Brandeberry transferred his <u>entire</u> interest in the Amtel name and marks to White, which in turn transferred them to Yellow Book. Moreover, even if the language in that agreement somehow could be deemed ambiguous, Brandeberry's own testimony reveals that the parties intended for all of the rights in the Amtel name and marks to be transferred to White. In fact, Brandeberry's own conduct after the sale demonstrates this intention. Thus, because Yellow Book has the exclusive right to use the Amtel name and marks, and since Brandeberry abandoned any right to use the Amtel name and marks,

---

[1] For purposes of this Motion, the "Amtel name and marks" include "Amtel Directories" and any derivation thereof, including "Am/Tel Directories" or "Am-Tel Directories."

Brandeberry's entire defense fails, and Yellow Book is entitled to partial summary judgment on its claims.

## II. ARGUMENT

### A. Brandeberry Transferred All of His Interest in the Amtel Name and Marks to White, Who Transferred Them to Yellow Book

Brandeberry first argues that he individually retained an interest in the Amtel name and marks because he and American Telephone Directories, Inc. jointly acquired from Herb Burkhalter the License to use the Amtel name and marks, yet only American Telephone Directories, Inc. contracted to sell assets to White. Brandeberry's argument is belied both by the express language of contracts, and by his own testimony.

The Contract for Sale of Assets dated July 1, 2002 between AMTEL Directories, Inc.[2] and White (the "2002 Contract") makes clear that "P.B.J. White Directories, LLC will acquire the assets, in their entirety, as set forth on the attached Exhibit 'A', of AM-TEL DIRECTORIES, INC. and the right to use the name AM-TEL DIRECTORIES effective as of the 1st day of July , 2002 . . ." 6/16/10 Brandeberry Dep., p. 92; Dep. Ex. 6. Exhibit A to the 2002 Contract is a balance sheet which identifies, among other assets, "Intang. Asset License Agrmnt" valued at $50,000. Notably, $50,000 is the exact amount paid by Brandeberry to Burkhalter for the License to the Amtel name and marks.

If Brandeberry somehow retained an interest in the Amtel name and mark, then how could the license transferred to White be valued at $50,000? If Brandeberry

---

[2] Brandeberry testified that he signed the contract "as is," and did not notice that his company was misnamed AMTEL Directories, Inc. and AM-TEL Directories, Inc. therein. 6/16/10 Brandeberry Dep., p. 107-10. Nevertheless, Brandeberry acknowledged that it was his understanding that he was indeed selling his entire yellow pages directories business to Mr. White. Id.

individually retained an interest in the Amtel name and marks, then surely the asset on the balance sheet would be valued at some amount less than $50,000 to account for Brandeberry's purported individual interest. The fact that Amtel name and marks were valued at $50,000, which is the exact same amount Brandeberry paid Burkhalter under the License, evidences that Brandeberry did not retain any individual interest in them.

Moreover, Brandeberry's own testimony demonstrates that did not intend to retain any interest in the Amtel name and marks. Brandeberry himself acknowledged transfer of the Amtel name and marks to White:

> Q. Now, there's a third line, it says, "Other Assets, Intan. Asset License Agreement", and that's valued at $50,000; do you see that?
>
> A. Correct.
>
> Q. And you'd agree with me that that is the exact same amount, $50,000, that is listed on the license agreement between you and Mr. Burkhalter that's Exhibit 4, right?
>
> MR. HECKMAN: Objection.
>
> Q. And that license agreement was the license agreement that involved the name, insignia and logo for AmTel and AmTel Directories, right?
>
> A. Which one? I'm sorry.
>
> Q. Exhibit 4.
>
> A. Exhibit 4, correct, is the license agreement to Steve Brandeberry and American Telephone Directories, correct, it was to both of us; that is correct. And American Telephone Directories. I said Amtel Directories.
>
> Q. So you would agree with me that Mr. White, through his company, acquired all of the intangible assets relating to that license agreement, right?
>
> MR. HECKMAN: Objection.
>
> A. I don't know the correct answer. Contractually, I don't know, but I could say yes.
>
> ****

3

> Q. We'll do it this way. Would you agree with me that Mr. White acquired the intangible asset license agreement valued at $50,000 that's listed on page three of this document?
>
> MR. HECKMAN: Objection.
>
> A. Yes.
>
> Q. And I think we've already agreed and you've already testified that that intangible asset license agreement was valued at $50,000, right?
>
> A. Correct.
>
> Q. And that's the same amount that is listed on Exhibit 4, right?
>
> A. Correct.

Id. at pp. 122-124.

Similarly, Brandeberry testified that when negotiating the terms of the sale of assets to White, the Amtel name and marks were never specifically mentioned, and a non-exclusive right was certainly never discussed. 6/16/10 Brandeberry Dep., p. 99. Brandeberry further testified that the Amtel name and marks were not discussed after the deal was committed to writing:

> Q: Now, the next line says -- after that it says, "P.B. White Directories, LLC, will acquire the assets in their entirety, as set forth on the attached Exhibit A, of AM-TEL DIRECTORIES, INC., and the right to use the name AM-TEL DIRECTORIES effective as of the 1st day of July, 2002, under the following terms"?
>
> A. Yes.
>
> Q. My question is, did you ever discuss this language with Mr. White about the use of any of the Amtel name, insignia or marks?
>
> A. There was never a discussion through the sale process of him using the name or having the name exclusively.

Brandeberry never told White that Brandeberry believed he had the right to use the Amtel name and marks after the sale:

4

> Q. Now, did you ever discuss with Mr. White any perceived -- let me ask you this. You told me Mr. White never had advised you that you had a non -- or you had an ability to use the Amtel names and mark subsequent to this contract, right?
>
> A. There was never a need to discuss it, and there was never a discussion, correct.
>
> Q. The answer is no. And you never told him that you believed that you had the ability to use the mark, right?
>
> A. Never discussed it and there was never a need to discuss it.
>
> Q. No conversations ever about that?
>
> A. Correct.
>
> Q. It was never discussed, period?
>
> A. Correct.

6/16/10 Brandeberry Dep., pp. 99, 125-26, 128-29. Both Mr. White and his lawyer, Harley Davidson, Esq., testified that a non-exclusive right to use the Amtel name and marks was never discussed during negotiations, and instead it was always the intent of the parties that all of the assets be transferred in their entirety to White. 1/26/11 White Dep., pp. 25-26; White Aff., ¶¶ 4, 5, 10; ¶¶ 4-8. In fact, Mr. White testified that had he believed that Brandeberry would retain any right in the Amtel name and marks, then he would not have consummated the transaction. White Aff., ¶ 6; 1/26/11 White Dep., p. 26.

Brandeberry's actions after the sale further demonstrate his belief that he sold all rights in the Amtel name and marks, including any purported individual or corporate interest. For example, Brandeberry testified that after the sale of his yellow pages directories business to White in 2002, American Telephone Directories, Inc. held no assets. 6/16/10 Brandeberry Dep., p. 138-39. If Brandeberry retained some right or interest in the Amtel name and marks, then presumably his company would have shown

5

an asset on its books. Id. at pp. 27-28. Similarly, had Brandeberry believed that he had some right or interest in the Amtel name and mark, then presumably he would have objected when White registered the mark with the State of Ohio, or when White changed the look of the logo after he acquired the business. See, 1/26/11 White Dep., pp. 30-33; Dep. Ex. 8. Brandeberry's inaction demonstrates that he believed that he transferred all of the rights in the Amtel name and marks to White.

Brandeberry next asserts that because the 2002 Contract states in its second clause that White obtained "the right to use the name AM-TEL DIRECTORIES", rather than "the exclusive right to use" the name, then necessarily the rights obtained by White were non-exclusive. Brandeberry's interpretation, if accepted, would render meaningless the previous provision of the 2002 Contract, which states that White acquired the assets on the attached exhibit "in their entirety." Contrary to Brandeberry's assertion, the "right to use" language is not controlling over the language transferring the assets "in their entirety." Rather, the two must be read together, and if "two interpretations can be given to a term in a contract, one will make a provision meaningless, and one which will give full force to all provisions, the latter must be adopted." *Aho v. Cleveland-Cliffs, Inc.*, 219 Fed. Appx. 419, 423 (6th Cir. 2007); *Nilavar v. Mercy Health Sys.*, 142 F. Supp. 2d 859, 892 (S.D. Ohio 2000) ("[A] court must read the contract as a whole and must attempt to give effect to each and every part of it; the court should avoid any interpretation of one part that will annul another part."). Unlike Brandeberry's construction, defining "right to use" to mean the exclusive right to use the Amtel name and marks would give meaning to all provisions in the 2002 Contract.

Brandeberry claims that his interpretation of the contract must be adopted because White's attorney drafted the agreement. That is simply not true. Ohio courts have generally resolved contract ambiguities against the drafter only where parties lacked equal bargaining power to select contract language. *4746 Dressler, LLC v. Fitzpatrick Enters.*, 2009 Ohio 4001, ¶ 38 (citing *G.F. Business Equip., Inc. v. Liston* (1982), 7 Ohio App.3d 223, 224, 7 Ohio B. 285, 454 N.E.2d 1358, 1359 and *Cline v. Rose* (1994), 96 Ohio App.3d 611, 645 N.E.2d 806. Here, Brandeberry and White were both sophisticated businessmen. Brandeberry could have retained an attorney to negotiate the terms and language of the contract, but he chose not to do so. 6/16/10 Brandeberry Dep., p. 104. The fact that he opted not to retain counsel does not mean that the contract language must be construed in his favor.

Brandeberry supports his strained interpretation of the contract by citing to a repurchase agreement that he and White were supposed to enter into which would allow Brandeberry to buy back the assets within a five year period of time. However, Brandeberry does not identify how that repurchase agreement impacts White's purchase of all of the assets pursuant to the 2002 Contract. Indeed, Brandeberry himself admits that the repurchase agreement he cites does not even mention the Amtel name and marks. See 9/13/10 Brandeberry Depo., pp. 238-239. Likewise, Amtel name and marks were never discussed an arbitration between White and Brandeberry relating to Brandeberry's purported ability to repurchase the assets:

> Q. I want to ask you one question though. In the course of that litigation was the name, insignia, or logo for AM/TEL or AM/TEL Directories or any of those intellectual property rights ever discussed?
>
> A. Not to my knowledge. I can't remember it being discussed.

7

1/26/11 White Depo. pp 33-34. In sum, any purported agreement to repurchase between Brandeberry and White has absolutely no impact on Brandeberry's contract with White which transferred all of the assets of the business, including the Amtel name and marks, to White.

### 2. Brandeberry Abandoned Any Purported Rights in the Amtel Marks

Pursuant to 15 U.S. C. § 1127:

> "[a] mark shall be deemed to be 'abandoned' . . .when its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment."

See also *Dominic's Rest. of Dayton, Inc. v. Mantia*, 2009 U.S. Dist. LEXIS 37215 (S.D. Ohio 2009). Brandeberry acknowledges that he did not use the Amtel name and marks in commerce from the time he sold them to White in 2003 until he began his competing yellow pages directory in 2009. Brandeberry concedes that his business carried no assets for a similar period of time. Pursuant to 15 U.S. C. § 1127. Brandeberry did not object when White registered the mark in the state of Ohio, nor did he object when White changed the look of the Amtel name and mark. See, 1/26/11 White Dep., pp. 30-33; Dep. Ex. 8. Consequently, Brandeberry's failure to use the Amtel name and mark for six years, coupled with his inaction with respect to White's activities relating to the intellectual property, demonstrates that Brandeberry abandoned any purported rights he had.

Faced with this insurmountable impediment, Brandeberry argues that while abandonment can cause a trademark owner to lose his right to sue for infringement, it cannot be used to deprive the owner of the right to use. Brandeberry cites no caselaw to support his theory, primarily because the caselaw makes no such distinction. Rather, 15

8

U.S.C. §1127 was specifically intended to strip an owner of its trademark rights when that person fails to use the mark. For that reason, courts specifically require a purported owner of a mark to demonstrate that his "use of the mark was 'deliberate and continuous, not sporadic, casual or transitory.'" *Circuit City Stores, Inc. v. Carmax, Inc.*, 165 F.3d 1047, 1054-55 (6th Cir. 1999). Brandeberry admittedly cannot make such a showing, and therefore has abandoned any claim to the Amtel name and marks.

Finally, Brandeberry claims that his failure to use the Amtel name and mark in commerce is "irrelevant because it was being used and retaining value for any of the permitted users." Once again, Brandeberry cites no caselaw for the proposition that use by White or Yellow Book somehow causes his purported interest in the marks to survive. Simply put, if Brandeberry retained some interest in the Amtel name and marks as he claims, then he was obligated to use them continuously in commerce. He did not, and as a result, he abandoned any purported rights in them.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs Yellow Book USA, Inc. and Yellow Book Sales and Distribution Company, Inc. hereby request that the Court grant in its entirety their Motion for Partial Summary Judgment.

Respectfully submitted,


/s/ Bryce A. Lenox
Robert P. Johnson (0040109)
Trial Attorney
Bryce A. Lenox (0069936)
THOMPSON HINE LLP
312 Walnut Street, 14th Floor
Cincinnati, Ohio 45202
Telephone: 513-352-6700
Facsimile: 513-241-4771
Robert.Johnson@ThompsonHine.com
Bryce.Lenox@THompsonHine.com

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on April 4, 2011, a copy of the foregoing was served by the Court's electronic filing system upon the following:

> Darrell L. Heckman
> Harris, Meyer, Heckman & Denkewalter, LLC
> One Monument Square, Suite 200
> Urbana, Ohio 43078
> Attorney for Defendant

                                  /s/ Bryce A. Lenox
                                  Attorney for Plaintiffs

808565.1